UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
MINEBEA CO., LTD., et al.,          )
                                    )
             Plaintiffs,            )
                                    )
     v.                             )   Civil Action No. 97-0590 (PLF)
                                    )
GEORG PAPST, et al.,                )
                                    )
             Defendants.            )
_____ )

OPINION

This matter is before the Court on Minebea's remaining objections to the Special Master's Report and Recommendation No. 6 ("R&R 6"). The Court has reviewed R&R 6, Minebea's objections, Papst's opposition and Minebea's reply, and has concluded that the majority of the Special Master's rulings should be upheld. This Opinion addresses Minebea's objections to the Special Master's conclusions with respect to (a) the joint defense privilege, (b) Seagate documents, (c) Ringi documents, (d) incomplete translations, and (e) other documents described in the Naka declaration.[1]

---

[1] The Special Master was hampered in his attempts to analyze claims of privilege with respect to certain foreign language documents because Minebea provided only partial translations of a number of its documents. Minebea has since provided to the Court verbatim translations of those documents specifically identified by the Special Master. The Court has thus been able to make a more detailed analysis of the documents in question and has done so in this Opinion. The Special Master's recommendation that all partially translated documents be produced therefore is modified so that only documents for which no translation was provided must be produced.

*A.  Joint Defense Privilege*

The Special Master ruled that communications between Minebea and third parties could be protected under the "joint defense" privilege only if they occurred after Minebea and the third party in question entered into a "relevant arrangement."  See R&R 6 at 78.  The Special Master found that the first joint defense agreement was entered into with Fujitsu, Samsung, NEC and Hitachi on January 22, 1998, and with others on later specified dates.  He therefore concluded that Minebea must produce:

> any document as to which Minebea asserts joint defense privilege or joint defense work product protection, and relating to or embodying (a) any alleged "joint defense" communication before January 22, 1998, (b) any such communication with Seagate before February 6, 1998, with IBM, Toshiba or Maxtor before March 3, 1998, or with Western Digital before March 10, 1998, and (c) any such communication with any entity other than Fujitsu, Samsung, NEC, Hitachi and those named in (b), regardless of date.

R&R 6 at 78-79.

"The joint defense privilege, often referred to as the common interest rule, is an extension of the attorney-client privilege that protects from forced disclosure communications between two or more parties and/or their respective counsel if they are participating in a joint defense agreement."  United States v. Hsia, 81 F. Supp. 2d 7, 16 (D.D.C. 2000).  It protects communications between the parties where they are "part of an on-going and joint effort to set up a common defense strategy" in connection with actual or prospective litigation.  In re Bevill, Bresler & Schulman Asset Management, 805 F.2d 120, 126 (3d Cir. 1986); see also In re Grand Jury Subpoena, 274 F.3d 563, 575 (1st Cir. 2001).[2]  "It permits a client to disclose information to

---

[2] "In an adversarial proceeding, a party's entitlement to this enhanced veil of confidentiality can be justified on policy grounds.  But outside the context of actual or

[its] attorney in the presence of joint parties and their counsel without waiving the attorney-client privilege and is intended to preclude joint parties and their attorneys from disclosing confidential information learned as a consequence of the joint defense without permission." United States v. Hsia, 81 F. Supp. 2d at 16. "[T]he rule applies not only to communications subject to the attorney-client privilege, but also to communications protected by the work-product doctrine." In re Grand Jury Subpoenas, 902 F.2d 244, 249 (4th Cir. 1990); see also Lugosch v. Congel, 219 F.R.D. 220, 240 (N.D.N.Y. 2003) ("The exchange of work product among attorneys with identical litigation perspectives should not render such tangible information vulnerable to pre-trial discovery.")

