UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
MINEBEA CO., LTD., <u>et al.</u>,           )
                                        )
              Plaintiffs,               )
                                        )
       v.                               )          Civil Action No. 97-0590 (PLF)
                                        )
GEORG PAPST, <u>et al.</u>,                 )
                                        )
              Defendants.               )
_____ )


<u>OPINION</u>

       This matter is before the Court on the parties' cross-motions for summary

judgment on the issue of patent exhaustion.[1]  Upon consideration of Minebea's motion, Papst's

opposition, Minebea's reply, Papst's motion, Minebea's opposition and Papst's reply, the Court

must conclude that there are genuine issues of material fact which prevent the granting of either

motion.  The Court will, however, clarify its legal conclusions with respect to both the law of

patent exhaustion and the meaning of the 1995 Settlement Agreement to aid the parties in

preparing for trial and in drafting preliminary and final jury instructions.

       This is not the first time in this litigation that the issue of patent exhaustion has

come before the Court on a motion for summary judgment.  In October 2004, the Court denied a

motion by Papst for partial summary judgment on the issue of patent exhaustion.  At that time,

the Court gave its preliminary views regarding the 1995 Settlement Agreement and patent

_____

       [1]     Minebea notes that only five of the patents listed on Appendix III of the 1995
Settlement Agreement are at issue in its motion for summary judgment.  Those are: U.S. Patent
Nos. 4,519,010; 4,535,373; Re. 34,412; 4,894,738; and 5,216,557.

exhaustion and invited Minebea to file a motion for summary judgment with respect to the patent

exhaustion claim.  Many of the views expressed by the Court in October are reflected in this

Opinion.

## I.  DISCUSSION

At the heart of the controversy in this case is whether certain of Papst's disk drive

patents have been exhausted by Minebea's sales of hard disk drive motors.  Papst owns both

motor and disk drive patents.  "Every patent . . . contain[s] . . . a grant to the patentee . . . of the

right to exclude others from making, using, offering for sale, or selling the invention throughout

the United States . . . ."  35 U.S.C. § 154.  Patent owners also have the right to exclude others

from performing acts that induce infringement of the patent or contributorily infringe the patent.

35 U.S.C. § 271(b) and (c).  A patent right is exhausted, and thus no longer enforceable by the

patentee, if "there has been such a disposition of the article that it may fairly be said that the

patentee has received his reward for the use of the patent."  United States v. Masonite Corp., 316

U.S. 265, 278 (1942).  It thus follows that "[t]he unrestricted sale of a patented article, by or with

the authority of the patentee, 'exhausts' the patentee's right to control further sale and use of that

article by enforcing the patent under which it was first sold."  Jazz Photo Corporation v. ITC, 264

F.3d 1094, 1105 (Fed. Cir. 2001).  "This longstanding principle applies similarly to a sale of a

patented product manufactured by a licensee acting within the scope of its license."  Intel Corp.

v. ULSI System Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993).

Thus, generally, the authorized, unconditional sale of a patented article exhausts

the patent with respect to the future use or sale of that article.  This is true so long as "the

authorized first sale . . . occurred under the United States patent." <u>Jazz Photo Corporation v. ITC</u>, 264 F.3d at 1105.  Minebea argues that it was authorized to sell its motors unconditionally and that it sold them "under" the United States patents.  In this case, however, Minebea does not seek a finding merely that its sale of motors exhausts the patent on the motor itself, a conclusion no one seems to question.  Rather, Minebea contends that its sale of motors exhausts other Papst patents, namely, those disk drive patents listed in Appendix III of the 1995 Settlement Agreement.  As Judge Harris said at an earlier stage of this case: "[W]hen a patent holder sells an incomplete product that has no substantial use other than to be further manufactured into a complete patented and allegedly infringing article, the patent holder cannot claim that the final product infringes the patent." <u>Minebea v. Papst</u>, 13 F. Supp. 2d 34, 44 (D.D.C. 1998).  Minebea, as the licensee, stands in the place of the patent holder, Papst.  In order to establish that its motor sales exhausted the disk drive patents, Minebea therefore must establish that:  (a) it had authority to sell the HDD motors; (b) there were no conditions on its sale of motors; (c) its motors are the "essential feature" of the Appendix III patents such that they have no substantial use which does not infringe the Appendix III patents; and (d) the sale of its motors occurred "under" the United States patents.

## A.  Authority to Sell

The first question is whether Minebea's sales of motors were "with the authority of the patentee." <u>Jazz Photo Corporation v. ITC</u>, 264 F.3d at 1105.  Minebea maintains that it is authorized to sell its motors under the 1995 Settlement Agreement as well as under earlier agreements between the parties.  As has been true throughout this case, the parties focus on the

1995 Settlement Agreement rather than on the prior agreements.  Because Minebea claims it was

authorized under all of these agreements, however, the Court will discuss each in turn.

### 1.  1995 Settlement Agreement[2]

At various points, Minebea has attempted to argues that all of its rights under

previous agreements with respect to the Papst Drive Patents ("Appendix III patents") were

incorporated into the 1995 Settlement Agreement.  This is contrary to the plain language of the

---

[2]	There have been disagreements in the past with respect to the scope of certain categories of patents under the 1995 Settlement Agreement.  For example, Minebea states its belief that the Appendix III patents are included within the contract term "Future Patents," although it notes that the Future Patents provisions are not relevant to resolution of its motion.  In the interest of clarifying various contract provisions prior to trial, however, the Court will explain the plain meaning of "Future Patents" from its reading of the Agreement.