"[T]he joint defense or common interest rule presupposes the existence of an otherwise valid privilege." In re Grand Jury Subpoenas, 902 F.2d at 249. All attorney-client communications or work product therefore must first satisfy the traditional requisites for the attorney-client or work product privilege before they become or remain privileged. Once these requirements are satisfied, shared or jointly created material must pass an *additional* test: It must be disclosed pursuant to a common legal interest and pursuant to an agreement to pursue a joint defense. Cf. Gregory J. Kopta, *Applying the Attorney-Client and Work Product Privileges to Allied Party Exchange of Information in California*, 36 U.C.L.A. L. REV. 151, 197 (1988). It is also established that the party asserting the attorney-client or work product privilege always bears the burden of demonstrating that the communications/documents sought to be shielded are, in fact, privileged. See, FED. R. CIV. P. 26(b)(5); In re Lindsey, 158 F.3d 1263, 1270 (D.C. Cir.

---

prospective litigation, there is more vice than virtue in such agreements. . . . Common sense suggests that there can be no joint defense agreement when there is no joint defense to pursue." In Re Grand Jury Subpoena, 274 F.3d at 575.

1998). The same is true in the context of the joint defense privilege. See In re Bevill, Bresler & Schulman Asset Management, 805 F.2d at 126.

"In order to establish the existence of a joint defense privilege, the party asserting the privilege must show that (1) the communications were made in the course of a joint defense effort, (2) the statements were designed to further the effort, and (3) the privilege has not been waived." In re Bevill, Bresler & Schulman Asset Management, 805 F.2d 120 at 126. It is incumbent on a party claiming the joint defense privilege, therefore, to establish that "the parties had agreed to pursue a joint defense strategy." Id. "Some form of joint strategy is necessary to establish a [joint defense agreement] rather than merely the impression of one side." United States v. Weissman, 195 F.3d 96, 100 (2d Cir. 1999). Obviously, a written agreement is the most effective method of establishing the existence of a joint defense agreement, although an oral agreement whose existence, terms and scope are proved by the party asserting it, may be enforceable as well. See United States v. Hsia, 81 F. Supp. 2d at 17. As Professor Saltzburg has suggested:

> The parties need not agree in *writing* to pursue a common interest; the doctrine permits an exchange of confidential information when the parties have clearly and specifically agreed in some manner to pool information for a common goal. Nonetheless, it is certainly prudent practice to execute a written agreement before significant communications are exchanged. This would eliminate any doubt about whether the parties to the discussion were pursuing a common goal with respect to the matters communicated. Without a written agreement, the party's burden of proving that a statement was made in the common interest will undoubtedly be more difficult.

2 STEPHEN A. SALTZBURG, ET AL., FEDERAL RULES OF EVIDENCE MANUAL at 501-35-36 (8th ed. 2002).

If a joint defense agreement has been proved to exist and the scope of the agreement is clear, the party seeking to claim privilege still must demonstrate that the specific communications at issue were designed to facilitate a common legal interest; a business or commercial interest will not suffice.  See, e.g., Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 447 (S.D.N.Y. 1995).  "The privilege arises out of the need for a common [legal] defense, as opposed merely to a common problem."  Medcom Holding Company v. Baxter Travenol Laboratories, 689 F. Supp. 841, 844 (N.D. Ill. 1988).  The joint defense privilege thus requires evidence of a "coordinated legal strategy" between two or more parties.  Shamis v. Ambassador Factors Corporation, 34 F. Supp. 2d 879, 893 (S.D.N.Y. 1999).

Assuming that the final written agreements entered into by Minebea with each of the companies identified are substantially identical to the draft Joint Defense Agreement attached to letters sent to various third parties and submitted to the Court,[3] the Court is satisfied that the joint defense agreement or agreements in question were entered into with the intent to formulate a common legal defense.  With respect to the majority of the third parties in question, however, Minebea has not demonstrated that a joint defense agreement was effective on some date prior to the execution of the written agreement.  While Minebea's initial objections offered no substantiation for its claim that the joint defense privilege should apply to documents predating the execution of the joint defense agreements, Minebea's reply offers documents, company by company, in an attempt to show earlier dates at which a joint defense arrangement was already in existence.  With respect to all but one of the third parties, Minebea also has informed the Court

---

[3]   See, e.g., In Camera Exhibits to Minebea's Reply Memorandum of Points and Authorities in Support of its Objections to Special Master Plant's Report and Recommendation No. 6 at 4J.

of the date on which the written joint defense agreement was signed by that party.  Minebea has failed to submit copies of the executed agreements, and several of the dates conflict with the dates suggested by the Special Master in R&R 6.[4]  The Court nevertheless accepts, for purposes of this Opinion, that the joint defense agreements were executed on the dates suggested by Minebea in its in camera submission.  Minebea will, however, be directed to submit to the Court an affidavit confirming that all of the dates on which Minebea maintains the that various joint defense agreements were executed, as set forth in this Opinion, are correct and attach to that affidavit the signature page from each of the aforementioned joint defense agreements.