The 1995 Settlement Agreement defines "Papst Patents" as "any and all patents and patents pending . . . as of the date of execution of this Agreement."  Agreement at ¶ 1.4.  "Papst Patents" includes without limitation the Appendix I and II patents, but explicitly does not include the Appendix III patents, which are defined as "Papst Drive Patents."  Id.  The Agreement defines "Future Patents" as "any and all patents and patents pending . . . other than Papst Patents," but explicitly does not include patent claims on Disk Drives.  Id. at ¶ 1.5.  The Agreement defines "Disk Drive" as "an assembly including a spindle motor, a clean room chamber, one or more data storage disks mounted on the spindle, and data heads mounted to access data on the disk(s), "but shall not mean the separate constituent components of such assembly."  Id. at ¶ 1.9.  The Appendix III patents are as follows:  Disk Drive with Below Deck Motor; Disk Drive with Below Deck Motor; Disk Drive with Reluctance Torque Motor, Disk Drive Having Spindle Brake; Disk Drive Having Magnetic Shielding, Disk Drive Having Labyrinth Seal; Disk Drive with Reluctance Torque Motor; Disk Drive with Various Motor Features, Disk Drive with Magnetic Shielding; Disk Drive with Various Motor Features; Disk Drive with Magnetic Shielding; Disk Drive with Bearing Seals; and Disk Drive Having Labyrinth Seal.  See Appendix III.

The Court concludes from the plain meaning of the Agreement, that "Papst Drive Patents" are not included in "Future Patents" because each and every patent listed in Appendix III is defined as either "Disk Drive with X" or "Disk Drive having X" and therefore must be included in the phrase "patent claims on Disk Drives" as defined in paragraph 1.5 of the Agreement.  See Appendix III.  It is clear, then, that Papst Patents, Papst Drive Patents, and Future Patents are three, non-overlapping categories.

Agreement, which provided:

> This Agreement supersedes and extinguishes all obligations of
> Minebea under agreements previously entered into between the
> parties in regards to the license of any Papst Patent. . . (hereinafter
> referred to as "Prior Agreements"), and the parties acknowledge
> that from the Effective Date hereof this Agreement shall govern the
> relationship between them.  Nothing herein shall be construed as
> limiting or abridging the rights of Minebea under such agreements,
> and any such rights are incorporated herein and preserved hereby.
> <u>However, with regard to the rights and obligations of the parties to
> this Agreement concerning Papst Drive Patents . . . such rights and
> obligations shall be governed only by the provisions of this
> Agreement.</u>

<u>See</u> Agreement ¶ 3.1 (emphasis added).  Through a somewhat twisted construction of this section

which the Court will not reiterate here, Minebea argues that this provision still preserves all of

Minebea's rights under previous agreements with respect to the Papst Drive Patents.  <u>See</u>

Minebea Mot. at 29-30.  This is contrary to the plain language of the 1995 Settlement

Agreement.  The rights and obligations of all parties to the 1995 Settlement Agreement, with

respect to the Papst Drive Patents, are limited to those expressly enumerated in the Agreement.

The question, then, is what rights are granted to Minebea with respect to the Papst

Drive Patents under the 1995 Settlement Agreement and whether Minebea's motor sales are

"authorized" under the Papst Drive Patents.  The Agreement expressly provides that:

> Papst and each of them agree not to assert any claim or prosecute
> any action, suit or proceeding against Minebea or any of them for
> contributory infringement or inducement of infringement of any
> Papst Patent or Papst Drive Patent

<u>See</u> Agreement ¶ 2.4.  The Agreement also provides:

> Minebea's manufacture, distribution, use or sale of motors by
> themselves do not directly infringe the claims in the Papst Drive
> Patents.  Papst and each of them agree not to assert any claim or

> initiate any proceeding against Minebea or any of them for
> contributory infringement or inducement of infringement of any
> Papst Drive Patent.

See Agreement ¶ 5.2.  It is clear from the language of the 1995 Settlement Agreement that

Minebea's motors, by themselves, have been warranted not to directly infringe the Papst Drive

Patents.  All that Minebea requires, therefore, is a license such that it will not be liable for

infringement should its customers combine its motors with other elements, resulting in

infringement of the Papst Drive Patents.

The 1995 Settlement Agreement explicitly waives Papst's right to sue Minebea

for contributory infringement or inducement of infringement of the Papst Drive Patents.  If,

therefore, a Minebea motor is sold to Company X, which uses it to make a product which

infringes a Papst Drive Patent, Minebea will not be liable for patent infringement with respect to

that product.  At no point in the Agreement is Minebea granted an explicit "license" under the

Papst Drive Patents, however.  Rather, Minebea receives a promise that Papst will not sue

Minebea should a Minebea motor be manufactured into a product which directly infringes a

Papst Drive Patent.

The Federal Circuit has explained:

> A patent license agreement is in essence nothing more than a
> promise by the licensor not to sue the licensee.  Even if couched in
> terms of '[l]icensee is given the right to make, use, or sell X,' the
> agreement cannot convey that absolute right because not even the
> patentee of X is given that right.  His right is merely one to exclude
> others from making, using, or selling X.

Spindelfabrik Suessen-Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik

Aktiengesellschaft, 829 F.2d 1075, 1081 (Fed. Cir. 1987).  By waiving Papst's right to sue

Minebea in the 1995 Settlement Agreement, Papst has authorized Minebea to manufacture and sell motors that would otherwise contribute to, or induce the infringement of, the Papst Drive Patents.  Minebea is thus "authorized" to sell its motors to customers who will combine those motors into products which directly infringe the Papst Drive Patents.[3]

2.  Rights under Previous Agreements

Minebea explains that Papst's previous motion for summary judgment on the issue of patent exhaustion involved only Minebea's sales after June 1995.  Because Minebea's current motion involves Minebea's sales prior to June 1995 as well, the motion addresses Minebea's rights under earlier contracts and agreements.  See Minebea Mot. at 23.

a.  Agreement for the Sale of Intangible Assets

The Agreement for the Sale of Intangible Assets, which governed the patent rights of the joint venture formed in 1990 between Minebea and Papst Motoren, provided that:

> Papst as the holder of patents (for the purposes of this agreement the term "patent" is defined as patents, and patent applications) grants to Minebea the right to use all of its patents; especially the predominant German patents and the corresponding international patents, enumerated in Exhibit B attached hereto, world-wide as far as they are required and necessary for research and development (R+D), manufacturing, engineering, use and sale of HDD [hard disk drive motors].  Minebea as licensee is not entitled to use the patents in other fields.[4]

---

[3]     Papst objects that Minebea was not "authorized" to pass a license to its customers under the Papst Drive Patents.  See Papst Opp. at 30.  This, however, is more properly characterized as an argument that there was a condition on the sale, a point that is addressed infra in Part B.