        The Court agrees with the Special Master that, generally, a joint defense privilege begins on the date the agreement was executed.  Minebea repeatedly points to letters sent to third

---

[4] Specifically:

- The Special Master found that Maxtor entered into the Joint Defense Agreement on March 3, 1998; Minebea indicates that it is March 4, 1998

- The Special Master did not identify Quantum as ever having entered into a joint defense agreement; Minebea indicates that Quantum joined on March 4, 1998.

- The Special Master found that Samsung entered into the Joint Defense Agreement on January 22, 1998; Minebea submits nothing with respect to Samsung.

- The Special Master found that Seagate entered into the Joint Defense Agreement on February 6, 1998; Minebea indicates that Seagate joined on January 22, 1998

- The Special Master found that Western Digital entered into the Joint Defense Agreement on March 10, 1998; Minebea indicates that Western Digital joined on January 22, 1998.

parties proposing a joint defense agreement and attaching a draft joint defense agreement as evidence of "cooperation." See Minebea's In Camera Exhibits to its Objections to the Special Master's Report and Recommendation No. 6 ("MIC") 1. The fact that a person or entity proposes a joint defense agreement, however, is not evidence that a joint defense agreement is actually in place. See United States v. Hsia, 81 F. Supp. 2d at 16 (parties must be "participating in a joint defense agreement" for communications to be protected). The intent of one of the parties to enter into an agreement is insufficient to establish the existence of a joint defense privilege. United States v. Weissman, 195 F.3d at 100 ("Some form of joint strategy is necessary to establish a [joint defense agreement] rather than merely the impression of one side."). Rather, there must be evidence of a "coordinated legal strategy" between the two parties. Shamis v. Ambassador Factors Corporation, 34 F. Supp. 2d at 893. Proposing to another that a joint defense agreement be executed is not evidence of such a coordinated strategy or an agreement to jointly mount one.

While a written, signed document is the best evidence that a joint defense agreement exists, as noted, there may sometimes be facts and circumstances other than a writing that prove there was a firm understanding that certain kinds of shared information is to be treated as privileged. See United States v. Hsia, 81 F. Supp. 2d at 15. The Court has reviewed all of the documents that Minebea has submitted in camera and concludes that with respect to only three companies – Fujitsu, Iomega and Seagate – is Minebea entitled to claim the joint defense privilege for any document predating that company's signing of the Joint Defense Agreement:

- **Fujitsu**. Fujitsu signed the Joint Defense Agreement in January 1998. Minebea has submitted a letter dated January 2, 1997, which indicates Fujitsu's understanding that its communications with Minebea are protected under joint defense doctrine. The Court

concludes that communications after that date are within the privilege. Minebea must produce any documents prior to January 2, 1997 which it purports to withhold under a joint defense agreement with Fujitsu.

- **Hewlett Packard.** While Minebea has submitted several letters indicating an exchange of information with HP. Minebea has not shown that HP ever signed or otherwise indicated that it was entering into a joint defense agreement. All documents which Minebea purports to withhold under a joint defense agreement with HP must be produced.

- **Hitachi.** Hitachi signed the Joint Defense Agreement on January 22, 1998. Minebea has submitted no evidence to show that an understanding was reached prior to the signing of the Joint Defense Agreement. All documents which Minebea purports to withhold under a joint defense agreement with Hitachi prior to January 22, 1998 must be produced.

- **IBM.** IBM signed the Joint Defense Agreement on March 3, 1998. Minebea has submitted no evidence to show that an understanding was reached prior to the signing of the Joint Defense Agreement. All documents which Minebea purports to withhold under a joint defense agreement with IBM prior to March 3, 1998 must be produced.