[4]     It appears that the list of patents is actually Appendix C, not Appendix B.

7

<u>See</u> Agreement for the Sale of Intangible Assets at ¶ 4(a) (emphasis added). It further provided

that:

> Patents which arise or are acquired by Papst during the life of this
> agreement and which may be required and necessary for research
> and development (R+D), manufacturing, engineering, use and sale
> of HDD Motors shall be made available by Papst by granting
> licenses to Minebea with the provisions of this Article 4(a)-(c)
> without additional royalties.

<u>See</u> Agreement for the Sale of Intangible Assets at ¶ 4(d).

      Minebea claims that each of the Papst Drive Patents at issue in this motion is

licensed to Minebea as a "corresponding international patent" under this agreement.  <u>See</u>

Minebea Mot. at 5.  Minebea argues that "each of the patents listed in Appendix III had either

been issued before the execution of the Sale of Intangible Assets Agreement, or issued directly

from an application that was in existence at the time the agreement was executed or issued as a

continuation of such an existing application."  Minebea Mot. at 25 n.16.  Papst does not respond

explicitly to this argument.  Papst responds only that the Papst Drive Patents were not "required

and necessary" to the HDD motor business – as exemplified by the fact that Minebea's

competitor Nidec was not granted rights under the Papst Drive Patents and yet sells HDD motors.

<u>See</u> Papst Opp. at 42.  Unlike the 1995 Settlement Agreement which specifically defines which

patents are and are not included in various waivers, the parties dispute which patents were

"required and necessary" to the HDD motor business referenced in the 1990 Agreement for the

Sale of Intangible Assets.

      The Court is not persuaded by Minebea's argument that it was licensed under

"all" Papst's patents under this 1990 agreement.  The Agreement explicitly states that Minebea

was licensed under all the patents only to the extent that they were "required and necessary" for use in the manufacture, use and sale of hard disk drive motors.  The Court believes that a strong argument can be made by Papst that a license was required under the Papst Drive Patents to the extent that Minebea could otherwise be found to contributorily infringe or to induce the infringement of the Papst Drive Patents by means of its sales.  The Court concludes, however, that the term "required and necessary" in the 1990 Agreement for the Sale of Intangible Assets is an ambiguous term and is therefore a matter of fact to be decided by the jury.

### b.  Termination Agreement

Minebea further maintains that the transfer of Papst's interest in the Joint Venture to Minebea in 1993 included a continuing grant of all patent rights "required and necessary" for Minebea to continue to use, manufacture, develop, and sell HDD spindle motors.  Minebea Mot. at 6.  The Agreement Concerning the Termination of Joint Venture ("Termination Agreement") provided that, following the termination, Minebea would continue to have rights under the patents as follows:

> Continued Granting of licenses by P to M for all patents and patent applications required and necessary in the field of HDD motor R+D, manufacturing, engineering, use and sale of such motors in so far as such patents and patent applications are available to P at the time this TA becomes effective. . .

See Termination Agreement at ¶ 1.2(c).  The Termination Agreement also provided that Section 4(a) of the Agreement for the Sale of Intangible Assets "shall remain in force."  See Termination Agreement at ¶ 9.1.  Papst does not really address the Termination Agreement in its brief, but it seems clear that the Termination Agreement provided for a continuation of the rights granted

under the Agreement for the Sale of Intangible Assets since both agreements contain the same

"required and necessary" language.  Just as the term "required and necessary" in the 1990

Agreement for the Sale of Intangible Assets is an ambiguous term, the term "required and

necessary" in the Termination Agreement is likewise an ambiguous term and is therefore a matter

of fact to be decided by the jury.

c.  Loan Agreement

Another agreement executed just before the Termination Agreement was the Loan

Agreement and Agreement Concerning Alterations of License Agreements ("Loan Agreement").

The Loan Agreement provided:

> It is understood between the parties that such license shall not
> apply to the so called drive patents (US-Pats: B1 Re. 32.702 and
> 4,337,491 and Jap. Pat. Appl. 142 123/1979 and German Patent 29
> 44 212), so called Drive Patents, which are not licensed under the
> Intangible Assets Agreement and are not licensed under this
> present agreement.  It is understood that purchasers of products
> from Minebea, PMDM-G and PMDM-T are not licensed under
> such Drive patents, notwithstanding the use of such purchased
> products in disk drives or other produckts [sic] made, used or sold
> by such purchasers.  PL shall covenant and agree that PL shall not
> sue or take any other action against Minebea, that PL shall not sue
> or take any other action against Minebea, PMDM-G and PMDM-T
> and other Minebea Group Companies in terms of infringement of
> the so called drive patents as long as Minebea, PMDM-G and
> PMDM-T and other Minebea Group Companies do not
> manufacture and/or sell complete HD drives whith [sic] the own
> brand name of Minebea, PMDM-G, PMDM-T or any one of
> Minebea Group Companies.

See Loan Agreement at ¶ 4.3  Papst notes that this agreement again contains a covenant not to

sue based on the sale of motors to customers.  See Papst Opp. at 44.  It is clear under this

agreement, just as under the 1995 Settlement Agreement, that regardless of what strictures may

10

or may not have been expressed with respect to Minebea's customers, <u>Minebea</u> was authorized to sell its HDD motors without fear of suit by Papst for contributory infringement or inducement of infringement.

The Court concludes that Minebea was clearly authorized under the 1995 Settlement Agreement to sell its motors under the Papst Drive Patents.  This authorization, through a similar covenant not to sue, was also evidenced under the Loan Agreement.  In the Court's view, it is a logical conclusion that this waiver by Papst of contributory infringement and inducement of infringement was also "required and necessary" under the Intangible Assets Agreement and the Termination Agreement, but the Court agrees with Papst  that there is a genuine issue of material fact with respect to what rights under which patents were "required and necessary" under these agreements.