- **Iomega.** Iomega signed the Joint Defense Agreement on February 20, 1998. On January 12, 1998, however, counsel for Iomega sent a letter to Minebea requesting that its communications "be accorded the confidential protection contemplated by the draft Joint Defense Agreement that you sent us." The Court concludes that communications after that date are within the privilege. All documents which Minebea purports to withhold under a joint defense agreement with IBM prior to January 12, 1998 must be produced.

- **Maxtor.** Maxtor signed the Joint Defense Agreement on March 4, 1998. While Minebea has submitted a document indicating an exchange of information with Maxtor, there is no evidence to show that an understanding was reached prior to the signing of the Joint Defense Agreement. All documents which Minebea purports to withhold under a joint defense agreement with Maxtor prior to March 4, 1998 must be produced.

- **NEC.** NEC signed the Joint Defense Agreement on January 22, 1998. While Minebea has submitted documents indicating NEC's interest in possibly entering into a joint defense arrangement, there is no evidence to show that an understanding was reached prior to the signing of the Joint Defense Agreement. All documents which Minebea purports to withhold under a joint defense agreement with NEC prior to January 22, 1998 must be produced.

- **Quantum.** Quantum signed the Joint Defense Agreement on March 4, 1998. Minebea has submitted no documents that any understanding with Quantum was reached prior to that date. All documents which Minebea purports to withhold under a joint defense

agreement with Quantum prior to March 4, 1998 must be produced.

- **Samsung.** Minebea has submitted no in camera discussion regarding Samsung. The Court therefore will adopt the Special Master's recommendation that all documents which Minebea purports to withhold under a joint defense agreement with Samsung prior to January 22, 1998 must be produced.

- **Seagate.** Seagate signed the Joint Defense Agreement on January 22, 1998. Counsel for Seagate sent a letter to Minebea on December 18, 1997 indicating that the joint defense agreement was satisfactory. The Court concludes that communications after that date are within the privilege. All documents which Minebea purports to withhold under a joint defense agreement with Seagate prior to December 18, 1997 must be produced.

- **Toshiba.** Toshiba signed the Joint Defense Agreement on March 3, 1998. Although it quoted a different sentence in the letter, Minebea submitted a letter to the Court in which Toshiba expressly declined to enter into a joint defense agreement in January 1998. All documents which Minebea purports to withhold under a joint defense agreement with Toshiba prior to March 3, 1998 must be produced.

- **Western Digital.** Western Digital signed the Joint Defense Agreement on January 22, 1998. While Minebea has submitted a document indicating an exchange of information with Western Digital, there is no evidence to show that an understanding was reached prior to the signing of the Joint Defense Agreement. All documents which Minebea purports to withhold under a joint defense agreement with Western Digital prior to January 22, 1998 must be produced.

Minebea also objected in camera to the Special Master's conclusions with respect to four specific documents. With respect to these four documents, the Court finds no error in the Special Master's reasoning. "Communications from attorney to client are shielded [by the attorney-client privilege] if they rest on confidential information obtained from the client. . . . Correlatively, when an attorney conveys to his client facts acquired from other persons or sources, those facts are not privileged." In re Sealed Case, 737 F.2d 94, 99 (D.C. Cir. 1984) (quotations and citations omitted). See also 24 WRIGHT & GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5491 at 452 ("[F]ederal courts have generally held the [attorney-client] privilege does not apply when the attorney tells his client about information the attorney has

9

garnered from third persons."); Sedco International, S.A. v. Cory, 683 F.2d 1201, 1205 (8th Cir. 1982) ("Clients cannot refuse to disclose facts which their attorneys conveyed to them and which the attorneys obtained from independent sources"). Therefore, where a Minebea attorney conveyed to Minebea facts learned from a third party, the facts contained within the communication are not privileged.