### B.  Unconditional Sale

The second requirement for patent exhaustion is that the authorized sale be "unconditional."  "[A]n unconditional sale of a patented device exhausts the patentee's right to control the purchaser's use of the device thereafter."  <u>B. Braun Medical, Inc. v. Abbott Labs</u>, 124 F.3d 1419, 1426 (Fed. Cir. 1997).  "This exhaustion doctrine, however, does not apply to an expressly conditional sale or license."  <u>Id</u>.  "The principle of exhaustion of the patent right [does] not turn a conditional sale into an unconditional one."  <u>Mallinckrodt, Inc. v. Mediport, Inc.</u>, 976 F.2d 700, 706 (Fed. Cir. 1992).

It seems readily apparent from the language of the 1995 Settlement Agreement that the parties anticipated that Papst would retain the right to sue Minebea's customers for direct

infringement of the Papst Drive Patents.  This was reiterated throughout the 1995 Settlement

Agreement and is evidenced in the Loan Agreement as well.  Specifically, the 1995 Settlement

Agreement provided as follows:

> In consideration for the Settlement Amount to be paid hereunder,
> Papst and each of them hereby and forever release and discharge
> Minebea and each of them from any and all past and future actions,
> [etc.] . . . for infringement of the Papst Patents or the Future
> Patents arising out of the manufacture, distribution, use or sale of
> Minebea Products in whatever country, up to the Effective Date.
> This release extends to all customers, distributors and end-users of
> Minebea Products and to all of Minebea's suppliers of Minebea
> Products or components thereof.  <u>Provided, however, that this
> release does not extend to any Minebea customer for any act of
> infringement of Papst Patents or Papst Drive Patents performed
> where the customer combines or authorizes another to combine a
> Minebea Product with any component, material or process not
> produced by Minebea;</u> provided, however that this exclusion shall
> not apply to acts of infringement of Papst Integrated Baseplate
> Patents.

<u>See</u> Agreement ¶ 2.2 (emphasis added).  The Agreement also provided:

> provided, however, that <u>this provision shall not bar Papst from the
> legal right to assert an infringement claim against a Minebea
> customer or subsequent purchaser or user for direct infringement of
> a Papst Drive Patent</u>, other than a Papst Integrated Baseplate
> Patent, or for direct infringement of a Papst Patent if acts of such
> customer or subsequent purchaser or user first result in the direct
> infringement.

<u>See</u> Agreement ¶ 2.4 (emphasis added).  The Agreement expressly explained that "no license is

granted hereunder to any Minebea customer with respect to any of the Papst Drive Patents other

than the Papst Integrated Baseplate Patents."  <u>See</u> Agreement ¶ 4.1.  Regardless of Papst's intent

to retain the right to bring infringement suits against Minebea's customers, however, the question

under the doctrine of patent exhaustion is whether these provisions make Minebea's

authorization under the Papst Drive Patents "conditional."  That is, does Papst's reservation of the right to sue the customers require Minebea to condition its sales to its customers in some way?

Although there are no Federal Circuit cases directly on point, two district court cases, one of which already has been affirmed by the Federal Circuit, are factually comparable to the instant case.  In the first case, LG Electronics, Inc. v. Asustek Computer, Inc., 248 F. Supp. 2d 912, 914 (N.D. Cal. 2003), plaintiff had issued Intel a license giving it the right to manufacture products that would otherwise infringe its patents.  Intel manufactured microprocessors and chipsets and sold them to defendant.  Defendant then installed them in computers which allegedly infringed LGE patents.  See id.  The license between LGE and Intel expressly disclaimed any implied license to Intel customers who combined products covered by the license with non-Intel products.  See id.  The court found that LGE's patent rights were exhausted even though the microprocessors and chipsets were themselves unpatented components.  See id. at 917.  The district court relied upon United States v. Univis Lens Co., 316 U.S. 241 (1942), where the Supreme Court held that:

> where one has sold an uncompleted article which, because it embodies essential features of his patented invention is within the protection of his patent, and has destined the article to be finished by the purchaser in conformity to the patent, he has sold his invention so far as it is or may be embodied in that particular article.

Id. at 250-51.  The district court thus concluded that plaintiff's licensee's sale of the unpatented microprocessors and chipsets "did in fact exhaust LGE's patent rights because those microprocessors and chipsets were 'destined . . . to be finished by the purchaser in conformity

with the patent' because they have no reasonable non-infringing use."  See LG Electronics, Inc.

v. Asustek Computer, Inc., 248 F. Supp. 2d at 915.

In Cyrix Corp. v. Intel Corp., 846 F. Supp. 522 (E.D. Tex. 1994), Texas

Instruments ("TI") was licensed to make, use and sell microprocessors which were covered by

Intel's patents.  TI was not permitted to sell products which combined the microprocessor with

external memory.  A microprocessor was claim 1 of a given patent.  The combination with

external memory were claims 2 and 6.  See id. at 536.  TI sold the microprocessor to Cyrix,

which then combined it with external memory and sold it.  The district court found that Cyrix:

> as the purchaser of licensed . . . microprocessors . . . is free to resell
> those products to its customers.  Cyrix and its customer also are
> free to use the microprocessors for their intended purpose,
> including by combining them with external memory . . . .  Such
> further use and sale is beyond the reach of the patent laws, and not
> an infringement of the . . . Patent.

Id. at 541.  This was true even though the agreement between Intel and TI clearly stated that no

licenses were granted to third parties acquiring products for the purpose of combining them.  Id.

at 532-33.  The court noted that the microprocessors, "although complete in and of themselves,

are unfinished in the sense that they need to be combined with external memory to be used."  Id.

at 540.  "The sale or other transfer by . . . TI to Cyrix of a claim 1 microprocessor exhausts Intel's

patent rights in the '338 Patent, including without limitation in claims 1, 2, and 6 of the '338

Patent . . . .   Intel is barred by the doctrine of patent exhaustion from asserting claims 2 and 6 of

the '338 Patent against Cyrix or Cyrix's customers."  Id. at 541.