Document M-350110-13 is a letter from Mr. Lutzger to Mr. Dutz, Minebea's in-house counsel. See MIC 2. The document, dated October 14, 1997, predates any joint defense agreement with NEC. As the Special Master quite rightly concluded, the first two pages, through the final paragraph on page two, detail Mr. Lutzker's communications with NEC and are not privileged. The Court does not agree with Minebea's assertion that the first two pages reveal Mr. Lutzker's mental impressions and therefore are protected work product. Only Mr. Lutzker's mental impressions in the remainder of the letter are privileged. Similarly, Document M-350114-21, which is a letter from Mr. Lutzker to various individuals at Minebea, contains seven numbered points which contain information received by Mr. Lutzker from communications with counsel for NEC. See MIC 3. It, too, is dated prior to any joint defense arrangement at a time when the two lawyers were dealing at arms' length unprotected by any joint defense agreement. The information received from NEC must be disclosed. The third document, M-350122-24, is an email from Minebea's in-house counsel, Mr. Dutz, to Minebea personnel, with a copy to Mr. Lutzker, dated December 2, 1997, regarding communications with Hitachi. It predates any joint defense agreement with Hitachi. See MIC 4. As with the previous two documents, the portions of the letter that merely convey information learned from a third party are not protected. The final document, M-350239-53, is a letter from Mr. Lutzker and Mr.

Kagan, another of Minebea's outside counsel, to a number of individuals at Minebea. See MIC 5. The document references information received from Quantum, but is dated January 7, 1998, prior to any joint defense agreement with Quantum. Once again, to the extent that the letter merely transmits information obtained from the third party (for example, paragraph one of M-350239), it must be disclosed. Attachments to the letter which are not themselves privileged, such as letters from third party counsel and facsimile covers, also must be disclosed.

This same reasoning applies to all of the other documents identified by the Special Master that fall outside the time frame of an applicable joint defense privilege. Minebea shall produce such documents as described above.

### B. Seagate Documents

The Special Master explained that Mr. Naka listed 22 documents in Appendix B to his declaration that relate to the "Papst-Seagate" litigation. The Special Master identified nine specific documents which he found are not privileged and therefore must be produced. See R&R 6 at 52-53. The Special Master further held that "[e]very other Minebea withheld document of the same kind must be produced." R&R 6 at 53. Minebea submitted two examples of documents in camera which it maintained demonstrated the privileged nature of these documents.

Document M-65228-31 is a memorandum from Mr. Mizukami, Managing Director of Minebea, to Mr. Naka, General Counsel and Manager of Minebea's Legal Department, relaying the content of a conversation between a third party and President Ogino of Minebea and requesting that Mr. Naka draft a document in response. See MIC 8. This document

is requesting legal advice and therefore was properly withheld. The second example, M-067380-81 and M-067395-96, are memoranda from Mr. Naka to Mr. Mizukami containing legal advice and are protected under the attorney-client privilege. See MIC 9. The Court notes, however, that a review of the summary translation provided to the Special Master suggested – incorrectly as it turns out – that these memoranda were letters from Papst's counsel. It therefore is not surprising that the Special Master ruled that they were not protected by the attorney-client privilege. None of these three documents must be produced.

Minebea makes no argument with respect to the remaining documents found by the Special Master to be outside the privilege, and the Court's review of the Special Master's summary of these documents confirms that they do not appear to be privileged. The remaining documents therefore must be produced to Papst. All other documents of similar type also are to be produced.

### C.   Ringi Documents

The Special Master ruled that 23 documents withheld by Minebea as "Ringi" documents must be produced. The Special Master explained that "Ringi documents are said to be circulated among a limited number of Minebea decision makers in order to obtain a consensus." R&R 6 at 53. Minebea withheld the documents pursuant to the attorney-client privilege. The Special Master specifically found that a number of the Ringi documents were not privileged and then concluded that "[i]n light of the foregoing broad and indiscriminate assertions of the privilege, each of the withheld Ringi documents must be produced." R&R 6 at 55.

Minebea objects that "Ringi documents contain confidential information and are distributed to a small number of people, including Minebea attorney Mr. Naka and the Minebea legal department." Objections at 42. Minebea maintains that "[c]omments made by business people to the documents were considered by the Minebea legal department when providing legal advice related to the issues presented in the Ringi." Id. Minebea acknowledges that in order for a communication to be protected by the attorney-client privilege, the communication must "relate[] to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding. . . ." See In re Sealed Case, 737 F.2d at 98-99. After a review of Minebea's sample documents, the Court concludes that all Ringi documents must be produced.