As this Court stated in October 2004, it is unclear what rights are denied to

Minebea in connection with the sale of its motors under the Papst Drive Patents.  The motors do

not directly infringe the Papst Drive Patents, and Papst waived the right to sue Minebea for

contributory infringement or inducement of infringement in connection with the Papst Drive

Patents.  There was no provision in the 1995 Settlement Agreement that placed any condition on

this waiver.  Clearly, Papst could have included in the Agreement, rather than an express

reservation of the right to sue Minebea's customers, a requirement that Minebea's sales to its

customers must be conditioned in some way.  A patentee may "impose more onerous conditions

on someone who purchases the patented device from a licensee than on the licensee."  LG

Electronics, Inc. v. Asustek Computer, Inc., 248 F. Supp. 2d at 916.  But, "the mere fact that

[Papst] is entitled to impose conditions on the sale of the essential components of its patented

products does not mean that it actually did so here."  Id. at 916-17.  Like the purchase by the

defendants in LG Electronics, Minebea's motor sales to its customers were unconditional and the

fact that they were unconditional was not in violation of Minebea's rights under the 1995

Settlement Agreement.  Although Papst could have imposed conditions on Minebea's sales to its

customers, it did not do so.

    The Court agrees with Papst that such a conclusion seems unfair given the express

language in the contract reserving the right to sue Minebea's customers for infringement of the

Papst Drive Patents.  The Court has no doubt, given the language of the contract, that Papst fully

intended to preserve to itself the right to sue customers of Minebea in connection with their

infringement of these patents, and the Court is hard-pressed to see how Minebea could not have

been aware of Papst's intent.  Given the doctrine of patent exhaustion, however, because Papst

failed to condition Minebea's sales of motors to its customers, the Court cannot conclude that the

sale of those motors could not exhaust the Papst Drive Patents despite language evidencing a

contrary intent.

As this Court already said in its ruling denying Papst's earlier motion for partial summary judgment:

> [M]y reaction upon reading the contract was that it was not at all clear that this was a conditional contract, and that it was pretty clear to me that it was unconditional.  That's why I asked Mr. Lutzker why he didn't move for summary judgment.  I read this contract, and sure it says no license is granted to Minebea customers, but it doesn't condition Minebea's right to do anything with what it got.

> One could have written an agreement that placed limits on the right to sell or to have made any sale like the ones that Minebea made to its customers unauthorized.  it may even under [Braun] and [Malinckrodt] have been written to require Minebea to only sell what it sold with conditions.  But my reading of the contract suggested nothing that restricted Minebea from selling hard disk drive motors without restrictions.

> * * *

> Minebea didn't place conditions on its sales to its customers, but this agreement didn't require it to.  Minebea's sales to its customers, it seems to me, are within the scope of authority that it received.

> * * *

> It seems to me as I read the contract that Minebea was completely free to sell any product that it itself manufactured.  There was no provision in the agreement that provided that Minebea had to condition its sales to its customers.  Papst could have included in the agreement, rather than express reservation of a right to sue Minebea's customers, or rather than a statement that it wasn't granting license rights, it could have included a requirement that Minebea's sale to its customers had to be conditioned in some way.

> * * *

> Papst could have placed limitations on the rights of Minebea to sell
> to customers, but I don't think [there are such limitations] in this
> contract.  I don't see anything in the contract that restricts Minebea
> from selling hard disk drive motors without restriction.

Transcript of October 19, 2004 hearing at 48-55.

As the Court concluded last fall, the 1995 Settlement Agreement expressly warrants that Minebea's motor sales do not infringe the Papst Drive Patents and waives Minebea's liability for contributory infringement or inducement of infringement under the Papst Drive Patents.  This combination gives Minebea the authority to sell its HDD motors.  There is absolutely no language in the contract requiring Minebea to condition its sales of these motors to its customers, and the Court therefore concludes that Minebea had the unconditional authority to sell motors that would contribute to the infringement of the Papst Drive Patents under the 1995 Settlement Agreement.

## C.  Essential Feature/Non-Infringing Use

It therefore is clear that Minebea was authorized to sell its motors and that it was not required to condition its sale of motors to its customers.  Because, however, Minebea's motors do not directly infringe the Papst Drive Patents, unconditional authorization to sell those motors is insufficient to establish patent exhaustion.  Rather, it is only when a Minebea customer uses a Minebea motor in combination with other components to produce a hard disk drive that the Papst Drive Patents are infringed.  "[W]hen a patent holder sells an incomplete product that has no substantial use other than to be further manufactured into a complete patented and allegedly infringing article, the patent holder cannot claim that the final product infringes the patent."  Minebea v. Papst, 13 F. Supp. 2d at 44.  That is, a finding of exhaustion is proper only

17

"where one has sold an uncompleted article which, because it embodies essential features of [its] patented invention is within the protection of the patent." United States v. Univis Lens Co., 316 U.S. at 250-251.  To establish that Minebea's motor sales exhaust the Papst Drive Patents, therefore, Minebea must demonstrate that its motors have "no substantial use other than to be further manufactured into a completed patented and allegedly infringing article." Cyrix Corp. v. Intel Corp., 846 F. Supp. at 540.  In other words, Minebea must establish that its motors are the "essential features" of the Papst Drive Patents.  This is a question of fact which cannot be resolved on a motion for summary judgment.