Minebea submitted in camera explanations of two Ringi documents, M-016624-27 and M-017699-703, to support its arguments that all of the Ringi documents are privileged. See MIC 10, 11. Minebea maintains that M-016624-27 and M-017699-703, which were both memoranda sent to Mr. Naka, among others, included certain facts "to seek the legal advice of Mr. Naka with respect to the legal issues that are implicated by the presence of the past agreement between Papst and Minebea and the entering of another agreement between Papst and Minebea." MIC 1 at 8-9. Contrary to Minebea's assertions, however, the Court's review of the documents in question reveals no indication that these memoranda were sent to Mr. Naka for the purpose of obtaining a legal opinion or legal advice. Mr. Naka is simply one of multiple individuals at management levels in the company copied on the memoranda. He is listed under a section entitled "circulated to" which included officers in the legal, financial, control and

13

accounting departments.  See MIC 11.

> This Court previously has held that:
>
> Communications made by and to in-house lawyers in connection with representatives of the corporation seeking and obtaining legal advice may be protected by the attorney-client privilege just as much as communications with outside counsel.  By contrast, communications made by and to the same in-house lawyer with respect to business matters, management decisions or business advice are not protected by the privilege. . . .  Because an in-house lawyer often has other functions in addition to providing legal advice, the lawyer's role on a particular occasion will not be self-evident as it usually is in the case of outside counsel

Boca Investerings Partnership v. United States, 31 F. Supp. 2d 9, 11-12 (D.D.C. 1998)(citations omitted).  "Only communications that seek 'legal advice' from a professional legal advisor in his capacity as such' are protected."  In re Lindsey, 158 F.3d at 1270 (citing 8 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2292 at 554 (McNaughton rev. 1961); see also Lugosch v. Congel, 219 F.R.D. at 235 (An attorney-client privilege "attaches to only those communications (1) where legal advice of any kind is sought, (2) from a professional legal advisor in his or her capacity as such, (3) the communication relates to that purpose, (4) made in confidence, (5) by the client, and (6) are at his or her insistence permanently protected, (7) from disclosure by the client or the legal advisor, (8) except if the protection is waived.").  "A corporation cannot be permitted to insulate its files from discovery simply by sending a 'cc' to in-house counsel."  USPS v. Phelps Dodge Refining Corp., 852 F. Supp 156, 163-64 (E.D.N.Y. 1994).  Yet that is precisely what happened here.  There is no indication that any of these memoranda were prepared for a predominately legal purpose.  The Court therefore adopts the Special Master's recommendation, and Minebea must produce all the Ringi documents.

*D. Partial Translations*

The Special Master also identified a number of documents for which only partial translations were provided. Because the Special Master was not able to analyze the privileged nature of these documents with only the partial translations, he simply ordered that all the documents be produced. Minebea now has submitted verbatim translations of these documents to demonstrate to the Court that the translations were objective and were sufficient to demonstrate their privileged nature. See MIC 21. The Court does not have the benefit either of the Special Master's analysis of the documents, nor Minebea's explanation as to why they are privileged. Minebea has not even provided a copy of the relevant portions of its privilege log for the Court's review. The Court has, however, reviewed these documents and has determined that a number of these documents are not privileged. The Court also has noted that the majority of the documents fall within the temporal scope of "at issue" waiver found by the Court and therefore quite possibly already should have been produced. The documents submitted by Minebea are as follows:

- **M-059599.** This is a memorandum from Mr. Naka to Mr. Mizukami. Although it does appear to be a privileged communication relating to a letter from Mr. Schnayer, the Court notes that the document is dated December 12, 1994 and therefore falls within the temporal scope of the waiver found in this Court's February 4, 2005 Order. See MIC 22. It must be produced.