Papst suggests that the non-infringing use analysis requires an analysis of the claims of the patents under which Minebea is licensed, the Papst Patents and the Future Patents, and a comparison, claim-by-claim, of those patents to the Papst Drive Patents to determine whether Minebea can practice under the Papst Patents and the Future Patents without infringing the Papst Drive Patents.  See Papst Opp. at 56.  The Court rejects Papst's argument.  The requirement of a comparison between the Papst Patents and the Papst Drive Patents ignores the very important point that Minebea is already authorized under the Papst Drive Patents to sell its motors.  Minebea does not require that an implied license be found because it already has the equivalent of an express license in Papst's contractual waiver of its right to sue Minebea for contributory infringement or inducement of infringement.  Claim construction of the Papst Patents and Future Patents is unnecessary to determine whether the Papst Drive Patents were exhausted by Minebea's sales of motors.  The question, then, is whether claim construction is necessary, as Papst claims, on the Papst Drive Patents before expert testimony regarding noninfringing uses can be permitted.

Minebea must establish that the motors it is authorized to sell under the Papst

Drive Patents do not have any reasonable use other than to be used in combinations which

infringe the Papst Drive Patents, that is, that its motors are the "essential features" of the Papst

Drive Patents.  Minebea steadfastly maintains that its motors have no commercially viable use

other than to be combined with one or more other elements found in a hard disk drive.  See

Minebea Mot. at 56.[5]  As a threshold matter, the Court notes that "a legally acceptable

noninfringing use need not be as profitable as the patented method – it need only be reasonable."

Glass Equipment Development, Inc. v. Besten, Inc., 174 F.3d 1337, 1342 (Fed. Cir. 1999)

(demonstrating that noninfringing methods did not permit the user to sell the resulting device at a

profit was insufficient to establish no noninfringing uses).  Minebea therefore must demonstrate

that there are no "reasonable" uses for its motors which do not infringe the Papst Drive Patents

rather than just no uses of comparable profitability.

Minebea argues that the Papst Drive Patents cover alleged improvements in an

HDD motor "by describing them in their intended environment as a combination with one or

more elements found in every hard disk drive and not provided by the motor manufacturer, such

as a clean chamber, magnetic storage disk or read/write head."  Minebea Mot. at 11 (citing

declaration of Mr. Dalziel).[6]  Minebea maintains that its motors embody "essential features" of

---

[5]      Minebea notes that Papst has accused Minebea' customers of infringing claims in
the Papst Drive Patents in connection with hard disk drives incorporating Minebea motors.  See
Minebea Mot. at 57.  This, however, establishes only that Minebea's customers have combined
the motors with other elements in a manner that infringes the patents, not that there are no other
uses for the motors.  This argument therefore is irrelevant to Minebea's claims.

[6]      Minebea thus concludes that these are "motor" patents rather than "drive" patents
and goes so far as to suggest in a footnote that its motors might directly infringe some claims of
the Papst Drive Patents.  See id. at 57 n.30.  This is a novel argument since the 1995 Settlement

the Papst Drive Patents and that the non-motor features of the patents are "generic" and do not

distinguish an infringing hard disk drive from a non-infringing hard disk drive.  See id. at 56, 59.

Even accepting all of Minebea's arguments as true – which is not appropriate on a motion for

summary judgment –  it follows only that its motors cannot be used in the manufacture of hard

disk drives without infringing the Papst Drive Patents.  None of these arguments establishes that

there is no non-infringing use for Minebea's motors outside of the realm of hard disk drives.

Papst suggests that Minebea's motors can be used in applications such as fans, optical disk drives

and floppy disk drives that unquestionably do not infringe the Papst Drive Patents.  Id. at 12.

Papst argues that Minebea's own patents state that there are noninfringing uses, as do patents

owned by Minebea's competitors.  Id.

   Claim construction would be necessary if there were disputes regarding what

products directly infringe the Papst Drive Patents.  Papst, however, has already accused

Minebea's customers of direct infringement, either through lawsuits, or by negotiating licenses

with them to cover the manufacture of hard disk drives.  The Court presumes that Papst does not

intend to argue now that the customers' hard disk drives do not infringe the Papst Drive Patents.

For purposes of this lawsuit, then, it appears that both parties agree that the customers' hard disk

drives directly infringe.  If they did not, then clearly there would be no patent exhaustion because

the patent would not even be implicated.

   To demonstrate, then, that any given Papst Drive Patent is exhausted by the sale

of any given motor, and assuming, due to the actions taken by Papst, that the motor in question

---

Agreement expressly warrants that Minebea's motors do not expressly infringe the Papst Drive
Patents.

contributes to or induces the infringement of a Papst Drive Patent, Minebea must demonstrate (a) that a hard disk drive cannot be constructed using the motor in question without infringing a Papst Drive Patent because the motor is the "essential feature" of the Papst Drive Patents and (b) that there is no other noninfringing use – outside of the realm of hard disk drives – to which the motor can reasonably be put.  A showing with respect to (b) clearly requires no claim construction.  Papst maintains that Minebea's motors can be used in products such as optical disk drives and fans which admittedly do not infringe the Papst Drive Patents.  There is no need to construe the claims of a Papst Drive Patent to establish that an entirely different product such as an optical disk drive, which Papst itself says "indisputably" does not infringe the Papst Drive Patents, constitutes a non-infringing use.

The Court has already ruled, in the context of its Daubert Opinion, that Mr. Dalziel will not be permitted to opine with respect to whether it is possible to design around the Papst Motor Patents or the Papst Drive Patents  – with the conclusion being that it is not possible to design a non-infringing hard disk drive using a Minebea motor – because such an analysis implicates a claim construction, and Minebea has reiterated many times that no claim construction is necessary in this case.  See June 21, 2005 Opinion at 21.  Minebea must therefore establish, through other evidence, that its motors embody an "essential feature" of the Papst Drive Patents.  The Court is not clear how Minebea intends to present its case, but in any event there clearly are genuine issues of material fact with respect to whether Minebea's motors have a non-infringing use, and resolution of this question must be left to the finder of fact.