- **M-059500-01.** This is a memorandum from the Material Sales Department to Mr. Hirokawa, an attorney in the Legal Affairs Division, and a subsequent memorandum to Mr. Moritomo reporting that there is no specification for a certain patent because the application was withdrawn. See MIC 23. These memoranda appear to neither request, nor impart legal advice and therefore are not privileged. They must be produced.

- **M-025896.** This is a memorandum from Mr. Naka forwarding documents relating to the Seagate litigation. See MIC 24. This memorandum does not impart legal advice and must be produced.

- **M-047629.** Same. See MIC 25.

- **M-007868-71 and M-007872-79.** The Court has insufficient information regarding the authors and recipients to make a ruling on privilege. The Court does note, however, that this document falls within the temporal scope of the waiver found by this Court's February 4, 2005 Order. See MIC 26. It therefore must be produced.

- **M-016861 and M-059515.** These appear to be delivery receipts for patent specifications delivered to Mr. Hirokawa. See MIC 27. The Court sees no reason why a delivery receipt is privileged. It must be produced.

- **M-042352.** The Court has insufficient information regarding the authors and recipients to make a ruling on privilege. The Court does note, however, that this document falls within the temporal scope of the waiver found by this Court's February 4, 2005 Order. See MIC 28. The document must be produced.

- **M-059513.** This is a memorandum from Mr. Hirokawa to Mr. Moritomo, of the R&D Division, attaching three Japanese patent publications. See MIC 29. This memorandum does not impart legal advice and must be produced.

- **M-182166-68.** This is a memorandum from Mr. Moritomo, of the R&D Division, to Mr. Naka assessing a claim of infringement of a Papst patent. It is possible that this document is privileged if it was requested by Mr. Naka in order to provide a legal opinion. The Court notes, however, that this document falls within the temporal scope of the waiver found by this Court's February 4, 2005 Order. See MIC 30. It therefore must be produced.

- **M-182171-72.** This is a fax from Mr. Lutzger to an unnamed recipient answering certain questions. It may very well be privileged. The Court notes, however, that this document falls within the temporal scope of the waiver found by this Court's February 4, 2005 Order. See MIC 31.[5] It must be produced.

- **M-182196-202.** This submission consists of several faxes to Mr. Naka from Mr. Lutzker. They may very well be privileged. The Court notes, however, that these document falls within the temporal scope of the waiver found by this Court's February 4, 2005 Order. See MIC 32. It must be produced.

- **M-182867-77.** This is a document entitled "answers to Mr. Lutzker's questions." The source is unknown. It may very well be privileged. The Court notes, however, that this

---

[5] Following this document is some manner of annotated spreadsheet which appears to be an incomplete exhibit list for a filing. The Court presumes this was mistakenly included in the in camera documents.

document falls within the temporal scope of the waiver found by this Court's February 4, 2005 Order.  See MIC 33.  It therefore must be produced.

- **M-182980-81.**  This appears to be the same document as M-059599.  See MIC 34.

- **M-183047-50.**  This is a memorandum from Mr. Moritomo to Mr. Naka reporting which patent publications have been obtained.  It does not appear to request legal advice and is therefore not privileged.  The Court also notes that this document falls within the temporal scope of the waiver found by this Court's February 4, 2005 Order.  See MIC 35.  It therefore must be produced.

- **M-183051-65.**  Same as above attaching a list of Papst patents.  See MIC 36.

- **M-027680.**  This is a fax from Mr. Yoshimura to Mr. Mizukami copying Mr. Naka.  This appears to be a privileged document conveying legal advice.

*E.  Naka Declaration*

The Special Master also identified six specific documents from the Naka Declaration which the Special Master has determined are not privileged.  See R&R 6 at 55-57.  The Special Master suggests that "many, if not the majority, of the entries in Minebea's log are in material respects inaccurate and incomplete."  R&R 6 at 57.  Although Minebea's privilege log is not currently before the Court, it is readily apparent, from the Court's conclusions above, that Minebea has withheld a significant number of documents for which no privilege should have been claimed.  Minebea is directed to review all of its withholdings and produce all documents that are not privileged under the holdings and guidance set forth in this Opinion.