*D.  "Under" the United States Patents*

Minebea's motion addresses, and Papst's motion focuses solely on, the legal question of whether sales outside the United States can ever exhaust Papst's United States patent rights and whether Minebea's motor sales to its customers took place outside of the United States.  See Defendant Papst Licensing's Memorandum in Support of its Motion for Summary Judgment on Count I on the Ground that Minebea's Sales of Motors Outside the United States Do Not Exhaust Papst's Patent Rights ("Papst Mot.") at 1.  Papst maintains that a pair of recent Federal Circuit decisions concretely establish that foreign sales cannot exhaust United States patent rights.  See id.[7]  Papst argues that Minebea "does not make or sell its motors inside the United States for use in commercial hard disk drive products."  Id. at 10.  Papst concludes that Minebea bears the burden of establishing, on an article-by-article basis, that its motors were sold in the United States, and that Minebea will be unable to satisfy that burden.  See id.

1.  Location of Sales

Minebea and Papst agree that Federal Circuit precedent requires that a sale must occur "under" a United States patent for the doctrine of patent exhaustion to apply.  See Minebea's Opposition to Papst's Motion for Summary Judgement on Patent Exhaustion ("Minebea Opp.") at 5.  "[W]hen a patented device has been lawfully sold in the United States, subsequent purchasers inherit the same immunity under the doctrine of patent exhaustion."  Jazz Photo Corporation v. ITC, 264 F.3d at 1105.  Indeed, the Federal Circuit has clearly stated that

---

[7]     Solely for purposes of its motion for summary judgment, Papst assumed that Minebea's motor sales were fully authorized and that they would have exhausted Papst's patent rights had they taken place in the United States.  See id. at 1.

22

"[t]o invoke the protection of the first sale doctrine, the authorized first sale must have occurred under the United States patent." Id.

Minebea then goes on to argue that there is no requirement that a sale must occur "in the United States" for the sale to be "under" the United States patent. Minebea Opp. at 5. This position is clearly contrary to the plain language of the Federal Circuit's decisions in Jazz Photo and Fuji Photo Film Co., Ltd v. Jazz Photo Corp., 394 F.3d 1368 (Fed. Cir. 2005). The court in 2001 stated that "our decision applies only to [disposable cameras] for which the United States patent right has been exhausted by first sale in the United States." 264 F.3d at 1105 (emphasis added). "Imported [disposable cameras] of solely foreign provenance are not immunized from infringement of United States patents by the nature of their refurbishment." Id. Four years later, in the same case, the Federal Circuit clarified:

> Read in full context, this court in Jazz stated that only [disposable cameras] sold within the United States under a United States patent qualify for the repair defense under the exhaustion doctrine. Moreover, Fuji's foreign sales can never occur under a United States patent because the United States patent system does not provide for extraterritorial effect.

Fuji Photo Film Co. Ltd v. Jazz Photo Corp., 394 F.3d at 1376 (emphasis added).

Minebea maintains that "the authorized sale of a component of a patented combination outside the United States, with knowledge and intent that it will be imported into the United States and used to form the complete infringing combination" is a component sold "under" the United States patent. See Minebea Opp. at 9. Minebea argues that the "single-use" cameras at issue in Jazz Photo were not sold "under" United States patents because no authority was required to make the foreign sales since there was no anticipation that the products would

later be sold in the United States.  See id.  Minebea maintains that since its sales were authorized and use of its motors in HDDs sold in the United States was fully anticipated, the exhaustion doctrine applies to its sales even if those sales are found to be foreign.

The Federal Circuit specifically stated, however, that "[t]he patentee's authorization of an international first sale does not affect exhaustion of that patentee's rights in the United States." Fuji Photo Film, Co. Ltd v. Jazz Photo Corp., 394 F.3d at 1376.  Specifically, the court held that it "does not construe the 'solely foreign provenance' language or the Boesch citation [in its 2001 opinion] to dictate a narrow application of the exhaustion principle." Id.[8]  The court explicitly found that the exhaustion principle was not limited to unauthorized sales.  See id.  This Court is not persuaded by Minebea's argument that previous decisions – such as the Southern District of New York's decision in Kabushiki Kaisha Hattori Seiko v. Refac Tech. Develop. Corp., 690 F. Supp. 1339 (S.D.N.Y. 1988), which held that sales are "under" the United States patent even if the first sale is overseas, so long as the products are intended for resale in the Unites States – survive the Federal Circuit's subsequent decisions.  Nor is Minebea helped by the many cases it cites which stand for the proposition that active inducement can be found in events outside the United States even though the patent laws of the United States do not have extraterritorial effect.  The question here is not whether actions abroad can be viewed as "inducing" infringement in the United States, but whether an authorized foreign sale can ever exhaust a United States patent.  Although the result may seem unfair, the language of the Federal Circuit in  Jazz Photo and Fuji Photo Film makes clear that authorized foreign sales do not exhaust a United States patent.  To establish exhaustion of the Papst Drive Patents, therefore, Minebea must establish that its sales were "in the United States."

---

[8]        Boesch v. Graff, 133 U.S. 697 (1890).

2.  Location of Minebea's Sales

Minebea states that "some of Minebea's sales at issue in this motion were F.O.B. the United States" but that "[m]ost were F.O.B. abroad."  Minebea Mot. at 32.  Minebea acknowledges that Mr. Dosho did state in his deposition that "Minebea manufactures its motors in Thailand, that particular customers have their HDD production facilities (and in some cases HDD development facilities) outside of the United States, and that Minebea's foreign sales offices were involved in sales of volume HDD motors to certain customers."  Id.  Minebea argues, however, that "the sale of many of Minebea's HDD motors for use in commercial HDDs arise from the design and procurement efforts in the United States of Minebea's United States subsidiary, NMB."  Minebea Opp. at 5.  Minebea maintains that these "extensive" United States activities are sufficient to defeat Papst's motion for summary judgment.  See id.  Minebea's motion for summary judgment contains an extended argument that its motors sales were "in the United States."  See Minebea's Motion for Summary Judgment on Patent Exhaustion ("Minebea Mot.") at 48-55.