The Court will address the six specific documents identified by the Special Master:

17

M019610-14 is a memorandum from Mr. Mizukami to Mr. Dosho with a cc to Mr. Naka. See MIC 12.[6] It discusses Mr. Mizukami's understanding of the arrangement between Minebea and Papst and attaches a letter received from Papst. As the Court already has explained, copying an attorney on a memorandum does not automatically make it privileged. The key factor is always the purpose of the communication: was it or was it not for the purpose of obtaining legal advice? Contrary to Minebea's assertions, the only aspect of this memorandum which could possibly be construed as even an implicit request for legal advice is one paragraph which has a handwritten notation that Mr. Naka is "involved in the work." See M-019611. This is not a request for legal advice. The document is to be produced in its entirety.

M034456-57 is a letter from Mr. Naka to various individuals at Minebea. See MIC 13. It describes a conversation between Mr. Naka and an IBM representative. Minebea claims that the document reveals Minebea's confidential information, but the only information in the letter is information revealed by Mr. Naka to IBM. Also contrary to Minebea's claim that the memorandum includes Mr. Naka's mental impression as to who will be the IBM negotiator, the document says only "the Mr. Kamihara of IBM Japan who is mentioned in this document is the same person who was the other party in the negotiations on the IBM '804 patent concerning magnetic heads." M-034456. There are no mental impressions contained in that statement. The document is not privileged.

Minebea has failed to provide the Court with a translation of M-069389. See MIC 14. It is impossible for the Court to assess the accuracy of Minebea's in camera explanation

---

[6] Mr. Dosho is not identified by title, but Minebea describes this as a memorandum between "Minebea business personnel" with a copy going to Mr. Naka, the General Counsel.

when the document is in Japanese.  Minebea shall produce this document to Papst.

M020232-36 is a memorandum from Mr. Naka to Mr.Mizukami, which the Special Master already has determined to be privileged.  See MIC 15.  The Special Master ruled, however, that the attachments to the memorandum must be released.  This is not surprising since Minebea failed to provide a translation of those attachments.  Now that Minebea has submitted a translation of these documents, the attached pages appear to be material assembled by the R&D Department at the direction of Mr. Naka for the purpose of providing a legal opinion.  The documents therefore are privileged.

M069387-88 is a letter from Mr. Naka to Mr. Moritomo, Division Chief of the R&D Division, attaching a letter from Mr. Kobayashi, Division Chief of the Spindle Motor Sales Division, to Mr. Naka.  See MIC 16.  M-18657-93 is a second copy of these two letters with an attachment.  See MIC 17.  Minebea explains that it has already produced the attachment because it was found independently elsewhere in its files.  Contrary to Minebea's assertion that the attachment would otherwise be privileged, merely by virtue of being attached to the aforementioned letters, the Court would remind Minebea that sending a non-privileged document to an attorney does not render it privileged.  With respect to the letters themselves, once again Minebea failed to provide the Special Master with a sufficiently detailed translation of the documents.  These documents were created in May of 1995 and therefore fall within the time frame for which this Court has already found "at issue" waiver.  From Minebea's in camera submission, it appears that these documents, which refer to a request made by a third party regarding patents, likely fall within the scope of the Court's February 4, 2005 Order.  If the

documents are referring to Appendix III patents in their broadest sense, see April 27, 2005 Memorandum Opinion and Order, they must be released.

Although this Opinion does overrule certain of the Special Master's determinations regarding privilege, the Court would note that in many cases the fault rests solely with Minebea for failing to provide the Special Master with a sufficiently detailed translation of its withheld documents.  The Court will reiterate at this time that Minebea is directed to review all of its withholdings and produce all documents which are not privileged under the holdings contained in this Opinion.  In doing so, Minebea is reminded of the Court's long-held view – only reinforced by reviewing the documents discussed herein – that both it and its lawyers and Papst and its lawyers – have an overly expansive view of the attorney-client and attorney work product privileges.  Both are exceptions to the general presumption that all relevant information must be disclosed during the discovery process in civil litigation.

A separate Order consistent with this Opinion shall issue this same day.

SO ORDERED.

_____/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE: April 29, 2005