Minebea submits the declaration of Junichi Taino, the manager of NMB Technologies Corporation, which is a United States subsidiary of Minebea, to support its claim that its sales are "in the United States."  He explains that NMB sales personnel are alerted to new HDD designs by the United States-based HDD manufacturers and that NMB works with the HDD manufacturer to design an appropriate HDD motor.  See Declaration of Junichi Taino ¶¶ 9-10.  Sample motors – which are presumably manufactured abroad – are delivered to the HDD manufacturer.  See id. ¶¶ 11-12.  NMB then obtains a sales contract for a pilot production – delivery location unspecified. See id. ¶ 14.  The declaration then explains that "NMB, in conjunction with other Minebea entities, negotiates with the HDD manufacturer the price of the HDD motors used in mass production."  See

25

id. ¶ 15.   There is no indication that most – or even some – of these sales negotiations are taking

place in the United States, that purchase orders are submitted to NMB, or what role NMB actually

plays.

        The declaration offers a number of examples of motor development and sales: the

Maxtor Altair, the Maxtor Meteor, the Hewlett Packard Wolverine III, the Maxtor Lightning, the

Maxtor Comet, the Maxtor Nebula, and the Quantum Empire.   See Taino Declaration ¶¶ 20-26.

The evaluation and qualification of sample motors appears to have taken place at the customers'

United States facilities with respect to all these samples.   Id.   The declarations submitted by Thomas

Nieto, Keith Berding and Donald Nieman – all of Western Digital – support Minebea's argument

that testing and qualification of the sample motors takes place in the United States.   See Declaration

of Thomas Nieto, Minebea Opp., Appendix C; Declaration of Keith Berding, Minebea Opp.,

Appendix D; and Declaration of Donald Nieman, Minebea Opp., Appendix E.   For the most part,

however, only the negotiations and sales contracts for the pilot productions appear to have taken

place in the United States.   See ¶¶ 20-26.   With respect to the negotiation of the mass production,

the Taino declaration states only that NMB, "in conjunction with other Minebea entities" negotiates

the price.   See, e.g., Taino Declaration ¶ 23(g).   It is entirely unclear where the negotiation takes

place and where purchase orders are submitted.   It is only with respect to the Comet motor that the

declaration indicates that NMB "received a purchase order."   Id. at 24(f).   With the exception of the

Wolverine motor, there is no indication that any portion of the delivery of any mass production was

to a location in the United States.   Id. ¶ 22(h).[9]   The declaration does explain that "[f]or all HDD

---

[9]     The declaration indicates that some mass-produced Wolverine motors were
shipped to Idaho.   Id. ¶ 22(h).

motors shipped to the United States, NMB invoices the sale and is paid by the HDD manufacturer in the United States," id. ¶ 19, but does not identify what proportion of the overall sales this is.  It appears from the information provided in the Taino declaration that these may be almost entirely samples – or perhaps pilot productions – for development purposes.   The second declaration of Junichi Taino, submitted in support of its opposition to Papst's motion for summary judgment, is similarly unilluminating.

Many of Minebea's descriptions of activities occurring in the United States center around limited quantities of sample motors rather than the mass produced motors which are presumably incorporated in the vast majority of the allegedly infringing hard disk drives at issue in this case.  The Court is not persuaded that simply working with HDD manufacturers in the United States to develop the motors in question qualifies later foreign sales as sales  "in the United States," and it will so instruct the jury.  The cases cited by Minebea do not lead to a contrary conclusion.  While The Ensign-Bickford Company v. ICI Explosives USA, Inc., 817 F. Supp. 1018, 1025-26 (D. Conn. 1993) does suggest that sales strategy meetings in the United States and receipt of payment in the United States may contribute to a finding of a sale "in the United States" even if the product is delivered F.O.B. abroad, Minebea neglects to mention that although the products in question in Ensign-Bickford were F.O.B. Canada, they were actually delivered to Kentucky. Likewise, in Semitool, Inc. v. Dynamic Microsystems Semiconductor Equipment GMBH, 2002 U.S. Dist. LEXIS 23050, *22 (N.D. Cal. Sept. 5, 2002), the court noted that the fact that the product was F.O.B. abroad was not determinative as to whether the sale was "in the United States" for patent-law purposes, but it appears once again that actual delivery took place in the United States.

See id.[10]   In this case, however,  it appears that, with respect to the majority of Minebea's motors, the motors are both F.O.B. abroad and delivered abroad.

The Court finds Minebea's argument that NMB receives a commission even if the motor is manufactured and delivered outside of the United States and the purchase order is received by another Minebea related company (presumably overseas) completely irrelevant.  See Declaration of Junichi Taino ¶ 16.  The Court also finds it irrelevant that Minebea "intended that its HDD motors be incorporated into HDD's and imported into the United States." Id. ¶ 18.  As the Court noted above, "[t]he patentee's authorization of an international first sale does not affect exhaustion of that patentee's rights in the United States." Fuji Photo Film, Co. Ltd v. Jazz Photo Corp., 394 F.3d at 1376.

Minebea has an uphill battle to establish that any of its motors were sold "in the United States," particularly in light of Papst's allegations that Minebea has foreign sales offices and the lack of concrete evidence demonstrating mass-production negotiations, sales or delivery in the United States.  The Taino declaration, however, contains barely enough information to satisfy the Court that a jury might find that not all of Minebea's sales were "solely of foreign provenance." Such questions, however, are far too fact-intensive to be resolved on a motion for summary judgment.  Minebea is correct that Papst has failed to establish on a motor-by-motor basis that all of Minebea's HDD motors were sold outside of the United States and summary judgment therefore is not appropriate.  The Court notes, however, that the burden is on Minebea at trial to prove which of its motor sales actually occurred in the United States.  The Court will not hesitate to grant a

---

[10]     The court acknowledged that it was unnecessary even to reach this argument since defendant's own admissions in its responses to interrogatories stated that its sales were "in the United States." Id.

motion by Papst under Rule 50 of the Federal Rules of Civil Procedure at the close of Minebea's

case should Minebea fail to establish that at least some of its sales were "in the United States."

For the foregoing reasons, both motions for summary judgment are denied.

SO ORDERED.


_____/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE: June 24, 2005