UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
MINEBEA CO., LTD., et al.,                          )
                                                    )
              Plaintiffs,                           )
                                                    )
       v.                                           )        Civil Action No. 97-0590 (PLF)
                                                    )
GEORG PAPST, et al.,                                )
                                                    )
              Defendants.                           )
_____)


OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

TABLE OF CONTENTS

**PART ONE:  BACKGROUND AND FACTUAL FINDINGS** . . . . . . . . . . . . . . . . . . . . . . . 1

I. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
   A.  The Joint Venture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   B.  Minebea's Claims Against Papst. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

II. THE TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   A.  Minebea's Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      1.  Minebea's Testifying Fact Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      2.  Minebea's Expert Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
   B.  Papst's Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
      1.  Papst's Testifying Fact Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15
      2.  Papst's Expert Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
   C.  Hague Convention Witnesses and Deposition Testimony. . . . . . . . . . . . . . . . . . 17

III. FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
   A.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
   B.  Creation of the Joint Venture, its Termination, the 1995 Settlement, and Beyond . . 23
      1.  The Inception of the Joint Venture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
      2.  The Agreements Founding the Joint Venture . . . . . . . . . . . . . . . . . . . . . . . 28
         a.  The General Business Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . 29
         b.  The Joint Venture Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30
         c.  The Agreement for the Sale of Intangible Assets . . . . . . . . . . . . . . . 32
      3.  Operation of the Joint Venture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
      4.  Termination of the Joint Venture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
      5.  Post-termination Communications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
      6.  The 1995 Settlement Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
      7.  Papst's Licensing Agreements With Minebea's Customers . . . . . . . . . . . . . 53
      8.  The Instant Litigation and Consolidated Cases . . . . . . . . . . . . . . . . . . . . . 54
   C.  The Written Contracts Define the Parties' Relationship . . . . . . . . . . . . . . . . . . . 55
      1.  Minebea's Rights During the Joint Venture . . . . . . . . . . . . . . . . . . . . . . . . 56
         a.  Minebea's rights under Paragraph 4(a) of the Intangible Assets
            Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
            i.  "Required and Necessary" under the Intangible
               Assets Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
            ii.  Corresponding international patents. . . . . . . . . . . . . . . . . . . . . . 62
         b.  Minebea's rights under Paragraph 4(d) of the Intangible
            Assets Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
      2.  Minebea's Rights After Termination of the Joint Venture . . . . . . . . . . . . . . 66
      3.  Minebea's Rights Under the 1995 Settlement Agreement . . . . . . . . . . . . . . 69
         a.  Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

b.  Scope of rights under the 1995 Settlement Agreement . . . . . . . . . . . 74
c.  Minebea's rights to Papst Drive Patents under the
1995 Settlement Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
d.  Minebea's rights to Papst Patents under the
1995 Settlement Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
e.  Minebea's rights to Future Patents under the
1995 Settlement Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
f.  Summary of Minebea's patent rights after Settlement . . . . . . . . . . . 89
D.  The Parties Always Understood the Distinction
Between Drive Patents and Motor Patents. . . . . . . . . . . . . . . . . . . . . . . . 92
E.  The Parties Always Understood that Papst Could Sue Minebea's
Customers Under the Drive Patents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

PART TWO:  CONCLUSIONS OF LAW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

I. SUBJECT MATTER JURISDICTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

II. COUNT I:  PATENT EXHAUSTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113
A.  The Law of Patent Exhaustion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114
B.  Sales "Under" United States Patents . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117
1. Must a Sale "Under" a U.S. Patent Occur in the United States? . . . . . . . . 118
2. Minebea's Sales in the United States  . . . . . . . . . . . . . . . . . . . . . . . . . 124
a.  The evidence adduced on summary judgment and at trial  . . . . . . . 124
b.  The specific motors claimed                                  131
i.   Hewlett Packard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131
ii.  Quantum. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134
iii. Conner Peripherals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137
iv.  Seagate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138
v.   Maxtor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139
vi.  Western Digital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140
vii. IBM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140
c.  Which motor sales occurred under United States patents? . . . . . . . 141
C.  Minebea's Authority to Sell Motors . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141
1. Patents Related to HP Wolverine III Motors  . . . . . . . . . . . . . . . . . . . . 144
a.  U.S. Patent No. 4,894,738 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144
b.  U.S. Patent No. 4,843,500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145
c.  U.S. Patent No. 5,173,814 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147
2. Patents Related to Quantum Empire Motors  . . . . . . . . . . . . . . . . . . . . 148
a.  Re 34,412  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148
b.  U.S. Patent No. 4,519,010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149
c.  U.S. Patent No. 4,535,373 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150
d.  U.S. Patent No. 5,006,943 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151
e.  U.S. Patent No. 4,658,312 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

D.  Unconditional Sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153
E.  Essential Feature/No Non-infringing Use  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159
    1.  Non-infringing Uses of Minebea Motors  . . . . . . . . . . . . . . . . . . . . . . . . . 161
        a.  There are no reasonable uses for Minebea motors that do not involve
            incorporation into hard disk drives. . . . . . . . . . . . . . . . . . . . . . . 162
        b.  Minebea's motors have no HDD-related uses that do not involve
            assembly into potentially infringing hard drives. . . . . . . . . . . . 165
    2.  Essential Features . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169
F.  Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

III. COUNT V:  CONVERSION AND UNJUST ENRICHMENT  . . . . . . . . . . . . . . . . . . . 176
A.  Factual Background  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177
B.  Papst's Defenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180
    1.  Statute of Limitations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180
        a.  When did Minebea's claims accrue? . . . . . . . . . . . . . . . . . . . . . . . 181
        b.  The law of inquiry notice  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184
        c.  Was Minebea on inquiry notice?  . . . . . . . . . . . . . . . . . . . . . . . . . 187
    2.  Releases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192
    3.  The Mannheim Court Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195
C.  The Merits of Minebea's Count V Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197
    1.  Conversion by Breach of Contract  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197
    2.  German Penal Code Claim  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200
    3.  Unjust Enrichment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204
    4.  Claim for an Accounting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

IV.  COUNT X:  LICENSE RIGHTS AND BREACH OF CONTRACT . . . . . . . . . . . . . . . 209
A.  Breach of the Duty of Good Faith and Fair Dealing  . . . . . . . . . . . . . . . . . . . . 209
    1.  Implied Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 212
        a.  Appendix III Patents  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 212
        b.  Non-Appendix III Patents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219
    2.  Subjective Bad Faith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 221
B.  Express Breach of Contract  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226

V.  COUNT XIII:  EQUITABLE ESTOPPEL, LEGAL ESTOPPEL
AND IMPLIED LICENSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227
A.  Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227
    1.  Addition of Legal Estoppel Claim to Count XIII  . . . . . . . . . . . . . . . . . . 228
    2.  Evolution of Minebea's Equitable Estoppel and Legal Estoppel Claims . . . 230
B.  Equitable Estoppel Claim  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233
    1.  Minebea's Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234
    2.  Papst's Defenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234
    3.  The Merits of Minebea's Equitable Estoppel Claims and its Failure to Prove
        Misleading Conduct and Reasonable Reliance  . . . . . . . . . . . . . . . . . . 237

iii

          a. Communications prior to the formation of the joint venture ...... 238

          b. General Business Agreement and Agreement for
             Sale of Intangible Assets ............................ 240

          c. December 10, 1990 Press Release .......................... 241

          d. May 1993 termination of the Joint Venture .................. 242

  C. Legal Estoppel Claim ..................................... 243

    1. The Parties' Arguments ........................................ 243

    2. Legal Estoppel ............................................. 244

VI. COUNT XIV:  PATENT MISUSE ......................................... 250

  A. Double Royalties ...................................................... 252

    1. <u>PSC, Inc. v. Symbol Technologies, Inc.</u> ........................... 252

    2. Papst Did Not Collect Double Royalties ........................... 255

  B. Package Licensing ................................................... 257

    1. Package Licensing is Not *per se* Unlawful ........................ 257

    2. Papst Did Not Condition Its Licenses .............................. 260

  C. Minebea Did Not Prove Anticompetitive Effects ...................... 262

    1. The Motor and Hard Disk Drive Product Markets .................... 264

    2. The Purported "Technology Market" ............................... 265

    3. Papst's Licensing Activities Had No Anticompetitive Effect ........... 269

**CONCLUSION** ..................................................... 270

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
MINEBEA CO., LTD., et al.,              )
                                        )
              Plaintiffs,               )
                                        )
        v.                              )        Civil Action No. 97-0590 (PLF)
                                        )
GEORG PAPST, et al.,                    )
                                        )
              Defendants.               )
_____)

OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

**PART ONE:  BACKGROUND AND FACTUAL FINDINGS**

I.  BACKGROUND

This is a complex patent case involving parties who have either been doing business together or litigating against each other for the last sixteen years.  The patent rights and technology at issue relate generally to computer hard disk drives ("HDDs") and hard disk drive motors.  In 1990, the parties entered into a joint venture to engage in the design, manufacture, and sale of improved hard disk drive motors, and thereby to compete effectively in the highly competitive market for such components.  The joint venture terminated in 1993.  In creating the joint venture, dissolving it, and attempting to resolve various conflicts that arose during and after the joint venture, the parties entered into numerous written agreements, the proper interpretation of which is central to this lawsuit.

*A.  The Joint Venture*

Plaintiff Minebea Co., Ltd. ("Minebea") is a Japanese concern that supplies hard disk drive spindle motors to hard disk drive manufacturers.[1]  These customers incorporate Minebea's spindle motors into hard disk drives which they sell to computer manufacturers, the final end product being computers.[2]

Hard disk drives store information on rigid magnetic storage disks inside computers.  According to the commands of the computer user, information is written to and retrieved from discrete locations on the storage disks by a read/write head that accesses information on the disk, while a spindle motor spins the disk in a precise fashion to move the relevant storage locations into position near the read/write head.

The patents and patent rights at issue in this case belong to defendant Papst Licensing GmbH ("Papst Licensing"), a German company holding a substantial portfolio of patents relating to hard disk drives and hard disk drive spindle motors.  In general, the patents in Papst Licensing's portfolio were developed by Papst Motoren GmbH & Co. ("Papst Motoren") and were assigned to Papst Licensing in 1993.  Papst Motoren is not a party to this litigation.

---

[1]     Precision Motors Deutsche Minebea, GmbH ("PMDM") and Nippon Miniature Bearing Corporation are also plaintiffs.  PMDM is the entity that was formerly the Papst/Minebea joint venture. NMB Corporation (now NMB Technologies Corporation) ("NMB") is a United States subsidiary of Minebea that focuses on the sales and marketing of Minebea's products in the United States.  According to Mr. Bergsma's testimony, NMB USA Incorporated ("NMB USA") is a United States holding company owned by NMB Technologies Corporation.  See 7/8/05 (p.m.) Trial Tr. at 13:24-14:23, 15:20-16:4 (Bergsma testim.).  Mr. Bergsma also testified that in recent years Minebea has been consolidating and/or closing its major United States subsidiaries.  Id. at 14:12-19.

[2]     Minebea also manufactures a number of other kinds of electronic components, including miniature bearings, fan motors, and lighting devices for liquid-crystal displays – none of which are at issue in this litigation.

Minebea and Papst Motoren combined forces in 1990 to form a joint venture, Papst Minebea Deutsche Motoren ("PMDM" or "Joint Venture"), for the design, manufacture and sale of HDD motors.  Mr. Georg Papst, whose father had founded Papst Motoren in 1952, was appointed the Managing Director of the Joint Venture.  Papst Motoren granted licenses to Minebea and, through Minebea, to the Joint Venture, to those Papst patents "required and necessary" for the Joint Venture's and (later) Minebea's participation in the HDD motor business.  The Joint Venture sold its motors to hard disk drive manufacturers who incorporated those motors into finished hard disk drives.

In 1992, Papst Motoren was sold to a company not involved in this litigation, Electrobau Mulfingen GmbH & Co. ("EBM").  On January 1, 1993, Georg Papst founded Papst Licensing, which purchased Papst Motoren's entire portfolio of patents in May 1993.  Papst Licensing does not manufacture motors, but owns and licenses patents concerning small electric motors and devices in which electric motors are used.  In May of 1993, the joint operation of the Joint Venture was terminated and Papst Motoren sold its share of the Joint Venture to Minebea. 7/28/05 (p.m.) Trial Tr. at 25:22-27:4 (G. Papst testim.).[3]  On June 19, 1995, Georg Papst, Papst

---

[3]     Typically, throughout this Opinion, trial testimony will be cited to indicate the date of the proceeding, whether the citation is to the morning or afternoon session, the page(s) and lines of the transcript, and the name of the witness.  For example:  "7/28/05 (p.m.) Trial Tr. at 13:24-14-12 (G. Papst testim.)."  Depositions will be cited to indicate the date of the deposition, the name of the witness and the page and line numbers.  For example:  "3/15/05 H.D. Papst Dep. Tr. at 21:10-19."  Exhibits generally are cited in the following way:  "PTX 195, Agreement for the Sale of Intangible Assets (Nov. 5, 1990) ¶ 4a."

The reports of experts generally are cited in the following manner:  "Adelman Expert Report (Apr. 4, 2005) ¶ 2," or "Expert Report of Andreas Junius (June 20, 2005) at 12," or "Junius Rebuttal Report at 12."  The written testimony of experts is cited in the following manner:  "Written Direct Testimony of Warren L. Dalziel (July 10, 2005) (Docket No. 1300) ¶ 6," or "Dalziel Direct Testimony ¶ 6."

Licensing and Minebea entered into a Settlement Agreement to resolve disputes between them arising from the Joint Venture and its termination.  See PTX 771, Settlement Agreement (June 19, 1995) ("1995 Settlement Agreement").

One of the central questions in this litigation is what rights in Papst's patents Minebea acquired for itself and, importantly, for its customers during the Joint Venture, and what rights it had when the Joint Venture was terminated in 1993, and after the parties entered into the Settlement Agreement in 1995.

### B.  Minebea's Claims Against Papst

In 1997, plaintiffs Minebea Co., Ltd., Precision Motors Deutsche Minebea, GmbH, and Nippon Miniature Bearing Corporation (collectively "Minebea") filed their complaint against Georg Papst, Papst Licensing GmbH, and Papst Licensing Verwaltungsgesellschaft Mit Beschrankter Haftung (collectively "the Papst defendants") in this Court.  On October 12, 1999, the case was consolidated with other similar actions and transferred by the Multidistrict Litigation Panel ("MDL") to Judge Morey Sear of the United States District Court for the Eastern District of Louisiana.  See In re Papst Licensing, GmbH, Patent Litigation, MDL No. 99-1298 (E.D. La. 1999); Minebea Co. Ltd. v. Georg Papst, Civil No. 99-3118 (E.D. La. 1999).[4]

Minebea's Second Amended and Supplemental Complaint ("Second Amended Complaint"), filed on February 22, 2000, in the Eastern District of Louisiana, included sixteen counts:  (I) Declaratory Judgment of Exhaustion of Patent Rights; (II) Fraudulent Concealment;

---

[4]        The case has since been reassigned to Judge Carl J. Barbier of that court.

(III) Negligent Misrepresentation; (IV) Breach of Fiduciary Duty; (V) Conversion, Unjust

Enrichment and for an Accounting; (VI) Contract Reformation; (VII) Violation of Section 43(A)

of the Lanham Act; (X) Declaratory Judgment of License Rights; (XI) Declaratory Judgment of

Invalidity and Non-Infringement of the '010 Patent, '665 Patent, '373 Patent, and '406 Patent;

(XII) Declaratory Judgment of Invalidity and Non Infringement; (XIII) Declaratory Judgment of

Equitable Estoppel; (XIV) Declaratory Judgment of Patent Misuse; (XV) Sherman Act, Section 2

(15 U.S.C. § 2); (XVI) Sherman Act, Section 2 (15 U.S.C. § 2); (XVII) Sherman Act, Section 1

(15 U.S.C. § 1); and (XVIII) Inequitable Conduct.[5]

      Nine of the sixteen counts in the MDL litigation were remanded to this Court on

April 19, 2002.  See In re Papst Licensing, GmbH, Patent Litigation, MDL No. 99-1298,

Separation of Claims and Remand Order (E.D. La. Apr. 19, 2002).  The remanded Counts were:

(I) Declaratory Judgment of Exhaustion of Patent Rights; (II) Fraudulent Concealment;

(III) Negligent Misrepresentation; (IV) Breach of Fiduciary Duty; (V) Conversion, Unjust

Enrichment and for an Accounting; (VI) Contract Reformation; (X) Declaratory Judgment of

License Rights; (XIII) Declaratory Judgment of Equitable Estoppel; and (XIV) Declaratory

Judgment of Patent Misuse.  The remaining counts, still pending in the United States District

Court for the Eastern District of Louisiana, have been stayed pending this Court's resolution of

the claims before it.

      After extensive and intensive discovery in the United States and abroad, managed

for the Court by Special Master David Plant, and many disputes that had to be resolved by the

---

[5]    The misnumbering of counts in the Second Amended Complaint suggests that there are eighteen causes of action, when in fact there are only sixteen.  For convenience and clarity, the original number of each count has been retained.

Special Master or by the Court, the remanded counts were all scheduled for trial during the summer of 2005.  On June 27, 2005, nearly the eve of trial and shortly after this Court issued its Opinion on patent exhaustion on June 24, 2005, see Minebea Co. v. Papst, 374 F. Supp. 2d 202 (D.D.C. 2005), denying the parties' cross-motions for summary judgment on the Patent Exhaustion claim (Count I), Minebea withdrew with prejudice its claims for Fraudulent Concealment (Count II), Negligent Misrepresentation (Count III), Breach of Fiduciary Duty (Count IV), and Contract Reformation (Count VI).  Finally, after a lengthy jury selection process and the actual selection of a jury, Papst withdrew its jury demand on June 28, 2005.  The trial thus proceeded as a bench trial, which began on July 5, 2005.

        The central question raised by several of Minebea's claims (there are others) is whether Papst, which holds patents on hard disk drives in addition to hard disk drive motors, may enforce those "drive patents," not against Minebea but against companies that purchase spindle motors from Minebea and integrate those motors into hard disk drives that infringe Papst's patents.  Minebea claims in Count I that under the terms of the Joint Venture agreement and all subsequent agreements (including the 1995 Settlement Agreement), Minebea was fully authorized by Papst to design, manufacture and sell HDD motors under all Papst patents (including the so-called drive patents) without restriction and that Minebea's authorized and unrestricted sale of HDD motors occurs under the Papst U.S. patents.[6]  Accordingly, Minebea contends, the Papst U.S. patents are exhausted, and Papst is precluded from enforcing its patents

_____

        [6]        Of great significance in this litigation is the distinction between "motor patents," which (as the term suggests) pertain to HDD motors, and "drive patents," which are "combination patents" describing HDD motors as incorporated into a full or partial hard disk drive assembly.  The Court discusses this distinction in detail, infra at 92-99.

against (and from obtaining or attempting to obtain a second royalty from) Minebea customers who purchase fully authorized HDD motors from Minebea and incorporate them into hard disk drives.

Minebea contends in Count V that pursuant to the terms of the 1990 Agreement for the Sale of Intangible Assets, any patents applied for during the period of the Joint Venture that related to HDD motors were to be owned by the Joint Venture, and that Georg Papst as Managing Director of the Joint Venture had a duty to ensure that all such patents were properly assigned to the Joint Venture.  Minebea argues that Papst failed to comply with this contractual obligation and converted to its own use valuable patent rights that properly belonged to the Joint Venture.  Accordingly, Minebea maintains, Papst's registration in its own name of U.S. Patents relating to HDD motors, based on inventions arising during the Joint Venture and corresponding to German patents registered (improperly, Minebea argues) to Papst, gives rise to various claims under German law, which Minebea characterizes as "the German equivalent to conversion and unjust enrichment."  Minebea's Summary of its Conversion Claims (Count V) (July 1, 2005) (Docket No. 1204) at 2.

In Count X, Minebea claims that by suing and threatening to sue Minebea's customers for their use of Minebea-supplied HDD motors in hard disk drives, Papst breached the 1995 Settlement Agreement between the parties and the covenant of good faith and fair dealing that is implied thereunder.

Minebea contends in Count XIII of its Second Amended Complaint that Papst's actions misled Minebea and its customers to believe that Papst would not enforce its so-called drive patents against Minebea's customers for their use of Minebea-supplied HDD motors in hard

disk drives.  See 2d Am. Compl. ¶ 217.  Minebea claims that because it and its customers

detrimentally relied on Papst's misleading actions, Papst should be equitably estopped from

enforcing its drive patent rights against Minebea's customers.  See id. ¶¶ 218-20.  Alternatively,

Minebea claims under Count XIII that Papst is legally estopped from enforcing its drive patents

against Minebea's customers for their use of Minebea-supplied HDD motors in hard disk drives.

Minebea argues that because Papst, in the 1995 Settlement Agreement, licensed or assigned

Minebea the right to sell HDD motors for use in hard disk drives, and because Papst received

consideration for that right, it cannot now take steps to derogate from the right it has granted.

See Minebea Br. at 18-21; Minebea's Prop. Concl. of Law ¶¶ 5.1, 5.6.[7]  Under Minebea's theory

of legal estoppel, Papst has granted Minebea's customers an implied sublicense which bars Papst

from suing them for infringement of the drive patents.  See Minebea Br. at 21; Minebea's Prop.

Concl. of Law ¶ 5.6.

---

[7]     Minebea's post-trial filings are cited as follows throughout this Opinion:
(1) Minebea's Proposed Conclusions of Law (August 23, 2005) (Docket No. 1611) ("Minebea's
Prop. Concl. of Law"); (2) Minebea's Corrected Post-Trial Brief (August 25, 2005) (Docket No.
1616) ("Minebea Br."); (3) Minebea's Corrected Proposed Findings of Fact (August 25, 2005)
(Docket No. 1617) ("Minebea's PFF"); (4) Minebea's Opposition to Papst's Post-Trial Brief
(September 1, 2005) (Docket No. 1634) ("Minebea Opp."); (5) Minebea's Response to Papst's
Proposed Findings of Fact (September 1, 2005) ("Minebea's Resp. to Papst's PFF"); and
(6) Minebea's Corrected Response to Papst's Proposed Conclusions of Law (September 2, 2005)
(Docket No. 1637) ("Minebea's Resp. to Papst's Prop. Concl. of Law").

        Papst's post-trial filings are cited as follows throughout this Opinion:  (1) Papst's
Proposed Findings of Fact and Conclusions of Law (August 23, 2005) (Docket No. 1607)
("Papst's PFF" or "Papst's Prop. Concl. of Law," as appropriate); (2) Papst's Post Trial Brief
(August 23, 2005) (Docket No. 1608) (Papst Post-Trial Brief" or "Papst Br."); (3) Papst's
Response to Minebea's Post Trial Brief (September 1, 2005) (Docket No. 1622) ("Papst Opp.");
(4) Papst's Response to Minebea's Conclusion of Law (September 1, 2005) (Docket No. 1623)
("Papst's Resp. to Minebea's Prop. Concl. of Law"); and (5) Papst's Objections to Minebea's
Proposed Findings of Fact (September 1, 2006) (Docket No. 1628) ("Papst's Obj. to Minebea's
PFF").

Finally, Minebea claims in Count XIV, its patent misuse claim, that under the 1995 Settlement Agreement and prior agreements, Minebea paid Papst a first royalty in order to design, manufacture and sell without restriction HDD motors under all Papst patents (including the drive patents).  Minebea's customers also paid Papst a royalty under Papst's drive patents in order to use Minebea-supplied HDD motors in hard disk drives.  Minebea claims that by collecting, or attempting to collect, a second royalty from Minebea's customers for their use of Minebea-supplied HDD motors in hard disk drives, Papst misued its drive patents, rendering them unenforceable.  It also claims that Papst misued its patents by engaging in illegal, anticompetitive package licensing.

## II.  THE TRIAL

At trial, which began on July 5, 2005 and ended on August 5, 2005, each side was allotted 60 in-court hours to present its case, and the Court sat five days a week from 9:00 a.m. until (usually) 5:30 p.m.  Eighteen witnesses were called to present live testimony during the trial.  Of these 18 live witnesses, seven were expert witnesses.  Each expert witness's direct testimony was submitted in writing in advance, either through written expert statements and rebuttal reports and/or through written testimony.  The testimony of more than 20 witnesses was presented through deposition testimony, including some Hague Convention examination transcripts.[8]  Only five of these witnesses also testified in person at trial.  In total, the Court considered the testimony (including trial and/or deposition testimony) of some three dozen

---

[8]        The Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, signed at the Hague on March 18, 1970, provides for the taking of evidence abroad, without recourse to consular or diplomatic channels, by means of "letters of request."  See 28 U.S.C. § 1871.

9

witnesses, ten of whom were experts.[9]  In addition to the testimony of the witnesses, the Court

considered hundreds of exhibits, mostly patents, agreements, letters, memoranda and other

correspondence.  Minebea also offered in evidence 12 physical exhibits, and Papst offered 10

physical exhibits.

*A.  Minebea's Witnesses*

1.  Minebea's Testifying Fact Witnesses

Rex Bergsma was an employee of NMB USA, a United States subsidiary of

Minebea, from roughly April of 1991 through July of 2003.  7/8/05 (p.m.) Trial Tr. at 23-24,

15:2-3, 15:15-16 (Bergsma testim.).  He was a sales engineer for ball bearings and ball bearing

value added products when he was hired, then was promoted to division manager for NMB's

spindle motor business.  Id. at 16:16-20.  In the Fall of 1994, Mr. Bergsma was promoted to

product manager, overseeing all of NMB's motor business in the United States.  Id. at 16:21-22.

Two years later, in Fall of 1996, he became director, overseeing all of NMB's products and a

group of managers running those business units.  Id. at 16:23-25.  He became director of business

development in 1999 or 2000.  Id. at 17:1-5.  Mr. Bergsma testified about the role of NMB in

selling and facilitating the sale of HDD spindle motors in the United States.

Koichi Dosho began working for Minebea in 1973.  He was employed by PMDM

from 1990 to 1995.  See 3/2/04 Dosho Dep. Tr. at 95:13-15; 7/7/05 (p.m.) Trial Tr. at 66:24-68:4

(Dosho testim.).  Mr. Dosho is the managing director in charge of worldwide sales for Minebea

---

[9]        Some witnesses were relied upon or called by both sides.

and is a member of the board of directors of Minebea.  He testified about worldwide sales for Minebea's HDD motors.

Kenji Fukunaga is an engineer who has worked for Minebea for 29 years.  7/14/05 (p.m.) Trial Tr. at 7:22 (Fukunaga testim.).  From 1991 until 1996 or 1997, he was a manager for spindle motor production for Minebea in Thailand.  Id. at 8:19-25.  From 1996 or 1997 until 2005, he was General Manager of Minebea's spindle motor department, and was responsible for manufacturing and production, including the technological aspects.  Id. at 8:15-18.  In July 2005, he became the Deputy Division Manager of the DC brush motor department.  Id. at 8:1-6.

Douglas Hymas was associate general counsel of Minebea from the Fall of 1993 through June of 1995.  8/1/05 (p.m.) Trial Tr. at 24:22-25:5 (Hymas testim.).  During the time Mr. Hymas held this position at Minebea, he reported to Minebea's General Counsel, Takuya Naka.  Id. at 25:10-17.  Mr. Hymas is an attorney licensed to practice law in California.  Id. at 24:3-6.  He prepared the initial draft of the 1995 Settlement Agreement and was responsible for the negotiation and drafting of the Agreement on behalf of the Minebea side.  Id. at 25:18-22, 32:25-33:6.

Yoshihisa Kainuma is an employee and member of the board of directors of Minebea, currently holding the title of Senior Managing Executive Officer.  7/8/05 (a.m.) Trial Tr. at 48:21-49:6 (Kainuma testim.).  He started working full-time for Minebea around 1989, briefly in the legal department before joining management.  Id. at 53:19-23.  Mr. Kainuma holds a law degree from Keio University in Tokyo and an L.L.M. from Harvard Law School.  He is licensed to practice law in Japan and New York.  Id. at 53:10-18.  Mr. Kainuma negotiated agreements in connection with the Joint Venture between Minebea and Papst in 1990.

11

Oswald Kuwert retired from PMDM on April 30, 2005.  He had been employed there for 14 years.  See 7/5/05 (p.m.) Trial Tr. at 15:11-14 (Kuwert testim.).  Mr. Kuwert succeeded Georg Papst as Managing Director of PMDM, and held that position for almost 12 years before his retirement.  See id. at 15:18-24.

Ryusuke Mizukami, probably the key fact witness for Minebea with respect to the Joint Venture, is currently a director and Senior Managing Director of Minebea.  He has worked for Minebea for 38 years.  For the past 23 years he has been the Senior Managing Executive Officer in charge of corporate planning and production.  He is one of the seven inside directors of Minebea.  7/6/05 (a.m.) Trial Tr. at 54:18-55:16 (Mizukami testim.).  He was involved in the formation of the joint venture between Minebea and Papst, Minebea's purchase of Papst Motoren's interest in the joint venture, and the 1995 Settlement Agreement.

Junichi Taino began working for Minebea in 1985, handling sales of ball bearings, cooling fan motors, step motors, and other components.  7/11/05 (a.m.) Trial Tr. at 41:3-10 (Taino testim.).  He transferred to Minebea-Thailand in 1987 to become Sales Coordinator, where his duties included organizing visits to factories for overseas customers.  Id. at 41:19-24. In 1989, he became Sales Coordinator for Minebea-Singapore.  Id. at 42:3-16.  In 1990, he began working as Sales Coordinator for NMB Technologies in the United States.  Id. at 42:20-43:23. His duties for NMB included supporting sales activities between customers in the United States and sales people in regard to cooling fan motors and keyboards.  Id. at 43:20-23.  In 1994, he became responsible for HDD spindle motors.  Id. at 44:1-8.  In 1997 he became Assistant Product Manager at NMB, where his duties included supporting HDD sales activities and coordinating between sales members and the HDD customers and overseas operations.  Id.

at 44:14-23.  In 2002, he became Manager of the Storage Components Division.  Mr. Taino

testified for several days about the role of NMB in selling and facilitating the sale of HDD

spindle motors and about certain specific Minebea motor projects.

In addition to these witnesses, Minebea called Jerold Schnayer and Richard Smith

as adverse witnesses.

### 2.  Minebea's Expert Witnesses

Martin J. Adelman is Minebea's patent law expert.  Professor Adelman teaches at

the George Washington University Law School.  Adelman Expert Report (Apr. 4, 2005) ¶ 2.  He

previously taught patent law for 24 years at Wayne State University Law School.  Id.  Before

that, Professor Adelman practiced patent law for many years and was a partner at Barnard,

McGlynn & Reising in Michigan.  Id.  Professor Adelman is the sole author of a continuously

updated, eight-volume treatise on patent law.  Id. ¶ 3.

Dr. Christopher Ann is a German lawyer who holds a German doctorate degree in

law and an LL.M. from Duke University School of Law.  Dr. Ann is a tenured law professor at

Munich Technical University.  He provided an expert opinion on German law issues, primarily

relevant to Minebea's conversion and unjust enrichment claim.

Warren L. Dalziel is Minebea's technical expert on hard disk drives.  Mr. Dalziel

has a master's degree in Mechanical Engineering and 42 years of experience as an electro-

mechanical design engineer, including 18 years in the computer peripheral industry and 24 years

as an independent contractor-consultant.  Written Direct Testimony of Warren L. Dalziel

(July 10, 2005) (Docket No. 1300) ¶ 2.  He has worked on designing major mechanical and

13

electromechanical components of disk drives including hubs, spindles, disk clamping components, read/write head arms and actuators, base-castings, top covers, seals and filters.  Id.

Thomas E. Gardner is one of Minebea's damages experts.  He is an expert in the hard disk drive industry, including engineering, marketing and operations.  Gardner Expert Report (Apr. 4, 2005) ¶ 1.  Mr. Gardner is a principal at Regent Pacific Management Corporation in California.  Id. at Exhibit 1.  He holds master's degrees in Management and Engineering Science and a Bachelors degree in Electronics Engineering.  Id.  He has extensive experience with the technical and business aspects of the computer industry.  Id.

Jerry A. Hausman is Minebea's economics/damages expert.  He is a professor of economics at the Massachusetts Institute of Technology.  Written Direct Testimony of Jerry A. Hausman (July 6, 2005) (Docket No. 1269) ¶ 1.  He received a Ph.D. in economics from Oxford University.  Id.  His academic specialties include econometrics, the application of statistical methods to economic data, and applied microeconomics, the study of behavior by firms and by consumers.  Id.  Professor Hausman has published over 130 academic research papers in leading economic journals.  Id. at ¶ 2.

James E. Malackowski is one of Minebea's damages experts.  He is President and CEO of ICMB Ocean Tomo, an Intellectual Capital Bank providing expert services, among other things.  Malackowski Expert Report (Apr. 4, 2005) at 4.  Prior to forming Ocean Tomo, he spent two years at a private equity firm and 15 years as a management consultant and forensic accountant focused on intangible assets.  Id.  Mr. Malackowski holds a Bachelors degree in Accountancy and is a Certified Public Accountant in Illinois.  Id.  He has written many articles and given numerous presentations related to his profession.  Id.

14

*B. Papst's Witnesses*

1. Papst's Testifying Fact Witnesses

Georg Papst is the President of Papst Licensing and a named defendant in this case.  See 7/29/05 (p.m.) Trial Tr. at 33:11-13 (G. Papst testim.).  He is one of the sons of Herman Papst, the founder of Papst Motoren.  See 7/27/05 (p.m.) Trial Tr. at 6:6-24 (G. Papst testim.).  Georg Papst began his employment with Papst Motoren in 1958, and became Papst Motoren's technical manager in 1965.  See id. at 7:7-24.  He was the Managing Director of PMDM, the Joint Venture between Minebea and Papst, until August 5, 1993, three months after the May 1993 termination of the Joint Venture.  See 5/8/03 G. Papst Dep. Tr. at 383:12-15, 385:19-386:9.  Mr. Papst testified about the events and agreements relevant to the Joint Venture, its termination in 1993, the formation of Papst Licensing, and the negotiation and execution of the 1995 Settlement Agreement with Minebea.

Richard H. Smith, a partner at Finnegan, Henderson, Farabow, Garrett & Dunner, is a patent attorney who started representing Papst Motoren around 1989.  See 7/28/05 (a.m.) Trial Tr. at 75:23-76:76 (Smith testim.).  Mr. Smith has been involved in representing Papst Licensing since its creation in 1993.  See id. at 76:5-7.

Jerold B. Schnayer, a partner in the law firm of Welsh & Katz, is a patent attorney who represented Papst Motoren beginning in the early 1990s.  See 7/21/05 (p.m.) Trial Tr. at 6:13-7:8 (Schnayer testim.).  At first, he represented Papst Motoren only in the negotiation of certain contracts and with respect to patent prosecution issues.  See id. at 7:7-11.  He was not involved in negotiating the Joint Venture Agreement on behalf of Papst.  See id. at 72:9-13.  He was involved in advising with respect to the overall business relationship between Papst and

15

Minebea beginning in late 1993, and in the disputes that developed between them.  He has been closely involved in the present litigation by representing Papst at depositions and many appearances in Court.  See 7/21/05 (p.m.) Trial Tr. at 15:16-20:1 (Schnayer testim.).

### 2.  Papst's Expert Witnesses

Bruce G. Dubinsky is Papst's damages expert.  Mr. Dubinsky is a principal at the public accounting firm of Klausner, Dubinsky & Associates.  8/4/05 (a.m.) Trial Tr. at 43:13-14 (Dubinsky testim.).  He holds a bachelor's degree in accounting and a master's degree in taxation.  Id. at 43:17-25.  Mr. Dubinsky has over 22 years of practical experience in forensic accounting and fraud examinations, commercial damage analyses, income tax and accounting matters, business valuations and investment matters.  Dubinsky Rebuttal Report (Apr. 25, 2005) at 33.

George H. Gerstman is Papst's patent law expert.  He is a partner at the law firm of Seyfarth Shaw LLP in Chicago.  Gerstman Expert Report (Mar. 16, 2005) ¶ 1.  Mr. Gerstman is a former United States Patent Examiner and has over 40 years of experience as an attorney in the field of patent law.  Id. ¶ 2.

Andreas Junius is Papst's German law expert.  Dr. Junius has an LL.M. from Columbia University School of Law and a doctor of jurisprudence (J.S.D.) equivalent from a German university.  He is admitted to practice law in both New York and Germany and is currently an attorney with Clifford Chance in New York.  His opinions were considered by the Court primarily in connection with Count V, conversion and unjust enrichment.

Chera M. Sayers is Papst's economics expert.  Dr. Sayers holds a doctoral degree in economics and works for the firm of Klausner Dubinsky & Associates.  8/3/05 (p.m.) Trial Tr.

16

at 33:10-18 (Sayers testim.).  She testified about the relative market positions of Minebea and

Nippon Densan ("Nidec"), the market leader in the HDD spindle motor market.  See id.

at 35:19-39:11.

### C.  Hague Convention Witnesses and Deposition Testimony[10]

Takao Anzai began working at Minebea in 1977 and is currently employed there.

5/13/05 Anzai De Bene Esse Dep. Tr. at 9:4-7, 9:23-10:1; 5/16/05 Anzai De Bene Esse Dep. Tr.

at 83:20-22.  He worked as an engineer, engineering HDD spindle motors from 1980 through

1995.  He was stationed at PMDM beginning in December of 1990, where his title was Senior

Project Manager.  5/13/05 Anzai De Bene Esse Dep. Tr. at 10:12-14, 11:13-15, 14:7-15:2, 15:25-

16:3.  At his deposition, Mr. Anzai discussed the formation of the joint venture and

conversations he had with Georg Papst and Georg Papst's brother (and Papst executive) Hans

Dieter Papst, although his recollection of specific events and conversations was vague and

limited.

Heinrich Cap worked for Papst Motoren until leaving the company on December

31, 1990.  2/23/05 Cap Hague Tr. at 1.  He was department head of the cassette drive department

and then head of the motor construction department, which he led for four years.  Id.  He

invented one or more of the inventions underlying a number of the patents at issue.

Dieter Elsasser is a precision engineer and was team leader of the design division

of Papst Motoren.  2/15/05 Elsasser Hague Tr. at 1.  Mr. Elsasser was employed by Papst

---

[10]     Most of the deposition testimony was offered by Minebea, although Papst also
relied on some of this testimony in its case or supplemented the portions of the depositions
proffered by Minebea to put the testimony in context or to provide additional information.

Motoren until September 30, 1990, and began working for EBM Papst in 1999.  Id.  He invented one or more of the inventions underlying a number of the patents at issue here.

Michael Hermann worked in the patent department of Papst Motoren from mid-1989 until March 31, 1993, doing general patent-related administrative work including preparing patent applications, cooperating with outside patent attorneys, testing outside products for patent infringement and patent research.  2/14/05 Hermann Hague Tr. at 2-3.  He occasionally advises Papst Licensing on patent issues, especially with regard to patent matters pending before German courts.  Id. at 3.  He invented one or more of the inventions underlying a number of the patents at issue here.

Tobias Kessler began working for Papst Licensing in September or October of 1998.  4/10/03 Kessler Dep. Tr. at 37:6-9.  He is in-house general counsel for Papst Licensing. Id. at 22:2-3.  He also is Georg Papst's personal lawyer.

Ulrich Koletzki is a certified engineer specializing in mechanical engineering. 12/16/04 Koletzki Hague Tr. at 1.  He was President of Sales and Marketing for the joint venture. Prior to working for PMDM, he worked for Papst Motoren as technical support for fans.  Id.  He has been working in HDD motors since the early 1980s when at Papst Motoren.  Id.  He invented one or more of the inventions underlying a number of the patents at issue.

Klaus Lenz has a master's degree in engineering.  2/11/05 Lenz Hague Tr. at 2. He worked in the Papst Motoren patent department for Hans Dieter Papst.  Id. at 3.  His work focused on research of foreign patents, evaluation of foreign patents, the preparation of patent rights, and the maintenance of patents.  Id.

Dr. Rolf Müller was an engineer working at Papst Motoren until he left in 1987. 4/27/05 Müller Hague Tr. at 2-3.  Thereafter, he continued to do some freelance work for Papst Motoren and then for Papst Licensing.  Id.  He invented one or more of the inventions underlying a number of the patents at issue.

Takuya Naka is Minebea's General Counsel.  He began working for Minebea in late 1990.  7/6/05 (p.m.) Trial Tr. at 21:7-10 (Mizukami testim.).  He holds a Master's of law degree from Columbia University School of Law and is licensed to practice law in both California and New York.  4/22/03 Naka Dep. Tr. at 6:4-24.  He was involved in the purchase of Papst's interest in the joint venture in 1993.

Hans Dieter Papst is Georg Papst's brother.  He was head of the Papst Motoren patent department from 1968 through the end of 1992.  3/15/05 H.D. Papst Dep. Tr. at 21:10-19. He worked full-time as head of the patent department for Papst Licensing from the time the company was created in 1993 until 1995 or 1996.  Id. at 14:24-15:11.

Manfred Reuter works for Papst Licensing.  2/2/05 Reuter Dep. Tr. at 10:20-22. His job responsibilities involve disassembling hard disk drives and PC peripherals, to look for certain characteristics, including possibly infringing characteristics.  Id. at 41:4, 8-9, 14-17; 42:1-4.

Jeffrey Salmon is a patent attorney and a partner at Welsh & Katz, where he has been since 1995.  2/18/05 Salmon Dep Tr. at 7:19-8:5.  Mr. Salmon's representation of Papst Licensing has included: patent prosecution, assisting in licensing efforts and involvement in litigation.  Id. at 9:16-22.  He has prosecuted applications for Papst Licensing that concern various aspects and applications of brushless DC motor technology.  Id. at 12:1-4.

19

Dr. Gerhard Schätzle was one of the three directors of Papst Motoren in 1990. 2/21/05 Schätzle Hague Tr. at 3.  He was responsible for controlling, human resources, purchasing, and information technology.  Id.  At that time, the other two directors were two of the Papst brothers, Georg, responsible for product development and motor sales, and Gunter, responsible for the sale of ventilators and for public relations.  Id.  Dr. Schätzle worked there at the time of the sale of Papst Motoren and for a period of time thereafter.

Bernhard Schuh is a graduate engineer whose last position at Papst Motoren was as section head of DC Systems.  4/19/05 Schuh Hague Tr. at 4.  He began in the Papst Motoren sales department in 1972 as a sales engineer and he advanced to team leader for the sale of motors within the United States and Europe.  Id.  He worked on various ideas while at Papst Motoren, including having an operating system without belts and sealing relating to the hard disk drive and motor.  Id. at 5.  He invented one or more of the inventions underlying a number of the patents at issue.

Johann Von der Heide is a professional engineer who worked for Papst Motoren from 1971 through 1991.  4/25/05 Von der Heide Hague Tr. at 3-4.  He was director of motor development, which included motors for hard disk drives.  Id. at 4.  He worked only on technical issues.  Id.  Papst Motoren filed patent applications on the improvements he made to motors for hard disk drives.  Id.  He began working for the joint venture, PMDM, on January 1, 1992.  Id. at 8.  He invented one or more of the inventions underlying a number of the patents at issue.

20

### III.  FINDINGS OF FACT

*A.  Introduction*

Despite the dozens of witnesses who were deposed in this case, many of whose deposition excerpts were introduced at trial, the lay witnesses who were presented live at trial, and the expert witnesses who presented expert reports and/or written direct testimony and were cross-examined at trial, this case turns largely on issues of law and the meaning and significance of certain written agreements – that is, binding contracts between the parties, as well as on correspondence they exchanged over the years and other documentary evidence.  Much of the testimony presented at trial and through depositions sought to explain the agreements or to put them in context – or, in some cases, to explain away what the contents of the documents appear clearly to mean.  As the Court held in its two rulings (one oral and one written) denying the parties' motions for partial summary judgment on patent exhaustion, and reiterates here, however, the key provisions of the 1995 Settlement Agreement (and many provisions of other relevant agreements) are clear and unambiguous.  See 10/19/04 Tr. at 46-56 (Court's oral ruling); Minebea Co. v. Papst, 374 F. Supp. 2d at 205-12.

The testimony at trial also sought to explain the realities of the hard disk drive and HDD spindle motor industries, Minebea's sales in the United States, and the course of dealing between the parties.  The parties offered expert testimony to aid the Court in understanding some of these matters, as well as certain technical areas of both patent law and the industry, German law, and damages.  All the expert witnesses were helpful and credible, although the opinions of some (particularly Warren Dalziel) were not fully supported in certain particulars, and much of the testimony of both parties' experts on German law did not explicate the relevant principles of

German law, but simply sought to apply it (in an often partisan and unhelpful manner) to the facts of the case.

       For reasons that were expressed by the Court during the trial – and, as necessary or appropriate, as are elucidated here – the Court did <u>not</u> find credible certain aspects of the testimony of Douglas Hymas and Ryuske Mizukami for Minebea, and Jerold Schnayer for Papst. Mr. Hymas' performance at his deposition totally undermined his credibility at trial and the Court simply cannot rely on it except where corroborated by documentary evidence.  Mr. Mizukami's insistence throughout days of testimony that he always thought Minebea obtained all rights to all Papst patents cannot be credited when there were no documents to support it and when every relevant document that was offered in evidence leads to the opposite conclusion.  Mr. Schnayer was such an advocate for his client during discovery and pretrial proceedings that his objectivity as a fact witness was dubious from the start.  His testimony about events in which he was not a direct participant, his thought processes, his understanding of the meaning of terms such as "drive patents," and his statements that he brought that understanding to various meetings, discussions and negotiations over the years must be discounted either as post-hoc rationalizations, advocacy or wishful thinking.  With regard to events in which he was directly involved and information that representatives of Minebea acknowledge that he conveyed – and particularly when his testimony is corroborated by documentary evidence – the Court (insofar as noted below) does rely on his testimony as to what was said and done.  Georg Papst was a much more credible witness than Mr. Schnayer on many of the same matters, however, and the documentary evidence introduced at trial largely supported what he said.

22

There is too much testimony and there are too many documents to permit a full statement of the facts as shown by the evidence.  The findings of fact included in this section are of necessity abbreviated and not inclusive.  For the most part, they state only the factual findings that are essential to the decision in this case.  Additional "findings of fact" are found later in this Opinion as they are important to the particular claim or count of the complaint then being discussed.

### B.  Creation of the Joint Venture, its Termination, the 1995 Settlement, and Beyond

#### 1.  The Inception of the Joint Venture

1.      Mr. Ryusuke Mizukami of Minebea met Mr. Georg Papst in or about 1976, soon after Mr. Mizukami began his European assignment for Minebea.  Mr. Mizukami was introduced to Papst-Motoren and to Georg Papst by Mr. Koichi Dosho of Minebea.  Mr. Dosho had been working for Minebea in Europe for a number of years, was stationed in Germany, and knew Mr. Papst.  7/6/05 (a.m.) Trial Tr. at 65:7-24, 66:8-21, 72:2-4 (Mizukami testim.).

2.      Georg Papst was Geschäftsführer, or Managing Director, of Papst Motoren. 7/5/05 (p.m.) Trial Tr. at 69:25-70:4 (Kuwert testim.); 7/6/05 (p.m.) Trial Tr. at 37:2-38:24 (Mizukami testim.); 5/8/03 G. Papst Dep. Tr. at 385:21-23.

3.      In 1990, Georg Papst and Mr. Dosho of Minebea discussed the possibility of the two companies joining forces to go into the hard disk drive spindle motor business together, to combine Papst's  patent portfolio and technological expertise in the design and development of HDD motors with Minebea's mass production and sales capabilities.  There was a meeting between them and other Minebea representatives in early 1990 in Tokyo.  7/28/05 (a.m.) Trial Tr. at 20:3-24 (G. Papst testim.).  The business of the proposed joint venture was, among other

23

things, to engage in the research, development, manufacture and sales of HDD spindle motors. 7/6/05 (a.m.) Trial Tr. at 72:4-11 (Mizukami testim.); 7/28/05 (a.m.) Trial Tr. at 51:23-52:4 (G. Papst testim.).

4.      From its experience manufacturing HDD motors for HDD manufacturer Seagate, Minebea believed that there were promising growth opportunities in the HDD motor market.  See 7/6/05 (a.m.) Trial Tr. at 75:3-11 (Mizukami testim.).

5.      At that time, Nidec was the dominant supplier of HDD spindle motors, possessing approximately 80 to 90 percent of the market.  See 7/6/05 (a.m.) Trial Tr. at 75:13-24-76:14-17 (Mizukami testim.); 7/28/05 (a.m.) Trial Tr. at 21:2-11 (G. Papst testim.).  Minebea believed that hard disk drive manufacturers did not like being so dependent on a single supplier of HDD motors, and believed that hard disk drive manufacturers would welcome and seek to do business with a new supplier of HDD motors.  See 7/6/05 (a.m.) Trial Tr. at 75:19-24 (Mizukami testim.).

6.      It was understood that Minebea and Papst-Motoren had complementary strengths that, in combination, might enable them to create an effective and competitive new supplier in the HDD motor market.  See 7/6/05 (a.m.) Trial Tr. at 73:2-14 (Mizukami testim.).

7.      Minebea had expertise in the large-scale manufacture of precision parts and components, but did not have the technology or engineering expertise to design and develop HDD motors on its own.  See 7/6/05 (a.m.) Trial Tr. at 73:13-20, 74:6-10, 79:7-10 (Mizukami testim.).

8.      Minebea understood that Papst-Motoren already was in the business of designing HDD motors, and possessed many technologies and patents that would be useful in a joint enterprise.  7/6/05 (a.m.) Trial Tr. at 74:12-22, 76:3-10, 79:7-12 (Mizukami testim.).

24

9.      During the discussions between Minebea and Papst, Georg Papst told several representatives of Minebea that Seagate had been infringing Papst patents and that Papst was considering suing Seagate.  See 7/28/05 (a.m.) Trial Tr. at 38:12-39:6, 40:4-41:25 (G. Papst testim.).

10.      On August 14, 1990, Georg Papst sent a letter to Mr. Mizukami with respect to the Papst patents that would be available to the Joint Venture.  See PTX 138, Letter from G. Papst to R. Mizukami (Aug. 14, 1990).  Among other things, he stated:  "The Joint Venture is entitled to take a non-exclusive, not-transferrable license on all patent matters, as long as they will be used for spindle motors for hard disk drives and be manufactured and distributed by the Joint Venture."  Id. at 2.

11.      Prior to entering into the joint venture, Minebea requested and received copies of Papst Motoren patents.  In a letter to Georg Papst dated July 31, 1990, Mr. Dosho of Minebea advised Mr. Papst that Minebea "would like to check the contents of these patents [Papst patents concerning the future joint venture] before signing an agreement."  DTX 44, Letter from K. Dosho to G. Papst re: joint venture negotiations (July 31, 1990).  The letter describes these as "patents for disk memory motor."  Id.

12.      On August 16, 1990, Ms. Uta Simon of Papst sent Mr. Mizukami three packages which together included 45 U.S. patents related to hard disk drives.  See PTX 147, Letter from Uta Simon, to R. Mizukami (enclosing "45 granted US patent specifications relevant to hard disk drives") (one of three packages) (Aug. 16, 1990); PTX 148 (same, one of three packages); PTX 149 (same, one of three packages); see also PTX 143, Letter from G. Papst to R. Mizukami (Aug. 14, 1990) (enclosing "126 pages of our German first applications of patents"); DTX 44, Fax from

25

K. Dosho to G. Papst (July 31, 1990); 7/6/05 (a.m.) Trial Tr. at 84:10-87:22 (Mizukami testim.);

7/6/05 (p.m.) Trial Tr. at 51:20-55:7 (Mizukami testim.).

13.     On August 17, 1990, Hans Dieter Papst, the head of Papst Motoren's patent

department, wrote to Mr. Mizukami concerning events leading up to the creation of the joint

venture between Minebea and Papst Motoren.  Referring to the 45 U.S. Patents, Hans Dieter

Papst stated:

> Yesterday, we sent you by courier letter in three envelopes copies
> of 45 US-Patents, which are listed in the following enclosure.
> These patents reflect somehow Papst's activities in developing
> spindle motors.
>
> We want to point out, that the bigger part of these patents are
> typical for use in spindle motors, whereas a smaller part can or may
> be used or have been used in this field.  Yet, there may be further
> patents of Papst which could be applicable in spindle motors.  In an
> [sic] US-patent there are sometimes several different independent
> claims, i.e. it is like several patents – and therefore one can have a
> mixed situation with regard to application in one and the same
> patent.  So, these things are sometimes complex.
>
> In any event, it is clear, as already expressed, that any spindle
> motor of the envisaged project would be free from any charge
> based on Papst-patents.

PTX 152, Letter from H.D. Papst to R. Mizukami (Aug. 17, 1990).

14.     On August 24, 1990, the parties entered into a letter of intent signed by the

President of Minebea and Georg Papst.  PTX 157, Letter of Intent (Aug. 24, 1990); see also

7/6/05 (a.m.) Trial Tr. at 91:8-92:19 (Mizukami testim.).  They agreed in the letter to create a

joint venture in which Papst-Motoren and Minebea would be equal partners.  See PTX 157,

Letter of Intent (Aug. 24, 1990) at 1.  Each partner agreed to "transfer into the joint venture all

activities and assets including the right to use patents related to HDD motors."  Id.  Minebea was

26

to pay Papst-Motoren for the joint venture between 22 million and 28 million Deutsche Marks. Id. at 2; see also 7/6/05 (a.m.) Trial Tr. at 90:20-91:13, 92:24-93:8 (Mizukami testim.).

15.     The letter of intent concluded:  "It is further understood that this letter is not intended to constitute a contract or create any legal obligation by either Papst-Motoren or Minebea, but only serves to establish those broad areas of agreement leading to a formal contract which reflect the matters described in this letter."  PTX 157, Letter of Intent (Aug. 24, 1990) at 3.

16.     Among the series of faxes between the parties concerning the drafting of agreements between Minebea and Papst was an October 30, 1990, fax from Mr. Mizukami and Yoshihisa Kainuma to Papst Motoren.  DTX 75, fax from R. Mizukami and Y. Kainuma to G. Papst re: joint venture negotiations (Oct. 30, 1990); 7/8/05 (p.m.) Trial Tr. at 4:5-6:10 (Kainuma testim.).  In the fax, Minebea expressed its view that the phrase "required and necessary," to be included in the proposed Intangible Assets Agreement, was ambiguous:

> Minor deletions and assertions were made for the sake of clarity.
> The words "required and necessary" were deleted because at this
> time neither party knows what information is actually necessary or
> required for the research, development and manufacture of HDD
> motors.  In addition, for tax purposes the listing of as many
> intangible assets as possible is advantageous to us.  Therefore, the
> transfer of all technical information related to Papst's HDD Motor
> Division is reasonable.

DTX 75, fax from R. Mizukami and Y. Kainuma to G. Papst and G. Schätzle, re: Comments Regarding Agreement for the Sale of Intangible Assets (Oct. 30, 1990) at 3.

17.     Despite these concerns, the phrase "required and necessary" was included in the final version of the 1990 Agreement for the Sale of Intangible Assets, signed by both parties six days later.  See PTX 195, Agreement for the Sale of Intangible Assets (Nov. 5, 1990) ¶¶ 4(a), 4(d) .

27

18.     Mr. Mizukami testified that he believed Papst represented to Minebea that Papst

Motoren would make its patent portfolio fully available to the Joint Venture.  7/6/05 (a.m.) Trial

Tr. at 76:18-77:6, 79:7-25, 80:13-17 (Mizukami testim.).  He also testified that the Joint Venture

would have the right to use any Papst patents that were necessary for the HDD motor business:

"[W]e can use all his patent, everything, if it is necessary and for making, manufacturing and

distributing . . . he has a lot of patent[s] and everything is available when we get together, if that

is necessary for doing this HDD motor business."  Id. at 80:24-81:12.  Georg Papst testified that

he never intended to license all Papst Motoren patents to Minebea, only the spindle motor

patents.  7/28/05 (a.m.) Trial Tr. at 51:23-25 (G. Papst testim.).


2.  The Agreements Founding the Joint Venture

19.     PMDM was founded on November 5, 1990, officially as a joint venture between

Papst Motoren and Minebea, Ltd.  See PTX 193, Joint Venture Agreement (Nov. 5, 1990).

20.     In establishing the Joint Venture, Papst Motoren and Minebea entered into a

number of agreements, including:

(a)     a General Business Agreement, entered into on October 2, 1990,

establishing the joint venture relationship between Papst-Motoren and Minebea, see PTX 169;

(b)     two Joint Venture Agreements, one to establish a German joint venture

entity, see PTX 193 (Nov. 5, 1990), and the other to establish a Thai joint venture entity;

(c)     an Agreement for the Sale of Intangible Assets (or "Intangible Assets

Agreement"), entered into on November 5, 1990, see PTX 195, for Papst-Motoren to transfer to

Minebea various "intangible assets" of Papst's motor division (including manufacturing know-

28

how and patents on HDD motors) which were "required and necessary" for Minebea's

participation in the HDD motor business; and

> (d)    a License Agreement Regarding Intangible Assets, entered into on March

15, 1991, see PTX 264, for Minebea to license the patent rights acquired from Papst Motoren to

the joint venture entities.

### a.  The General Business Agreement

21.    On October 2, 1990, Minebea and Papst-Motoren entered into the General

Business Agreement to establish the parties' joint venture.  Georg Papst signed the General

Business Agreement on behalf of Papst-Motoren.  Mr. Goro Ogino signed it on behalf of

Minebea.  PTX 169, General Business Agreement (Oct. 2, 1990); Jul. 6, 2005 (p.m.) Trial Tr. at

8:4-21 (Mizukami testim.).

22.    The "Whereas" clauses of the General Business Agreement noted the following:

> Papst has been – amongst various operations in other fields of
> business – engaged for years, and has gained extensive experience,
> patents, know-how, etc. in research and development (R+D),
> manufacturing, and sale of Hard Disc Drive Spindle Motors . . .
> and in related fields; . . . Minebea has been – also amongst various
> operations in other fields of business – engaged in manufacturing
> precision parts and components for HDD Motors and so possesses
> favorable conditions and local advantage for manufacturing HDD
> Motors; . . . . [B]oth parties to this Agreement intend to closely
> cooperate in the field of HDD Motors by the establishment of Joint
> Ventures for R + D, engineering, manufacturing and sale of HDD
> Motors[.]

PTX 169, General Business Agreement (Oct. 2, 1990) at 1-2.

23.    The General Business Agreement provided that Minebea and Papst-Motoren

"shall jointly incorporate" a joint venture company in Germany (the "GJV") and a joint venture

company in Thailand (the "TJV"), each "on an equal 50/50% basis."  "[T]he purpose" of each joint venture company "shall be to conduct R + D and to develop, manufacture and sell HDD Motors."  PTX 169, General Business Agreement (Oct. 2, 1990) ¶¶ 2-3; <u>see</u> 7/6/05 (p.m.) Trial Tr. at 9:11-14 (Mizukami testim.).[11]

24.     The General Business Agreement also provided that:

> Papst agrees to spin off [its] HDD motor division, including machinery, tools, materials, works in process (the 'Tangible Assets'), technical information and data, drawings of the HDD motors developed and/or being developed, know-how, the right to use all relevant patents, and the current order balance as of the date of transfer from Papst (the 'Intangible Assets') which are all required and necessary for the operation and business of GJV [the German joint venture] and TJV [the Thai joint venture].  Papst shall sell the Intangible Assets for the consideration specified in Article 5 hereunder, and shall sell the Tangible Assets to GJV and TJV principally on the book value basis which shall be agreed by the parties hereto.

PTX 169, General Business Agreement (Oct. 2, 1990) ¶ 4; <u>see</u> <u>also</u> 7/6/05 (p.m.) Trial Tr. at 8:22-9:19 (Mizukami testim.).

b.  The Joint Venture Agreement

25.     On November 5, 1990, Minebea and Papst-Motoren entered into a Joint Venture Agreement to establish their German joint venture.  <u>See</u> PTX 193, Joint Venture Agreement (Nov. 5, 1990); 7/6/05 (p.m.) Trial Tr. at 10:7-14 (Mizukami testim.).  The Joint Venture Agreement was signed by Georg Papst for Papst-Motoren and Goro Ogino for Minebea.  <u>See</u> <u>id.</u>

---

[11]     The German Joint Venture company sometimes is also referred to as PMDM-G, and the Thai Joint Venture company as PMDM-T.

26.     The Joint Venture Agreement stated that the name of the parties' new joint

venture company would be "Papst-Minebea-Disc-Motor-GmbH" ("PMDM").  PTX 193, Joint

Venture Agreement (Nov. 5, 1990) ¶ 3(a).  Management responsibilities were divided between

Papst-Motoren and Minebea.  See id. ¶ 7(c)-(d); 7/6/05 (p.m.) Trial Tr. at 15:24-17:9 (Mizukami

testim.).

27.     The Joint Venture Agreement stated that "Minebea and Papst . . . desire to

establish a joint venture company . . . in which they will jointly invest, to conduct research and

development ('R & D'), manufacture, and sell hard disc drive spindle motors[.]"  PTX 193, Joint

Venture Agreement (Nov. 5, 1990).

28.     The Joint Venture Agreement stated that the scope of PMDM's activities would

include:

(a)     to conduct R & D, manufacture, market and sell HDD
        Motors;

(b)     to establish and organize a facility located in Spaichingen
        to develop and to manufacture the HDD Motors;

(c)     to lease the premises and/or space for the Company from
        Papst;

(d)     to develop HDD Motors manufacturing technology and
        other related technologies;

(e)     to license to use such developed technology to a third party
        as the Parties [i.e., Papst and Minebea] deem appropriate;

(f)     to market and sell the HDD Motors to the worldwide
        market;

(g)     to provide engineering and technical support to various
        sales companies to enhance and support sales activities.

PTX 193, Joint Venture Agreement (Nov. 5, 1990) ¶ 2.

31

29.     The Joint Venture Agreement required that Minebea -- having agreed in the

October 2, 1990 General Business Agreement to purchase Papst-Motoren's Intangible Assets for

22 to 28 million Deutsche Marks --  would grant to the German Joint Venture "a license with a

sublicensing right to TJV [the Thai Joint Venture]" to "use the Intangible Assets in order to

support R & D, manufacturing and sales of HDD Motors."  PTX 193, Joint Venture Agreement

(Nov. 5, 1990) ¶ 3(e); see also PTX 169, General Business Agreement (Oct. 2, 1990)  ¶ 5(a).

30.     The Joint Venture Agreement further provided that "[n]ew patents, patent

applications and petty patents required and necessary for the R+D, manufacturing, use and sale of

HDD motors, which arise by Minebea or Papst during the life of the General Business

Agreement and this Agreement, shall be made available by Minebea or Papst to GJV [the

German Joint Venture] by way of a cost-free, non exclusive and non-assignable license."  PTX

193, Joint Venture Agreement (Nov. 5, 1990) ¶ 3(f).

### c.  The Agreement for the Sale of Intangible Assets

31.     On November 5, 1990, Minebea and Papst Motoren also entered into an

Agreement for the Sale of Intangible Assets, signed by Georg Papst on behalf of Papst Motoren

and Goro Ogino on behalf of Minebea.  PTX 195, Agreement for the Sale of Intangible Assets

(Nov. 5, 1990).

32.     Under this Agreement, Papst was to give up its HDD Motor Division and

"convince its customers to transfer current orders and contracts respecting its HDD Motor

Division to GJV."  PTX 195, Agreement for the Sale of Intangible Assets (Nov. 5, 1990) ¶ 7(c).

33.     Under the Agreement, Minebea was granted a license to patents and patent

applications "required and necessary for research and development (R+D), manufacturing,

32

engineering, use and sale of HDD motors."  PTX 195, Agreement for the Sale of Intangible

Assets (Nov. 5, 1990) ¶ 4(a); see 8/1/05 (p.m.) Trial Tr. at 9:10-10:3 (G. Papst testim.).

34.     More specifically, Paragraph 4(a) of the 1990 Intangible Assets Agreement states:

> Papst as the holder of patents (for the purposes of this agreement
> the term "patent" is defined as patents, and patent applications)
> grants to Minebea the right to use all of its patents; especially the
> predominant German patents and the corresponding international
> patents, enumerated in Exhibit B [C] attached hereto, world-wide
> as far as they are required and necessary for research and
> development (R+D), manufacturing, engineering, use and sale of
> HDD motors.  Minebea as licensee is not entitled to use the patents
> in other fields.

PTX 195, Agreement for the Sale of Intangible Assets (Nov. 5, 1990) ¶ 4(a).

35.     Paragraph 4(d) of the Intangible Assets Agreement states:

> Patents which arise or are acquired by Papst during the life of this
> agreement and which may be required and necessary for research
> and development (R+D), manufacturing, engineering, use and sale
> of HDD Motors shall be made available by Papst by granting
> licenses to Minebea with the provisions of this Article 4(a)-(c)
> without additional royalties.

PTX 195, Agreement for the Sale of Intangible Assets (Nov. 5, 1990) ¶ 4(d).

36.     On December 10, 1990, Papst-Motoren and Minebea jointly issued a press release

announcing the formation of Papst-Motoren's and Minebea's joint venture and the formation of

PMDM.  The press release stated in part:

> The combination of development know-how, engineering expertise
> and patents of Papst with Minebea's large scale production
> capabilities and manufacturing components in cost competitive
> locations is expected to create synergy effects ensuring
> competitiveness of the new joint venture companies which will
> enable them to obtain a leading position in the HDD Motor market.

PTX 204,  Press release (Dec. 10, 1990).

### 3.  Operation of the Joint Venture

37.     Following the execution of the several agreements establishing the Joint Venture, Papst-Motoren and Minebea engaged jointly in the business activities contemplated by their several related agreements.  7/6/05 (p.m.) Trial Tr. at 11:20-15:22 (Mizukami testim.).

38.     Georg Papst was appointed Geschäftsführer, or Managing Director, of PMDM. See 7/6/05 (p.m.) Trial Tr. at 36:12-37:19 (Mizukami testim.); 7/29/05 (p.m.) Trial Tr. at 33:17-20 (G. Papst testim.).  He resigned as Managing Director of PMDM on August 5, 1993. See 5/8/03 G. Papst Dep. Tr. at 383:12-15, 385:19-386:9; 7/29/05 (p.m.) Trial Tr. at 33:17-20 (G. Papst testim.).

39.     Georg Papst testified that during the existence of the Joint Venture Papst normally did not enforce its patents against motor customers of the Joint Venture or Minebea, on the theory that "as long as we could make business with people, we have normally not asserted our customers for those products where we have sold, shipped them or provided them with motors." PTX 695, 5/11/95 G. Papst Dep. Tr. (Western Digital litig.) at 155-57.

40.     After the formation of the Joint Venture, representatives of Papst-Motoren and Minebea jointly visited customers and potential customers in the United States and other countries to promote the Joint Venture's HDD motors.  Georg Papst participated in some of these visits.  PTX 209, Letter from G. Papst to R. Mizukami (Dec. 19, 1990); 7/6/05 (p.m.) Trial Tr. at 34:24-36:8 (Mizukami testim.).

41.     On June 25, 1991, Georg Papst, in his capacity as Managing Director of Papst Motoren, sent a letter to the president of Minebea, Mr. Ogino, offering to sell Minebea a license to the Papst Motoren drive patents.  DTX 141, Letter from G. Papst to G. Ogino (June 25, 1991).

34

The following day, a copy of this letter also was sent by Georg Papst to Mr. Mizukami.  DTX

142, Letter from G. Papst to Mizukami (June 26, 1991).  In this letter, Mr. Papst advised Mr.

Ogino that, pursuant to the current license agreement in place between the parties, neither

Minebea nor the Joint Venture had rights under Papst Motoren drive patents.  7/28/05 (a.m.)

Trial Tr. at 54:19-59:24 (G. Papst testim.).

     42.     Georg Papst's June 25, 1991 letter to Mr. Ogino (with a copy to Mr. Mizukami)

stated in part:

> As you know, Papst owns a large number of international
> patent rights, which are related to hard disk drives per se, so-called
> "drive patents" and, also especially to spindle motors, so-called
> "HDD motor patents."  One drive patent in particular (US RE
> 32,702) has gained extraordinary importance since not only the
> market leader Seagate but also numerous other drive manufacturers
> are or have been using this significant US patent.  As you can
> surely easily imagine, we are more and more confronted with the
> question of what our position is towards such disk drive
> manufacturers who, on the one hand, desire to be supplied by
> PMDM and, on the other hand, have largely used the above
> mentioned patent in the past or may do so still in the future.  Not
> only have these questions been raised towards your sales people by
> Toshiba but also, recently, by IBM-Fujisawa.
>
> These questions have, of course, resulted in basic
> considerations on our side.  First, we may recall that the patent
> policy of Papst towards PMDM principally differentiates between
> such rights with disk drives per se or with HDD spindle motors.
> For the future use of HDD spindle motor patents such customers
> can be released by Papst without their having to pay any extra
> license fee.
>
>      *     *     *
>
> As you know, in the framework of our present agreement,
> PMDM can make use of all patents of Papst applicable to HDD
> spindle motors. Drive patents, however, are reserved solely for
> exploitation directly with the drive manufacturers.

It is therefore my proposal to grant to PMDM the right to convey licenses under Papst's drive patents directly to the drive manufacturers.

\*   \*   \*

In return for granting these rights to PMDM, Papst believes that it would be entitled to a fair compensation from Minebea, which, of course, would be a matter of further discussion between us.

DTX 141, Letter from G. Papst to G. Ogino (June 25, 1991); see 7/6/05 (p.m.) Trial Tr. at 66:7-72:20 (Mizukami testimony); 7/28/05 (a.m.) Trial Tr. at 54:19-59:24 (G. Papst testim.).

43.     Georg Papst testified that he never received a letter from anybody at Minebea in response to his June 26, 1991 letter to Minebea president Ogino, which letter also was sent to Mr. Mizukami.  See 7/28/05 (a.m.) Trial Tr. at 59:25-60:5 (G. Papst testim.).  Mr. Mizukami testified that he does not recall whether, after he received a copy of Georg Papst's June 25, 1991 letter to President Ogino, he sent any response to Georg Papst asserting that Minebea already had rights to the drive patents.  See 7/6/05 (p.m.) Trial Tr. at 78:9-15 (Mizukami testim.).  Other than this asserted lack of recollection at trial, Minebea offered no testimony and no exhibit to contradict anything stated in the letter, or to contradict Mr. Papst's testimony.

44.     Three months later, in September 1991, there was a meeting of the PMDM board of directors in Bangkok, Thailand.  Representing Minebea were Mr. Mizukami, Mr. Dosho, Mr. Obara, and Mr. Yoshimura.  Georg Papst and Dr. Schätzle represented Papst Motoren.  Mr. Yoshimura of Minebea drafted the minutes of the meeting.  Both Mr. Mizukami and Mr. Papst signed the minutes.  These minutes describe what was discussed and decided at the board meeting concerning Papst Motoren drive patents.  See DTX 147, PMDM Board Meeting minutes (Sept. 28, 1991).  The minutes state, in pertinent part:

36

(B)     Subjects and decisions

1.     HDD Drive Patents

Conclusion 1.
Minebea will not purchase above patents.  Papst KG is free
to deal with third parties.

Conclusion 2.
Further patent rights are as follows:

| Papst [Past][12] | Future |
|---|---|
| Drive patent | Papst | Papst |
| Motor patent | Papst | PM.DM. * |

*  PMDM has the right to use all patents, which are in the
past applied by Papst KG.  PMDM has the rights for all the
patents which will be applied for in the future.

DTX 147, PM-DM Board Meeting minutes (Sept. 28, 1991) (footnote added).

45.     According to the testimony of Georg Papst, Minebea representatives told Papst

Motoren representatives at the meeting that Minebea did not want to acquire rights to the Papst

Motoren drive patents, and, as reflected in the minutes of the meeting, Minebea declined to

purchase the Papst Motoren drive patents.  See 7/29/05 (p.m.) Trial Tr. at 31:24-33:7 (G. Papst

testim.); DTX 147, PMDM Board Meeting Minutes ("Minebea will not purchase above patents

[HDD Drive Patents]").  Mr. Mizukami testified that he must have been at the meeting and did

sign the minutes, but he had no recollection of the meeting and found the minutes "confusing."

7/21/05 (p.m.) Trial Tr. at 35:1-22, 38:8-23 (Mizukami testim.).  Beyond this, Minebea called no

witnesses to dispute the testimony of Mr. Papst or the Board minutes.  The Court credits the

uncontradicted testimony of Georg Papst, which is consistent with the minutes of the meeting.

---

[12]     The parties agree that the word "Past" (not "Papst") was intended.

37

46.     Papst Motoren entered into a number of licensing agreements whereby certain HDD manufacturers acquired licenses to a particular patent owned by Papst, U.S. Patent No. Re 32,702 (the "'702 patent").  These companies included Seagate, Hitachi, Fujitsu, and NEC. 7/21/05 (p.m.) Trial Tr. at 11:24-12:9 (Schnayer testim.).

47.     On September 28, 1990, Papst Motoren sued hard disk drive manufacturer Seagate for infringement of the '702 patent in the United States District Court for the District of Delaware.  See Papst-Motoren GmbH & Co. KG v. Seagate Tech., Inc., Civil No. 90-0542 (D. Del. 1990).  On June 23, 1992, Mr. Naka at Minebea received a copy of the complaint filed by Papst in that litigation.  See DTX 182, transmittal letter of original Complaint and Answer from Ms. St. John to Mr. Naka; DTX 770, Complaint, Papst-Motoren GmbH & Co. KG v. Seagate Tech., Inc. (September 28, 1990); 2/4/03 Naka Dep. Tr. at 17:8-19:6.  Mr. Naka was concerned that Papst had sued an important customer of the Joint Venture.  See id. at 32:20-33:3, 33:13-34:7.

48.     In October, 1992, Georg Papst and Papst Motoren attorney Richard Smith traveled to Japan for a meeting with Minebea.  Mr. Mizukami, Mr. Naka, and a number of Minebea engineers attended the meeting.  See 8/3/05 (p.m.) Trial Tr. at 12:8-19 (Smith testim.); 7/28/05 (a.m.) Trial Tr. at 71:7-9 (G. Papst testim.); 12/4/03 Naka Dep. Tr. at 29:9-30:8, 31:11-34:7.  At the meeting, Mr. Smith made a presentation in which he explained the lawsuit then pending between Papst Motoren and Seagate concerning the '702 patent.  See 8/3/05 (p.m.) Trial Tr. at 12:24-13:5 (Smith testim.).  He explained why Papst Motoren brought the suit, what the accused infringing equipment was, and what he thought about the prospects of the litigation.  See id. at 13:6-16.

38

49.     According to Minebea General Counsel Takuya Naka, who was in attendance, the Seagate lawsuit was discussed at the meeting.  See 12/4/03 Naka Dep. Tr. at 29:9-30:8, 31:11-34:7.  According to Mr. Naka, it was discussed that it would violate the joint venture for a partner of the joint venture to sue the joint venture's most important customer (or that it would "constitute infringement on the joint venture agreement"), so the suit would have to be withdrawn.  See id. at 33:15-18, 33:21-34:7.

### 4.  Termination of the Joint Venture

50.     In June, 1992, Papst Motoren was sold to a third party, a company called Electrobau Mulfingen GmbH & Co. ("EBM").  Papst Motoren became a wholly-owned subsidiary of EBM, which did not want to proceed with the Joint Venture.  See 7/28/05 (a.m.) Trial Tr. at 74:23-75:4 (G. Papst testim.); 7/7/05 (a.m.) Trial Tr. at 74:17-21 (Mizukami testim.).

51.     Georg Papst founded defendant Papst Licensing GmbH on January 1, 1993 and purchased the patent portfolio of Papst Motoren.  7/28/05 (p.m.) Trial Tr. at 26:13-14 (G. Papst testim.).  Mr. Papst was and is the president of Papst Licensing.  7/29/05 (p.m.) Trial Tr. at 33:11-13 (G. Papst testim.).

52.     On April 27, 1993, Minebea and Papst Licensing entered into the Loan Agreement and Agreement Concerning Alterations of License Agreements ("Loan Agreement"), under which Minebea lent Papst Licensing 1.5 million Deutsche Marks.  7/6/05 (p.m.) Trial Tr. at 43:13-46:5 (Mizukami testim.); PTX 1467, 1993 Loan Agreement (Apr. 27, 1993) § 5.  Mr. Mizukami and Mr. Naka represented Minebea in negotiating the 1993 Loan Agreement.  See 12/5/03 Naka Dep. Tr. at 182:18-185:12.

53.     The Loan Agreement stated, in part:

> It is understood between the parties that such license shall not
> apply to the so called drive patents (US-Pats: B1 Re. 32,702 and
> 4,337,491 and Jap. Pat. Appl. 142 123/1979 and German Patent 29
> 44 212), so called Drive Patents, which are not licensed under the
> Intangible Assets Agreement and are not licensed under this
> present agreement.  It is understood that purchasers of products
> from Minebea, PMDM-G and PMDM-T are not licensed under
> such Drive Patents, notwithstanding the use of such purchased
> products in disk drives or other produkts [sic] made, used or sold
> by such purchasers.

PTX 1467, 1993 Loan Agreement (Apr. 27, 1993) § 4(3).

54.     On May 26, 1993, Papst Licensing acquired all of the patents of Papst Motoren.

See 7/28/05 (p.m.) Trial Tr. at 26:16-27:4 (G. Papst testim.); PTX 487, Purchase Contract

between Papst Motoren and Papst Licensing (May 26, 1993) §1.

55.     In April 1993, Papst-Motoren, at EBM's direction, sold its 50% interest in PMDM

to Minebea.  7/6/05 (p.m.) Trial Tr. at 37:17-39:15, 40:21-41-25 (Mizukami testim.).

56.     In connection with EBM's sale of Papst-Motoren's interest in PMDM to Minebea,

Minebea and EBM agreed to terminate the joint venture between Papst-Motoren and Minebea.

7/6/05 (p.m.) Trial Tr. at 40:2-43:9. (Mizukami testim.).

57.     During calendar year 1993 there were a number of meetings between Georg Papst

and representatives of Minebea to discuss the termination of the joint venture.  The parties

discussed which patents would be licensed to PMDM after the joint venture ended.  Georg Papst

testified that he told Minebea that he intended to continue to grant Minebea a license under the

motor patents and that he also agreed to grant Minebea a license for two specific drive patents,

namely, the integrated baseplate patents.  See 7/28/05 (p.m.) Trial Tr. at 5:21-6:2, 7:13-19 (G.

Papst testim.).[13]  While the licensing of other drive patents also was discussed, Georg Papst

testified that he did not agree to grant to Minebea a license to any drive patents other than the

integrated baseplate patents.  See id. at 12:18-13:15.

58.     On May 3, 1993, Papst-Motoren and Minebea entered into an Agreement

Concerning the Termination of Joint Venture (the "Termination Agreement").  PTX 470, 1993

Termination Agreement (May 3, 1993); see 7/6/05 (p.m.) Trial Tr. at 40:2-43:9 (Mizukami

testim.).

59.     The Termination Agreement recognized in its preamble that "P [Papst Motoren]

has sold to M [Minebea] certain intangible assets and in particular, has granted to M [Minebea]

the right to use all patents in the field of HDD motors which are required and necessary for the

operation and business of PMDM-G [PMDM Germany] and PMDM-T [PMDM Thailand]".

PTX 470, Termination Agreement (May 3, 1993) at 2.

60.     The Termination Agreement specified that most of the agreements that the parties

had entered into to establish their joint venture would cease to be effective; certain agreements

and portions of agreements, however, would remain in force.  See PTX 470, Termination

Agreement (May 3, 1993), Article 9.1.

61.     The Termination Agreement provided that, following termination, Minebea would

continue to have patent rights as follows:

> Continued Granting of licenses by P [Papst] to M [Minebea] for all
> patents and patent applications required and necessary in the field
> of HDD motor R+D, manufacturing, engineering, use and sale of

---

[13]     "Integrated baseplate patents" describe a subclass of patents reading on a spindle
motor which at the time of manufacture is integrated with another hard disk drive component, a
baseplate.  These patents are not at issue in this litigation.

> such motors in as far as such patents and patent applications are
> available to P at the time this TA [Termination Agreement]
> becomes effective[.]

PTX 470, Termination Agreement (May 3, 1993), Article 1.2(c).  It also provided:

> P shall continue to grant to M the right to use all the patents and
> patent applications, as defined in article 1.2. c) above and as they
> have arisen or were acquired by P during the life of the I.A.
> [Intangible Assets Agreement] and in accordance with its terms
> and conditions.  A list of the latter ones (i.e. those arisen or
> acquired by P during the life of the I.A.) is hereto attached as
> Exhibit B, provided however that if there is any such patent not
> listed in Exhibit B the forgoing provision nevertheless shall apply
> to such patents.

Id., Article 7.

62.    The Termination Agreement called upon the members of the board of directors of

PMDM-Germany, as well as the Papst-nominated members of the board of PMDM-Thailand, to

resign as of the effective date of the Agreement.  See PTX 470, Termination Agreement (May 3,

1993), Article 5.3.

63.    Georg Papst continued to serve as Managing Director of PMDM Germany until

his resignation on August 5, 1993.  See 5/8/03 G. Papst Dep. Tr. at 383:12-15, 385:19-386:9;

7/28/05 (p.m.) Trial Tr. at 25:22-27:4 (G. Papst testim.); 7/6/05 (p.m.) Trial Tr. at 37:17-39:15,

40:21-41-25 (Mizukami testim.).  The same day, the Board of Directors of PMDM unanimously

passed a resolution accepting Georg Papst's resignation, and stating that "Herr Georg Friedrich

Papst is no longer Managing Director of the Company.  He will be discharged from his

responsibility."  DTX 308, PMDM Shareholder Resolution (Aug. 5, 1993).

64.    In August 1993, PMDM became a wholly-owned subsidiary of Minebea.  When

PMDM became a wholly-owned subsidiary, the name was changed from Papst Minebea Disk

Motor GmbH to Precision Motors Deutsche Minebea GmbH.  7/5/05 (p.m.) Trial Tr. at 72:14-74:3 (Kuwert testim.).

### 5.  Post-termination Communications

65.     On November 14, 1994, there was a meeting at the headquarters of Minebea in Japan.  See DTX 383, Letter from G. Papst to R. Mizukami (Dec. 13, 1994); 7/21/05 (p.m.) Trial Tr. at 44:6-11 (Schnayer testim.).  Mr. Mizukami and Mr. Naka attended the meeting on behalf of Minebea, and Mr. Papst and Mr. Schnayer attended on behalf of Papst Licensing.  See 7/21/05 (p.m.) Trial Tr. at 41:5-42:25 (Schnayer testim.).  During the meeting, Georg Papst offered to grant Minebea a non-exclusive license for all patents and patent application rights currently filed, but not including the so-called drive patents (aside from the two integrated baseplate patents).  See id. at 41:18-21, 43:1-10; 7/28/05 (p.m.) Trial Tr. at 42:8-21 (G. Papst testim.).

66.     According to Mr. Papst, this offer was confirmed in a letter, dated December 13, 1994, from Georg Papst to Mr. Mizukami.  7/28/05 (p.m.) Trial Tr. at 39:22-42:21 (G. Papst testim.); see DTX 383, Letter from G. Papst to R. Mizukami (Dec. 13, 1994).  Mr. Mizukami did not respond to Mr. Papst's December 13, 1994 letter.  See 7/28/05 (p.m.) Trial Tr. at 42:28-25 (G. Papst testim.).

67.     On February 9, 1995, at Georg Papst's request, Richard Smith, an attorney representing Papst Licensing, sent a letter to Mr. Oswald Kuwert, then managing director of PMDM, regarding the licensing arrangement between Papst and PMDM.  DTX 409, Letter from R. Smith to O. Kuwert re: licensing rights (Feb. 9, 1995); DTX 409A, English translation of DTX 409; 7/28/05 (p.m.) Trial Tr. at 43:1-44:10 (G. Papst testim.).  The letter stated, in part:

> Except for the base plate integration patents, PM-DM and Minebea
> are not licensed in the field of Disk Drives and therefore cannot
> make or sell Disk Drives using the PL Disk Drive patents.
> Similarly, PM-DM's customers do not obtain a license to use PL
> Disk Drive patents, other than the base plate integration patents,
> when they purchase a PM-DM motor.  If PM-DM's customers
> make disk drives using PL's Disk Drive Patents they must obtain a
> Disk Drive license from PL.
>
> As you know, Nippon Densan (NIDEC) is also licensed under
> Papst Patents.  NIDEC's license also excludes the field of Disk
> Drives.  NIDEC and its customers cannot use PL's Disk Drive
> patents without obtaining a Disk Drive license from PL.

DTX 409A, English translation of DTX 409 at 2.

68.     Mr. Smith attached to his February 9, 1995 letter a list of patents that he said were

not licensed to Minebea.  The patents identified in this list include all of the patents later listed on

Appendix III of the 1995 Settlement Agreement.  DTX 409, Letter from R. Smith to O. Kuwert

re: licensing rights (Feb. 9, 1995); PTX 771, DTX 567, 1995 Settlement Agreement (June 19,

1995), App. III.[14]

69.     On February 20, 1995, PMDM president Oswald Kuwert forwarded Mr. Smith's

letter of February 9, 1995 to Mr. Mizukami, and a number of other individuals at Minebea along

with a cover letter containing Mr. Kuwert's comments.  See DTX 418, Letter from O. Kuwert to

R. Mizukami (Feb. 20, 1995).  The subject heading of the cover letter is "Patent License

Agreement Between Papst KG and Minebea."  In it, Mr. Kuwert requests that Mr. Mizukami

"verify" the positions taken by Mr. Smith in his February 9, 1995 letter:

---

[14]     The June 19, 1995 Settlement Agreement is sometimes cited with plaintiffs'
designated exhibit number (PTX 771), sometimes with defendants' exhibit number (DTX 567),
sometimes with both.

But Mr. Smith clearly stated that PM-DM and Minebea are not licensed in the field of disk drives using the Papst Licensing Disk Drive patents.  Our understanding is now, as an example, that we have the right to use:

1.      Motors with labyrinth seal - all rights.

2.      Motors with labyrinth seal integrated into base plates - all rights.

3.      Motors with labyrinth seal integrated into base plates used in disk drives - no rights.

It is now unclear, what this exactly means because all our motors are finally built into disk drives and all the patents, Papst Licensing is claiming for, are related to motors upgraded for disk drive use. Therefore this is a very serious problem for us.  Please, could you verify what Minebea's agreement and understanding is with Papst patents?

DTX 418, Letter from O. Kuwert to R. Mizukami (Feb. 20, 1995).  Mr. Mizukami did not respond to Mr. Kuwert.  7/7/05 (p.m.) Trial Tr. at 28:21-22 (Mizukami testim.).

70.      Mr. Kuwert's letter of February 20, 1995 was referred to Minebea's General Counsel, Mr. Naka, for reply, as evidenced by a copy of the letter with an additional Japanese notation reading (in English translation): "Mr. Naka, manager, please take care of this matter, February 22 note – Sato, Planning department."  DTX 420, Annotated copy of February 20, 1995 letter from O. Kuwert to R. Mizukami (Feb. 22, 1995); see also 7/7/05 (p.m.) Trial Tr. at 27:16-28:6 (Mizukami testim.).  Mr. Mizukami testified that he has been head of the corporate planning department for 23 years and that Mr. Sato worked for him.  7/7/05 (p.m.) Trial Tr. at 27:24-28:1-20 (Mizukami testim.).

71.      On February 22, 1995, Mr. Kainuma responded to Mr. Kuwert by fax, asserting that Papst's position that PMDM did not have rights to the drive patents amounted to "a re-

45

interpretation of the contract" between Papst and Minebea, and that Minebea should have rights to the drive patents.  DTX 421, Letter from Y. Kainuma to O. Kuwert by facsimile (Feb. 22, 1995).  Mr. Kainuma directed a copy of this fax to Mr. Mizukami's attention.  Mr. Naka also received copies of Mr. Kuwert's February 20, 1995 letter and Mr. Kainuma's February 22 fax. See 2/23/05 Naka Dep. Tr. at 133:4-134:3 (referring to Dep. Ex. 59, now DTX 420 and Dep. Ex. 4, now DTX 421).  Despite Mr. Kainuma's reaction, Mr. Naka testified that when he read Mr. Smith's letter, he thought that Smith's explanation of the prior Papst-Minebea licensing agreement was "basically correct."  See 2/23/05 Naka Dep. Tr. at 139:19-141:2.

72.     Despite receiving a copy of the letter from Mr. Kuwert, Mr. Mizukami did not initiate any communications with Papst to challenge its position regarding drive patent rights. See 7/7/05 (p.m.) Trial Tr. at 33:5-9 (Mizukami testim.).  Nor did he direct Mr. Naka or any other Minebea employee to do so.  See id. at 33:10-21.

73.     On March 13, 1995, there was a meeting at Minebea's Tokyo headquarters. 7/28/05 (p.m.) Trial Tr. at 52:24-53:3 (G. Papst testim.).  Georg Papst and Jerold Schnayer attended the meeting for Papst and Mr. Mizukami and Douglas Hymas attended for Minebea.  Id. at 53:4-13; 7/21/05 (p.m.) Trial Tr. at 103:12-104:6 (Schnayer testim.).

74.     During the meeting, Mr. Mizukami told Mr. Papst and Mr. Schnayer that Minebea had been approached by its HDD manufacturer customers who told Minebea that Papst Licensing had charged the customers with infringement of the Papst drive patents, that the patents concerned Minebea products, and that the customers wanted Minebea to accept liability for these charges of infringement by Papst Licensing.  See 7/28/05 Trial Tr. at 54:19-55:16 (G. Papst testim.); 7/21/05 (p.m.) Trial Tr. at 105:7-106:5, 117:19-118:11 (Schnayer testim.).  According to

46

the testimony of both Mr. Papst and Mr. Schnayer, Mr. Mizukami told Mr. Papst at the meeting

that he, Mr. Mizukami, had told Minebea's HDD manufacturer customers that Minebea only had

licensing rights under the spindle motor patents, not the drive patents, and that when they

purchased Minebea motors, they did not purchase rights to Papst drive patents other than the

integrated baseplate patents.  See 7/28/05 (p.m.) Trial Tr. at 54:22-55:1, 55:6-16, 55:25-56:19;

(G. Papst testim.) 7/21/05 (p.m.) Trial Tr. at 118:3-19 (Schnayer testim.).

        75.     Mr. Schnayer testified that at the March 13, 1995 meeting he drew a diagram and

showed it to everyone at the meeting it to illustrate the relative costs of licensing a motor versus

licensing an entire hard disk drive assembly (including a motor).  He stated, by way of example,

that if it cost ten dollars to license a motor, it might cost one hundred dollars to license the hard

disk drive.  Schnayer testified that he showed the diagram to everyone in the room.  See 7/21/05

(p.m.) Trial Tr. at 107:6-15, 108:12-23, 109:18-110:6, 110:11-113:5 (Schnayer testim.); DTX

445, Handwritten notes and diagram by Schnayer re: meeting with Minebea (Mar. 13, 1995).[15]

Schnayer said he used this drawing to explain why a license to the drive patents would be much

more expensive than a license to the motor patents.  7/21/05 (p.m.) Trial Tr. at 108:14-23,

---

        [15]     On July 5, 2005, the Court stated that it would not admit "self-serving
contemporaneous notes" offered by either party for the purpose of corroborating the note-taker's
testimony.  7/5/05 Trial Tr. (a.m.) at 85:22-86:22 (comments by the Court).  This remains true.
In the course of this Opinion, the Court may, however, rely on contemporaneous notes when
(1) the content of the notes is adverse to the interests of the party who recorded them (as is the
case with Mr. Hymas' notes); (2) the notes are themselves directly corroborated by other
documents; or (3) the other side saw the notes at or about the time they were recorded, and did
not disagree with their content (as is the case with Mr. Schnayer's notes and diagram).  On this
basis, the Court has excluded the handwritten notes of Georg Papst prepared at and with respect
to the March 13, 1995 meeting, while at the same time admitting the Schnayer and Hymas notes.
See DTX 443, Handwritten notes of G. Papst re:  meeting with Minebea (Mar. 13, 1995)
(excluded); DTX 444 (translation of DTX 443) (excluded).

118:25-19:4 (Schnayer testim.); <u>see also</u> 7/28/05 (p.m.) Trial Tr. at 55:18-24, 56:2-25, 57:6-22

(G. Papst testim.). Mr. Mizukami, who attended the March 13, 1995 meeting and was present at

counsel table throughout the trial, was not called as a rebuttal witness to refute this testimony.

76.     At the March 13, 1995 meeting, Mr. Papst, on behalf of Papst Licensing, offered

the Papst drive patent rights to Minebea. <u>See</u> 7/21/05 (p.m.) Trial Tr. at 107:6-15, 108:12-23,

113:6-11 (Schnayer testim.). According to both Mr. Papst and Mr. Schnayer, Mr. Mizukami

stated that Minebea was not interested in obtaining licensing rights to the drive patents, that they

had anticipated this issue when they first negotiated with Papst Licensing, and that they had told

Minebea's sales people that customers purchasing motors from Minebea would not have an

advantage in this respect over customers purchasing from Nidec. 7/28/05 (p.m.) Trial Tr. at

58:5-18 (G. Papst testim.); 7/21/05 (p.m.) Trial Tr. at 113:6-17, 120:6-20 (Schnayer testim.).

According to Mr. Papst, Mr. Mizukami "said that Minebea, as a matter of principle, never

wanted drive patents." 7/28/05 Trial Tr. at 58:17-18 (G. Papst testim.). Mr. Mizukami was not

called to the witness stand to rebut this testimony.

77.     At the March 13, 1995 meeting, the parties agreed in principle on a global license

agreement for Minebea of Papst Licensing's patent rights, excluding Papst Licensing drive

patents. 7/28/05 (p.m.) Trial Tr. at 57:24-58:4 (G. Papst testim.); 8/2/05 (a.m.) Trial Tr. at 47:2-

10 (Hymas testim.). The parties further discussed the price Minebea would pay to Papst

Licensing for the proposed licensing rights. It was agreed that Mr. Hymas would prepare the first

draft of the global agreement, and that a meeting to sign the final agreement would occur on

June 19, 1995. <u>See</u> 7/28/05 (p.m.) Trial Tr. 59:5-21 (G. Papst testim.); 7/21/05 (p.m.) Trial Tr. at

115:2-116:8 (Schnayer testim.).

78.     There was no testimony from any witness that Mr. Mizukami or Mr. Hymas ever said to Mr. Papst or Mr. Schnayer at the March 13, 1995 meeting, in words or substance, "What are you talking about?  Minebea already has rights to the drive patents."  7/21/05 (p.m.) Trial Tr. at 113:14-17 (Schnayer testim.); 8/1/05 (p.m.) Trial Tr. at 69:19-25 (Hymas testim.).

79.     Douglas Hymas, Minebea's in-house lawyer, took notes during the March 13, 1995 meeting.  PTX 662, Handwritten notes of Douglas Hymas (Mar. 13, 1995); 8/1/05 (p.m.) Trial Tr. at 29:7-30:24 (Hymas testim.).  These contemporaneous notes state, in part:

> Papst distinguishes between motor patents and drive patents
>
> Minebea has licensed the motor patents only, with the exception of the base plate integration HDD motors, which is separately stated in a loan agreement?
>
> – but were not covered under drive patents unrelated to motors.

PTX 662. Handwritten notes of Douglas Hymas (Mar. 13, 1995); see also 8/1/05 (p.m.) Trial Tr. at 64:17-68:17 (Hymas testim.).  Mr. Hymas testified that at the meeting:

> Mr. Papst mentioned that Minebea had already licensed all the rights to any patents within the portfolio that related to the manufacture or sale of motors.  He also mentioned that we had not, we meaning Minebea, had not licensed the rights to hard disk drives except with respect to baseplate integrated patents.

8/01/05 (p.m.) Trial Tr. at 28:14-19 (Hymas testim.).  According to Mr. Hymas, Papst "distinguished between those patents that related to the manufacture and sale of motors and those patents that related to what was then called drives."  Id. at 30:16-19 ¶ 81.

80.     Mr. Hymas's testimony and notes corroborate the testimony of Mr. Papst and Mr. Schnayer that the subject of motor patents and drive patents was discussed at the March 13, 1995 meeting, and that Mr. Mizukami and Mr. Hymas were advised by Papst that Minebea only had

49

licensing rights to motor patents, except for the integrated baseplate patents, and that it did not

have rights under drive patents.  See PTX 662, Handwritten notes of Douglas Hymas (Mar. 13,

1995); 8/1/05 (p.m.) Trial Tr. at 27:22-30:24 (Hymas testim.).

81.     During his deposition in this case, Mr. Hymas was asked numerous simple

questions that he did not answer in a straightforward manner, or professed not to understand.  See

8/1/05 (p.m.) Trial Tr. at 39:20-40:23, 44:18-48:25, 49:1-50:6 (Hymas testim.) (discussing

deposition); 8/2/05 (a.m.) Trial Tr. at 39:21-42:12 (proffer); 8/2/05 (p.m.) Trial Tr. at 20:7-22:2

(Hymas testim.).

82.     At trial the Court found that Mr. Hymas' credibility as a witness was seriously at

issue because of his attitude and performance at his deposition.  The Court stated:

> Mr. Sweetland, you had to know that this was going to happen as
> soon as you called Mr. Hymas to testify, particularly after you read
> his deposition.  His credibility – I don't know why you called him
> at all, but his credibility is at issue, at serious issue.  And anything
> that goes to his credibility is going to be permitted for that purpose.

8/2/05 (a.m.) Trial Tr. at 27:13-18 (comments by the Court).

### 6.  The 1995 Settlement Agreement

83.     The written provisions of the 1995 Settlement Agreement were negotiated

primarily between Mr. Schnayer representing Papst Licensing and Mr. Hymas representing

Minebea.  The parties exchanged correspondence and drafts of the agreement, see DTX 527;

DTX 529; DTX 566; DTX 559; DTX 561; and discussed various provisions of the agreement

between June 1, 1995 and June 19, 1995.  See DTX 545, Letter from J. Schnayer to D. Hymas

enclosing appendices (June 19, 1995); 8/2/05 (a.m.) Trial Tr. at 67:16-68:17, 74:5-75:16 (Hymas

testim.); 7/22/05 (p.m.) Trial Tr. at 56:1-59:12 (Schnayer testim.).

50

84.     On June 2, 1995, Mr. Schnayer sent Mr. Hymas a letter and a revised draft Settlement Agreement.  DTX 529, Letter from J. Schnayer to D. Hymas re: draft of 1995 Settlement Agreement (June 2, 1995).  The letter states in part: "[W]e have made extensive changes to accurately reflect the difference between hard disk drive patents and hard disk drive spindle motor patents."  See id.; 7/22/05 (a.m.) Trial Tr. at 46:12-48:4, 54:6-23 (Schnayer testim.).

85.     On June 9, 1995, Mr. Schnayer sent a fax to Mr. Hymas which included the appendices to the 1995 Settlement Agreement.  DTX 546, Letter from J. Schnayer to D. Hymas re: appendices to 1995 Settlement Agreement (June 9, 1995).

86.     Appendix I to the 1995 Settlement Agreement lists patents defined as "Papst Patents" under the Agreement.  Appendix II lists patents defined as the "Papst Integrated Baseplate Patents."  Appendix III lists patents defined as "Papst Drive Patents."  PTX 771, DTX 567, 1995 Settlement Agreement (June 19, 1995), App. III.

87.     Appendix III to the 1995 Settlement Agreement identifies the "Papst Drive Patents" referred to in Paragraph 1.4 of the 1995 Settlement Agreement.  Appendix III contains the same patents listed in the attachment to Richard Smith's February 9, 1995 letter, except that the two integrated baseplate patents were deleted.  See DTX 409, Letter from R. Smith to O. Kuwert re: licensing rights (Feb. 9, 1995); DTX 545, Letter from J. Schnayer to D. Hymas enclosing appendices (June 19, 1995); 7/21/05 (p.m.) Trial Tr. at 94:3-95:21, 96:6-98:11 (Schnayer testim.); 5/29/05 Smith Dep. Tr. at 90:10-12.

88.     Mr. Hymas had a number of discussions with Mr. Schnayer between June 9, 1995 and June 19, 1995, when the Settlement Agreement was signed.  Some of these were by

51

telephone and some of them were face to face.  Mr. Hymas does not recall saying to Mr.

Schnayer or handing him a document that said in words or substance, "Why are you excluding

the drive patents? Minebea already has rights to the drive patents."  8/2/05 (a.m.) Trial Tr. at

80:20-81:11 (Hymas testim.).

89.     The settlement negotiations included a meeting on June 16, 1995 between Georg

Papst, Mr. Schnayer, Mr. Mizukami and Mr. Hymas.  During this meeting, the parties discussed

the scope of Papst Licensing's integrated baseplate patents.  7/22/05 (a.m.) Trial Tr. at 67:23-

69:18, 71:20-72:8 (Schnayer testim.); 7/28/05 (p.m.) Trial Tr. at 67:11-23 (G. Papst testim.).

These patents were licensed to Minebea in 1993 when the Joint Venture was terminated, and the

1995 Settlement Agreement reflected that prior license.  PTX 771, DTX 567, 1995 Settlement

Agreement (June 19, 1995) App. II.

90.     Georg Papst testified that he was not sure whether rights to Papst Licensing drive

patents other than the integrated base plate patents were discussed at the June 16, 2005 meeting,

but he was clear that, if they were, the response from Mr. Mizukami was "a clear no, Minebea

was not interested in any other drive rights."  7/28/05 (p.m.) Trial Tr. at 67:24-68:7 (G. Papst

testim.).  He further recalled that at the March 13, 1995 meeting Minebea had made clear that it

was not interested in any drive rights other than rights to the integrated base plate patents.  Id. at

68:10-15.  Mr. Papst testified that he had "officially" offered the drive rights to Minebea "at a

minimum three times," "but they were always rejected."  Id. at 71:6-9.  Mr. Mizukami never

contradicted this testimony.

91.     The 1995 Settlement Agreement between Papst Licensing and Minebea was signed by both parties on June 19, 1995.  PTX 771, DTX 567, 1995 Settlement Agreement (June 19, 1995).  The relevant terms of the 1995 Settlement Agreement are discussed infra at 69-92.

7.  Papst's Licensing Agreements With Minebea's Customers

92.     Starting in 1998, Papst Licensing entered into license agreements with HDD manufacturers Fujitsu, Samsung Electronics Co., Ltd., Hitachi Corp., Toshiba Co., NEC Co., Epson Electronics America, Inc., Hewlett Packard Co., and Seagate, granting the manufacturers rights under Papst Licensing's so-called disk drive patents.  See 7/25/05 (a.m.) Trial Tr. at 53:19-54:4; 54:20-24; 59:9-60:2; 60:9-15; 64:22-65:10; 65:22-24; 66:8-24; 77:12-79:11 (Schnayer testim.); 7/19/05 (p.m.) Trial Tr. at 12:19-24; 14:25-15:6 (Gardner testim.); PTX 1211, License agreement between Papst Licensing and Samsung Electronics Co. (Dec. 11, 1998); DTX 627, License Agreement between Papst Licensing and Fujitsu (Nov. 15, 1998); DTX 632, License agreement between Papst Licensing and Hitachi Corp. (Mar. 4, 1999); PTX 1232, License agreement between Papst Licensing and Toshiba Co. (Mar. 15, 1999);  PTX 1247, License Agreement between Papst Licensing and NEC Corp. (July 13, 1999); PTX 1278, License agreement between Papst Licensing and Hewlett Packard Co. (Apr. 4, 2000); PTX 1312, License agreement between Papst Licensing and Epson Electronics America, Inc. (June 26, 2001); PTX 1345, License agreement between Papst Licensing and Seagate (Sept. 30, 2002); PTX 1387, License agreement between Papst Licensing and Hitachi (Feb. 20, 2004).

93.     Fujitsu, Samsung Electronics Co., Ltd., Hitachi Corp., Toshiba Co., NEC Co., Epson Electronics America, Inc., Hewlett Packard, and Seagate agreed to pay Papst Licensing a

lump sum royalty for rights under Papst Licensing's drive patents in settlement of controversies between these companies and Papst.  See DTX 627, License Agreement between Papst Licensing and Fujitsu (Nov. 15, 1998); PTX 1211, License agreement between Papst Licensing and Samsung Electronics Co. (Dec. 11, 1998);  DTX 632, License agreement between Papst Licensing and Hitachi Corp. (Mar. 4, 1999); PTX 1232, License agreement between Papst Licensing and Toshiba Co. (Mar. 15, 1999); PTX 1247, License Agreement between Papst Licensing and NEC Corp. (July 13, 1999); PTX 1312, License agreement between Papst Licensing and Epson Electronics America, Inc. (June 26, 2001); PTX 1278, License agreement between Papst Licensing and Hewlett Packard Co. (Apr. 4, 2000); PTX 1345, License agreement between Papst Licensing and Seagate (Sept. 30, 2002).

94.      Papst Licensing entered into a second license agreement with Hitachi on January 1, 2003 for rights under all existing and future claims (including claims of all related patents, reissues, and reexaminations), and claims of patent applications anywhere in the world that cover inventions relating to disk drive products including U.S. Patent Nos. 5,216,557, 5,424,887, 5,446,610, 5,557,487, 5,661,351, 5,801,900, 5,864,443, 5,887,916, 6,271,988, Re 34,412, Re 35,792, Re 37,058, and Re 38,178.  See PTX 1387, License agreement between Papst Licensing and Hitachi (Jan. 1, 2003); see 7/19/05 (p.m.) Trial Tr. at 12:19-24 (Gardner testim.).

### 8.  The Instant Litigation and Consolidated Cases

95.      On June 22, 1999, Hewlett-Packard filed an action against Papst Licensing and Papst Motoren in the United States District Court for the District of Delaware, seeking a declaratory judgment of non-infringement, invalidity, and exhaustion of Papst Licensing's disk drive patents, including Re 32,702; 4,535,373; 4,922,406; 5,424,887; 5,237,471; 4,519,010;

54

Re 34,412; 4,894,738; 5,216,557; 5,446,610; 5,001,581; 5,006,943; 5,040,085; 5,173,814;

5,422,769; 5,661,351; 4,517,480; 4,667,122; 5,361,010; 5,801,900; and 5,557,487.  See Hewlett-

Packard Co. v. Papst Licensing GmbH, Civil No. 99-395 (D. Del. June 22, 1999); 7/25/05 (a.m.)

Trial Tr. at 79:11-17 (Schnayer testim.); PTX 2816, Complaint.  The case subsequently was

transferred by the MDL Panel to the Eastern District of Louisiana.  See Hewlett-Packard Co. v.

Papst Licensing GmbH, Civil No. 99-3119 (E.D. La. Oct. 26, 1999).  The parties dismissed the

case voluntarily on April 12, 2000.

    96.     On July 15, 2002, Papst Licensing sued Western Digital Corp., Seagate

Technology LLC, Veritas Software Technology Corp., Excelstor Technology Ltd., Shenzen

Excelstore Technology Ltd., and Excelstore Technology Inc. in the United States District Court

for the Central District of California for infringement of Papst Licensing's so-called disk drive

patents, including U.S. Patent Nos. Re 32,702; B1 Re 32,702; 4,519,010; 4,535,373; 4,922,406;

5,216,557; Re 34,412; 5,424,887; 5,446,610; 5,557,487; 5,661,351; 5,708,539; 5,729,403; Re

35,792; 5,777,822; 5,796,548; 6,801,900; 5,864,443; and Re 37,058.  See Papst Licensing GmbH

v. Western Digital Corp., Civil No. 02-0650 (C.D. Cal. 2002); PTX 2815, Patent Infringement

Complaint.  That case also was transferred to the Eastern District of Louisiana by order of the

MDL Panel.  See Papst Licensing GmbH v. Western Digital Corp., Civil No. 2-3750 (E.D. La.

2002).  It then was consolidated with the other pending related cases and stayed.

## C. The Written Contracts Define the Parties' Relationship

    Fundamental to the Joint Venture and to the parties' relationship after its

termination was a set of contractual provisions under which Minebea – but not its customers –

was licensed to manufacture, use and sell hard disk drive motors that would infringe certain of

Papst's patents.  The Court discusses this arrangement as it existed in three stages:  (1) during the

life of the Joint Venture; (2) after the termination of the Joint Venture; and (3) after the parties

signed the 1995 Settlement Agreement.

### 1.  Minebea's Rights During the Joint Venture

The Joint Venture between Papst and Minebea commenced on November 5, 1990,

with the execution of the Joint Venture Agreement.  See PTX 193, Joint Venture Agreement

(Nov. 5, 1990).  The Agreement for the Sale of Intangible Assets, signed the same day, provided

that:

> Papst as the holder of patents (for the purposes of this agreement
> the term "patent" is defined as patents, and patent applications)
> grants to Minebea the right to use all of its patents; especially the
> predominant German patents and the corresponding international
> patents, enumerated in Exhibit B [sic C] attached hereto, world-
> wide as far as they are required and necessary for research and
> development (R+D), manufacturing, engineering, use and sale of
> HDD motors.  Minebea as licensee is not entitled to use the patents
> in other fields.

PTX 195, Agreement for the Sale of Intangible Assets (Nov. 5, 1990) ¶ 4(a) (emphasis added).

With regard to patents not yet in existence at the time of the Agreement, it further provided:

> Patents which arise or are acquired by Papst during the life of this
> agreement and which may be required and necessary for research
> and development (R+D), manufacturing, engineering, use and sale
> of HDD Motors shall be made available by Papst by granting
> licenses to Minebea with the provisions of this Article 4(a)-(c)
> without additional royalties.

Id. ¶ 4(d) (emphasis added).  Thus, during the Joint Venture (when the Agreement for the Sale of

Intangible Assets was entirely in effect), Minebea was licensed under Papst patents that either

existed before the agreement was signed, or arose or were acquired during the life of the

agreement, to the extent that such licenses were "required and necessary" for research and development, manufacturing, engineering, use and sale of motors.  Id.  Minebea was not licensed to use the patents "in other fields."  Id. ¶ 4(a).

Minebea argues that Paragraphs 4(a) and 4(d) of the Intangible Assets Agreement granted it "broad rights" to many of Papst's patents, including patents that have claims on motors and disk drives.  The Court finds, however, that Minebea's claims are overblown and not supported by the language of the Agreement.

a.  Minebea's rights under Paragraph 4(a) of the Intangible Assets Agreement

i.  "Required and Necessary" under the Intangible Assets Agreement

The phrase "required and necessary for research and development (R+D), manufacturing, engineering, use and sale of HDD motors" is employed in the 1990 Intangible Assets Agreement and in other agreements between the parties, but it is never defined precisely in any contract.  Nor does Minebea offer its own interpretation of the term in its post-trial briefs. Its arguments, however, proceed as though the term imposed no restriction whatsoever on the scope of the rights granted to Minebea, apparently because, it argues, "the technology taught in the Papst Patents at issue was 'required and necessary' for Minebea's HDD spindle motors." Minebea Br. at 14.  To the contrary, a reading of the agreements in context makes plain that this phrase explicitly limits the rights Minebea secured under the 1990 Intangible Assets Agreement and other agreements between the parties.

The language of the 1990 Intangible Assets Agreement itself is limiting: Papst grants to Minebea "the right to use all of its patents . . . as far as they are required and necessary for research and development (R+D), engineering, manufacturing use, and sale of HDD motors."

57

PTX 195, Agreement for the Sale of Intangible Assets (Nov. 5, 1990) ¶ 4(a).[16]  This is not an

open-ended license grant: It is a license to use Papst patents only "as required and necessary" for

manufacturing and sale of hard disk drive motors only.  Minebea is expressly "not entitled to use

the patents" in fields other than the manufacture, use and sale of HDD motors.

       The 1990 Agreement for the Sale of Intangible Assets does not have a choice-of-

law provision, but the parties agree that the substantive law of Germany governs.[17]  Under

German law, where a contract is ambiguous, it must be interpreted to determine the real intention

of the parties at the time of the conclusion of the agreement.  See Expert Report of Dr. Andreas

Junius (June 20, 2005) (Docket No. 1479) at 32-33.  But under German law the parties'

---

[16]     The term "required and necessary" also was used in the 1993 Termination Agreement, which provided for the "continued granting of licenses" by Papst to Minebea "for all patents and patent applications required and necessary in the field of HDD motor R+D, manufacturing, engineering, use and sale of such motors in as far as such patents and patent applications are available to P at the time this TA [Termination Agreement] becomes effective[.]"  PTX 470, 1993 Termination Agreement (May 3, 1993), Article 1.2(c).

[17]     In his Report and Recommendation No. 31, issued on June 12, 2005, the Special Master noted the parties' agreement that German law governs the 1990 Agreement for the Sale of Intangible Assets:

> Papst argues, and Minebea appears to agree, that German law
> governs (1) Minebea's August 1993 discharge of Georg Papst,
> (2) the April 1993 Alteration Agreement, (3) the 1993 Contract of
> Sale, and (4) two 1990 agreements and another 1993 agreement.
> (Agreements (2) and (3) expressly refer to German law as the
> relevant law.).

Report and Recommendation No. 31 (June 12, 2005) (Docket No. 979) at 15.  The two 1990 agreements referred to by the Special Master are the German Joint Venture Agreement and the Agreement for the Sale of Intangible Assets.  In upholding the Special Master's recommendation with respect to the conversion claims and rejecting his recommendations with respect to the applicability of New York law to other now dismissed claims in favor of German law, the Court took note of this agreement.  See Minebea v. Papst, 377 F. Supp. 2d 34, 38 & n.3 (D.D.C. 2005).

<u>subsequent</u> behavior also may be relevant to the interpretation of the agreement – particularly where, after the conclusion of the agreement, the parties expressly or impliedly agree on a certain interpretation.  Such subsequent behavior may be an indication of the intention of the parties at the time of the conclusion of the agreement.  <u>See</u> <u>id.</u> at 33 (citing BENKARD, COMMENTARY TO THE GERMAN PATENT LAW (9th ed. 1993) § 15 n.66).  Such is the case here, as reflected by the subsequent written agreements between the parties.

The Loan Agreement signed in 1993 (in connection with the termination of the Joint Venture and with Papst Licensing's acquisition of the Papst Motoren patent portfolio) affords some insight into the meaning of the term "required and necessary" as it was intended in the 1990 Agreement for the Sale of Intangible Assets, and as the term continued to be used by the parties.  The Loan Agreement expressly provided that Paragraph 4(a) of the Intangible Assets Agreement remained in force.  PTX 1467, 1993 Loan Agreement (Apr. 27, 1993) § 3(1).  Thus, Minebea could continue to use Papst's patents to the extent they were "required and necessary" for Minebea's motor business.  The Loan Agreement went on to expressly declare that certain "drive patents" – namely, the '702 and '491 patents – were not licensed under "this present agreement" (the 1993 Loan Agreement itself) or under the 1990 Agreement for the Sale of Intangible Assets, stating:

> It is understood between the parties that such license shall not apply to the so called drive patents (US-Pats: B1 Re. 32,702 and 4,337,491 and Jap. Pat. Appl. 142 123/1979 and German Patent 29 44 212), <u>so called Drive Patents, which are not licensed under the Intangible Assets Agreement and are not licensed under this present agreement</u>.  It is understood that purchasers of products from Minebea, PMDM-G and PMDM-T are not licensed under such Drive Patents, <u>notwithstanding the use of such purchased products in disk drives or other produkts [sic] made, used or sold by such purchasers.</u>

PTX 1467, 1993 Loan Agreement (Apr. 27, 1993), § 4(3) (emphasis added).  This provision, while specifically identifying certain specific "so called drive patents," when viewed in the context of all these agreements, makes clear that the parties did not consider drive patents in general to be "required and necessary" for the HDD motor business:  Minebea was licensed under all patents "required and necessary" for the motor business, but specifically was <u>not</u> licensed under the '702 patent and U.S. Patent No. 4,337,491, both of which were drive patents (Re '702 is actually a reissue of the '491 patent).

 The Loan Agreement also stated that Minebea's customers were <u>not</u> licensed under the drive patents.  PTX 1467, 1993 Loan Agreement (Apr. 27, 1993) § 4(3).  ("It is understood that purchasers of products from Minebea [or the Joint Venture] are not licensed under such Drive Patents . . .").  The agreement that these specific drive patents were not licensed under the 1993 Loan Agreement and were "not licensed" under the 1990 Intangible Assets Agreement is evidence that drive patents in general are not "required and necessary" to engage in the manufacture and sale of HDD motors.

 Under German law, a license grant is construed narrowly because it is always assumed that the owner of the intellectual property intends to grant "only the minimum rights necessary for the fulfillment of the purposes of the license agreement."  Junius Expert Report at 34.  The purpose of the 1990 Agreement for the Sale of Intangible Assets was to facilitate Papst and Minebea's cooperation in the "research and development (R+D), manufacturing, engineering, use and sale of HDD motors."  PTX 195, Agreement for the Sale of Intangible Assets (Nov. 5, 1990) ¶ 4(a).  As a practical matter, rights under the drive patents are not needed in the motor business – that is, they are not "required and necessary" for the research and

development, manufacturing, engineering, use and/or sale of <u>motors</u>, because (among other reasons) a motor manufacturer does not directly infringe such patents.  <u>See</u> <u>infra</u> at 89-92, 95-99.

Objective evidence from the marketplace confirms that rights under drive patents are not "required and necessary" to engage in the motor business.  The Court already has indicated that the negotiations between Mr. Smith and Mr. Schnayer with Nidec are not directly relevant because Papst's agreement with Nidec was a different agreement containing different language and different terms.  <u>See</u> 8/3/05 (p.m.) Trial Tr. at 67:25-68:9, 68:22-25, 73:11-16 (oral ruling by the Court).  Furthermore, what was in Mr. Schnayer's mind about the Nidec negotiations when he negotiated with Minebea is not directly relevant unless he communicated his thoughts to the Minebea representatives with whom he was negotiating.  <u>Id</u>. at 69:1-23.  Nevertheless, the evidence at trial showed that Nidec was the market leader in the manufacture of HDD motors at the time that Minebea and Papst created the joint venture.  <u>See</u> <u>supra</u> at 24; <u>infra</u> at 264.  In fact, the motivation for entering into the joint venture for both Minebea and Papst was to allow this new entity to compete effectively in the spindle motor market with Nidec, which at the time dominated that market.  <u>See</u> <u>supra</u> at 24; 7/6/05 (a.m.) Trial Tr. at 76:13-77:17 (Mizukami testim.).  Thus, while the terms of Nidec's license are not directly relevant, this evidence does tend to show that when Nidec, the market leader, sells its motors in the marketplace, it does not pass on a license to its customers to infringe Papst's drive patents – and therefore that a motor manufacturer need not have the right to give its customers sublicenses to drive patents to successfully participate in the motor business.  Such a right is not "required and necessary" to engage in the manufacture and sale of HDD motors.

In light of this interpretation of the term "required and necessary," the Court finds that under Paragraphs 4(a) and 4(d) of the 1990 Agreement for the Sale of Intangible Assets, Minebea was authorized to sell motors under (1) those Papst patents which Minebea's motors would directly infringe (that is, the motor patents), and (2) certain drive patents which might be contributorily infringed by Minebea's motors (or which Minebea's sale of motors might induce infringement of), but only to the extent required and necessary to protect Minebea from patent infringement lawsuits brought by Papst against Minebea itself.  In other words, Minebea's license under Papst patents claiming a motor plus other drive elements is limited to contributory infringement and inducement of infringement, since nothing more is "required and necessary" for Minebea's participation in the motor business.  Any other interpretation of the Intangible Assets Agreement strains logic and would afford Minebea rights it did not bargain for.

ii.  Corresponding international patents

Minebea also argues that under Paragraph 4(a) of the Intangible Assets Agreement it obtained rights to various drive patents because they are the "corresponding international patents" of German patents and patent applications enumerated in Exhibit C to the 1990 Agreement for the Sale of Intangible Assets.  According to Minebea, any U.S. patent claiming priority based on a particular patent earlier is by definition a "corresponding international patent," so long as at least one claim in the later U.S. patent is supported by the earlier foreign application.  See Minebea Br. at 9-10.

Minebea relies for this proposition primarily on the testimony of its patent law expert, Martin Adelman.  See Written Direct Testimony of Martin J. Adelman (July 4, 2005) (Docket No. 1237) ¶ 11.  Professor Adelman says that a United States patent filed within one

year of an earlier German patent "corresponds" to that earlier German patent if there is even one claim of priority. See id. ¶¶ 9, 10. Papst's patent law expert, George Gerstman, disagrees. In Mr. Gerstman's opinion, there must be more than a claim of priority for two patents to be considered "corresponding." While priority may be one factor to consider in making this determination, priority alone is not enough. In Mr. Gerstman's view, the allegedly corresponding patent must have a similar subject matter to the earlier patent in order to be a corresponding patent. 8/2/05 (p.m.) Trial Tr. at 63:11-18 (Gerstman testim.). Similar disclosures in the two patents are more important than priority alone; there must be "a lot of similar subject matter" for the later patent to be considered a corresponding patent. Id. at 70:21. Priority alone is insufficient because a patent can request priority based on an earlier patent even where the two patents have only "a minute amount of similar disclosure" – that is, the two patents may disclose vastly different inventions, despite what is – in Mr. Gerstman's view – an improper claim of priority. Id. at 65:25-66:3, 70:12-18.

     After Mr. Gerstman testified, Professor Adelman did not attempt to refute this view or reinforce the statement in his written direct testimony. Rather, he seemed in his supplemental declaration to accept the notion that common subject matter is important. See Supplemental Declaration of Martin J. Adelman (Aug. 9, 2005) (Docket No. 1573) ¶ 5 ("the claim of foreign priority can only be made where one or more claims of the subsequent application are supported by an adequate disclosure in the foreign priority document."). The Court accepts Mr. Gerstman's expert opinion over that of Professor Adelman and finds that, in the absence of proof by Minebea that a later filed patent has substantially similar subject matter

63

as the earlier patent, Minebea has failed to prove that any single patent at issue here is the "corresponding international patent" of any German patent.[18]

Paragraph 4(a) of the Intangible Assets Agreement granted Minebea the rights to all of Papst's patents that existed or had been applied for on the date the Intangible Assets Agreement was executed, but only insofar as such rights were "required and necessary" for the research and development, manufacturing, engineering, use and sale of HDD motors.  The Court finds that Minebea's rights included the right not to be sued for contributory infringement of the drive patents, but did <u>not</u> include either a license to directly infringe the drive patents or the right to provide Minebea's customers with sublicenses to those patents.  Furthermore, Minebea has not demonstrated that it was licensed to any particular patent by virtue of its being the "corresponding international patent" of the German patents or patent applications listed in Exhibit C of the Intangible Assets Agreement.

b.  Minebea's rights under Paragraph 4(d) of the Intangible Assets Agreement

Paragraph 4(d) of the Intangible Assets Agreement is clear on its face, and requires little interpretation.  Under this provision, Minebea acquired license rights to all patents which "arose" or "were acquired" during the life of the Joint Venture – that is, between November 5, 1990 and May 3, 1993 – to the extent that such licenses were "required and necessary."  The parties agree that a patent "arose" during this time if it was issued or applied for

---

[18]     Even if Minebea were correct, it would not follow that Minebea, much less its customers, had rights to use the drive patents, because (as has been discussed) Minebea was licensed to Papst's patents only to the extent required and necessary for the research and development, manufacturing, engineering, use and sale of its motors.  <u>See</u> PTX 195, Sale of Intangible Assets Agreement (Nov. 5, 1990) ¶ 4(a).

during this period.  See Minebea Br. at 16; Papst Opp. at 18; Minebea's Prop. Concl. of Law
¶¶ 2.3; 1.9.[19]

The Court therefore finds that, during the period of the Joint Venture Minebea
was licensed under all of Papst's patents that existed at the start of the Joint Venture or were
issued, applied for, or acquired during the Joint Venture, but only to the extent that such a license
was required and necessary to Minebea's participation in the HDD motor business.

There are 31 patents at issue in Minebea's patent exhaustion claim.  See infra
note 50.  Among these are fifteen that existed at the start of the Joint Venture or that were issued,
were applied for, or were acquired during the Joint Venture.[20]  Sixteen arose or were acquired
after the Joint Venture was terminated.  See infra note 23.  Minebea had rights with respect to the
former groups of patents to the extent a license to use them was "required and necessary" to
Minebea's participation in the Joint Venture before it was terminated.  And, as discussed infra at
66-68, even after termination, Article 1.2(c) of the Termination Agreement specifically provided
for the "continued granting of licenses by [Papst] to [Minebea] for all patents and patent
applications required and necessary in the field of HDD motor R+D, manufacturing, engineering,
use and sale of such motors in as far as such patents and patent applications are available to

---

[19]     Papst claims in its response to Minebea's post-trial brief that Minebea argues that
Paragraph 4(d) encompasses patents applied for after the May 3, 1993 Termination Agreement
"if they 'claim a priority date from an earlier filed application.'"  Papst Opp. at 17-18.  Although
it makes this argument as to patents licensed under Paragraph 4(a) of the Intangible Assets
Agreement, Minebea makes no such argument with respect to Paragraph 4(d).  See Minebea Br.
at 16.

[20]     No patents that were "acquired" during the life of the Joint Venture appear to be at
issue in this case.

[Papst]" at the time of termination.  PTX 470, Termination Agreement (May 3, 1993), Article

1.2(c); see also id., Article 7.

### 2.  Minebea's Rights After Termination of the Joint Venture

The termination of the Joint Venture on May 3, 1993, did not extinguish all of

Minebea's rights under Papst's patents.  Some provisions of the earlier contracts remained in

effect, while others ceased.  As a consequence, Minebea continued to enjoy some but not all of

the patent rights it had secured under those agreements.  As before, with the exception of the

precise meaning of the term "required and necessary," the terms of the contracts ending the Joint

Venture are clear and unambiguous.

The 1993 Termination Agreement provided that several of the prior agreements,

including the General Business Agreement and the German Joint Venture Agreement, would

cease to be legally binding as of the date of termination.  See PTX 470, Termination Agreement

(May 3, 1993), Article 2(b), 2(c).  Some provisions of the 1990 Agreement for the Sale of

Intangible Assets, however, remained in effect:  Paragraphs 4(a), 4(b) (partially), 4(c) (partially),

5(b) (partially), 8, 9(a) (partially), and 9(b).  See id., Article 9.1.  All other provisions of the

Intangible Assets Agreement – including, significantly, Paragraph 4(d) – ceased to be effective

when the Termination Agreement was signed.  See id., Article 9.2.[21]

The Termination Agreement provided that, following termination of the Joint

Venture, Minebea would continue to have patent rights as follows:

---

[21]      This partial cessation of the Intangible Assets Agreement was reiterated in the
1993 Loan Agreement.  See PTX 1467, 1993 Loan Agreement (Apr. 27, 1993), § 3(1).

> Continued Granting of licenses by P [Papst] to M [Minebea] for all patents and patent applications required and necessary in the field of HDD motor R+D, manufacturing, engineering, use and sale of such motors in as far as such patents and patent applications are available to P at the time this TA [Termination Agreement] becomes effective[.]

PTX 470, Termination Agreement (May 3, 1993), Article 1.2(c).[22]  It also provided:

> P shall continue to grant to M the right to use all the patents and patent applications, as defined in article 1.2. c) above and <u>as they have arisen or were acquired by P during the life of the I.A. [Intangible Assets Agreement] and in accordance with its terms and conditions.</u>  A list of the latter ones (i.e. those arisen or acquired by P during the life of the I.A.) is hereto attached as Exhibit B, provided however that if there is any such patent not listed in Exhibit B the forgoing provision nevertheless shall apply to such patents.

<u>Id.</u>, Article 7 (emphasis added).  Thus, although Paragraph 4(d) of the Agreement for the Sale of Intangible Assets ceased to have effect on termination, the Termination Agreement itself expressly provided that Minebea would <u>retain</u> the rights it had acquired under that provision to patents that had arisen or had been acquired by Papst during the life of the Joint Venture.

As the Court has discussed, <u>supra</u> at 32-33, 57-62, under Paragraph 4(a) of the 1990 Intangible Assets Agreement Minebea is licensed only to patents and pending patent applications already in existence at the time of the 1990 Intangible Assets Agreement, and only insofar as license rights are "required and necessary" to Minebea's motor business.  Paragraph 4(d) of the Intangible Assets Agreement similarly gave Minebea the "required and necessary" rights to patents that arose or were acquired by Papst during the life of that Agreement, which rights were preserved by Article 1.2(c) and Article 7 of the Termination Agreement.

---

[22]     Like the 1990 Agreement for the Sale of Intangible Assets, the Termination Agreement leaves the term "required and necessary" undefined.

In sum, after termination of the Joint Venture Minebea was licensed under all Papst patents "required and necessary" to the motor business that either had been filed by the time the Intangible Assets Agreement was executed on November 5, 1990, or that arose or were acquired by Papst between that date and the execution of the Termination Agreement on May 3, 1993.  Minebea had no rights to any patents that "arose" or were "acquired" by Papst after termination of the Joint Venture.[23]  Minebea also was not licensed to directly infringe Papst's drive patents, and explicitly was not granted the right to give its customers sublicenses to Papst's patents.  See PTX 195, Agreement for the Sale of Intangible Assets (Nov. 5, 1990) ¶ 4(c).

---

[23]     Among those patents that arose after termination are 16 of the 31 patents, see infra note 50 (full list of 31 patents), that Minebea maintains are at issue in Minebea's patent exhaustion claim:

U.S. Patent No. 5,422,769, which issued from an application filed April 4, 1994.
U.S. Patent No. 5,424,887, which issued from an application filed August 16, 1993.
U.S. Patent No. 5,557,487, which issued from an application filed May 30, 1995.
U.S. Patent No. 5,708,539, which issued from an application filed June 2, 1995.
U.S. Patent No. 5,729,403, which issued from an application filed April 17, 1995.
U.S. Patent No. 5,774,302, which issued from an application filed June 6, 1995.
U.S. Patent No. 5,777,822, which issued from an. application filed June 2, 1995.
U.S. Patent No. 5,801,900, which issued from an application filed June 6, 1995.
U.S. Patent No. 5,864,443, which issued from an application filed February 20, 1998.
U.S. Patent No. 5,946,161, which issued from an application filed April 16, 1998.
U.S. Patent No. Re 35,792, which issued from an application filed April 1, 1997.
U.S. Patent No. Re 37,058, which issued from an application filed March 4, 1997.
U.S. Patent No. Re 38,178, which issued from an application filed June 18, 1999.
U.S. Patent No. Re 38,601, which issued from an application filed June 18, 1999.
U.S. Patent No. Re 38,662, which issued from an application filed June 18, 1999.
U.S. Patent No. Re 38,673, which issued from an application filed June 18, 1999.

Because all of these patents issued from applications filed after termination of the Joint Venture, Minebea had no rights under the Termination Agreement or earlier agreements to any of these 16 patents (even if they were "required and necessary" to the motor business).

3.  Minebea's Rights Under the 1995 Settlement Agreement

On June 19, 1995, Papst and Minebea entered into a Settlement Agreement "to amicably resolve in a full, final and complete manner" claims by Papst that Minebea was infringing certain patents owned by Papst.  See PTX 771, 1995 Settlement Agreement (June 19, 1995) at 1.  Another goal of the Agreement was "to ensure that no such dispute arises in the future in relation to past, current or future intellectual property rights of Papst[.]"  Id.

The 1995 Settlement Agreement preserved some of Minebea's existing rights to Papst's patents, while redefining its rights with respect to others.  The Agreement defined four classes of patents (which the Court later discusses) – "Papst Patents," "Papst Drive Patents," "Future Patents," and "Integrated Baseplate Patents" – and, in Paragraph 3.1, stated:

> This Agreement supersedes and extinguishes all obligations of Minebea under agreements previously entered into between the parties in regards to the license of any Papst Patent. . . (hereinafter referred to as "Prior Agreements"), and the parties acknowledge that from the Effective Date hereof [June 19, 1995] this Agreement shall govern the relationship between them.[24]  Nothing herein shall be construed as limiting or abridging the rights of Minebea under such agreements, and any such rights are incorporated herein and preserved hereby.  However, with regard to the rights and obligations of the parties to this Agreement concerning Papst Drive Patents and Papst Integrated Baseplate Patents, such rights and obligations shall be governed only by the provisions of this Agreement.

---

[24]    The relevant "Prior Agreements" – that is, those referred to in Paragraph 3.1 – were included as Appendix IV to the 1995 Settlement Agreement.  They are the 1993 Loan Agreement, the 1990 License Agreement, and the 1990 Agreement for the Sale of Intangible Assets.  See PTX 771, DTX 567, 1995 Settlement Agreement (June 19, 1995), App. IV. Throughout this Opinion, in the parties' briefs, and in the underlying documents, the Court and the parties refer variously to these contracts as the "prior," "previous," or "earlier" agreements.

69

See PTX 771, DTX 567, 1995 Settlement Agreement (June 19, 1995) ¶ 3.1 (emphasis added) (footnote added).[25]

        The plain meaning of Paragraph 3.1 is that the 1995 Settlement Agreement relieves Minebea of all its "obligations" under all prior agreements with respect to all Papst Patents, but preserves all its "rights" under the prior agreements; except that the parties' rights and obligations concerning Papst Drive Patents and Papst Integrated Baseplate Patents are governed exclusively by the terms of the 1995 Settlement Agreement.  Indeed, the Court already has held it to be clear from this language that "[t]he rights and obligations of all parties to the 1995 Settlement Agreement, with respect to the Papst Drive Patents, are limited to those expressly enumerated in the 1995 Settlement Agreement."  Minebea Co. v. Papst, 374 F. Supp. 2d 202, 206 (D.D.C. 2005).[26]  It is also clear, however, that the Settlement Agreement preserved Minebea's pre-existing rights with respect to all patents other than the Papst Drive

---

[25]    When the Court refers specifically to the Papst Drive Patents, the words "Papst Drive Patents" will be capitalized.  When it refers to drive patents of Papst generally – a broader category, which includes but is not limited to the Papst Drive Patents listed in Appendix III to the 1995 Settlement Agreement – "drive patents" will not be capitalized.

[26]    At an earlier stage of this litigation, Minebea argued that the 1995 Settlement Agreement preserved all of Minebea's rights under previous agreements with respect to the Appendix III Patents (the "Papst Drive Patents").  See Minebea Mot. at 29-30.  In its June 24, 2005 Exhaustion Opinion, however, the Court held this position to be contrary to the plain language of the Settlement Agreement.  See Minebea Co. v. Papst, 374 F. Supp. 2d at 206 (citing Settlement Agreement ¶ 3.1).  Minebea now acknowledges that the only rights it has to the Papst Drive Patents and Integrated Baseplate Patents (which are not at issue here) are those expressly enumerated in the 1995 Settlement Agreement.  See Minebea Br. at 8.

Patents and Integrated Baseplate Patents – for example, the Papst Patents, including but not limited to those listed in Appendix I of the Settlement Agreement.[27]

Having discussed Minebea's rights under the prior agreements, the Court now turns to the other terms of the 1995 Settlement Agreement, and to the rights Minebea secured thereunder.

### a. Definitions

The 1995 Settlement Agreement sets forth two definitional terms of importance here: "Disk Drives" and "Counterparts."  The term "Disk Drive" is defined as follows:

> "Disk Drive" shall mean an assembly including a spindle motor, a clean room chamber, one or more data storage disks mounted on the spindle, and data heads mounted to access data on the disk(s), but shall not mean the separate constituent components of such assembly.

PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶ 1.9.  The term "Counterparts" is defined as follows:

> "Counterparts" shall mean any and all patents which arise from any (i) reissue, reexamination or extension of a patent, (ii) foreign patents and foreign patent applications based on or corresponding to such patent and (iii) continuations, divisionals and continuations-in-part.

---

[27]     Minebea does argue, somewhat cryptically, that "[p]rior to June of 1995, Minebea's rights with respect to all patents (including the Appendix III Drive Patents) are governed by the earlier agreements."  Minebea Br. at 8.  It is unclear whether Minebea means by this that (1) Minebea had some rights to the Papst Drive Patents under the earlier agreements, which rights were superseded or extinguished when the Settlement Agreement was signed in June 1995, or that (2) Minebea's rights to Papst Drive Patents that originated before June 1995 are governed by the earlier agreements, not by the 1995 Settlement Agreement.  If Minebea intends to argue the former, it does so without explaining how such a fact, if true, is at all relevant to its case; if it intends to argue the latter, it is simply wrong.

PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶ 1.6.  Because it includes continuations-

in-part, the term "Counterparts" includes even patents that add new matter to the original patent.

See id.; MANUAL OF PATENT EXAMINING PROCEDURE, § 201.08 ("A continuation-in-part is an

application filed during the lifetime of an earlier nonprovisional application, repeating some

substantial portion or all of the earlier nonprovisional application and adding matter not disclosed

in the said earlier nonprovisional application.") (emphasis in original).

> The 1995 Settlement Agreement also sets forth three categories of patents that are

relevant here: "Papst Patents," "Papst Drive Patents," and "Future Patents."[28]  What rights

Minebea secured with respect to particular patents depends largely on which of the categories

each patent falls into.

> "Papst Patents" are defined as follows:
>
> > "Papst Patents" shall mean any and all patents and patents pending,
> > including Counterparts thereof, naming Georg Papst as an inventor
> > (including those in which he is named as a joint inventor with
> > another), or which is owned, controlled, licensed or licensable,
> > whether in whole or in part, by Papst as of the date of execution of
> > this Agreement.  Papst Patents shall include without limitation, the
> > patents and patents pending set forth in APPENDIX I and II
> > attached hereto and incorporated herein by reference (the patents
> > listed in APPENDIX II are referred to as "Papst Integrated
> > Baseplate Patents").  Provided, however, that Papst Patents shall
> > not include the patents and patent applications set forth in
> > APPENDIX III (hereinafter referred to as the "Papst Drive
> > Patents"), or Counterparts thereof.

PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶ 1.4.  By definition, then, "Papst Patents"

includes all patents and patents pending (and Counterparts thereof):  (1) naming Georg Papst as

---

[28]     The category "Papst Integrated Baseplate Patents" also is defined in the
Settlement Agreement, but those patents are not at issue in this case.

sole or joint inventor, or (2) owned, controlled, licensed or licensable by Papst as of June 19,

1995, when the 1995 Settlement Agreement was executed; but not including those patents listed

in Appendix III (which are the Papst Drive Patents) or Counterparts thereof – basically, Papst's

entire patent portfolio at the time of the Settlement Agreement, with the exception of the Papst

Drive Patents and their Counterparts.  "Papst Patents" includes the patents and patents pending in

Appendices I and II of the Settlement Agreement.

> "Papst Drive Patents" includes only the patents set forth explicitly in Appendix III

of the 1995 Settlement Agreement.  The parties do not contest which patents belong in this

category.

> The category of "Future Patents" is defined in the Settlement Agreement as:

> > any and all patents and patents pending, including Counterparts
> > thereof, other than Papst Patents, which at any time during the term
> > of this Agreement (i) name Georg Papst as an inventor (including
> > those in which he is named as a joint inventor with another) and/or
> > (ii) are owned, licensed or licensable by Papst.  Provided, however,
> > that Future Patents shall not include patent claims on Disk Drives
> > (as defined herein).

PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶ 1.5 (emphasis added).  It appears that

this category was meant to encompass patents that arose after the Settlement Agreement, except

claims on Disk Drives or, as explained infra at 81-86, 92-94, so-called "drive patents."[29]

---

[29]     The Court has held it to be clear from this contractual language and from the fact
that Papst Drive Patents include patent claims on Disk Drives, that Papst Patents, Papst Drive
Patents and Future Patents are three distinct, non-overlapping categories.  See Minebea Co. v.
Papst, 374 F. Supp. 2d at 205 n.2.

b.  Scope of rights under the 1995 Settlement Agreement

The 1995 Settlement Agreement grants to Minebea:

> a non-exclusive, paid-up license to manufacture, distribute, use and
> sell Minebea Products under the claimed subject matter of the
> Papst Patents and the Future Patents without any further payment
> of royalties (hereinafter referred to as "Patent License").[30]  This
> Patent License shall apply to each Papst Patent and Future Patent
> for as long as such Papst Patent or Future Patent remains valid.
> The expiration of any Papst Patent or Future Patent shall not affect
> the Patent License in respect of any other valid Papst Patent or
> Future Patent.  However, no license is granted hereunder to any
> Minebea customer with regard to any product of the customer
> which directly infringes a Papst Patent if acts of the customer or
> any subsequent purchaser or user first results in the direct
> infringement of the Papst Patent.  Also, no license is granted
> hereunder to any Minebea customer with respect to any of the
> Papst Drive Patents other than the Papst Integrated Baseplate
> Patents.

PTX 771, 1995 Settlement Agreement (June 19, 1995), ¶ 4.1 (footnote added) (emphasis added).

The Agreement also expressly provided:

> In consideration for the Settlement Amount to be paid hereunder,
> Papst . . . hereby and forever release[s] and discharge[s]
> Minebea . . . from any and all past and future actions, causes of
> action, . . . liabilities and any and all other claims whatsoever, at
> law or in equity, for infringement of the Papst Patents or the Future
> Patents arising out of the manufacture, distribution, use or sale of
> Minebea Products in whatever country, up to the Effective Date.
> This release extends to all customers, distributors and end-users of
> Minebea Products or components thereof.  Provided, however, that
> this release does not extend to any Minebea customer for any act of
> infringement of Papst Patents or Papst Drive Patents performed
> where the customer combines or authorizes another to combine a
> Minebea Product with any component, material or process not
> produced by Minebea; provided, however, that this exclusion shall

---

[30]      "Minebea Products" are defined as "all products manufactured, distributed, used
and/or sold by Minebea, whether in the past, in the present or in the future."  PTX 771, 1995
Settlement Agreement (June 19, 1995) ¶ 1.3.

not apply to acts of infringement of Papst Integrated Baseplate
Patents.

Id. ¶ 2.2 (emphasis added).  The Agreement further provided:

> Papst . . . agree[s] not to assert any claim or prosecute any action,
> suit or proceeding against Minebea . . . for infringement of any
> Papst Patent as of the Effective Date.

Id. ¶ 2.3 (emphasis added).

> The 1995 Settlement Agreement also provided:

> Papst . . . agree[s] not to assert any claim or prosecute any action,
> suit or proceeding against Minebea . . . for contributory
> infringement or inducement of infringement of any Papst Patent or
> Papst Drive Patent; provided, however, that this provision shall not
> bar Papst from the legal right to assert an infringement claim
> against a Minebea customer or subsequent purchaser or user for
> direct infringement of a Papst Drive Patent, other than a Papst
> Integrated Baseplate Patent, or for direct infringement of a Papst
> Patent if acts of such customer or subsequent purchaser or user first
> result in the direct infringement.

PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶ 2.4 (emphasis added).

The Agreement further provided:

> Minebea's manufacture, distribution, use or sale of motors by
> themselves do not directly infringe the claims in the Papst Drive
> Patents.  Papst . . . agree[s] not to assert any claim or initiate any
> proceeding against Minebea . . . for contributory infringement or
> inducement of infringement of any Papst Drive Patent.

Id. ¶ 5.2.

> Thus, under the 1995 Settlement Agreement it is clear that Minebea received:

> 1.     An explicit license to manufacture, use, and sell its motors
>        under the Papst Patents and Future Patents.  PTX 771, 1995
>        Settlement Agreement (June 19, 1995) ¶ 4.1.

> 2.     A release from any claims of infringement of the Papst
>        Patents or Future Patents based on Minebea's manufacture,

75

use, or sale of motors before the effective date of the 1995 Settlement Agreement, as well as a promise not to sue Minebea for direct infringement of Papst Patents going forward. Id. ¶¶ 2.2, 2.3.

3.      Papst's promise not to sue Minebea for indirect infringement or contributory infringement of any Papst Patent or Papst Drive Patent. Id. ¶¶ 5.2, 2.4.

4.      A warranty that Minebea's manufacture, use, or sale of its motors did not, by themselves, directly infringe the Papst Drive Patents. Id. ¶ 5.2.

At the same time, it is clear under the 1995 Settlement Agreement that:

1.      No license is granted to any Minebea customer with regard to any product of the customer that directly infringes a Papst Patent. PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶ 4.1.

2.      No license is granted to any Minebea customer with respect to any of the (Appendix III) Papst Drive Patents. Id. ¶ 4.1.

3.      Minebea customers are not released from liability for any act of infringement of Papst Patents or Papst Drive Patents performed where the customers combines or authorizes another to combine a Minebea product with any component, material or process not produced by Minebea. Id. ¶ 2.2.

4.      Papst preserves the legal right to assert an infringement claim against a Minebea customer or subsequent purchasers or users for direct infringement of a Papst Drive Patent or a Papst Patent. Id. ¶ 2.4.

By waiving its right to sue Minebea in the 1995 Settlement Agreement – while at

the same time reserving the right to sue Minebea's customers for infringement – Papst authorized

Minebea to manufacture and sell motors that would otherwise contribute to, or induce, the

infringement of the Papst Patents or the Papst Drive Patents.  Minebea is thus authorized by the

Settlement Agreement to sell, without fear of suit, its motors to customers who will combine those motors into products that directly infringe the Papst Patents or the Papst Drive Patents.

The Agreement explicitly does not, however, provide a license to Minebea's customers for any acts of direct infringement of the Papst Patents or Papst Drive Patents where the customer is the first direct infringer. See id. ¶¶ 2.2, 2.4. If, therefore, Minebea sells a motor to a customer which incorporates the motor into a product that infringes a Papst Drive Patent, Minebea would not be liable for contributing to or inducing infringement with respect to that product, but Papst would be free to sue the customer for direct infringement.[31]

c.  Minebea's rights to Papst Drive Patents under the 1995 Settlement Agreement

Minebea's rights with respect to the Papst Drive Patents under the 1995 Settlement Agreement, in sum, are:  (1) Papst's promise not to sue Minebea for indirect infringement or contributory infringement of any Papst Drive Patent, PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶¶ 5.2, 2.4.; and (2) a warranty that Minebea's manufacture, use, or sale of its motors do not, by themselves, directly infringe the Papst Drive Patents. Id. ¶ 5.2.

As noted, the parties do not dispute which patents are Papst Drive Patents: they include only those patents listed in Appendix III of the 1995 Settlement Agreement and Counterparts thereto. See PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶ 1.4.

---

[31]  Papst argues that Paragraphs 2.4 and 5.2 of the 1995 Settlement Agreement never went into effect because they were not "triggered" by the direct infringement of a Papst Drive Patent by an unlicensed Minebea customer. See Papst Br. at 7-9. Most of Minebea's customers (including Conner/Seagate, Hewlett Packard, IBM, NEC, Seagate and Toshiba) already have obtained drive patent licenses from Papst, and thus, Papst argues, they cannot directly infringe the Papst Drive Patents. The Court rejects this argument because it is inconsistent with the language of the 1995 Settlement Agreement, a clear intention of which was to allow Minebea to continue selling HDD motors without the possibility of suit by Papst.

Determining the identity of the Papst Patents and the Future Patents, however, requires additional factual analysis.

  d.  Minebea's rights to Papst Patents under the 1995 Settlement Agreement

   The 1995 Settlement Agreement granted Minebea the following rights with respect to the Papst Patents:  (1) a license to manufacture, use, or sell motors under the Papst Patents, PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶ 4.1; (2) Papst's promise not to sue Minebea for past or future acts of direct infringement of the Papst Patents, id. ¶¶ 2.2, 2.3; and (3) Papst's promise not to sue Minebea for contributory infringement or inducement of infringement of the Papst Patents, id. ¶ 2.4.  It also preserved Minebea's pre-existing rights, if any, to the Papst Patents.  Id. ¶ 3.1

   As noted, "Papst Patents" are those patents and patents pending, including Counterparts, where Georg Papst is named as the sole or a joint inventor or which were owned, controlled, licensed or licensable by Papst as of the date of the 1995 Settlement Agreement.  See PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶ 1.4.[32]  Under the 1995 Settlement Agreement, "Papst Patents" include the patents and patents pending listed in Appendix I and II of the Settlement Agreement, and their Counterparts, as of June 19, 1995 (the date of execution of the Agreement), but explicitly do not include the Papst Drive Patents listed in Appendix III or

---

[32] Because the parties do not contest the issue, the Court assumes, consistent with the language of the 1995 Settlement Agreement, that either Georg Papst is the inventor or co-inventor of each Papst Patent at issue here or that each patent is owned, controlled, licensed or licensable, in whole or in part, by Papst as of the date of the execution of the 1995 Settlement Agreement.

their Counterparts.  See PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶ 1.4.[33]  As noted

above, the 1995 Settlement Agreement expressly defines "Counterparts" as "any and all patents

arising from any (i) reissue, reexamination or extension of a patent, (ii) foreign patents and

foreign patent applications based on or corresponding to such patent and (iii) continuations,

divisional and continuations-in-part."  Id. ¶ 1.6.

        In Minebea's Corrected Post-Trial Brief, Minebea argues that the following

twelve patents at issue in its exhaustion claims are Papst Patents, as defined in the 1995

Settlement Agreement:  U.S. Patent Nos. 4,658,312; 4,843,500; 5,001,581; 5,173,814;

4,779,165; 5,006,943; 5,128,819, Re 37,058; Re 38,178; Re 38,601; Re 38,662; and Re 38,673.

See Minebea Br. at 5-6.  Seven of these patents clearly are Papst Patents because they are listed

in Appendix I of the 1995 Settlement Agreement: U.S. Patent Nos. 4,658,312; 4,843,500;

5,001,581; 5,173,814; 4,779,165; 5,006,943; and 5,128,819.  See PTX 771, DTX 567, 1995

Settlement Agreement (June 19, 1995) ¶ 1.4, App. I.

        Minebea argues that the remaining five patents – U.S. Patent Nos. Re 37,058, Re

38,178; Re 38,601, Re 38,662, and Re 38,673 – also are Papst Patents because they are all

reissues (and therefore Counterparts) of a particular Papst Patent, U.S. Patent No. 5,173,814,

which is listed in Appendix I of the 1995 Settlement Agreement.  As Papst points out, however,

each of these five patents also is a Counterpart of an Appendix III patent, the Papst Drive Patents.

Paragraph 1.4 of the Settlement Agreement expressly excludes Appendix III patents and their

Counterparts from the category of Papst Patents:  "[P]atents and patent applications set forth in

---

[33]        Again, the Appendix II Patents, the two Integrated Baseplate Patents, are not at
issue.

79

Appendix III [Papst Drive Patents], or Counterparts thereof" are not "Papst Patents."  See PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶ 1.4; see also Papst Submission Re Family Tree, Ex. A (Aug. 19, 2005) (Docket No. 1601).  The Court therefore finds that under the explicit terms of the 1995 Settlement Agreement, none of these five reissued patents is a Papst Patent, even if it is a reissue or Counterpart of U.S. Patent No. 5,173,814.

U.S. Patent No. Re 37,058, a reissued patent, is a Counterpart of two Appendix III patents, U.S. Patent Nos. 4,894,738 and Re 34,412.  See PTX 1298; PTX 771, DTX 567, 1995 Settlement Agreement (June 19, 1995), App. III; Papst Submission Re Family Tree, Ex. A (Aug. 19, 2005) (Docket No. 1601).  Because both Appendix III patents are listed in Re 37,058's priority data, it is clear that Re 37,058 arises from those patents – that is, it is or arises from a reissue, reexamination, extension, continuation, divisional, or continuation-in-part of those patents.  It therefore is a Counterpart of those Appendix III patents under Paragraph 1.6 of the 1995 Settlement Agreement, and not a Papst Patent, which states explicitly that "any and all patents" that arise from such reissue, reexamination, extension, continuation, divisional or continuation-in-part is a counterpart.  PTX 771, DTX 567, 1995 Settlement Agreement (June 19, 1995) ¶ 1.6.

Similarly, Re 38,178 is a reissued patent that arises from three Appendix III patents listed in its U.S. Priority Data: U.S. Patent Nos. 4,894,738, 4,519,010 and Re 34,412.  See PTX 1380; PTX 771, DTX 567, 1995 Settlement Agreement (June 19, 1995), App. III; Papst Submission Re Family Tree, Ex. A (Aug. 19, 2005) (Docket No. 1601).  It therefore is a Counterpart of these Appendix III patents and not a Papst Patent.

Re 38,601 is a reissued patent arising from three Appendix III patents listed in its

U.S. Priority Data:  U.S. Patent Nos. 4,894,738, 4,519,010 and Re 34,412.  See PTX 1401; PTX

771, DTX 567, 1995 Settlement Agreement (June 19, 1995), App. III;  Papst Submission Re

Family Tree, Ex. A (Aug. 19, 2005) (Docket No. 1601).  It therefore is not a Papst Patent.

Re 38,662 is a reissued patent arising from three Appendix III patents listed in its

U.S. Priority Data:  U.S. Patent Nos. 4,894,738, 4,519,010 and Re 34,412.  See PTX 1411; PTX

771, DTX 567, 1995 Settlement Agreement (June 19, 1995), App. III; Papst Submission Re

Family Tree, Ex. A (Aug. 19, 2005) (Docket No. 1601).  It therefore is not a Papst Patent.

Finally, Re 38,673 is a reissued patent arising from three Appendix III patents

listed in its U.S. Priority Data:  U.S. Patent Nos. 4,894,738, 4,519,010 and Re 34,412.  See PTX

1414; PTX 771, DTX 567, 1995 Settlement Agreement (June 19, 1995), App. III;  Papst

Submission Re Family Tree, Ex. A (Aug. 19, 2005) (Docket No. 1601).  It therefore is not a

Papst Patent.

In sum, none of the five reissued patents that Minebea claims to be Papst Patents

actually are Papst Patents, because each is a Counterpart of one or more Appendix III Papst Drive

Patents.  Accordingly, U.S. Patent Nos. Re 37,058, Re 38,178; Re 38,601; Re 38,662 and

Re 38,673 are not Papst Patents.  On the other hand, U.S. Patent Nos. 4,658,312; 4,843,500;

5,001,581; 5,173,814; 4,779,165; 5,006,943 and 5,128,819 are Papst Patents because each is

explicitly listed on Appendix I of the 1995 Settlement Agreement.

e.  Minebea's rights to Future Patents under the 1995 Settlement Agreement

The 1995 Settlement Agreement gave Minebea the following rights with respect

to Future Patents:  (1) a non-exclusive license to manufacture, distribute, use or sell motors under

81

the Future Patents; and (2) Papst's promise not to sue Minebea for acts of direct infringement of the Future Patents before the effective date of the Settlement Agreement.  See PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶¶ 4.1, 2.2.  As noted earlier, the 1995 Settlement Agreement defines "Future Patents" as all patents and patents pending (including Counterparts), other than Papst Patents, which during the term of the Settlement Agreement name Georg Papst as sole or a joint inventor and/or are owned, licensed or licensable by Papst.  Id. ¶ 1.5.  Paragraph 1.5 goes on to say, however, that "Future Patents shall not include patent claims on Disk Drives (as defined herein)."  Id.[34]

> To determine which rights Minebea got with respect to Future Patents, it therefore becomes important to determine what constitutes a "patent claim on a Disk Drive."  The 1995 Settlement Agreement defines the term "Disk Drive" as "an assembly including a spindle motor, a clean room chamber, one or more data storage disks mounted on the spindle, and data heads mounted to access data on the disk(s), but . . . not . . . the separate constituent components of such assembly."  PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶ 1.9.  Thus, neither an individual component of an assembly or even two or three of the components are sufficient to constitute a Disk Drive as the parties defined the term in the Settlement Agreement.  Rather, a Disk Drive must include all four of the specified components:  (1) a spindle motor; (2) a clean room; (3) data storage disk(s); and (4) data heads.

---

[34]     As with Papst Patents, the parties do not dispute the ownership, inventorship, etc. of patents Minebea argues are Future Patents, so the Court assumes that either Georg Papst is the inventor or joint inventor with another, of each Future Patent and/or that it is owned, licensed or licensable by Papst.

It therefore is clear from the 1995 Settlement Agreement that the term "patent claims on Disk Drives" includes patent claims directed towards a motor in combination with all three of the non-motor elements specified in Paragraph 1.9 (for purposes of this discussion, "complete drive patents").  It is equally clear that "patent claims on Disk Drives" do not include claims directed towards only "the separate constituent" elements by themselves (and do not include, of course, patent claims directed towards a motor alone).  What arguably is ambiguous, however – and what is important to determining which patents are Future Patents – is whether "patent claims on Disk Drives" includes patent claims describing a spindle motor in combination with some, but not all, of the three non-motor elements (for purposes of this discussion, "partial drive patents").  If the term "patent claims on Disk Drives" includes such claims, then a patent with such a claim is not a Future Patent.  This is so because, under Paragraph 1.5 of the Settlement Agreement, a Future Patent does not include patent claims on Disk Drives.  And it therefore would follow that Minebea has acquired no rights with respect to such patents under Paragraphs 2.2 and 4.1 of the Settlement Agreement.

Minebea at least implicitly argues that the phrase "patent claims on Disk Drives" in the Settlement Agreement includes only claims that are directed to all four of the specified components of a Disk Drive.  Under its interpretation, therefore, only "complete drive patents" are "patent claims on Disk Drives."  This must be Minebea's position, since four of the six patents that Minebea claims to be Future Patents have claims directed towards a motor in combination with some, but not all, of the non-motor elements specified in Paragraph 1.9 of the Settlement Agreement – the '887 Patent, PTX 758; Re '792, PTX 1176; the '610 Patent, PTX 818; and the '487 Patent, PTX 965.  If Minebea were correct, then partial drive patents – but not

complete drive patents – would be Future Patents under the 1995 Settlement Agreement.  If, on the other hand, a claim that does not describe all four features, but only some of them, was nevertheless a patent claim on a Disk Drive, then a patent including such a claim would not be a Future Patent under the Settlement Agreement.

The Court concludes that the phrase "patent claims on Disk Drives" in Paragraph 1.5 of the Settlement Agreement includes both claims directed towards all four elements of a Disk Drive specified in Paragraph 1.9, as well as claims directed towards some, but not all, of the elements.  While the term "Disk Drive" is defined in the Settlement Agreement, the term "patent claims on Disk Drives" is not.  And although the parties have used the term "drive patent" throughout their course of dealing, they never formally defined it.  As they have employed the term, however, it is clear that they understood a drive patent – or a patent claim on a disk drive – to be one which included a motor and at least one other feature or element of a disk drive, but not necessarily all.

Minebea's expert, Warren Dalziel, identified a number of patents as "drive patents" that claim a motor and only one or two of the other elements that make up the assembly.  See, e.g., infra at 145-150.[35]  In addition to Mr. Dalziel, at trial Minebea called as an adverse witness one of Papst's outside counsel, Richard Smith.  Counsel for Minebea inquired about a February 29, 1996 letter Mr. Smith sent to Hans Dieter Papst enclosing a copy of Mr. Smith's February 13, 1996 letter to Georg Papst.  See 7/18/05 (a.m.) Trial Tr. at 77:4-24 (Smith testim.); PTX 889, Letter from R. Smith to H.D. Papst (Feb. 29, 1996).  In his letter to Georg Papst, Mr.

---

[35]     In some cases identified by Mr. Dalziel, some features are mentioned in the patent application or patent itself but are not actually claimed.

Smith identified "the criteria that in my opinion should be applied to determine if a patent claim

covers a disk drive."  PTX 889, Letter from R. Smith to H.D. Papst, enclosing Feb. 13, 1996

letter to G. Papst (Feb. 29, 1996).  Among the criteria listed were the following:

> [T]he claim should refer to <u>some part of a disk drive outside of the spindle assembly</u> such as a data storage disk, a clean room (chamber forming an area of maximum cleanness), read/write (data access) heads or head actuator mechanism, sound dampener, air filter, or the like.

<u>Id</u>. (emphasis added).  At trial Mr. Smith stated that while this "internal definition" of a drive

claim may have been set forth in writing for the first time in February of 1996, the principles

contained in his February 13, 1996 letter to Georg Papst merely reflected his understanding (and

that of Georg Papst) of the term "drive claim" as they understood the term since the time of their

negotiations with Nidec in 1990.  7/18/05 (a.m.) Trial Tr. at 79:23-82:9 (Smith testim.).[36]

Thus, the Court concludes that, as employed by the parties, the term "drive patent"

means a patent that may have claims directed towards a motor in combination with one or more

of the other elements of a disk drive, but not necessarily all of them.  The term "patent claims on

Disk Drives" therefore encompasses not only patents with claims on all drive elements but also

patents with claims on a motor in combination with even a single non-motor element.  The term

"Future Patents" therefore excludes all patents that include claims with some of the non-motor

elements, as well as claims with all of the non-motor elements.

---

[36]     The Court has scrupulously avoided reliance on the Nidec negotiations and ideas that were in the minds of Mr. Smith, Mr. Schnayer or Mr. Papst but never were communicated to Minebea.  In this instance, however, Minebea itself offered this testimony and offered PTX 889 in evidence.

Furthermore, reading the definition of "Future Patents" in Paragraph 1.5 of the 1995 Settlement Agreement as excluding <u>all</u> drive patents – both partial and complete – is consistent with and supported by other provisions of the Agreement which make clear that Papst retained its rights to drive patents – that is, its right to enforce its patents against disk drive manufacturers including Minebea's customers.  Paragraph 2.2 releases and discharges Minebea from liability for infringement of the Papst Patents and the Future Patents (with no mention of the Papst Drive Patents) arising out of the sale of Minebea products, but the release "does not extend to any Minebea customer for any act of infringement of Papst Patents or Papst Drive Patents performed where the customer combines or authorizes another to combine a Minebea Product with any component, material or process not produced by Minebea[.]"  PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶ 2.2.  And in paragraphs 2.3 and 2.4, Papst agrees not to assert any claim against Minebea for direct infringement of any Papst Patent or for contributory infringement or inducement of infringement of any Papst Drive Patent.  <u>Id.</u>  ¶¶ 2.3,  2.4.  But these paragraphs expressly do not bar Papst from suing a Minebea customer or subsequent purchaser or user for direct infringement of a Papst Drive Patent.  <u>Id.</u> ¶ 2.4.

In sum, the term "patent claims on Disk Drives" as employed in the 1995 Settlement Agreement includes claims directed towards a motor in combination with some or all of the non-motor elements specified in Paragraph 1.9 of the Agreement.  Therefore, the category of "Future Patents" excludes both Papst Patents and <u>all</u> drive patents, both partial and complete.

Minebea argues that the following six patents at issue in its exhaustion claim are Future Patents that it is authorized to sell under the 1995 Settlement Agreement:  U.S. Patent Nos. 5,424,887 ("the '887 Patent"); Re 35,792 ("Re '792"); 5,446,610 ("the '610 Patent");

5,557,487 ("the '487 Patent"); 5,422,769 ("the '769 Patent"); and 5,774,302 ("the '302 Patent").

See Minebea Br. at 7.  Based on the foregoing analysis, the Court disagrees with Minebea with

respect to all but two of these patents.

Minebea argues that the '887 Patent, PTX 758, is a Future Patent because it is a

Counterpart (continuation) of an Appendix III Patent, U.S. Patent No. 4,922,406 ("the '406

Patent"), PTX 125; it is owned by Papst Licensing; and it does not have patent claims on Disk

Drives as defined in Paragraph 1.9 of the Settlement Agreement (it claims "a motor", "a clean-

room chamber" and "at least one storage disk").  See Minebea Br. at 7.  Minebea is incorrect.

Because the '887 Patent includes claims directed to a motor and a clean room and at least one

storage disk, it is a "partial drive patent."  Thus, the '887 Patent includes patent claims on Disk

Drives, and it therefore is not a Future Patent.  See PTX 771, DTX 567, 1995 Settlement

Agreement (June 19, 1995) ¶ 1.4, App. III;  PTX 758, U.S. Patent No. 5,424,887.

For the same reason, the Court rejects Minebea's argument that Re '792, PTX

1176, is a "Future Patent."  Minebea contends that Re '792  is a Counterpart (reissue) of U.S.

Patent No. 4,894,738, PTX 118, listed on Appendix III; is owned by Papst Licensing and does

not have patent claims on Disk Drives as defined in Paragraph 1.9 (it claims "a motor" and "a

clean chamber").  See Minebea Br. at 7.  Re '792 Patent is not a Future Patent, however, because

it contains patent claims on Disk Drives – that is, claims directed to a motor and a clean chamber

– some but not all of the four elements of a Disk Drive – and therefore it is a "partial drive

patent."  See PTX 771, DTX 567, 1995 Settlement Agreement (June 19, 1995) ¶ 1.4, App. III;

PTX 1176.

Minebea also argues that U.S. Patent No. 5,446,610 (the '610 Patent"), PTX 818, is a licensed "Future Patent" because it is a Counterpart (continuation) of U.S. Patent No. 5,216,557 ("the '557 Patent"), PTX 490, listed on Appendix III; is owned by Papst Licensing and does not have patent claims on Disk Drives as defined in Paragraph 1.9 (it claims "a motor," "a clean chamber" and "a storage disk").  See Minebea Br. at 7.  The Court again rejects Minebea's argument.  The '610 Patent is not a Future Patent because it contains claims directed to a motor, a clean chamber and a storage disk, and it therefore is a "partial drive patent."  See PTX 771, DTX 567, 1995 Settlement Agreement (June 19, 1995) ¶ 1.4, App. III; PTX 818.

Minebea next argues that U.S. Patent No. 5,557,487 ("the '487 Patent"), PTX 965, is a licensed "Future Patent," since it is a Counterpart (continuation) of U.S. Patent No. 5,216,557 (the '557 Patent), PTX 490, is listed on Appendix III; is owned by Papst Licensing and does not have patent claims on Disk Drives as defined in Paragraph 1.9 (it claims "a motor," "a clean chamber" and "at least one data storage disk").  See Minebea Br. at 7.  The Court disagrees.  The '487 Patent is not a Future Patent because it contains patent claims on Disk Drives – that is, claims directed to a motor, a clean chamber and at least one data storage disk (again, it is a "partial drive patent").  See PTX 771, DTX 567, 1995 Settlement Agreement (June 19, 1995) ¶ 1.4, App. III; PTX 965.

Minebea is correct, however, in its argument that U.S. Patent Nos. 5,422,769 ("the '769 Patent"), PTX 741, and 5,774,302 ("the '302 Patent"), PTX 1183, are Future Patents.  The '769 Patent is a Counterpart (continuation) of an Appendix III Patent, U.S. Patent No. 5,216,557 ("the '557 Patent"), PTX 490; is owned by Papst Licensing; and does not have patent claims on Disk Drives as defined in Paragraph 1.9; (it claims only "a motor").  See PTX 771, DTX 567,

1995 Settlement Agreement (June 19, 1995) ¶ 1.4, App. III; PTX 741.  Because it claims only a

motor, and none of the three other elements of a hard disk drive, the '769 Patent is a "motor

patent," not a drive patent.

Finally, Minebea argues that U.S. Patent No. 5,774,302 ("the '302 Patent"), PTX

1183, is a Future Patent because it is a Counterpart (continuation) of U.S. Patent No. 5,216,557

("the '557 Patent"), PTX 490, listed on Appendix III; is owned by Papst Licensing and does not

have patent claims on Disk Drives as defined in Paragraph 1.9; (it claims only "a motor").  See

Minebea Br. at 7.  The Court again agrees with Minebea.  See PTX 771, DTX 567, 1995

Settlement Agreement (June 19, 1995),  ¶ 1.4 App. III; PTX 1183.

In sum, the Court finds that the '769 and '302 patents are Future Patents and that

the '887, Re '792, '610, and '487 patents are not Future Patents.

f.  Summary of Minebea's patent rights after Settlement

After the execution of the 1995 Settlement Agreement, Minebea's rights to the

various classes of patents described therein is as follows: Based on the clear language of

Paragraph 3.1 of the Settlement Agreement, the Court finds that Minebea's rights under the Papst

Drive Patents and Integrated Baseplate Patents are limited to those expressly enumerated in the

Settlement Agreement.  See Minebea Co. v. Papst, 374 F. Supp. 2d at 206; supra at 77, 79.

While the '769 Patent and the '302 Patent are Future Patents (as just discussed), Minebea's rights

to Future Patents also are limited to those set forth in the Settlement Agreement, not because of

any express limitation, but because the category of Future Patents specifically excludes any

89

patents that predate the Settlement Agreement.[37]  With respect to Papst Patents, however, the

1995 Settlement Agreement preserved Minebea's rights as set forth in the earlier agreements.

A concise summary of Minebea's rights to the various categories of patents, as

defined in the 1995 Settlement Agreement and by the Court, is as follows:

---

[37]      As the Court discusses later in this Opinion, patents arising or acquired after the
date of the earlier agreements (specifically, the 1990 Agreement for the Sale of Intangible Assets
and the 1993 Loan Agreement) were not licensed under those agreements.

Although it does not do so explicitly, by excluding from the category of Future Patents
both the Papst Patents and the Appendix III Patents (the Papst Drive Patents) and their
Counterparts (because all such patents have "patent claims on Disk Drives"), the Settlement
Agreement effectively excludes from the category of "Future Patents" all patents arising or
acquired before the 1995 Settlement Agreement.  See PTX 771, 1995 Settlement Agreement
¶¶ 1.4, 1.5, 1.6.

| Category | 1995 Settlement Agreement | Earlier Agreements |
|---|---|---|
| Papst Drive Patents | - Release from liability for indirect or contributory infringement (¶ 2.4)<br>- Warranty that motors do not directly infringe (¶ 5.2) | - No rights (extinguished by Settlement Agreement) |
| Future Patents | - License to manufacture, use and sell (¶ 4.1)<br>- Release from liability for direct infringement (past acts) (¶ 2.2) | - No rights (patents did not exist at time of earlier agreements) |
| Papst Patents | - License to manufacture, use and sell (¶ 4.1)<br>- Release from liability for direct infringement (past and future acts) (¶¶ 2.2, 2.3)<br>- Release from liability for indirect or contributory infringement (¶ 2.4) | - Licensed as far as required and necessary, if patent arose before Intangible Assets Agreement or during Joint Venture (Intangible Assets Agreement ¶ 4(a),(d))<br>- If patent arose after termination of Joint Venture, no rights. |
| Other drive patents[38] | - No rights | Same as Papst Patents |

Under the 1995 Settlement Agreement (and the provisions of the earlier

agreements, Minebea could sell its motors without fear of suit from Papst for (1) direct

infringement of Papst Patents or Future Patents for acts committed before the effective date of

the 1995 Settlement Agreement (under Paragraphs 2.2 and 4.1 of the Settlement Agreement);

(2) direct infringement of Papst Patents as of the effective date of the 1995 Settlement Agreement

(¶ 2.3); and (3) contributory or inducement of infringement of Papst Patents or Papst Drive

Patents (when Minebea's customers are the first direct infringers) (¶¶ 2.4, 5.2).

---

[38]     Of patents that arose before the Settlement Agreement, this includes only Counterparts of Appendix III patents, because all others are Papst Patents.  This category also includes all drive patents arising after the Settlement Agreement.

91

It is abundantly clear, however, that Minebea's customers were not licensed under the Papst Patents or the Papst Drive Patents to combine (or authorize another to combine) a Minebea product – that is, a Minebea motor – with any component, material or process not produced by Minebea (that is, other drive elements).  See PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶¶ 2.2, 2.4, 4.1.

Minebea had limited authority to sell motors that would infringe any of Papst's patents (including pending applications and corresponding international patents) that either had been issued or applied for before the start of the Joint Venture, or were acquired or arose during the Joint Venture (that is, before execution of the 1993 Termination Agreement), to the extent they were required and necessary for Minebea's motor business.  See supra at 56-62.  The scope of Minebea's limited authority under the earlier agreements is similar in scope to Minebea's authority under the 1995 Settlement Agreement, insofar as it was restricted to rights required and necessary for the motor business.  It is clear under the earlier agreements that no rights under the drive patents were granted to Minebea's customers.

D. The Parties Always Understood the Distinction Between Drive Patents and Motor Patents.

As just recounted, the evidence at trial shows that, throughout their course of dealing, the parties (and especially Papst) made frequent use of the term "drive patents" (also referred to as the "so-called 'drive patents'" or as "disk drive patents"), but – unlike many other relevant terms – this term was never defined in any of the agreements between the parties.  See, e.g., DTX 141, Letter from G. Papst to G. Ogino (June 25, 1991); DTX 147, PMDM Board Meeting minutes (Sept. 28, 1991); DTX 409A, English translation of DTX 409, Letter from R.

92

Smith to O. Kuwert (Feb. 9, 1995).  The parties seem always to have understood what the term

"drive patents" meant – or, at least, never to have demanded clarification.

   According to Minebea's own expert, Warren Dalziel, a typical hard disk drive

includes five basic elements: (1) a magnetic storage disk, (2) a motor that spins the disk on a

flange or baseplate, (3) a read/write head actuator, (4) a clean chamber in which all of these other

components typically reside, and (5) electronics for controlling the operation of the hard disk

drive including the rotation of the motor.  <u>See</u> Written Direct Testimony of Warren L. Dalziel

(July 10, 2005) (Docket No. 1300) ¶ 10.  The 1995 Settlement Agreement defines a Disk Drive

as "an assembly including a spindle motor, a clean room chamber, one or more data storage disks

mounted on the spindle, and data heads mounted to access data on the disk(s), but . . . not . . . the

separate constituent components of such assembly."  PTX 771, 1995 Settlement Agreement

(June 19, 1995) ¶ 1.9.  Finally, the parties have stipulated that a motor for a hard disk drive is "an

electric motor designed for use to directly drive a hub and/or disk in a hard disk drive," and that

such a motor may include "i) a hub for carrying a disk or ii) a base plate forming a portion of a

clean chamber of a hard disk drive."  Papst Licensing's Stipulation Concerning Subject Matter

Jurisdiction (Civil No. 99-MD-1298) (E.D. La. Sep. 19, 2000) ¶ 1 note 1, App. 1 to Minebea

Corrected Post-Trial Brief (Aug. 25, 2005) (Docket No. 1616).  Although most hard disk drives

contain a motor and all four of the elements listed by Mr. Dalziel and/or in Paragraph 1.9 of the

Settlement Agreement, the Court finds that a so-called drive patent need not include all of those

non-motor elements in its claims to qualify as a "drive patent".  See supra at 82-86 (discussing

Future Patents under 1995 Settlement Agreement).[39]

A "motor patent" (another term often used by Papst and Minebea) is a patent that

has claims directed towards only the motor elements of a disk drive, and not towards a motor in

combination with any drive elements.[40]  In contrast, a  "drive patent," as the term was employed

by the parties, has claims directed towards a motor in combination with one or more of the other

elements of a typical drive.  According to Minebea, each of Papst's drive patents corresponds to a

motor patent also owned by Papst – that is, the motors described (in combination with other

elements) in the drive patents are also described by themselves in motor patents.  See Minebea

Br. at 41.[41]

---

[39]      Papst concedes that its definition of a "drive patent" does not correspond to the
physical reality of a hard disk drive.  See 7/26/05 (p.m.) Trial Tr. at 67:22-68:2 (Schnayer
testim.) (drive patent "is not a term that an engineer" would recognize).  Papst defined the term
as it did not because of engineering necessity but because it was useful for patent licensing
negotiations.  See id. (a drive patent "is something that was defined in our negotiations in order
to distinguish between licensing certain patents to motor companies and certain patents to drive
companies").

[40]      An exception to this general rule is the Integrated Baseplate Patents, which
contain claims directed towards a motor in combination with a baseplate, one of the non-motor
elements of a hard disk drive.  These patents are so designed because (as their name suggests) the
integrated baseplate motors, unlike other motors, are physically integrated with a drive baseplate
at the time of manufacture.  An HDD manufacturer can incorporate such a motor into a fully-
functional hard disk drive without adding a separate baseplate.  Appendix II to the 1995
Settlement Agreement lists the Integrated Baseplate Patents, which appear never to have been a
matter of controversy between the parties and are not at issue in this litigation.

[41]      Central to Minebea's case is the argument that Papst's only reason for seeking
patents on both motors and drives was that it could thereby obtain a "double royalty," first by
requiring the motor manufacturer (Minebea) to pay to license the motor patents, and then by
requiring drive manufacturers (customers of Minebea's who purchased motors from either
Minebea or from the Joint Venture) to license the drive patents.  As the Court discusses in its
analysis of Minebea's Patent Misuse claim, however, there was nothing untoward about Papst's

94

The licensing significance of the distinction between a "motor patent" and a "drive patent" is as follows: a motor manufacturer (such as Minebea) directly infringes a motor patent by its manufacture, use, or sale of motors.  Thus, to engage in such activities without threat of infringement liability, a motor manufacturer must obtain a license to the relevant motor patents (that is, patents with claims directed towards motors alone).  A motor manufacturer does not, however, directly infringe a <u>drive</u> patent because it does not combine its motors with any other drive element.[42]  Thus, a license to directly infringe a drive patent is not necessary to the motor business.  A drive manufacturer, on the other hand, requires both a license to applicable motor patents, because it infringes those patents by using and selling the motors as part of its drives, and a license to any corresponding drive patents, because the manufacturer combines motors with other drive elements.[43]  This is why the term "drive patent" encompasses not only patents with claims on all drive elements, but also patents with claims on a motor in combination with even a single non-motor element:  because a drive manufacturer directly <u>infringes</u> both sorts of patents (although it is not the first infringer of a motor patent).

---

actions in this respect, and they in fact reflect sound patent licensing practice.  <u>See</u> <u>infra</u> at 255-257; <u>see</u> <u>also</u> 8/2/05 (p.m.) Trial Tr. at 72:8-73:2 (Gerstman testim.).

[42]     A motor manufacturer might be liable for indirect or contributory infringement if it sells motors to customers who manufacture infringing drives.  <u>See</u> 35 U.S.C. § 271(b), (c).

[43]     To read on a Disk Drive (as the term is defined in the 1995 Settlement Agreement), a patent claim need only contain at least one of the claimed Disk Drive elements.  <u>See</u> <u>A.B. Dick Co. v. Burroughs Corp.</u>, 713 F.2d 700, 703 (Fed. Cir. 1983) ("It is fundamental that one cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device.").  Papst has not asserted claims against the drive manufacturers for infringement of the motor patents.

This is true notwithstanding the fact that there may be nothing "innovative" about the non-motor elements described in the drive patents. This appears to be the case with regard to many of Papst's drive patents: Although the patent claims describe the Papst-developed motors with considerable specificity, the other elements are described only generically. For example, Claim 1 of U.S. Patent No. Re 34,412, one of the Appendix III patents at issue in Minebea's exhaustion claim, describes "a brushless drive motor," "an external rotor," "a hub," "an outer peripheral cylindrical surface," and a "yoke radial wall portion" – all motor components – in detail, while the only non-motor component, "a clean chamber for housing a storage disk," is named but not described at all. See PTX 524, U.S. Patent No. Re 34,412, at 12:15-54. This is consistent with the testimony of Papst employees, including H.D. Papst, who testified that Papst did not invent or make improvements to a clean room, read/write head, or magnetic storage disk, and that these items were all generic. See 3/3/05 H.D. Papst Dep. Tr. at 527:10-14, 528:13-529:8; see also infra at 170 ("essential features" analysis).

Most importantly, this functional definition of "drive patents" also is supported by the text and the logic of the agreements between the parties prior to the 1995 Settlement Agreement, even though the term itself is never defined. For example, under the 1990 Agreement for the Sale of Intangible Assets, Minebea was licensed to directly infringe certain patents "required and necessary for research and development (R+D), manufacturing, engineering, use and sale of HDD motors." PTX 195, Agreement for the Sale of Intangible Assets (Nov. 5, 1990) ¶ 4(a). As the parties made clear in the 1993 Loan Agreement (and as the Court discusses in its analysis of the term "required and necessary," supra at 57-62), the "so called Drive Patents" were not licensed to Minebea under the "required and necessary"

96

provisions of either the Intangible Assets Agreement or the Loan Agreement.  PTX 1467, 1993

Loan Agreement (Apr. 27, 1993), § 4(3).  Accordingly, a license to directly infringe the drive

patents could not have been "required and necessary" for the motor business.

   The 1995 Settlement Agreement confirms the parties' understanding of drive

patents.  It gives Minebea an explicit license to make, use or sell its motors under various motor

patents owned by Papst, but not with respect to Papst Drive Patents.  See PTX 771, 1995

Settlement Agreement (June 19, 1995) ¶ 5.2.[44]  With respect to the drive patents, the 1995

Settlement Agreement gives Minebea not a license but a warranty that its motors do not, by

themselves, directly infringe the drive patents.  See id.  The fact that the parties agreed to a

warranty, rather than to a license, indicates their mutual understanding that Minebea's motor

activities did not directly infringe the drive patents, and that Minebea therefore required no

license for direct infringement of those patents.  Thus, the parties recognized and memorialized

in their agreements as early as 1990 that:  (1) there was a significant distinction between drive

patents and motor patents, and (2) "drive patents" included not only patents claiming a complete

drive assembly, but also patents claiming a motor in combination with some but not all of the

common non-motor elements of a hard disk drive.  See supra at 85.

   This distinction is borne out in other communications between the parties.  For

example, in a June 1991 letter to Mr. Ogino of Minebea (which was also delivered to Mr.

---

[44]  As the name suggests, the Papst Drive Patents listed in Appendix III of the 1995
Settlement Agreement are all "drive patents."  The two categories are not, however, coextensive;
among the "Papst Patents" (as defined in the 1995 Settlement Agreement) are some drive patents,
and some patents not categorized under the Settlement Agreement (for example, Counterparts of
Appendix III patents) are drive patents, as well.

Mizukami), Georg Papst made clear Papst's position both on the distinction between motor

patents and drive patents and on the licensing significance of that distinction:

> As you know, Papst owns a large number of international patent
> rights, which are related to hard disk drives per se, so-called "drive
> patents" and, also especially to spindle motors, so-called "HDD
> motor patents." . . . [T]he patent policy of Papst towards PMDM
> principally differentiates between using such rights with disk
> drives per se or with HDD spindle motors.  For the future use of
> HDD spindle motor patents such customers can be released by
> Papst without their having to pay any extra license fee. . . .  PMDM
> can make use of all patents of Papst applicable to HDD spindle
> motors.  Drive patents, however, are reserved solely for Papst's
> exploitation directly with the drive manufacturers."

See DTX 141, Letter from G. Papst to G. Ogino (June 25, 1991).  As the Court found, supra, at

36, neither PMDM nor Minebea ever took issue with such statements, made in the June 1991

letter or at other times.  See supra at 27-28.

A February 1995 letter from Richard Smith, an attorney representing Papst

Licensing, to Mr. Oswald Kuwert at PMDM made a similar distinction:

> Except for the base plate integration patents, PM-DM and Minebea
> are not licensed in the field of Disk Drives and therefore cannot
> make or sell Disk Drives using the PL Disk Drive patents.
> Similarly, PM-DM's customers do not obtain a license to use PL
> Disk Drive patents, other than the base plate integration patents,
> when they purchase a PM-DM motor.  If PM-DM's customers
> make disk drives using PL's Disk Drive Patents they must obtain a
> Disk Drive license from PL.

DTX 409A, English translation of DTX 409, Letter from R. Smith to O. Kuwert (Feb. 9, 1995).

Again, neither PMDM nor Minebea took issue with such statements.  See supra at 43-46.

Further evidence demonstrates that the motor patent/drive patent distinction was

embraced and understood by the parties when they met face-to-face.  The distinction was

discussed at the September 1991 PMDM board meeting in Bangkok, Thailand, as evidenced by

98

the minutes of the meeting, which were prepared by Mr. Yoshimura of Minebea and signed by

Mr. Mizukami on behalf of Minebea.  See DTX 147, PM-DM Board Meeting minutes (Sept. 28,

1991) (distinguishing between "Drive patents" and "Motor patents" for purposes of allocating

patent rights to Papst or PMDM).  The distinction also was discussed at a later meeting between

representatives of Papst and Minebea on March 13, 1995.  The contemporaneous notes of

Minebea's lawyer, Douglas Hymas, show that at the meeting Papst expressed clearly its view on

the distinction between drive patents and motor patents (and of the licensing significance of the

distinction).  See PTX 662, Handwritten notes of Douglas Hymas (Mar. 13, 1995) ("Papst

distinguishes between motor patents and drive patents; Minebea has licensed the motor patents

only, with the exception of the base plate integration HDD motors[.]").  No one from Minebea

took issue with Papst's use of this distinction, at the March 1995 meeting or thereafter.  See

7/22/05 (p.m.) Trial Tr. at 31:5-20 (Schnayer testim.); see also 7/28/05 (p.m.) Trial Tr. at 54:19-

55:16, 58:5-18 (G. Papst testim.); 8/1/05 (p.m.) Trial Tr. at 53:1-54:9, 69:19-22, 81:7-11 (Hymas

testim.).

### E. The Parties Always Understood that Papst Could Sue Minebea's Customers Under the Drive Patents.

The nature of the patent licensing scheme between Papst and Minebea, as well as

many of the facts that show the parties' understanding of the distinction between drive patents

and motor patents, demonstrate that the parties always understood that Papst could sue

Minebea's customers for infringement of the drive patents.  As the Court already has concluded,

both the 1993 Loan Agreement and the 1995 Settlement Agreement contemplated that Papst

could sue Minebea's customers for infringement of the drive patents:

99

It seems readily apparent from the language of the 1995 Settlement
Agreement that the parties anticipated that Papst would retain the
right to sue Minebea's customers for direct infringement of the
Papst Drive Patents.  This was reiterated throughout the 1995
Settlement Agreement and is evidenced in the [1993] Loan
Agreement as well.

* * *

The Court has no doubt, given the language of the [1995
Settlement Agreement], that Papst fully intended to preserve to
itself the right to sue customers of Minebea in connection with
their infringement of these patents, and the Court is hard-pressed to
see how Minebea could not have been aware of Papst's intent.

Minebea Co. v. Papst, 374 F. Supp. 2d 202, 209-10, 211-12 (D.D.C. 2005).[45]

The 1995 Settlement Agreement provided that Minebea's customers do not get a

license to infringe Papst's drive patents and that Papst may sue Minebea's customers.  See PTX

---

[45]    The Court also indicated during trial that a finding of a breach of contract
(including the covenant of good faith and fair dealing) would be unlikely because when Papst
called or wrote Minebea's customers threatening suit for patent infringement, it was merely
doing what the parties had agreed to in the Settlement Agreement:

[I]f Minebea says that they're relying on the implied warranty of
good faith and fair dealing and totally objective evidence, namely
the contract, in view of my statement that the language of the
contract seems to preserve the right of Papst to sue the customers
of Minebea, and my statement that I'm hard-pressed to see how
Minebea could not have been aware of the intent, and not aware of
this reading of the contract, I find it difficult to see, still, how the
covenant of good faith and fair dealing could have been breached.

8/3/05(p.m.) Trial Tr. at 65:14-66:21 (comments by the Court).

That the parties always understood that Papst could pursue Minebea's customers
under the drive patents also renders untenable Minebea's claims of both equitable and legal
estoppel.  After all, how could it be said that Papst misled Minebea (which is what it would take
to find equitable estoppel) or that Papst had derogated from the rights granted to Minebea's
customers (which is what it would take to find legal estoppel) when, in fact, Papst did the very
thing it said that it would do or at least reserved the right to do?  See infra at 237-250.

100

771, 1995 Settlement Agreement (June 19, 1995) ¶¶ 2.2 (last sentence), 2.4 (last clause), 4.1 (last

sentence).  Inclusion of such provisions in 1995 would make sense only if the parties understood

that to have been the deal all along.  The 1995 Settlement Agreement simply made explicit what

always had been understood.  If that had not been the understanding all along, why would such

provisions be added in 1995?  Why would Minebea have agreed in 1995 to a changed

relationship that put its customers at risk of lawsuits by Papst?  The only logical inference is that

it was always recognized by both parties to the Joint Venture that Papst could assert its drive

patents against Minebea's customers.  That conclusion is corroborated by numerous other parts

of the record and the prior agreements as described in the Court's Findings of Fact.  It also is not

rebutted by <u>any</u> documentary evidence offered by Minebea – presumably because there is none.

The only contrary evidence is the conclusory testimony of Mr. Mizukami, which the Court does

not credit.

On June 25, 1991 – months after the Joint Venture agreement had been signed –

Georg Papst, managing director of Papst Motoren, sent a letter to the president of Minebea, Mr.

Ogino, offering to sell Minebea a license to the Papst Motoren drive patents.  <u>See</u> DTX 141,

Letter from G. Papst to G. Ogino (June 25, 1991).  Mr. Papst also sent a copy of the letter to Mr.

Mizukami.  <u>See</u> DTX 142, Letter from G. Papst to Mizukami (June 26, 1991).  In the letter, Mr.

Papst advised Mr. Ogino that, pursuant to the license agreement then in place between the

parties, neither Minebea nor the Joint Venture had rights under Papst Motoren's drive patents.

<u>See</u> DTX 141; DTX 142; 7/28/05 (a.m.) Trial Tr. at 54:19-59:24 (G. Papst testim.).  The letter

stated in relevant part:

> As you know, in the framework of our present agreement, PMDM
> can make use of all patents of Papst applicable to HDD spindle

101

motors.  <u>Drive patents, however, are reserved solely for Papst's
exploitation directly with the drive manufacturers</u>.

It is therefore my proposal to grant to PMDM the right to convey
licenses under Papst drive patents directly to the drive
manufacturers.

\* \* \*

As to the matter of past use of Papst's drive patents (as well as
motor patents), Papst would be willing to <u>give up its right to
recover infringement damages</u> as to the above-mentioned
companies [IBM, Fujisawa, Toshiba, NEC, Quantum, Maxtor,
Western Digital, Rodime, Micropolis, and others], thereby
removing the possibility of Papst's infringement claims interfering
with PMDM's ability to deal amicably with its customers and
potential customers.

In return for granting these rights to PMDM, Papst believes that it
would be entitled to a fair compensation from Minebea, which, of
course, would be a matter of further discussion between us.

DTX 141, Letter from G. Papst to G. Ogino (June 25, 1991) (emphasis added).

Georg Papst received no response from Minebea to this letter, either challenging

Papst's statement that it had reserved its drive rights with respect to Minebea's customers, or that

it was (under the then-current agreement) entitled to "recover infringement damages" from those

customers.  <u>See</u> 7/28/05 (a.m.) Trial Tr. at 52:22-55:2, 59:25-60:5 (G. Papst testim.).  At trial,

Mr. Mizukami testified only that he could not recall whether there had been a reply.  <u>See</u> 7/6/05

(p.m.) Trial Tr. at 78:9-15 (Mizukami testim.).

In September 1991, at PMDM's board of directors meeting in Bangkok, Thailand,

the Board concluded that Papst would be "free to deal with third parties" with respect to its drive

patents.  The salient portion of the minutes provides:

(B)     <u>Subjects and decisions</u>

102

1.      HDD Drive Patents

Conclusion 1.
Minebea will not purchase above patents.  Papst KG is free
to deal with third parties.

Conclusion 2.
Further patent rights are as follows:

| | Papst [Past] | Future |
|---|---|---|
| Drive patent | Papst | Papst |
| Motor patent | Papst | PM.DM. * |

*  PMDM has the right to use all patents, which are in the
past applied by Papst KG.  PMDM has the rights for all the
patents which will be applied for in the future.

DTX 147, PM-DM Board Meeting minutes (Sept. 28, 1991); see 7/29/05 (p.m.) Trial Tr. at

31:24-33:7 (G. Papst testim.).   Minebea's Mr. Yoshimura prepared the minutes of the meeting.

Mr. Mizukami was at this meeting, and in fact he signed the minutes.  Id.  These meeting minutes

contained no statement that Minebea's customers were licensed or that Papst could not pursue

them under the drive patents.

Papst Licensing was formed in early 1993 and acquired all the Papst Motoren

Patents in May 1993.  See supra at 40-41.  Shortly thereafter, it started to write letters to

numerous hard disk drive manufacturers who were customers of Minebea.  See supra at 46-47.

These letters included charges of infringement of numerous patents that were later categorized as

"Papst Drive Patents" and listed in Appendix III of the 1995 Settlement Agreement.  See, e.g.,

DTX 406, Letter from J. Schnayer to Samsung Electronics (Feb. 3, 1995); DTX 408, Letter from

J. Schnayer to Fujitsu (Feb. 8, 1995); 7/21/05 (p.m.) Trial Tr. at 51:12-63:5 (Schnayer testim);

see also 7/28/05 (p.m.) Trial Tr. at 30:21-31:7 (G. Papst testim.).  Minebea never sent a letter or

other communication to Papst challenging its right to sue Minebea's customers for infringement.

103

On November 14, 1994, at a meeting in Japan with Mr. Mizukami, Georg Papst offered to license to Minebea all patent rights and patent application rights currently filed, but not including the so called hard disk drive patents.  7/28/05 (p.m.) Trial Tr. at 42:8-25 (G. Papst testim.); 7/21/05 (p.m.) Trial Tr. at 41:5-42:25, 43:1-10 (Schnayer testim.).  Mr. Papst confirmed this by letter.  See DTX 383, Letter from G. Papst to R. Mizukami (Dec. 13, 1994).  Georg Papst testified at trial that Minebea never challenged in any way Papst's implicit assertion that Minebea did not already have licenses to the drive patents.  See 7/28/05 (p.m.) Trial Tr. at 42:8-25 (G. Papst testim.).  Mr. Mizukami did not take the stand to rebut this testimony by Mr. Papst.

On February 9, 1995, Richard Smith, one of Papst's patent attorneys, wrote to Minebea's PMDM subsidary, explaining that under the then-existing Papst-Minebea license agreements, Minebea's customers were not licensed to make hard disk drives that would infringe the drive patents, and attached a list of the drive patents.  See DTX 409, Letter from R. Smith to O. Kuwert re licensing rights (Feb. 9, 1995); DTX 409A, English translation of DTX 409; 7/28/05 (p.m.) Trial Tr. at 43:1-44:10 (G. Papst testim.).  The letter explicitly stated that Minebea's customers did not get a license to these patents:

> Except for the base plate integration patents, PM-DM and Minebea are not licensed in the field of Disk Drives and therefore cannot make or sell Disk Drives using the PL Disk Drive patents. Similarly, PM-DM's customers do not obtain a license to use PL Disk Drive patents, other than the base plate integration patents, when they purchase a PM-DM motor.  If PM-DM's customers make disk drives using PL's Disk Drive Patents they must obtain a Disk Drive license from PL.

DTX 409A, English translation of DTX 409, Letter from R. Smith to O. Kuwert re:  licensing agreements (Feb. 9, 1995).  Minebea did not respond to this communication.  See supra at 43-46.

On March 13, 1995, Georg Papst, Jerold Schnayer, Mr. Mizukami and Douglas Hymas attended a meeting that was held at Minebea's Tokyo headquarters.  See 7/28/05 (p.m.) Trial Tr. at 52:24-53:3 (G. Papst testim.); 7/21/05 (p.m.) Trial Tr. at 103:12-104:6 (Schnayer testim.).  During this meeting, Mr. Mizukami told Mr. Papst and Mr. Schnayer that Minebea had been approached by its HDD manufacturer customers who reported that Papst Licensing had accused them of infringement of its drive patents, that the patents concerned Minebea products, and that the customers wanted Minebea to accept liability for these charges of infringement by Papst Licensing.  See 7/28/05 Trial Tr. at 54:19-55:16 (G. Papst testim.); 7/21/05 (p.m.) Trial Tr. at 105:7-106:5, 117:19-118:11 (Schnayer testim.).  According to the testimony of both Mr. Papst and Mr. Schnayer, Mr. Mizukami reported to Mr. Papst at the meeting that he had told the customers that Minebea was only licensed under the spindle motor patents, and that when the customers purchased Minebea motors, they did not purchase rights to Papst drive patents other than the integrated baseplate patents.  See 7/28/05 (p.m.) Trial Tr. at 54:22-55:1, 55:6-16, 55:25-56:19 (G. Papst testim.), 7/21/05 (p.m.) Trial Tr. at 118:3-19 (Schnayer testim.).

At this March 13, 1995 meeting, Papst Licensing offered Minebea rights under the drive patents, explaining that it would cost "a lot more money" than the rights they already had under the motor patents.  7/21/05 (p.m.) Trial Tr. at 107:6-15, 108:12-23, 112:9-113:11 (Schnayer testim.);  see also 7/28/05 (p.m.) Trial Tr. at 42:22-25, 50:6-51:25, 54:19-58:18 (G. Papst testim.).  According to the testimony of both Mr. Papst and Mr. Schnayer, Mr. Mizukami stated that Minebea was not interested in obtaining licensing rights to the drive patents and that Minebea had anticipated this issue when it first negotiated with Papst Licensing.  7/28/05 (p.m.)

Trial Tr. at 58:5-18 (G. Papst testim.); 7/21/05 (p.m.) Trial Tr. at 113:6-17, 120:6-20 (Schnayer testim.).

Minebea's lawyer, Douglas Hymas, took notes at the March 13, 1995 meeting. PTX 662, Handwritten notes of Douglas Hymas (Mar. 13, 1995); 8/1/05 (p.m.) Trial Tr. at 29:7-30:24, 64:17-68:17 (Hymas testim.).  Mr. Hymas' contemporaneous notes record the statements and representations made by Papst to Minebea at the meeting as follows:

> Papst distinguishes between motor patents and drive patents
>
> Minebea has licensed the motor patents only, with the exception of the base plate integration HDD motors, which is separately stated in a loan agreement?
>
> – but were not covered under the drive patents unrelated to motors.

PTX 662.  Thus, Mr. Hymas' own notes corroborate that Papst told Minebea that it only had licensing rights to motor patents, and did not have rights under drive patents.  PTX 662; 8/1/05 (p.m.) Trial Tr. at 65:11-23, 69:19-25, 81:19-25 (Hymas testim.).

At no time during the March 13, 1995 meeting, or at any time thereafter, including up to the date the 1995 Settlement Agreement was signed, did Mr. Mizukami or Mr. Hymas assert that Minebea already had rights to the drive patents.  7/22/05 (p.m.) Trial Tr. at 31:5-20 (Schnayer testim.); see also 7/28/05 (p.m.) Trial Tr. at 54:19-55:16, 58:5-18 (G. Papst testim.); 8/1/05 (p.m.) Trial Tr. at 53:1-54:9, 69:19-22, 81:7-11 (Hymas testim.).  When asked at trial whether Minebea had said, in words or substance, that Minebea already had rights to the drive patents, Mr. Hymas answered, "I don't recall."  8/1/05 (p.m.) Trial Tr. at 53:9-12; see also 8/2/05 (a.m.) Trial Tr. at 81:7-11 (Hymas testim.).  Mr. Hymas agreed that nothing in his

contemporaneous notes indicated that Minebea said anything like that.  8/1/05 (p.m.) Trial Tr. at 69:19-22.

Mr. Mizukami's testimony during Minebea's case-in-chief abruptly stopped with events in 1993.  Mr. Mizukami was present in the courtroom throughout the trial, sitting at counsel table, and he heard all of the testimony of Mr. Papst, Mr. Schnayer, Mr. Smith and Mr. Hymas about the December 1994 letter Mr. Papst wrote to him, the February 1995 letter from Mr. Smith, and the March 13, 1995 meeting.  Mr. Mizukami did not take the stand to refute any of the foregoing testimony or the documentary evidence.

On June 19, 1995, Minebea and Papst signed the 1995 Settlement Agreement, which expressly states that Minebea's customers do not get a license and reserves to Papst the right to sue Minebea's customers for infringement of the drive patents.  See PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶¶ 2.2 (last sentence), 2.4 (last clause), 4.1 (last sentence). It was only later that Minebea complained to Papst about Papst's pursuing Minebea's customers under the drive patents.  If Minebea believed Papst's pursuit of Minebea's customers was impermissible, or if Minebea did not understand what Papst meant by the drive patents, the only rational course of action would have been for it to say so before signing the 1995 Settlement Agreement.  Instead, the evidence shows that Minebea said nothing until it brought suit in March of 1997.  Minebea's failure ever to speak or act on what it now says was its belief that its customers had rights to the drive patents, as well as the evidence and testimony offered by the parties, leads to the conclusion that the parties' mutual understanding – from the Joint Venture's inception until the Settlement Agreement was signed in 1995 – was that Papst would retain the right to sue PMDM's or Minebea's customers for infringement of the drive patents.

107

# PART TWO:  CONCLUSIONS OF LAW

## I.  SUBJECT MATTER JURISDICTION

Papst argues in its post-trial brief that this Court lacks subject matter jurisdiction over Minebea's claims for declaratory judgment of Patent Exhaustion (Count I), Equitable Estoppel/Legal Estoppel/Implied License (Count XIII), and Patent Misuse (Count XIV), "because there is no pending controversy between Minebea and Papst on the issue of whether Minebea infringes any of Papst's patent rights."  Papst Br. at 114.  This is the fifth time in the course of this litigation that Papst has made this argument.

Minebea argues that, although there is no realistic prospect that Papst will sue Minebea itself for infringement of any of Papst's patents, Papst has sued or threatened to sue Minebea's customers for infringement, and that this fact is sufficient to establish jurisdiction. Minebea claims that it "has an independent right under the patent laws to bring suit to ensure that its customers are not harassed by unwarranted infringement claims[,]" and that "a 'reasonable apprehension' of suit suffices to meet the declaratory judgment case or controversy requirement." Minebea Opp. at 77-78.  Minebea further argues that the prospect that it will be forced to indemnify its customers for any payment arising from Papst's patent infringement claims gives Minebea a direct stake in obtaining a declaratory judgment.  See Minebea Br. at 111.

Papst first moved to dismiss Minebea's declaratory judgment claims for lack of subject matter jurisdiction in 1998, arguing that the facts alleged in the complaint were insufficient to demonstrate a "case of actual controversy."  This Court denied the motion on June 22, 1998.  Minebea Co. v. Papst, 13 F. Supp. 2d 35, 39 (D.D.C. 1998).  In so doing, Judge Harris first discussed the test articulated by the Federal Circuit for determining the existence of an

actual case or controversy for a declaratory judgment action in the patent context: "The two core elements of the test are: '(1) acts of defendant indicating an intent to enforce its patent; and (2) acts of plaintiff that might subject it or its customers to suit for patent infringement.'"  Id. at 39 (quoting Arrowhead Industries Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 736-37 (Fed Cir. 1988)).  He went on to reject Papst's argument that any obligation on the part of Minebea to indemnify its customers is insufficient to create an actual controversy, noting that the parties had stipulated for purposes of the motion to dismiss that Papst already had accused several of Minebea's customers of infringing Papst's patents.  Minebea Co. v. Papst, 13 F. Supp. 2d at 40.

Approximately two years later, in proceedings in the United States District Court for the Eastern District of Louisiana, Papst filed a renewed motion to dismiss plaintiff's declaratory judgment claims for lack of subject matter jurisdiction.  Papst argued, inter alia, that many of Minebea's customers had entered into patent licensing agreements with Papst Licensing, thus resolving any potential infringement claims and depriving Minebea of a reasonable apprehension of indemnity liability as to those customers.  Judge Sear denied the motion,` rejecting Papst's argument and holding with respect to almost all of the customers in question "that Minebea has a very reasonable apprehension that [the customers] will seek indemnity for all or part of the payment[s] made to Papst pursuant to the License Agreement."  In re Papst Licensing, GmbH Patent Litigation, 2000 U.S. Dist. LEXIS 18809, at *24-*31 (E.D. La. 2000).[46]

---

[46]     Judge Sear engaged in a thorough analysis of the evidence as to Minebea's communications with its customers Toshiba, Samsung Electronics, Calluna, Fujitsu, Hitachi, NEC, and Hewlett-Packard.  See In re Papst Licensing, GmbH Patent Litigation, 2000 U.S. Dist. LEXIS 18809, at *24-*29.  Only as to Samsung Electronics and Calluna, whom Minebea had not identified as customers, did Judge Sear find that Minebea had failed to establish a reasonable apprehension of indemnity liability, and thus "a sufficient basis for declaratory judgment in connection with these companies."  Id. at *25.

Judge Sear also reiterated Judge Harris' holding that, as to customers who had not entered into licensing agreements with Papst, "Minebea's belief in its potential indemnification obligation to its motor customers is apparently both real and reasonable." Id. at *21.

In addition to analyzing the evidence submitted by the parties on the motion, Judge Sear relied in part on a stipulation filed by the parties on September 19, 2000. See In re Papst Licensing, GmbH Patent Litigation, 2000 U.S. Dist. LEXIS 18809, at *7.[47] Among the facts stipulated to was that "[w]ith respect to all patents-in-suit, HDD Motors and customers, Minebea has a reasonable apprehension of indemnity liability[.]" See Papst Licensing's Stipulation Concerning Subject Matter Jurisdiction (Civil No. 99-MD-1298) (E.D. La. Sep. 19, 2000) ¶ 1, App. 1 to Minebea Br. (Aug. 25, 2005) (Docket No. 1616). Papst has not challenged the accuracy of that statement, but only asserts that it is "not relevant to any issues in this case." Papst's Obj. to Minebea's PFF ¶ 3.1.12; Papst's Submission Regarding Subject Matter Jurisdiction Stipulation (June 22, 2005) (Docket No. 1024) at 3.

In 2002, defendants filed a further renewed motion to dismiss Minebea's declaratory judgment claims, arguing that a 2001 decision by the United States Court of Appeals for the Federal Circuit, Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc., 248 F.3d 1333 (Fed. Cir. 2001), so altered the legal landscape that Judge Harris' and Judge Sear's earlier decisions finding subject matter jurisdiction to exist were no longer consistent with the law. This Court rejected defendants' argument, stating that:

> TCI does not change the law in any fundamental way. While the
> court in TCI stated in the text of the opinion that the declaratory

---

[47] The parties agreed to stipulate to the facts recited therein "for all purpose[s] of this lawsuit[.]" In re Papst Licensing, GmbH Patent Litigation, 2000 U.S. Dist. LEXIS 18809, at *7.

> judgment justiciability test "requires action by the patent owner
> that creates 'reasonable apprehension' on the part of the
> declaratory plaintiff that it will face an infringement suit" . . .  TCI
> broke no new ground on the matters at issue here: Arrowhead is
> still good law and plaintiffs' apprehension about suits against its
> customers is sufficient – as Judge Harris and Judge Sear concluded
> – to provide the Court with subject matter jurisdiction.

Minebea Co. v. Papst, 229 F. Supp. 2d 1, 3 (D.D.C. 2002) (citing Arrowhead Industrial Water,

Inc. v. Ecolochem, Inc., 846 F.2d 731, 737 (Fed. Cir. 1988)).

Finally, in 2003, defendants petitioned the United States Court of Appeals for the

Federal Circuit to issue a writ of mandamus directing this Court and the Eastern District of

Louisiana to vacate their orders denying Papst's motions to dismiss.  See In re Papst, 55 Fed.

App'x 543 (Fed. Cir. 2003).  The Federal Circuit denied the petition, noting the fact-intensive

nature of jurisdictional inquiries and stating that  "Papst has a high hurdle to transcend to show

that its right to a certain result is 'clear and indisputable' and that mandamus is appropriate.  It

has not met that burden."  Id. at 544 (citations omitted).

Papst's post-trial brief simply rehashes the argument that TCI requires a plaintiff

asserting a declaratory judgment claim to have "a reasonable apprehension on the part of the

declaratory judgment plaintiff that it will face an infringement suit," that apprehension about

suits against customers is insufficient, and thus that there is no case or controversy because

Minebea itself has no reasonable apprehension of being sued by Papst.  Papst Br. at 114 (quoting

Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc., 248 F.3d at 1340)

(emphasis omitted).  The Court rejected this argument in 2002, see Minebea Co. v. Papst, 229

F. Supp. 2d at 3, and there are no intervening factual developments or changes in the governing

law that would justify altering its conclusion now.

111

The only changed circumstance Papst points to is its consummation of settlements in the form of licensing agreements with almost all of the Minebea customers Papst had accused of infringing its patents.  See Papst Br. at 116.[48]  This has no effect on the Court's jurisdiction to hear Minebea's declaratory judgment claims.  Although a case or controversy clearly exists with respect to any customer who has yet to settle with Papst, as Judge Sear held, even with respect to customers who have entered into licensing agreements the evidence shows (and the parties have stipulated) that "Minebea has a very reasonable apprehension that [its customers] will seek indemnity for all or part of the payment[s] made to Papst" pursuant to those licensing agreements.  In re Papst Licensing, GmbH Patent Litigation, 2000 U.S. Dist. LEXIS 18809, at *24-*31.  Even under the Federal Circuit's recent post-TCI jurisprudence, which arguably restricts somewhat the scope of declaratory judgment jurisdiction, such a "legal adverse interest" as created by these licensing agreements is sufficient to establish a case or controversy as to these customers.  See Microchip Tech. Inc.  v.  Chamberlain Group, 441 F.3d 936, 943 (Fed. Cir. 2006).[49]

For these reasons, the Court rejects Papst's argument and finds that it has subject matter jurisdiction over Minebea's declaratory judgment claims.

---

[48]     After the case was tried and the parties submitted their post-trial briefs, Papst also notified the Court that it had settled its infringement suit against IBM Corporation, leaving Quantum/Maxtor the only one of Minebea's "significant" customers not to have settled with Papst.  See Papst's Notice of Settlement With IBM and Updated Pages of Findings of Fact and Conclusions of Law (Dec. 6, 2005) (Docket No. 1653); Papst Br. at 116.

[49]     The court in Microchip noted that, unlike the situation here, Microchip had not established that any of its witnesses had a legal interest adverse to Chamberlain, "such as the existence of an indemnity agreement between Microchip and its customer."  Microchip Tech. Inc. v. Chamberlain Group, 441 F.3d at 943.

## II.  COUNT I:  PATENT EXHAUSTION

In Count I of the Second Amended Complaint, Minebea argues that its authorized, unconditional sale of HDD motors has exhausted certain of Papst's drive patents, so that those patents are no longer enforceable by Papst against Minebea's customers.  The Court has twice considered motions for summary judgment on this issue.  On October 19, 2004, the Court denied Papst's motion for partial summary judgment on Minebea's patent exhaustion claim.  <u>See</u> 10/19/04 Tr. at 42-56 (Court's oral ruling).  In that decision, the Court gave its preliminary views regarding the proper reading of the 1995 Settlement Agreement and the doctrine of patent exhaustion.  On June 24, 2005, the Court denied Minebea's and Papst's cross motions for summary judgment on the same issue.  <u>Minebea Co. v. Papst</u>, 374 F. Supp. 2d 202 (D.D.C. 2005).  In the second opinion, the Court set forth further legal conclusions with respect to both the meaning of the 1995 Settlement Agreement and the law of patent exhaustion.  Now, after a full trial on the merits, the Court issues its third opinion on Minebea's patent exhaustion claim.

Although Minebea has shown that its sales of HDD motors were authorized by Papst and unconditional, the Court concludes that only two of the motors at issue were actually sold "under" United States patents – the Quantum Empire and the Hewlett Packard Wolverine III.  Minebea therefore cannot prove patent exhaustion with respect to the vast majority of the patents and motors at issue.  Moreover, although Minebea has shown that, as a general matter, its motors had no reasonable use that would not infringe some of Papst's drive patents, it did <u>not</u> show this to be the case with respect to the two motors sold under United States patents.  Nor did it show that these two motors embodied the "essential features" of the patent claims their sale is

alleged to have exhausted.  Accordingly, Minebea is not entitled to a declaratory judgment of

patent exhaustion with respect to any of Papst's patents.

### A.  The Law of Patent Exhaustion

"Every patent . . . contain[s] . . . a grant to the patentee . . . of the right to exclude

others from making, using, offering for sale, or selling the invention throughout the United

States. . . ." 35 U.S.C. § 154.  Patent owners also have the right to exclude others from

performing acts that induce infringement of the patent or contributorily infringe the patent.  <u>See</u>

35 U.S.C. § 271(b), (c).  Under the doctrine of patent exhaustion, however, a patent holder loses

the right to enforce a patent with respect to a particular article if it unconditionally sells, or

authorizes the unconditional sale of, the patented article.  "The unrestricted sale of a patented

article, by or with the authority of the patentee, 'exhausts' the patentee's right to control further

sale and use of that article by enforcing the patent under which it was first sold." <u>Jazz Photo</u>

<u>Corp. v. ITC</u>, 264 F.3d 1094, 1105 (Fed. Cir. 2001).  The rationale underlying the doctrine is that

"there has been such a disposition of the article that it may fairly be said that the patentee has

received his reward for the use of the patent," and that as a matter of public policy the patent

holder is no longer entitled to the protection of the patent statute.  <u>See</u> <u>United States v. Masonite</u>

<u>Corp.</u>, 316 U.S. 265, 278 (1942); <u>see also</u> <u>United States v. Univis Lens Corp.</u>, 316 U.S. 241, 250

(1942) (sale of a patented article "exhausts the monopoly in that article and the patentee may not

thereafter, by virtue of his patent, control the use or disposition of the article").

The doctrine of patent exhaustion applies not only when the patent holder itself

makes the unconditional sale, but also when, as here, the article is sold to a third party by an

authorized licensee.  <u>Intel Corp. v. ULSI Sys. Tech., Inc.</u>, 995 F.2d 1566, 1568 (Fed. Cir. 1993)

("This longstanding principle applies similarly to a sale of a patented product manufactured by a licensee acting within the scope of its license."). To exhaust a United States patent, however, the "authorized first sale" of the article must have "occurred under the United States patent." Jazz Photo Corp. v. ITC, 264 F.3d at 1105. In this case, Minebea, a licensee of Papst's patents, made the alleged unconditional sales of HDD spindle motors that were covered by certain of Papst's patents. Thus, generally, the authorized, unconditional sale of a patented article under a United States patent exhausts the patent with respect to the future use or sale of that article. See Jazz Photo Corp. v. ITC, 264 F.3d at 1105.

Minebea argues that it was authorized by the 1995 Settlement Agreement and prior agreements to sell its motors unconditionally and that it sold them "under" United States patents. It does not, however, seek a finding merely that its sales of motors exhaust Papst's patent rights with respect to patents on the motors themselves. Rather, Minebea contends that its authorized sale of motors exhausted certain Papst drive patents, the "essential features" of which Minebea argues are embodied in the motors it sold. Minebea's patent exhaustion claim concerns a total of 31 disk drive patents.[50]

---

[50]     The 31 patents that Minebea claims are at issue in its exhaustion claim are discussed in Paragraphs 2.1 through 2.7 and 8.4 of Minebea's Proposed Findings of Fact. They are:

U.S. Patent No. 4,658,312 ("the '312 Patent")
U.S. Patent No. 4,843,500 ("the '500 Patent")
U.S. Patent No. 4,894,738 ("the '738 Patent")
U.S. Patent No. Re 35,792 ("Re '792")
U.S. Patent No. 5,001,581 ("the '581 Patent")
U.S. Patent No. 5,173,814 ("the '814 Patent")
U.S. Patent No. Re 37,058 ("the '058 Patent")
U.S. Patent No. Re 38,178 ("the '178 Patent")
U.S. Patent No. Re 38,601 ("the '601 Patent")

To prevail on its patent exhaustion claims, Minebea must establish that: (a) it had authority to sell its motors; (b) there were no conditions on its sale of motors; (c) its motors were sold "under" the United States patents in question; and (d) the motors sold embody the "essential feature" of the Papst drive patents such that they have no reasonable use which does not infringe the Papst drive patents. The first two questions were answered in Minebea's favor in the Court's June 24, 2005 Opinion denying both parties' motions for summary judgment on Count I (the "Patent Exhaustion Opinion" or "June 24, 2005 Exhaustion Opinion"). Minebea Co. Ltd. v. Papst, 374 F. Supp. 2d 202 (D.D.C. 2005). The Court reiterates and amplifies those holdings here based on a reading of the relevant provisions of the applicable agreements and (to the extent probative) the evidence adduced at trial.

---

U.S. Patent No. Re 38,662 ("the '662 Patent")
U.S. Patent No. Re 38,673 ("the '673 Patent")
U.S. Patent No. 4,779,165 ("the '165 Patent")
U.S. Patent No. Re 34,412 ("Re '412")
U.S. Patent No. 5,006,943 ("the '943 Patent")
U.S. Patent No. 5,128,819 ("the '819 Patent")
U.S. Patent No. 5,040,085 ("the '085 Patent")
U.S. Patent No. 5,216,557 ("the '557 Patent")
U.S. Patent No. 5,446,610 ("the '610 Patent")
U.S. Patent No. 5,422,769 ("the '769 Patent")
U.S. Patent No. 5,557,487 ("the '487 Patent")
U.S. Patent No. 5,801,900 ("the '900 Patent")
U.S. Patent No. 5,774,302 ("the '302 Patent")
U.S. Patent No. 5,864,443 ("the '443 Patent")
U.S. Patent No. 4,535,373 ("the '373 Patent")
U.S. Patent No. 4,922,406 ("the '406 Patent")
U.S. Patent No. 5,424,887 ("the '887 Patent")
U.S. Patent No. 5,729,403 ("the '403 Patent")
U.S. Patent No. 5,708,539 ("the '539 Patent")
U.S. Patent No. 5,777,822 ("the '822 Patent")
U.S. Patent No. 5,946,161 ("the '161 Patent")
U.S. Patent No. 4,519,010 ("the '010 Patent")

116

Before discussing Minebea's authorization to sell its motors unconditionally, or whether the motors sold embodied the essential features of the allegedly exhausted patents, the Court first will consider which of the allegedly exhausting motor sales actually occurred "under" Papst's United States patents.[51]   Upon consideration of the evidence, the Court finds that Minebea has successfully demonstrated only that two of its motors – the Quantum Empire and the Hewlett-Packard Wolverine III – were sold under United States patents.

## B.   Sales "Under" United States Patents

For an authorized and unconditional sale to exhaust a United States Patent, the sale must occur "under" the United States Patent.  See Jazz Photo Corp. v. ITC, 264 F.3d at 1105.  Two recent Federal Circuit decisions establish that foreign sales cannot exhaust United States patent rights and that only an authorized and unrestricted sale occurring in the United States may exhaust a U.S. patent.  Fuji Photo Film Co. v. Jazz Photo Corp., 394 F.3d 1368, 1376 (Fed. Cir. 2005); Jazz Photo Corp. v. ITC, 264 F.3d at 1105.  Papst argues that Minebea does not make or sell its motors inside the United States, because its customers do not mass produce their hard drives in the United States, and that Minebea's motor sales therefore do not occur "under" Papst's U.S. patents.  See Papst Br. at 25.  Minebea argues that a sale may occur "under" a U.S. patent even though the sale does not occur in the United States and that, through its U.S. subsidiary, NMB, Minebea engages in sufficient sales activity in the United States to establish that its motors were sold "under" United States patents.  See Minebea Br. at 65-67.

_____

[51]      The Court takes this issue up first because, for those motors not actually sold in the United States, there is no need to examine the patents underlying such motors patent-by-patent and claim-by-claim.

1.  Must a Sale "Under" a U.S. Patent Occur in the United States?

Minebea argues that there is no requirement that a sale actually occur in the

United States for it to be to be "under" a United States patent.  See Minebea Br. at 63.  It

maintains that under the patent statute, many factors are relevant in determining where a sale

occurs:  the place of the offer to sell, the location of negotiations, the place of acceptance, the

route and final place of delivery, the terms of the sales contract, the provision of product support,

and when the risk of loss passes from seller to buyer.  See id. at 64 (citing 35 U.S.C. § 271).

According to Minebea, "for patent purposes,  the realities of the HDD industry dictate that a

single sale of a product may occur in several different locations."  Id.

Minebea maintains that the evidence adduced at trial surrounding its sales

activities and the sales activities of NMB proves that its sales occurred under the United States

patents.  It argues that its sales are the result of negotiations conducted and offers made and

accepted in the United States; that it received payment for its sales in the United States; and that

its products were delivered in the United States.  See Minebea Br. at 65.  For example, according

to Minebea, over 65% of its HDD spindle motor sales are to U.S.-based customers.  Id. at 66;

7/8/05 (p.m.) Trial Tr. at 95:9-13 (Hausman testim.).

The evidence at trial showed that NMB has sales offices in California, Colorado,

Illinois, Minnesota and Texas, and that it has engaged in sales-related activities of HDD motors

in the United States with respect to Maxtor, Conner Peripherals, Seagate, Hewlett-Packard and

Western Digital.  See Minebea Br. at 68; 7/11/05 (a.m.) Trial Tr. at 48:21-49:14, 51:15-52:7

(Taino testim.); 7/7/05 (p.m.) Trial Tr. at 69:7-12 (Dosho testim.); 7/8/05 (p.m.) Trial Tr. at

18:8-13, 34:15-22, 35:3-6 (Bergsma testim.).  Indeed, Minebea spent nearly three of its trial days

118

– a substantial part of the 60 hours it was allotted to present its case-in-chief – painstakingly endeavoring to establish, mostly through the testimony of Junichi Taino and dozens of summary charts showing the dates and summaries of various activities of NMB relating to the sale of Minebea motors, that there was significant "sales activity" in the United States.  Minebea argues from this evidence that even where delivery is F.O.B. abroad, the sale is "under" a United States patent when Minebea has offered the motors for sale in the United States, has negotiated pricing and quantities in the United States, has supported design and testing in the United States, has invoiced in the United States, and has been paid in the United States.  See Minebea Br. at 68; 7/8/05 (p.m.) Trial Tr. at 24:15-23, 25:5-10, 30:18-31:4 (Bergsma testim.); 7/7/05 (p.m.) Trial Tr. at 70:2-11, 70:20-71:2, 76:4-20, 79:10-11 (Dosho testim.); 7/11/05 (a.m.) Trial Tr. at 23:19-25:7, 31:8-25, 62:6-21, 68:10-69:2, 69:16-19 (Taino testim.); 7/11/05 (p.m.) Trial Tr. at 16:10-19, 17:2-10, 18:1-7, 18:24-19:1 (same).

Minebea's position, however, is contrary to the plain language of the Federal Circuit's decisions in Jazz Photo and Fuji Photo.  In 2001 the Federal Circuit stated that the patent exhaustion doctrine "applies only to [products] for which the United States patent right has been exhausted by first sale in the United States."  Jazz Photo Corp. v. ITC, 264 F.3d at 1105 (emphasis added).  Four years later, in another decision in a related case, the Federal Circuit reiterated and underscored:

> Read in full context, this court in Jazz stated that only [disposable cameras] sold within the United States under a United States patent qualify for the repair defense under the exhaustion doctrine. Moreover, Fuji's foreign sales can never occur under a United States patent because the United States patent system does not provide for extraterritorial effect.

Fuji Photo Film Co. v. Jazz Photo Corp., 394 F.3d at 1376 (emphasis added).

119

Attempting to distinguish Jazz Photo and Fuji Photo, Minebea argues that whether its motors were first sold overseas is irrelevant, because those motors ultimately are incorporated into hard disk drives or computers that are sold in the United States. "Since Minebea sold its HDD spindle motors to non-U.S. customers . . . with the knowledge and intent that they would be used to form the complete infringing combination that would be shipped into the United States, the motors it sold to those HDD manufacturers . . . were sold under the U.S. patent."  Minebea Br. at 64 & n.27; see id. at 66-67.  Minebea argues that the products at issue in Jazz Photo were not sold "under" United States patents because no authority was required to make the foreign sales in that case and there was no anticipation that the products would later be sold in the United States.  See Minebea Br. at 63-64.  Minebea maintains that since its sales were authorized, and use of its motors in hard disk drives sold in the United States was fully anticipated, the exhaustion doctrine applies even if those sales are foreign.  Id. at 66.  In support of this proposition, Minebea cites Kabushiki Kaisha Hattori Seiko v. Refac Tech. Develop. Corp., 690 F. Supp. 1339 (S.D.N.Y. 1988), which held that sales are "under" the United States patent even if the first sale is overseas, so long as the products are intended for resale in the Unites States.

Papst characterizes this argument as an attempt to "climb on the bandwagon of Minebea's customers' importation into the U.S."  See Papst's Post Trial Brief at 28.  According to Papst, Minebea's sales are outside the United States, and the first sales actually "under" the United States patent are actually Minebea's customers' (or Minebea's customers' customers') sales of hard drives or computers into the United States.  See id.  The problem with Minebea's theory, Papst says, is that the sale or activity which supposedly exhausts the patent (the eventual sale of computers containing Minebea HDD motors into the U.S.) cannot also be the sale that

120

enjoys the benefit of exhaustion.  See id.  In other words, Papst argues that the exhaustion

doctrine contemplates a first sale which renders a later sale non-infringing, because the first sale

exhausted the patent's ability to enjoin later activities.  See id.  Papst says Minebea has no

exhaustion claim since "[a]ctivity by Minebea's customers' cannot simultaneously be both the

'first' (exhausting) sales and the later sales (infringement-free sales that enjoy exhaustion)."  Id.

Even assuming that Minebea was authorized by Papst to sell its HDD motors

worldwide, the Federal Circuit has stated that "[t]he patentee's authorization of an international

first sale does not affect exhaustion of that patentee's rights in the United States."  Fuji Photo

Film Co. v. Jazz Photo Corp., 394 F.3d at 1376 (emphasis added).  Specifically, the court held

that it "does not construe the 'solely foreign provenance' language or the Boesch citation [in its

Jazz Photo opinion] to dictate a narrow application of the exhaustion principle."  Id.[52]  The court

explicitly stated that the exhaustion principle was not limited to unauthorized sales, and that first

sales under the exhaustion doctrine are those occurring within the United States.  See id.  Under

Jazz Photo, a foreign first sale does not exhaust United States patent rights.  Jazz Photo Corp. v.

ITC, 264 F.3d at 1105; Fuji Photo Film Co. v. Jazz Photo Corp., 394 F.3d at 1376 ("[F]oreign

sales can never occur under a United States patent because the United States patent system does

not provide for extraterritorial effect.").

The cases cited by Minebea in support of its argument that foreign sales may

occur "under" a United States patent if the product sold is intended for resale in the Unites States

do not survive the Federal Circuit's subsequent decisions in Jazz Photo and Fuji Photo Film.  See

Minebea Br. at 64 n.27 (citing Kabushiki Kaisha Hattori Seiko v. Refac Tech. Dev. Corp., 690 F.

---

[52]        Boesch v. Graff, 133 U.S. 697 (1890).

Supp. 1339 (S.D.N.Y. 1988) and Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.,

246 F.3d 1336, 1351 (Fed. Cir. 2001)).  Nor is Minebea helped by the many cases it cites for the

proposition that active inducement or contributory infringement can be found in events that take

place outside the United States, even though the patent laws of the United States do not have

extraterritorial effect.  The question here is not whether actions abroad can be viewed as

"inducing" or "contributing" to infringement in the United States, but whether an authorized

foreign sale – that is, the sale of a product delivered abroad – can ever exhaust a United States

patent.  The language of the Federal Circuit's decisions in  Jazz Photo and Fuji Photo Film

makes clear that even authorized foreign sales do not exhaust a United States patent.

Papst further argues that "a sale occurs at the place where the performance under

the contract occurs – i.e., where the goods are delivered[.]"  Papst's Br. at 23-24 (citing Quality

Tubing, Inc. v. Precision Tube Holdings Corp., 75 F. Supp. 2d 613, 621 (S.D. Tex. 1999) and

Ecodyne Corp. v. Croll-Reynolds Eng'g Co., 491 F. Supp 194, 197 (D. Del. 1979)).[53]  According

to Papst, Minebea's HDD motors are mass-produced in Thailand and most are delivered to HDD

manufacturing facilities located throughout Asia.  Papst's Br. at 25-27; see 7/13/05 (p.m.) Trial

Tr. at 29:18-20, 31:5-12 (Taino testim.); 7/8/05 (a.m.) Trial Tr. at 25:10-32:19 (Dosho testim).

Only about 0.4% of Minebea's motors are delivered in the United States.  See Papst's Br. at 23-

24; 7/20/05 (a.m.) Trial Tr. at 32:22-35:9 (Malackowski testim.).  Papst maintains that Minebea's

foreign "first sales" to HDD manufacturers cannot exhaust its patent rights because they are

foreign, not domestic, and therefore are not "under" the United States patents.

---

[53]      Papst also relies on the Uniform Commercial Code for this proposition.  See
Papst's Post Trial Brief at 23-24 (citing U.C.C. §§ 2-106, 2-401).

The cases cited by Minebea do not lead to a contrary conclusion.  While The Ensign-Bickford Co. v. ICI Explosives USA, Inc., 817 F. Supp. 1018, 1025-26 (D. Conn. 1993), suggests that sales strategy meetings in the United States and receipt of payment in the United States may contribute to a finding of a sale "in the United States" even if the product is delivered F.O.B. abroad, the facts in The Ensign-Bickford were that the products in question, while F.O.B. Canada, were actually delivered to Kentucky.  Likewise, in Semitool, Inc. v. Dynamic Microsys. Semiconductor Equip. GmbH, 2002 U.S. Dist. LEXIS 23050, *22 (N.D. Cal. Sept. 5, 2002), the court noted that the fact that the product was F.O.B. abroad was not determinative of whether the sale was "in the United States" for patent law purposes, but it appears once again that actual delivery in that case took place in the United States.  See id.[54]  In Minebea's case, however,  it appeared at the summary judgment stage – and continues to be the case after trial – that the vast majority of Minebea's motors not only were F.O.B. abroad, but also were in fact delivered abroad.

Contrary to Minebea's argument, it is irrelevant that NMB receives a commission even if the motors are manufactured and delivered outside of the United States and the purchase order is received by another Minebea-related company (presumably overseas).  See Declaration of Junichi Taino ¶ 16 (App. A to Minebea's Motion for Summary Judgment on Patent Exhaustion, Docket No. 660) (April 25, 2005) (hereinafter "First Declaration of Junichi Taino").  It is also irrelevant that Minebea "intended that its HDD motors be incorporated into HDD's and imported into the United States." Id. ¶ 18.  As the Court noted above, "[t]he patentee's

---

[54]     The court acknowledged that it was unnecessary even to reach this argument since defendant's own admissions in its responses to interrogatories stated that its sales were "in the United States." Id.

authorization of an international first sale does not affect exhaustion of that patentee's rights in the United States." Fuji Photo Film Co. v. Jazz Photo Corp., 394 F.3d at 1376.

Patent exhaustion applies only when the first sale of the patented product occurs "under" the United States patent, and the Federal Circuit has explained that a sale under a United States patent means that the sale must have occurred in the United States. Jazz Photo Corp. v. ITC, 264 F.3d at 1105.  Accordingly, to establish exhaustion of Papst's drive patents, Minebea must establish that its motors were sold in the United States – that is, delivered into the United States "under" a United States patent.

### 2.  Minebea's Sales in the United States

Because a sale must occur in the United States in order to occur "under" a United States patent (and thus to exhaust that patent), the Court must determine which, if any, of Minebea's motor sales occurred in the United States.  Upon consideration of the evidence, the Court concludes that only two of the motors still at issue in the case – the HP Wolverine III and the Quantum Empire – meet this criterion.

### a.  The evidence adduced on summary judgment and at trial

On summary judgment, Minebea submitted the declaration of Junichi Taino, the manager of NMB Technologies Corporation, to support its claim that its motor sales are "in the United States."  Mr. Taino explained that when a U.S.-based hard disk drive manufacturer designs a new hard drive for which it desires a motor, the manufacturer notifies sales personnel of NMB Technologies, and NMB works with the manufacturer to design a motor to fit its needs. See First Declaration of Junichi Taino ¶¶ 9-10.  Custom-made sample motors (which presumably

124

are manufactured abroad) are then delivered to the HDD manufacturer.  See id. ¶¶ 11-12.  NMB

then obtains a sales contract for a pilot production, with the delivery location unspecified.  See id.

¶ 14.  The Taino declaration explained that "NMB, in conjunction with other Minebea entities,

negotiates with the HDD manufacturer the price of the HDD motors used in mass production."

Id. ¶ 15.[55]

        The Taino declaration offered a number of examples of motor development and

sales:  the Maxtor Altair, the Maxtor Meteor, the Hewlett Packard Wolverine III, the Maxtor

Lightning, the Maxtor Comet, the Maxtor Nebula, and the Quantum Empire.  See First

Declaration of Junichi Taino ¶¶ 20-26.  The evaluation and qualification of all of these sample

motors appears from Mr. Taino's declaration to have taken place at the customers' United States

facilities.  Id.  The declarations submitted by Thomas Nieto, Keith Berding and Donald Nieman –

all of Western Digital – further supported Minebea's contention that testing and qualification of

the sample motors took place in the United States.  See Declaration of Thomas Nieto, Minebea

Motion for Summary Judgment, Appendix C; Declaration of Keith Berding, Minebea Motion for

Summary Judgment, Appendix D; and Declaration of Donald Nieman, Minebea Motion for

Summary Judgment, Appendix E.  For the most part, however, these declarations discussed only

the negotiations and sales contracts for the production of pilot or sample motors.  With respect to

the negotiation of mass production motors, Mr. Taino's declaration stated only that NMB, "in

conjunction with other Minebea entities," negotiates the price.  See, e.g., First Declaration of

---

[55]        On summary judgment, there was no indication that most – or even some – of
these sales negotiations took place in the United States, that purchase orders are submitted to
NMB, or what role NMB actually plays.  That deficiency was corrected at trial.

Junichi Taino ¶ 23(g).[56]  Only with respect to the Comet Maxtor did NMB "receive[] a purchase

order," and, except in the case of the HP Wolverine III motor, there was no indication that any

number of mass-produced motors were delivered to a location in the United States.  Id. ¶¶ 22(h),

24(f).[57]  The Taino declaration did explain that "[f]or all HDD motors shipped to the United

States, NMB invoices the sale and is paid by the HDD manufacturer in the United States," id.

¶ 19, but did not identify what proportion of the overall sales are so delivered.

It appeared from the information provided in the Taino declaration submitted at

the summary judgment stage that most of Minebea's descriptions of sales activities occurring in

the United States centered around limited quantities of sample motors.  These appeared to be

almost entirely samples – or perhaps pilot productions – for development purposes, rather than

actual sales or deliveries of mass-produced motors for commercial sale.[58]  On summary

---

[56]     The second declaration of Junichi Taino, submitted in support of Minebea's
opposition to Papst's motion for summary judgment, was similarly unilluminating.  See Second
Declaration of Junichi Taino (May 20, 2005) (Docket No. 735) (Appendix A).  In general, on
summary judgment, it was entirely unclear where the negotiations took place and where purchase
orders were submitted.  Again, at trial, Minebea went to great lengths to attempt to correct this
deficiency.

[57]     The Taino declaration indicates that some mass-produced HP Wolverine motors
were shipped to Idaho.  Id. ¶ 22(h).

[58]     Minebea acknowledged at the summary judgment stage that Mr. Dosho stated in
his deposition that "Minebea manufactures its motors in Thailand, that particular customers have
their HDD production facilities (and in some cases HDD development facilities) outside of the
United States, and that Minebea's foreign sales offices were involved in sales of volume HDD
motors to certain customers."  Minebea Mot. at 32.  Minebea nevertheless argued – and
continued to argue at trial – that "the sale of many of Minebea's HDD motors for use in
commercial HDDs arise from the design and procurement efforts in the United States of
Minebea's United States subsidiary, NMB."  Minebea Opp. at 5; see Minebea Br. at 68-79.

The Court held in its June 24, 2005 Patent Exhaustion Opinion that the delivery of
"limited quantities of sample motors" (as opposed to mass-production quantities) in the United

judgment, the Court was not persuaded that simply working with HDD manufacturers in the United States to develop the motors in question qualifies later foreign sales as sales "in the United States." Minebea Co. v. Papst, 374 F. Supp. 2d at 218.

In sum, the Taino declaration contained barely enough information to raise genuine issues of material fact as to whether not all of Minebea's sales were "solely of foreign provenance." In attempting to prove its exhaustion claim at trial, of course, Minebea bore the burden of proving which of its motor sales actually occurred in the United States.

At trial, Mr. Taino testified that NMB is headquartered in Chatsworth, California and also has offices in San Jose, California and in Colorado, Illinois, Minnesota and Texas. It has 150 employees in the United States. See 7/11/05 (a.m.) Trial Tr. at 46:3-18 (Taino testim.). Mr. Taino identified NMB's current HDD spindle motor customers as Seagate, Maxtor, and Western Digital, and said that its former customers included Hewlett Packard, Connor Peripherals, and Quantum. See id. at 49:25-50:9. He described with the aid of exhibits the "sales activity" of Minebea in the United States, through NMB, and discussed specifically the work that he and those he supervises do in the United States. He testified that he is involved in such activities as customer meetings and communications, negotiations, the budgetary process, the setting of prices, and pilot production coordination – all in the United States. He testified that there were no mass-production quantities of motors manufactured or produced in the United States. Furthermore, his testimony, together with the exhibits offered, show that only two of the motors at issue were actually delivered in the United States in mass-production quantities.

States was insufficient to constitute "sales in the United States." Minebea Co. v. Papst, 374 F. Supp. 2d at 218.

Through Mr. Taino, Minebea introduced numerous motor summary charts ("Motor Stories") at trial detailing its HDD-motor-related sales activities which Minebea claims exhausted certain Papst drive patents.  See PTX 2447; PTX 2451; PTX 2453; PTX 2456; PTX 2457; PTX PTX 2459; PTX 2461; PTX 2462; PTX 2463; PTX 2464; PTX 2465; PTX 2466; PTX 2467; PTX 2468; PTX 2469; PTX 2470; PTX 2472; PTX 2473; PTX 2474; PTX 2475; PTX 2476; PTX 2477; PTX 2480; PTX 2481; PTX 2482; PTX 2483; PTX 2484; PTX 2485; PTX 2487; PTX 2638; PTX 2639; PTX 2640; PTX 2642; PTX 2644; PTX 2648; PTX 2650; PTX 2661; PTX 2669; PTX 2676; PTX 2788; PTX 2789 and PTX 2790.  Most of these summary charts bear captions along the lines of "Documentation of Minebea/[customer] U.S. Activity."  Some of them show significant sales-related activities in the United States.  See, e.g., PTX 2451; PTX 2642.  Upon analysis, however, they do not show delivery of motors into the United States.   Other Motor Stories, moreover, show little sales activity even remotely related to the United States –  sometimes no more than NMB's receipt of carbon-copies (cc's) of sales-related emails, or the direct receipt of a few incidental sales communications.  See, e.g., PTX 2464; PTX 2470; PTX 2472.

As noted, these Motor Story exhibits and other exhibits related to them were introduced at trial primarily through the testimony of Junichi Taino, Manager of the Storage Components Division at NMB, the same person whose declaration was relied upon at the summary judgment stage.  See DTX 853, Certification of Documents Pursuant to Federal Rules of Evidence 803(6), 902(11) and 902(12) (Docket No. 1310) (July 11, 2005).  For each Motor Story, Mr. Taino identified in his Certification a Plaintiff's Trial Exhibit containing collections of underlying documents which were summarized on each Motor Story.  See id.  The underlying

documents for the Motor Stories include, for example, purchase orders, motor specifications, internal NMB documents, and NMB communications with HDD manufacturers such as price negotiations. Minebea also individually offered a number of the underlying documents in evidence. See, e.g., PTX 2642 (Maxtor Lightning Motor Story); PTX 2149.230 (3/29/96 letter re pricing from Maxtor to NMB); PTX 2149.301-302 (6/15/95 fax re shipping from NMB to Maxtor); PTX 2149.236-239 (3/2/95 fax re pricing and tooling from NMB to Maxtor); PTX 2149.242-244 (1/18/95 letter re mass production price quotation from NMB to Maxtor); PTX 2149.281-284 (7/21/95 memo re Maxtor status from R. Bergsma to Mr. Shimba); PTX 2149.285-289 (7/10/95 fax re Maxtor action items from PMDM-G to Maxtor, PMDM-G and PMDM-A (NMB)); PTX 2149.319-321A (2/8/96 fax re status from NMB to other PMDM offices); PTX 2149.368 (12/1/95 sample motors purchase order from Maxtor to NMB) and PTX 2149.373-396 (9/13/95 fax re motor issues from Maxtor to NMB).

Minebea also offered many demonstrative exhibits which were not formally admitted in evidence but which have been considered by the Court to assist it in understanding the evidence. Minebea offered a chart entitled "Minebea's United States Customers," PTX 2490, which listed who Minebea considers its "United States customers" (Maxtor, Quantum, Seagate, Hewlett-Packard, Conner and Western Digital). Minebea also offered a demonstrative chart for each of the customers it claims are U.S. customers. Each chart contains all of the HDD motor projects per HDD manufacturer, which Minebea claims exhausted certain of Papst's drive patents. See PTX 2798; PTX 2800; PTX 2801; PTX 2802 and PTX 2803. These demonstrative charts regarding Minebea's sales-related activities in the United States are entitled, "NMB USA's Sales Activities Relating to [HDD manufacturer name]." Minebea also offered for the Court's

consideration as a demonstrative exhibit a chart entitled "Minebea's Motor Project Activities," PTX 2488, outlining Minebea/Customer's United States "sales activity" showing certain activities in the United States followed by motor manufacturing, hard disk drive manufacturing and computer manufacturing in Eastern Asia, with the end product (computers) being delivered into the United States.  On this chart and through the testimony of Mr. Taino, Minebea explained the division of its "Minebea/Customer U.S. Sales Activity" into four separate categories: (1) Design Initiation, (2) Motor Qualification, (3) Pilot Production, and (4) Mass Production. See PTX 2488.

According to Mr. Taino and the exhibits he sponsored, design initiation for a motor includes initiating the new design project; developing an initial design specification; negotiating price, setting quantities and a delivery schedule for sample motors; providing mass production budgetary quotations; evaluating sample motors; and finalizing the specification. Motor Qualification includes negotiating a price; setting quantities and a delivery schedule for sample motors; arranging for sample motors for qualification; and testing sample motors against the final specification.  Pilot Production includes negotiating a price; setting quantities and delivery schedules for pilot motors; and evaluating and approving pilot production.  Mass Production includes negotiating a price; setting quantities and a delivery schedule of mass production motors; addressing any quality control issues or design changes; and any additional motor qualification.  In addition to these four categories of sales-related activities, Minebea also listed the categories of: Budgetary Pricing Established and Negotiation and Establishment of Mass Production Pricing.  See, e.g., PTX 2797.

On the basis of this summary evidence and demonstrative exhibits, and certain exhibits admitted that underlie them, Minebea claims that NMB, its United States subsidiary, has "birth to grave" responsibility for sales of HDD spindle motors to Minebea's U.S. customers. Minebea Br. at 69-70; 7/7/05 (p.m.) Trial Tr. at 69:4-6, 74:23-25, 75:16-21 (Dosho testim.); 7/11/05 (a.m.) Trial Tr. at 55:9-12 (Taino testim.); 7/8/05 (p.m.) Trial Tr. at 21:16, 21:24-22:15 (Bergsma testim.).  According to Minebea, NMB engages in meetings and negotiations addressing design qualification, HDD spindle motor samples, and mass production issues ranging from engineering, quality issues and pricing.  7/11/05 (a.m.) Trial Tr. at 7:25-8:2; 50:17-25 (Taino testim.).  Nonetheless, because the Court has concluded that for Minebea to prevail on its patent exhaustion claim it must show that specific motor sales resulted in delivery of mass-produced quantities of motors into the United States, much of Mr. Taino's testimony and the documentary evidence offered does not in the end further Minebea's claim.

### b.  The specific motors claimed

### i.  Hewlett Packard

Minebea claims that its sales of the Wolverine III (PTX 2453) and Cougar (PTX 2461) motors to Hewlett Packard ("HP") exhausted certain Papst drive patents.  None of the documents summarized in Minebea's Motor Story for the Cougar motor indicate delivery of mass-produced Cougar motors in the United States, however.  See PTX 2461.  And there was no other evidence introduced at trial to show that mass-produced quantities of Cougar motors ever were delivered in the United States.  The only two documents Minebea highlighted relevant to the HP Cougar motor were a letter from NMB to HP regarding price quotations (PTX 2155.468-470) and an NMB-PMDM internal memorandum regarding mass production prices (PTX

131

2155.138).  The fact that such a letter and response were prepared in the United States is irrelevant to whether mass-production quantities of Cougar motors ever were delivered in the United States.  Accordingly, the Court finds that Minebea has failed to prove that Cougar motors were sold "under" the United States patents because Minebea has offered no evidence that any Cougar motors were either mass produced in the United States or delivered in mass-production quantities in the United States.

The evidence presented at trial leads to a different conclusion with respect to the Wolverine III motor.  A packing slip dated January 1, 1994 indicates that NMB packed and shipped, from its Chatsworth, California facility, 2,416 Wolverine III motors to HP's Boise, Idaho location.  PTX 2147.1400.  Mr. Taino testified that such a packing slip is prepared when a shipment is made and is attached to the shipment.  See PTX 2453; 7/13/05 (p.m.) Trial Tr. at 13:11-15:5 (Taino testim.).  Minebea also introduced a purchase order issued to NMB from HP on December 1, 1993 for (1) 10,800 Wolverine III motors to be delivered on March 4, 1994, and (2) 5,400 Wolverine III motors to be delivered on March 11, 1994, both to HP in Boise.  See PTX 2147.1406.  Similar purchase orders from HP to NMB, dated November 3, 1994, call for the further delivery of Wolverine III motors to HP in Boise:  10,800 on January 9, 1995; 10,800 on January 16, 1995; 10,800 on January 23, 1995; and a final 8,100 on January 30, 1995.  See PTX 2147.1141-1143.

The January 1, 1994 packing slip indicates that a shipment of 2,416 Wolverine III motors was sent from NMB to HP's Boise, Idaho location, and therefore is proof that a particular motor, the Wolverine III, was delivered in mass-production quantities and thus was sold in the United States.  See PTX 2147.1400.  The December 1, 1993 and November 3, 1994 purchase

orders, on the other hand, show only that HP <u>ordered</u> significant mass-produced quantities of

Wolverine III motors to be delivered to HP's U.S. facility in Boise, Idaho.  Minebea, however,

failed to present any concrete evidence that these purchase orders were accepted by Minebea or

that a shipment of these motors ever actually <u>occurred</u>.  Mr. Taino's non-specific testimony about

these matters, not based on his personal knowledge, was not sufficient to establish this fact.  Why

a more knowledgeable Minebea or HP employee was not called as a witness, or why Mr.

Bergsma – who apparently was personally involved with some of these matters – was not asked

about them while he was on the witness stand – was never explained.  Accordingly, the Court

finds that Minebea has proven by a preponderance of the evidence only that its sale of 2,416

Wolverine III motors on January 1, 1994 was in the United States – that is, that these motors

were delivered in the United States.  Minebea has not proven that it sold any other Wolverine III

motors in the United States.[59]

       For Minebea's sales of Wolverine III motors to have been "under" a particular

United States patent, the sales must have occurred while the relevant patent was in force.

Minebea claims that its Wolverine III sales have exhausted certain claims of the following three

---

[59]      In addition to the documentary evidence he sponsored – some of which reflected transactions about which he had personal knowledge, much of which did not – Mr. Taino gave generalized testimony stating that NMB "was conducting the mass production delivery" of HDD spindle motors to HP in the United States up until HP terminated its disk drive business in 1996. 7/13/05 (a.m.) Trial Tr. at 67:5-11 (Taino testim.).  Mr.  Taino further testified that when HP purchased mass-produced HDD motors from NMB, the motors were shipped to HP's Boise, Idaho location where HP manufactured hard disk drives.  <u>Id.</u> at 67:10-68:4.  Mr. Taino's testimony, while credible so far as it goes, is insufficient to show on a motor-by-motor basis that any particular Minebea motor (other than as described above) was delivered in the United States. Furthermore, the additional portions of the trial transcript cited by Minebea regarding the purchase orders do not confirm whether the purchase orders described above were ever filled. <u>See</u> 7/8/05 (p.m.) Trial Tr. at 60:23-61:6 (Bergsma testim.); 7/13/05 (p.m.) Trial Tr. at 5:17-23, 7:5-9, 8:20-23, 12:9-15 (Taino testim.).

U.S. Patents:  (1) U.S. Pat. No. 4,843,500 ("the '500 patent"); (2) U.S. Patent No. 4,894,738

("the '738 patent"); and (3) U.S. Pat. No. 5,173,814 ("the '814 patent").  See Minebea's Opp.,

App. I at 10, 36.  Each of these patents was in force at the time of the January 1, 1994 delivery of

Wolverine III motors to HP's Boise, Idaho facility.  Therefore, the Court finds that Minebea's

delivery of 2,416 Wolverine III motors to HP on January 1, 1994 at HP's Boise, Idaho facilities

was a sale "under" the '500 patent, the '738 patent, and the '814 patent.

ii.  Quantum

Minebea claims that its sales of the following HDD motors to Quantum exhausted

certain Papst drive patents: Atlantis (PTX 2790), Cyclone 1 Disk, Excalibur (PTX 2788), Galaxy

(PTX 2466), Olympus (PTX 2469), Orca, Sirocco / Tempest 1 Disk (PTX 2481), Trailblazer

(PTX 2482), T-Rex (PTX 2483), Tsunami (PTX 2485), Typhoon (PTX 2676), Vortex (PTX

2661), Eagle (PTX 2462), Empire (PTX 2451), Cobra 1/2/4 D, Corona 1/2D, Corona Plus 1/2D,

Eclipse ½ Disk (PTX 2789), Stratus 2/3 Disk (PTX 2480) and Tempest 2/3D (PTX 2476).

After reviewing the evidence presented at trial with regard to each of the above-

mentioned Quantum motor projects, the Court finds that Minebea has proven sales of mass-

production quantities in the United States only with respect to the Empire motor.  With respect to

the other motors, the U.S. sales-related activities described in the evidence presented are

insufficient to establish any sales in the United States.  While there may have been so-called

"sales activity" in the United States, none of these motors was either manufactured or delivered

in mass-production quantities in the United States.

Mr. Taino testified that mass-production quantities of Empire motors were

shipped into the United States for delivery to Quantum in the United States.  7/13/05 (a.m.) Trial

134

Tr. at 36:9-17, 54:8-10 (Taino testim.).  The Quantum Empire Motor Story (PTX 2451) summarized a Quantum purchase order, dated July 26, 1994, issued to NMB and indicating an order for seven shipments of 4000 motors each to be delivered to Quantum at its Milpitas, California location on October 14, October 21, October 28, November 4, November 11, November 18, and November 23, 1994, respectively.  See PTX 2153.226-227; 7/13/05 (a.m.) Trial Tr. at 59:12-21 (Taino testim.).  Mr. Taino identified this document and confirmed the above-stated description, but did not testify specifically that there had been actual shipment and delivery of these ordered motors into the United States.  7/13/05 (a.m.) Trial Tr. at 59:12-21 (Taino testim.).  Mr. Taino did testify, however, that he assumed responsibility for hard disk drive spindle motors at NMB sometime in 1994, and testified that mass-production quantities of Empire model motors were being delivered to Quantum in the United States in 1994.  Id. at 58:6-20.  "In regards to this Quantum Empire, we were doing mass-production delivery [in 1994], and the place that the mass-production delivery was being delivered to was Quantum U.S.A."  Id. at 57:23-58:9.  Other documents summarized on Minebea's Motor Story for the Quantum Empire are two production order sheets for PMDM USA, dated August 15, 1994 and November 23, 1994, while Mr. Taino was involved with hard disk drive spindle motors.  See PTX 2153.289-290.  These production order sheets were issued from NMB to Minebea in Thailand and pertain to mass-production delivery of Empire motors, to be shipped to Quantum's Milpitas, California location.  PTX 2153.289-290.  Mr. Taino explained that they specified the time, location and

135

quantity for delivery of mass-production quantities of the Empire motor to Quantum in the United States.   7/13/05 (a.m.) Trial Tr. at 61:7-18 (Taino testim.).[60]

While Minebea has offered no packing slips with respect to the Empire motor (as it had with the Wolverine III), the purchase orders and the production order sheets, together with Mr. Taino's testimony, lead the Court to conclude that Minebea has proven by a preponderance of the evidence that it sold mass-produced Empire motors in the United States in 1994.  Although Mr. Taino's testimony was insufficiently detailed to prove the exact dates when such motors were delivered in the United States, he did testify that in 1994 he knew, from personal knowledge and involvement, that Minebea was providing Quantum with mass-production quantities of Empire motors delivered into the United States.  7/13/05 (a.m.) Trial Tr. at 54:8-55:6 (Taino testim.).  And the documents just referenced all relate to sales in the second half of 1994 in the United States.

Mr. Taino's testimony did not specify particular quantities of Empire Motors actually delivered into the United States in 1994.  This information would be important to assure that the quantities involved were mass-produced quantities and not merely samples.  An examination of the Quantum Empire Motor Story and underlying documents, however, shows that 28,000 units of the motor were ordered for delivery to Quantum in Milpitas in October and November of 1994.  See PTX 2153.226-227.  Minebea has proved delivery of mass-production quantities by a preponderance of the evidence.

---

[60]      An unsigned agreement between Minebea and Quantum for production and sale of Empire motors to be delivered into the United States is entitled, "Basic Order Agreement" and is summarized on Minebea's Motor Story for the Quantum Empire.  PTX 2451; PTX 2153.25-50; 7/13/05 (a.m.) Trial Tr. 54:8-59:8 (Taino testim.).  This agreement, however, is signed only by NMB, not by Quantum; it therefore does not appear to be a contract.

136

Minebea alleges that its sale of Empire motors in the United States exhausts certain claims in the following five U.S. patents:  (1) Re 34,412 ("Re '412"); (2) 5,006,943 ("the '943 patent"); (3) 4,519,010 ("the '010 patent"); (4) 4,658,312 ("the '312 patent"); and (5) 4,535,373 ("the '373 patent").   Each of these five patents was in effect and enforceable in 1994.   Therefore, while Minebea has failed to provide the Court with the exact dates or quantities of motors delivered, the Court concludes that Minebea has proven that its sales of Empire motors to Quantum during 1994 were "under" Re '412, the '943 patent, the '010 patent, the '312 patent, and the '373 patent.

### iii.  Conner Peripherals

Minebea claims that its sales of the following HDD motors to Conner Peripherals ("Conner") have exhausted certain Papst drive patents: Cabo/BLS (PTX 2457), Caboboat (PTX 2648), Filepro 2, Filepro 3 (PTX 2465), La Paz (PTX 2650), Steamboat, Stingray (PTX 2669) and Trigger (PTX 2484).

In addition to the Motor Stories, certain additional sales-related documents were admitted in evidence.   For the Conner Filepro III motor, an NMB fax related to quantities and prices was admitted (PTX 2171.68) as well as a Minebea Malaysia office document regarding the mass-production unit pricing (DTX 845).   For the Conner La Paz motor, Minebea highlighted documents related to motor qualification of La Paz motors (PTX 2159.422-426), small quantities of sample La Paz motors – including delivery thereof to Conner's San Jose, California location (PTX 2159.79-83; PTX 2159.31; PTX 2160.19 and various documents related generally to project status and mass production pricing (PTX 2158.51-52; PTX 2159.111-112A; PTX 2159.154-155).   Finally, documents were admitted relating to mass production pricing,

specifications and status of motor projects for Conner Caboboat, Steamboat and Stingray motors. See PTX 2159.111-112A; PTX 2159.154-155; PTX 2158.51-52; PTX 2169.86-87; PTX 2169.93-96; and DTX 848.

After carefully reviewing the evidence adduced at trial with regard to each of the Conner motor projects, the Court finds that the Motor Stories, documents and testimony do not support Minebea's assertion that it ever delivered any mass-production quantities of HDD motors to Conner in the United States.[61]   Sales-related activities such as those reflected in the documentary evidence and the testimony of Mr. Taino are not enough.   Accordingly, Minebea has failed prove that its sale of this motor occurred "under" any U.S. patent.

iv.   Seagate

Minebea claims that its sales of the following HDD motors to Seagate exhausted certain Papst drive patents: Alpine 1D, Alpine 2D, Alpine Plus 1D, Aspen FDB, Avalanche, C1/C2, Cheetah 36ES, Cheetah x15 36LP, Cheetah 1573 LP (PTX 2459), La Paz (PTX 2650), Saturn, Snowmass FDB (PTX 2473), ST 32132, ST 3243, ST 51080 (PTX 2477), ST 52520 (PTX 2474), ST 5660 (PTX 2475), Stingray and U6 AV.   In addition to the Motor Stories and the testimony of Mr. Taino, at trial Minebea offered only two NMB faxes, one related to its monitoring of Seagate ST5660 shipments and one related to ST-52520 pricing.   See PTX 2173.186-187 and PTX 2152.96.   Minebea introduced no evidence whatsoever with respect to many of these motors.

---

[61]      The only delivery of motors in the United States was of small quantities of sample La Paz motors.

After reviewing the evidence presented at trial with regard to each of the Seagate motor projects, including Motor Stories, documents and testimony, the Court finds that the U.S. sales-related activities for each of these motors are insufficient to establish any sales in the United States.  Minebea has failed to prove through testimony or documents that it ever delivered to Seagate in the United States any mass production quantities of HDD motors.

v.  Maxtor

Minebea claims that its sales of the following HDD motors to Maxtor have exhausted certain Papst drive patents: Altair (Leo) (PTX 2639), Apache 3 (PTX 2487), Apollo FDB, Ares BB, Ares FDB, Athena (PTX 2456), Calypso 1D, Calypso 2/3D, Comet (PTX 2640), Excalibur (PTX 2463), Falcon (PTX 2464), Falcon 1D FDB, Lightning (PTX 2642), M7000 (PTX 2467), Meteor (PTX 2638), Nebula (PTX 2644), Neptune (PTX 2468), Proxima (PTX 2470), Quasar, Rigel SC/Ribula and Romulus (PTX 2472).  In addition to its Motors Stories for each allegedly exhausted motor, Minebea introduced many underlying documents, but only related to its sales of Maxtor Lightning motors.  The underlying documents related to the Maxtor Lightning motor include NMB letters and faxes regarding a visit by NMB to Maxtor, price quotations, production schedules and motor qualification plans for mass quantities of motors; a NMB fax regarding a final pricing proposal; a fax from Maxtor sent to NMB regarding changes to the motor design; a motor project status report; and a purchase order from Maxtor to NMB for 25 motors to be delivered to Maxtor's Longmont, Colorado facility.  See PTX 2149.242-244.

After reviewing the evidence presented at trial, including the Motor Stories, the specific underlying documents relating to the Lightning motors, and the generalized testimony of Mr. Taino, the Court finds that the U.S. sales-related activities described are insufficient to

139

establish any sales in the United States.  The documents and testimony offered show that the only motors actually delivered were 25 sample or pilot motors.  Minebea has failed to prove through testimony or documents that it ever delivered to Maxtor in the United States any mass production quantities of HDD motors.

### vi.  Western Digital

Minebea claims that its sales of the Revolution L and Xenon FDB motors to Western Digital exhausted certain Papst drive patents.  Minebea, however, did not introduce Motor Stories or indeed any documentary evidence of its sales of these motors during trial.  Two of Minebea's trial witnesses, Mr. Dosho and Mr. Taino, generally discussed NMB's sales-related relationship with Western Digital, <u>see</u> 7/8/05 (a.m.) Trial Tr. at 33:14-34:2 (Dosho testim.); 7/11/05 (a.m.) Trial Tr. at 51:25-52:1, 55:12-56:1 (Taino testim.); 7/13/05 (a.m.) Trial Tr. at 64:20-65:2; 65:18-66:4, 66:10-24 (Taino testim.), but Minebea cannot discharge its burden of proof for sales "under" the United States patents with such generalized testimony that lacks any specifics about time frame and quantities (if any) actually delivered in the United States.

### vii.  IBM

Minebea claims that its sales of Vancouver LP HDD motors to IBM have exhausted certain Papst drive patents.  After reviewing the evidence presented at trial regarding the IBM Vancouver LP, including the testimony of Mr. Taino and the Vancouver LP Motor Story, the Court finds that Minebea has failed to establish that any Vancouver LP motors were sold in the United States.  PTX 2477;  7/13/05 (a.m.) Trial Tr. at 63:1-64:10 (Taino testim.).

Minebea failed to present any evidence that IBM Vancouver LP motors were ever delivered in the United States.

c.  Which motor sales occurred under United States patents?

In sum, the Court finds that despite Minebea's sales-related activities in the United States, the only potentially exhausting sales "under" United States patents were a few sales of HP Wolverine III motors and Quantum Empire motors in mass-production quantities. Specifically, Minebea's delivery of 2,416 Wolverine III motors to HP on January 1, 1994 at HP's Boise, Idaho facilities was a sale "under" the '500 patent, the '738 patent and the '814 patent. Minebea also has proven that its sales of Empire motors to Quantum during late 1994 were "under" Re '412, the '943 patent, the '010 patent, the '312 patent, and the '373 patent.

*C.  Minebea's Authority to Sell Motors*

Having determined that only the HP Wolverine III and the Quantum Empire motors were sold "under" United States patents, the Court now must consider whether those sales were carried out "with the authority of the patentee," namely, Papst.  See Jazz Photo Corp. v. ITC, 264 F.3d at 1105.[62]  The allegedly exhausting sales occurred in 1994, see PTX 2453; PTX 2451 – after the termination of the Joint Venture but before the parties signed the 1995

---

[62]     The Court's findings as to which motors were sold "under" U.S. patents narrows considerably the scope of patents and sales that must be analyzed.

141

Settlement Agreement.[63]  The Court therefore must determine whether, under the agreements

then in effect, Minebea was authorized to make such sales.

The Court already has discussed the patent licensing scheme between Papst and

Minebea in some detail.  As has been stated, between the date on which the Joint Venture was

terminated (May 3, 1993) and the date on which the Settlement Agreement was signed (June 19,

1995), Minebea was licensed under all of Papst's patents that existed before the Agreement for

the Sale of Intangible Assets was signed – that is, before November 5, 1990 – to the extent

required and necessary for research and development, manufacturing, engineering, use and sale

of motors.  See PTX 195, Agreement for the Sale of Intangible Assets (Nov. 5, 1990) ¶ 4(a);

PTX 470, Termination Agreement (May 3, 1993) Article 9.1.  Furthermore, Minebea had

acquired (also to the extent "required and necessary") licenses to patents that arose or were

acquired during the life of the Joint Venture – that is, between November 5, 1990 and May 3,

1993.  See PTX 470, Termination Agreement (May 3, 1993), Articles 1.2(c), 7; PTX 195,

Agreement for the Sale of Intangible Assets (Nov. 5, 1990) ¶ 4(d).  Minebea was not licensed to

use the patents "in other fields." See id. ¶ 4(a).  Nor was it licensed under patents that "arose" or

were "acquired"  by Papst after termination of the Joint Venture on May 3, 1993.  See supra at

66-68.

Based on the discussion in the preceding section, the Court has concluded that the

only patents at issue with respect to the HP Wolverine III motor are as follows:  (1) U.S. Patent

No. 4,894,738 ("the '738 Patent"), application filed June 2, 1988; (2) U.S. Patent No. 4,843,500

---

[63]      The allegedly exhausting sales of the Wolverine III motors occurred on January 1,
1994.  See supra at 132-133.  The relevant sales of the Empire motor occurred in October and
November of 1994.  See supra at 135.

("the '500 Patent"), application filed April 14, 1989; and (3) U.S. Patent No. 5,173,814 ("the

'814 Patent"), application filed February 8, 1991.  The only patents at issue with respect to the

Quantum Empire motor are:  (1) U.S. Patent No. 4,519,010 ("the '010 Patent"), application filed

December 2, 1981; (2) U.S. Patent No. 4,535,373 ("the '373 Patent"), application filed December

29, 1981; (3) U.S. Patent No. 4,658,312 ("the '312 Patent"), application filed August 21, 1985;

(4) U.S. Patent No. 5,006,943 ("the '943 Patent"), application filed October 18, 1988; and

(5) U.S. Patent No. Re 34,412 ("Re '412"), application filed October 18, 1990.

   With the exception of the '814 Patent, all of these patents arose from applications

filed before November 5, 1990, and therefore were licensed to Minebea under Paragraph 4(a) of

the Agreement for the Sale of Intangible Assets.  The '814 patent "arose or was acquired" during

the life of the Joint Venture, and Minebea thus acquired rights to it under Paragraph 4(d) of the

Intangible Assets Agreement and Articles 1.2(c) and 7 of the Termination Agreement.  Under the

terms of the agreements, Minebea was licensed to use these patents as "required and necessary

for research and development (R+D), manufacturing, engineering, use and sale of HDD motors."

PTX 195, Agreement for the Sale of Intangible Assets (Nov. 5, 1990) ¶ 4(a).  The authority to

sell is, of course, required and necessary to the sale of HDD motors; thus, it follows, and the

Court concludes, that Papst authorized Minebea to sell its motors under all of the patents in

question.  The Court briefly explains its reasoning with regard to each of the eight patents still at

issue here.

1.  Patents Related to HP Wolverine III Motors

a.  U.S. Patent No. 4,894,738

U.S. Patent No. 4,894,738, entitled "Disk Storage Drive" ("the '738 Patent"),

issued from an application filed on June 2, 1988.  Thus, it arose before the execution of the 1990

Intangible Assets Agreement, and under Paragraph 4(a) of that Agreement Minebea was licensed

to this patent insofar as it was required and necessary.   Examination of the '738 Patent shows it

to be a drive patent, so that it was only "required and necessary" that Minebea be licensed to

contributorily infringe or induce infringement of the '738 Patent – it was not licensed to directly

infringe the '738 patent.  Therefore, during the life of the Joint Venture and until the Settlement

Agreement was signed, Minebea was authorized to sell its motors free from suit by Papst for

contributory or inducement of infringement of the '738 Patent.

The '738 Patent is not just a generic drive patent but is a Papst Drive Patent as

defined in the 1995 Settlement Agreement; it is expressly listed in Appendix III.  Accordingly,

Minebea's rights to this patent after termination are governed exclusively by the 1995 Settlement

Agreement.  See supra at 77-78.  Under the Settlement Agreement, Minebea's motors are

warranted not to directly infringe this patent, see PTX 771, 1995 Settlement Agreement (June 19,

1995) ¶ 5.2, and Minebea is authorized to make motors that would contribute to or induce

infringement of this patent.  See id. ¶¶ 5.2, 2.4.  Minebea's customers, however, have no license

under this patent if they are the first direct infringers.  Under the Settlement Agreement,

Minebea's customers are not released if they combined a Minebea product with a non-Minebea

product in order to infringe this patent.

144

b.  U.S. Patent No. 4,843,500

U.S. Patent No. 4,843,500, entitled "Disk Storage Drive" ("the '500 Patent"),

issued from an application filed on April 14, 1989.  Thus, it arose before the execution of the

1990 Intangible Assets Agreement, and under Paragraph 4(a) of that Agreement Minebea was

licensed to this patent insofar as it was required and necessary.  The Court's examination of the

'500 Patent shows it to be a motor patent, not a drive patent, because it claims only a motor, and

none of the non-motor elements common to drive patents.  Although Mr. Dalziel's Table A states

that the '500 patent claims a disk and a clean chamber in addition to a motor, he is in error.  The

Court's own examination of the '500 Patent has revealed that those elements are not actually

claimed in the patent.[64]

---

[64]    Mr. Dalziel did not do claim construction or claim interpretation in this case, as
Minebea consistently maintained that such was not required and that Mr. Dalziel was not offered
for that purpose.  See, e.g., Memorandum Opinion and Order (June 24, 2005) (Docket No. 1123)
at 3 (Minebea "steadfastly maintains" that claim construction is not necessary.).  Mr. Dalziel is
neither an attorney nor a patent expert; he is an engineer with 42 years of experience, much of
that in the realm of hard disk drives and electro-magnetic and brushless motors.  Minebea thus
explained that Mr. Dalziel was not relying for his conclusions on technical claim construction but
rather on his experience in the industry and his understanding of the patent claims and their
relationship to the drives and motors as "one of ordinary skill in the art of hard disk drives and
HDD motors."  Minebea's Memorandum of Points and Authorities in Support of its Motion to
Strike Papst's Statement Regarding What Claim Interpretation the Court is to Perform With
Regard to Mr. Dalziel's Testimony (June 14, 2005) (Docket No. 1020) at 5-6.  See also
Minebea's Opposition to Papst's Strike Throughs of Warren L. Dalziel's Direct Testimony and
Two Expert Reports and Objections to Addendum to his Direct Testimony (July 15, 2005)
(Docket No. 1385) at 1.

Mr. Dalziel's analysis did not involve a thorough review of the prior art and he
did not look at the prosecution histories of the patents in question – as generally would be
required for a full claim construction -- although he did read portions of some of the patents and
looked at the drawings and specifications relating to each of about 100 Minebea motors.  7/19/05
(a.m.) Trial Tr. at 37:15-23, 41:18-42:8 (Dalziel testim.); see id. at 75:9-17 ("I have read and
examined these patents as again through the eyes of someone with ordinary skill in the art, and I
have interpreted the words based on my experience and the specifications and drawings.  I don't

Because the '500 Patent is a motor patent, during the life of the Joint Venture and until the Settlement Agreement was signed, Minebea was authorized to sell its motors free from suit by Papst for direct infringement, contributory infringement or inducement of infringement of the '500 Patent. The '500 Patent also is a Papst Patent listed in Appendix I of the 1995 Settlement Agreement. Thus, the rights to this patent that Minebea had secured under the Intangible Assets Agreement were preserved in the Settlement Agreement. Under the 1995 Settlement Agreement, Minebea also is authorized to make motors that directly infringe this patent and is authorized to make motors to the extent that they would contribute to or induce infringement of this patent. See PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶¶ 4.1, 2.4. Minebea is explicitly released from any liability for direct infringement of this patent. See

---

think I was making any interpretation here other than to classify them as what type of hub, if they had a hub, were they in-hub or under-hub, just as I said, all these categories to categorize them, as I was interpreting to the extent that I could categorize them.").

Based on the proffers and representations of Minebea, the concessions concerning the limitations on both Mr. Dalziel's areas of expertise and the review of the patents and motors he undertook, and the parties' arguments at the Daubert hearing, the Court accepted Mr. Dalziel as a technical expert qualified to discuss the general characteristics of the Papst Drive Patents and the identification of various elements of the patents and Minebea's motors in order to assist the Court in understanding "motor" and "drive" elements. See Minebea Co. v. Papst, No. 97-0590, 2005 U.S. Dist. Lexis 11946 at *33-34 (D.D.C. June 21, 2005) (Dalziel's proffered testimony does "not implicate claim construction but rather simply call[s] on his years of experience in the HDD industry. His proffer of testimony . . . regard[s] general characterizations of the patent claims" and "his knowledge of reasonable use(s) for Minebea's motors."). See also Opinion and Order (July 18, 2005) (Docket No. 1417) at 11-12. ("Mr. Dalziel is proffered to testify regarding his general characterization of the Papst Drive Patent claim elements . . . . [N]o claim elements need be construed.").

The Court, as finder of fact in this case, is not bound by Mr. Dalziel's reading of the patents and need not accept his construction of "the ordinary meaning of . . . terms" in a claim or a patent, or his categorization of motor elements and drive elements – even though he may be a person of "ordinary skill in the art." The Court is free (if not obligated) to review the relevant patents itself, as it has done, and to reach its own conclusions.

id. ¶¶ 2.2, 2.3.  Minebea's customers, however, have no license under this patent if they are the first direct infringers, and they are not released if they combined a Minebea product with a non-Minebea product in order to infringe this patent.

c.  U.S. Patent No. 5,173,814

U.S. Patent No. 5,173,814, entitled "Disk Storage Drive Having Internal Electrical Connection Passages and Contamination Seals at Ends of the Motor" ("the '814 Patent"), was filed on February 8, 1991 and issued on December 22, 1992.  Thus, it "arose" during the life of the Joint Venture and, pursuant to Paragraph 4(d) of the Agreement for the Sale of Intangible Assets, Minebea was licensed to the '814 Patent as required and necessary.  Again, although Mr. Dalziel states in Table A that the '814 Patent claims a disk and a clean chamber, the Court's own examination of the patent shows that it actually claims only a motor.  Thus, the '814 Patent is a motor patent.  Therefore, during the life of the Joint Venture (and at the time Minebea sold the motors in question) Minebea was authorized to sell its motors free from suit by Papst for direct infringement, contributory infringement or inducement of infringement of the '814 Patent.

The '814 Patent is listed in Appendix I of the 1995 Settlement Agreement and is considered a Papst Patent under that Agreement.  Thus, the rights to the '814 Patent Minebea had secured under the Intangible Assets Agreement were preserved in the Settlement Agreement.  Under the 1995 Settlement Agreement, Minebea also is authorized to make motors that directly infringe this patent and is authorized to make motors to the extent that they would contribute to or induce infringement of this patent.  See PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶¶ 4.1, 2.4.  Minebea is explicitly released from any liability for direct infringement of this patent.  See id. ¶¶ 2.2, 2.3.  Minebea's customers, however, have no license under this patent if

147

they are the first direct infringers, and they are not released if they combined a Minebea product with a non-Minebea product in order to infringe this patent.

## 2.  Patents Related to Quantum Empire Motors

### a.  Re 34,412

Re 34,412, entitled "Disk Storage Drive Having Motor Drive With Non-Corrodible Hub" ("Re '412"), issued from an application filed on October 18, 1990, before the 1990 Intangible Assets Agreement was executed.  Pursuant to Paragraph 4(a) of that Agreement, Minebea was licensed under Re '412 insofar as it was required and necessary.  Examination of Re '412 shows it to be a drive patent, because it claims a motor and a clean chamber.[65] Therefore, during the life of the Joint Venture and until the Settlement Agreement was signed, Minebea was authorized to sell its motors free from suit by Papst for contributory infringement or inducement of infringement of Re '412.

Re '412 is a Papst Drive Patent listed in Appendix III of the 1995 Settlement Agreement.  Accordingly, Minebea's rights to this patent after termination are governed exclusively by the 1995 Settlement Agreement.  Under the Settlement Agreement, Minebea's motors are warranted not to directly infringe this patent, see PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶ 5.2, and Minebea is authorized to make motors that would contribute to or induce infringement of this patent.  See id. ¶¶ 5.2, 2.4.  Minebea's customers, however, have no license under this patent if they are the first direct infringers.  Under the

---

[65]     Mr. Dalziel's Table A states that Re '412 claims a disk, as well, but the Court's examination of the patent shows that he is incorrect.

Settlement Agreement, Minebea's customers are not released if they combined a Minebea product with a non-Minebea product in order to infringe this patent.

### b.  U.S. Patent No. 4,519,010

U.S. Patent No. 4,519,010, entitled "Driving Mechanism For Magnetic Hard Disc Memories" ("the '010 Patent"), issued from an application filed on December 2, 1981. Accordingly, pursuant to Paragraph 4(a) of the 1990 Intangible Assets Agreement, Minebea was licensed under this patent insofar as it was required and necessary.  Examination of the '010 Patent shows it to be a drive patent, because it claims a motor and a clean chamber. Mr. Dalziel's Table A states that the patent also claims a disk and a read/write head; those elements, however, are only mentioned in the preamble of the patent claim, and are not actually claimed.

Because the '010 Patent is a drive patent, during the life of the Joint Venture and until the Settlement Agreement was signed, Minebea was authorized to sell its motors free from suit by Papst for contributory infringement or inducement of infringement of the '010 Patent. The '010 Patent is a Papst Drive Patent listed in Appendix III of the 1995 Settlement Agreement. Accordingly, Minebea's rights to this patent after termination are governed exclusively by the 1995 Settlement Agreement.  See supra at 70.  Under the Settlement Agreement, Minebea's motors are warranted not to directly infringe this patent, see PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶ 5.2, and Minebea is authorized to make motors that would contribute to or induce infringement of this patent.  See id. ¶¶ 5.2, 2.4.  Minebea's customers, however, have no license under this patent if they are the first direct infringers.  Under the

149

Settlement Agreement, Minebea's customers are not released if they combined a Minebea product with a non-Minebea product in order to infringe this patent.

### c.  U.S. Patent No. 4,535,373

U.S. Patent No. 4,535,373, entitled "Labyrinth Seal in Disk Storage Drive" ("the '373 Patent"), issued from an application filed on December 29, 1991, and was thus licensed to Minebea, pursuant to Paragraph 4(a) of the Agreement for the Sale of Intangible Assets, insofar as required and necessary.  Examination of the '373 patent reveals it to be a drive patent, because it claims a motor and a storage disk.  The Court finds, upon its own review of the '373 Patent, that the other elements listed by Mr. Dalziel in Table A are not within the claims of the '373 Patent.

During the life of the Joint Venture and until the Settlement Agreement was signed, Minebea was authorized to sell its motors free from suit by Papst for contributory infringement or inducement of infringement of the '373 Patent.   The '373 Patent is a Papst Drive Patent listed in Appendix III of the 1995 Settlement Agreement.  Accordingly, Minebea's rights to this patent after termination are governed exclusively by the 1995 Settlement Agreement. Under the Settlement Agreement, Minebea's motors are warranted not to directly infringe this patent, see PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶ 5.2, and Minebea is authorized to make motors that would contribute to or induce infringement of this patent.  See id. ¶¶ 5.2, 2.4.  Minebea's customers, however, have no license under this patent if they are the first direct infringers.  Under the Settlement Agreement, Minebea's customers are not released if they combined a Minebea product with a non-Minebea product in order to infringe this patent.

d.  U.S. Patent No. 5,006,943

U.S. Patent No. 5,006,943 entitled "Disk Storage Drive" ("the '943 Patent")

issued from an application filed on October 18, 1988.  Pursuant to Paragraph 4(a) of the 1990

Intangible Assets Agreement, therefore, Minebea was authorized under the '943 Patent insofar as

it was required and necessary.  Because it claims only a motor, the '943 Patent is a motor patent,

and thus Minebea was authorized to sell its motors free from suit by Papst for direct

infringement, contributory infringement or inducement of infringement.

The '943 Patent is a Papst Patent listed in Appendix I of the 1995 Settlement

Agreement.  Thus, the rights to this patent that Minebea had secured under the Intangible Assets

Agreement were preserved in the Settlement Agreement.  Under the 1995 Settlement Agreement,

Minebea also is authorized to make motors that directly infringe this patent and is authorized to

make motors to the extent that they would contribute to or induce infringement of this patent.

See PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶¶ 4.1, 2.4.  Minebea is explicitly

released from any liability for direct infringement of this patent.  See id. ¶¶ 2.2, 2.3.  Minebea's

customers, however, have no license under this patent if they are the first direct infringers, and

are not released if they combine a Minebea product with a non-Minebea product in order to

infringe this patent.

e.  U.S. Patent No. 4,658,312

U.S. Patent No. 4,658,312, entitled "Disk Storage Drive" ("the '312 Patent"),

issued from an application filed on August 21, 1985.  Pursuant to Paragraph 4(a) of the 1990

Intangible Assets Agreement, Minebea therefore was authorized under the '312 Patent insofar as

it was required and necessary.  Because it claims only a motor, the '312 Patent is a motor patent,

and thus Minebea was authorized to sell its motors free from suit by Papst for direct infringement, contributory infringement or inducement of infringement.

The '312 Patent is a Papst Patent listed in Appendix I of the 1995 Settlement Agreement. Thus, the rights to this patent that Minebea had secured under the Intangible Assets Agreement were preserved in the Settlement Agreement. Under the 1995 Settlement Agreement, Minebea also is authorized to make motors that directly infringe this patent and is authorized to make motors to the extent that they would contribute to or induce infringement of this patent. See PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶¶ 4.1, 2.4. Minebea is explicitly released from any liability for direct infringement of this patent. See id. ¶¶ 2.2, 2.3. Minebea's customers, however, have no license under this patent if they are the first direct infringers, and are not released if they combine a Minebea product with a non-Minebea product in order to infringe this patent.

As the foregoing analysis shows, at the time the HDD motors were sold "under United States patents" – the HP Wolverine III and the Quantum Empire – Minebea was licensed to make use of each of the patents in question insofar as "required and necessary" for the manufacture, use and sale of those motors. For purposes of patent exhaustion analysis, then, Minebea was "authorized" to directly infringe the motor patents and to indirectly infringe the drive patents, in order to manufacture and sell those motors. And – although this observation is relevant not to patent exhaustion, but to other of Minebea's claims – it is equally clear from the agreements between the parties that Minebea was not licensed to directly infringe the drive patents at issue. Nor were its customers granted any license or sublicense to Papst's drive patents

152

under the operative agreements.  The Court now considers whether, in light of these facts,

Minebea's motor sales can be considered "unconditional."

### D.  Unconditional Sale

The patent exhaustion doctrine also requires that the authorized sale be

"unconditional" – that is, without any express conditions on the sale or license.  See LG Elecs.,

Inc. v. Bizcom Elecs., Inc., 2006 U.S. App. LEXIS 16916, at *7-*8 (Fed. Cir. 2006).  "[A]n

unconditional sale of a patented device exhausts the patentee's right to control the purchaser's

use of the device thereafter."  B. Braun Med., Inc. v. Abbott Labs., 124 F.3d 1419, 1426 (Fed.

Cir. 1997).  The exhaustion doctrine does not apply to an expressly conditional sale or license,

and the seller of a patented device is free to impose conditions on the sale.  Id.  "The principle of

exhaustion of the patent right [does] not turn a conditional sale into an unconditional one."

Mallinckrodt, Inc. v. Mediport, Inc., 976 F.2d 700, 706 (Fed. Cir. 1992).

As the Court has just discussed, Minebea was authorized under Papst's patents to

manufacture, use, and sell hard drive motors to its customers during the life of the Joint Venture,

after its termination, and after the signing of the 1995 Settlement Agreement.  The relevant

agreements, however, stated specifically that Minebea was not entitled to give its customers

sublicenses to Papst's patents.  See PTX 195, Intangible Assets Agreement (Nov. 5, 1990) ¶ 4(c)

("Minebea is not entitled either to grant sublicenses or to sell and transfer the licenses completely

or partly to anyone without previous consent by Papst given by registered letter[.]"); PTX 264,

License Agreement Regarding Intangible Assets (Mar. 15, 1991) ¶ 1(c) ("Minebea is not entitled

to grant sublicenses or to sell or transfer the licenses [to Papst's patents] completely or partly to

anyone else" except the German Joint Venture or the Thai Joint Venture); PTX 771, 1995

Settlement Agreement (June 19, 1995) ¶¶ 4.1 ("no license is granted hereunder to any Minebea customer with respect to any of the Papst Drive Patents other than the Papst Integrated Baseplate Patents"); see also PTX 1467, Loan Agreement (Apr. 27, 1993) § 4(3) ("purchasers of products from Minebea, PMDM-G and PMDM-T are not licensed under such Drive Patents [U.S. Patent Nos. B1 Re. 32,702 and 4,337,491], notwithstanding the use of such purchased products in disk drives or other produkts [sic] made, used or sold by such purchasers").[66]  Beyond these explicit disclaimers of sublicenses to Minebea's customers and Papst's clear reservation, in the 1995 Settlement Agreement, of the right to sue the customers for infringement, see Minebea Co. v. Papst, 374 F. Supp. 2d at 209-10, Papst did not expressly require the imposition of any conditions on Minebea's sales of its hard disk drive motors.  The question for the Court is whether Papst's express disclaimer of sublicenses to Minebea customers in the relevant agreements rendered Minebea's sale of its motors under those agreements "conditional."

In its June 24, 2005 Patent Exhaustion Opinion denying Papst's motion for summary judgment on Minebea's patent exhaustion claims, the Court held Minebea's motor sales under the 1995 Settlement Agreement to have been unconditional, notwithstanding the fact that it was "readily apparent from the language of the 1995 Settlement Agreement that the parties anticipated that Papst would retain the right to sue Minebea's customers for direct infringement of the Papst Drive Patents."  Minebea Co. v. Papst, 374 F. Supp. 2d at 209.  In so holding, the Court – in the absence of clear, relevant authority from the Federal Circuit – followed closely the reasoning set forth by the district court in LG Electronics, Inc. v. Asustek Computer, Inc., 248

---

[66]    The "so-called drive patents" described in Section 4(3) of the Loan Agreement include United States Patent Nos. B1 Re. 32,702 and 4,337,491, which are not among the patents listed in Minebea's exhaustion claim.

F. Supp. 2d 912, 914 (N.D. Cal. 2003), a case from the United States District Court for the

Northern District of California factually similar to the one at bar.

        The plaintiff in LG Electronics had licensed Intel Corporation to manufacture and

sell microprocessors and chipsets that infringed the plaintiff's patents.  The license to Intel

expressly disclaimed any sublicense to Intel customers who combined products covered by the

license with non-Intel products, and required Intel to notify its customers that they received no

license to LGE's patents by virtue of their purchase of products from Intel.  See

LG Elecs., Inc. v. Asustek Computer, Inc., 248 F. Supp. 2d at 918; Minebea's Citation of New

Federal Circuit Decision Relevant to Issue of Patent Exhaustion (July 10, 2006) (Docket No.

1677) at 2.  Intel manufactured infringing microprocessors and chipsets and sold them to the

defendants who assembled them into computers, which LGE claimed infringed its patents.  See

LG Elecs., Inc. v. Asustek Computer, Inc., 248 F. Supp. 2d at 914.  The district court found

Intel's sales to its customers to have been unconditional despite the contractual language

disclaiming sublicenses to Intel customers, because "Defendants' purchase of microprocessors

and chipsets from Intel was in no way conditioned on their agreement not to combine the Intel

microprocessors and chipsets with other non-Intel parts and then sell the resultant products."  Id.

at 917.  The court further stated that Intel's post-sale notice to its customers that they had no

rights under LGE's patents "does not demonstrate that Defendants agreed as a condition of sale

not to combine the microprocessors and chipsets purchased from Intel with non-Intel parts and

not to sell the resultant products."  Id.

        On July 7, 2006, after post-trial briefing in this case had concluded, the Federal

Circuit reversed in part the district court's holding in LGE, finding that Intel's sales of infringing

products to its customers were in fact conditional.  See LG Elecs., Inc. v. Bizcom Elecs., Inc.,

2006 U.S. App. LEXIS 16916, at *9-*10.  In so holding, the court relied on the express

disclaimer of the grant of sublicenses to Intel customers contained in the LGE-Intel licensing

agreement.  The court stated that:

> The LGE-Intel license expressly disclaims granting a license
> allowing computer system manufacturers to combine Intel's
> licensed parts with other non-Intel components.  Moreover, this
> conditional agreement required Intel to notify its customers of the
> limited scope of the license, which it did.  Although Intel was free
> to sell its microprocessors and chipsets, those sales were
> conditional, and Intel's customers were expressly prohibited from
> infringing LGE's combination patents.

Id.

In view of this holding, the Court finds that Minebea's sales of HDD spindle

motors to its customers to have been conditional and therefore non-exhausting.  The facts of LGE

are analytically almost indistinguishable from those here.  The only salient difference is that in

LGE, the licensing agreement between the patent holder and the manufacturer/seller not only

disclaimed a grant of sublicenses to the manufacturer/seller's customers, but also required the

manufacturer/seller to notify its customers of that fact (which it did).  See Minebea's Citation of

New Federal Circuit Decision Relevant to Issue of Patent Exhaustion (July 10, 2006) (Docket

No. 1677) at 2; LG Elecs., Inc. v. Asustek Computer, Inc., 248 F. Supp. 2d at 918.  There was no

such notice requirement in the Papst/Minebea licensing agreements.[67]  Although the Federal

Circuit's LGE opinion may be open to interpretation on this point, in this Court's judgment the

---

[67]     Papst does argue that Minebea's customers in fact did receive notice that they had
not received sublicenses to the drive patents.  See Papst's Comments Regarding the Federal
Circuit's Reversal of the Holding of Exhaustion in LG Electronics (July 18, 2006) (Docket No.
1678) at 6.

decision in LGE turned on the existence of an express disclaimer of sublicenses, not on the presence or absence of a notice requirement; it is the former, not the latter, that determines whether an authorized sale is conditional or unconditional.

That notice is not the crucial factor is apparent first from the language used by the Federal Circuit in LGE: "The LGE-Intel license expressly disclaims granting a license allowing computer system manufacturers to combine Intel's licensed parts with other non-Intel components. Moreover, this conditional agreement required Intel to notify its customers of the limited scope of the license[.]" LG Elecs., Inc. v. Bizcom Elecs., Inc., 2006 U.S. App. LEXIS 16916, at *9-*10 (emphasis added). The order and structure of these sentences strongly suggest that a notice requirement (or the lack thereof) is of secondary importance. Moreover, it would make no sense to afford dispositive weight to the presence or absence of a notice requirement in view of the reasoning underlying the unconditional sale requirement of the patent exhaustion doctrine: "The theory behind this rule is that in [an unconditional sale], the patentee has bargained for, and received, an amount equal to the full value of the goods." Id., at *7-*8. The exhaustion doctrine does not apply to an expressly conditional sale or license because "[i]n such a transaction, it is more reasonable to infer that the parties negotiated a price that reflects only the value of the 'use' rights conferred by the patentee." Id. at *8 (quoting B. Braun Med. Inc. v. Abbott Labs., 124 F.3d at 1426). While it is reasonable to believe that an express disclaimer of sublicenses in a licensing agreement could substantially affect the value of the license – and thus, that a patent holder selling a license incorporating such a disclaimer might not receive as compensation "an amount equal to the full value" of the patent – the Court cannot imagine that the presence or absence of a notice requirement would have any effect whatsoever on the price

157

the parties negotiated.  A notice requirement is unlikely to affect whether the patentee "has

bargained for, and received, an amount equal to the full value of the goods."  LG Elecs., Inc. v.

Bizcom Elecs., Inc., 2006 U.S. App. LEXIS 16916, at *7-*8.

The Federal Circuit's LGE decision is controlling here.  At each stage of the

parties' relationship, Papst expressly disclaimed the granting of any sublicenses to the customers

of Minebea or the Joint Venture.  See PTX 195, Intangible Assets Agreement (Nov. 5, 1990)

§ 4(c); PTX 264, License Agreement Regarding Intangible Assets (Mar. 15, 1991) ¶ 1(c); PTX

1467, Loan Agreement (Apr. 27, 1993) § 4(3); PTX 771, 1995 Settlement Agreement (June 19,

1995) ¶¶ 4.1 ("no license is granted hereunder to any Minebea customer with respect to any of

the Papst Drive Patents other than the Papst Integrated Baseplate Patents").[68]  Therefore –

contrary to the reasoning expressed in the Court's June 24, 2005 Patent Exhaustion Opinion, see

Minebea Co. v. Papst, 374 F. Supp. 2d at 209-12 (citing LG Elecs., Inc. v. Asustek Computer,

Inc., 248 F. Supp. 2d 912 (N.D. Cal. 2003) and Cyrix Corp. v. Intel Corp., 846 F. Supp. 522

(E.D. Tex.1994)) – the Court now concludes under LGE that Minebea's HDD motor sales to its

customers were conditioned on the customers not assembling the purchased motors into hard

disk drives that would directly infringe Papst's patents.  Because those sales were conditional,

they cannot have exhausted Papst's patents and Minebea cannot prevail on its patent exhaustion

claims.

---

[68]     Because the Termination Agreement which ended the Joint Venture merely
extended the patent licenses granted to Minebea under the Intangible Assets Agreement, the
express disclaimer of sublicenses under the earlier agreement also applied to the Termination
Agreement.  See PTX 470, Termination Agreement (May 3, 1993), Article 7 ("[Papst] shall
continue to grant to [Minebea] the right to use all the patents and patent applications . . . as they
have arisen or were acquired by P during the life of the [Intangible Assets Agreement] and in
accordance with its terms and conditions.").

### E.  Essential Feature/No Non-infringing Use

As the Court stated in its June 24, 2005 Patent Exhaustion Opinion denying the parties' cross-motions for summary judgment on patent exhaustion, "a finding of exhaustion is proper only 'where one has sold an uncompleted article which, because it embodies essential features of [its] patented invention, is within the protection of the patent.'"  Minebea Co. v. Papst, 374 F. Supp. 2d at 213 (quoting United States v. Univis Lens Co., 316 U.S. 241, 250-251 (1942)).  The Court made clear before trial that Minebea would be required to establish this fact – as it would be required to establish the other elements of its patent exhaustion claim – on a patent-by-patent and motor-by-motor basis.  See Memorandum Opinion and Order (June 24, 2005) (Docket No. 1123) at 3 ("Minebea, therefore, must prove exhaustion on a claim by claim basis with respect to each HDD motor and HDD product it presents to the jury.") (emphasis added).[69]  With this in mind, the Court articulated the proof Minebea would have to offer at trial with respect this element of patent exhaustion as follows:

> To demonstrate . . . that any given Papst Drive Patent is exhausted by the sale of any given motor, and assuming, due to the actions taken by Papst, that the motor in question contributes to or induces the infringement of a Papst Drive Patent, Minebea must demonstrate (a) that a hard disk drive cannot be constructed using the motor in question without infringing a Papst Drive Patent because the motor is the "essential feature" of the Papst Drive Patents and (b) that there is no other noninfringing use – outside of

---

[69]     The unit of analysis for patent exhaustion is, after all, the article sold, and the authorized first sale of an article under a patent may exhaust the patent holder's rights only with respect to that article.  "An incident to the purchase of any article, whether patented or unpatented, is the right to use and sell it, and upon familiar principles the authorized sale of an article which is capable of use only in practicing the patent is a relinquishment of the patent monopoly with respect to the article sold."  United States v. Univis Lens Co., 316 U.S. at 249 (emphasis added).

the realm of hard disk drives – to which the motor can reasonably be put.

Minebea Co. v. Papst, 374 F. Supp. 2d at 214 (emphasis added).

Although Minebea directed some of its evidence at trial to the issue of whether individual motors embodied the essential features of individual patents and claims, by and large it directed its efforts towards proving that, as a general matter:  (a) Minebea's motors embodied the "essential features" of Papst's drive patents, and (b) there existed no reasonable use for Minebea's motors that would not infringe some of Papst's drive patents.  Unfortunately for Minebea, its motor-by-motor proof was insufficient to link the features of particular motors to particular patents, and its proof with respect to its motors as a class was insufficient to show, by a preponderance of the evidence, that the individual motors at issue here embodied the essential features of the patent claims Minebea alleges they exhausted.[70]  Minebea did succeed in demonstrating that its motors could only be used in hard disk drives, and thus that there were no reasonable non-infringing uses outside of hard disk drives.  It did not succeed, however, in proving that any particular motor so embodied the essential features of any particular drive patent that no non-infringing hard disk drive reasonably could be built using Minebea motors.  Accordingly, Minebea has failed to satisfy this prong of the patent exhaustion analysis.

---

[70]     Based on the Court's finding that only the Quantum Empire and HP Wolverine III motors were sold under United States patents, only two motors and eight corresponding patents are still at issue:  (1) the Quantum Empire, the sale of which Minebea argues exhausts certain claims of Re '412, the '943 patent, the '010 patent, the '312 patent, and the '373 patent; and (2) the HP Wolverine III, the sale of which Minebea argues exhausts the '500 patent, the '738 patent, and the '814 patent.  See supra at 141.

1.  Non-infringing Uses of Minebea Motors

Minebea's motors infringe Papst's drive patents only when combined with certain other components and assembled into hard disk drives.  The sale of an article that "can only be used in [a] patented combination" which "must be completed by the purchaser" may exhaust the patent-holder's right to the patented article.  Anton/Bauer, Inc. v. PAG, Ltd., 329 F.3d 1343, 1351 (Fed. Cir. 2003).[71]  The sale of Minebea's motors cannot exhaust Papst's patents if they could be put to some reasonable use other than being assembled into the "patented combination," that is, a hard disk drive.

The party asserting exhaustion (here Minebea) bears the burden of proving that there is no reasonable non-infringing use.  See Bandag, Inc. v. Al Boster's Tire Stores, Inc., 750 F.2d 903, 924-25 (Fed. Cir. 1984).  Nonetheless, "a legally acceptable noninfringing use need not be as profitable as the patented method – it need only be reasonable."  Glass Equip. Dev., Inc. v. Besten, Inc., 174 F.3d 1337, 1342 (Fed. Cir. 1999) (demonstrating that non-infringing methods did not permit the user to sell the resulting device at a profit was insufficient to establish no non-infringing uses).

At trial, Papst proposed several putative uses for Minebea's HDD motors that did not involve assembling them into hard disk drives.  Because the evidence showed, however, that

---

[71]      Papst argues that the appropriate inquiry is not whether the articles sold embody the essential features of the allegedly exhausted patents, but whether those articles have any reasonable uses that do not infringe Papst's patents.  Papst argues that an "essential features" analysis is inappropriate because "there is no legally cognizable or protected 'essential' element, 'gist' or 'heart' of the invention in a combination patent."  See Papst Br. at 19 (quoting Aro Mfg. Co. v. Convertible Top Co., 365 U.S. 336, 345 (1961)).  Minebea maintains that "essential features" is the correct inquiry.  Because Minebea loses under either the non-infringing uses or the essential features analysis, the Court need not resolve this question.

161

none of these proposed uses was actually reasonable, Minebea prevails on this point.  Papst also

proposed several hard disk drive-related uses for Minebea motors that did not involve designing

"around" its drive patents.  None of these proposed uses was reasonable, either.  Finally, Papst

posited several possible "design-arounds" for the Minebea motors – that is, ways of assembling

the Minebea motors into hard disk drives that would not infringe Papst's drive patents.  None of

these, however, were viable uses of the motors.  The Court now turns to a discussion of each of

these arguments.

a.  There are no reasonable uses for Minebea motors that do not involve incorporation into hard
disk drives.

The evidence at trial showed that the only reasonable use of Minebea's motors

was incorporation into hard disk drives.  Minebea's motors have unique features – such as

magnetic fluid seals or labyrinth seals, materials that avoid outgassing, low power consumption,

magnetic shielding, and a hub adapted to carry the disk – that are not included in other electric

motors and that make Minebea's motors especially suited for use in hard disk drives.  See PTX

2827 (list of hard disk drive components discussed by Mr. Kuwert); 7/5/05 (p.m.) Trial Tr. at

23:2-30:4, 31:21-34:22, 73:3-6 (Kuwert testim.).  For example, because electric motors

inherently generate contaminants, it is useful to incorporate structural features into HDD motors

that protect the disks from contaminants during use.  See Written Direct Testimony of Warren L.

Dalziel (July 10, 2005) (Docket No. 1300) ¶ 100.  It is also important for HDD motors to

incorporate structural features that prevent the magnetic fields generated by the motors from

interfering with the magnetic recording and reading function of the drive.  See id.  Minebea's

HDD motors are designed to meet each particular customer's individual requirements; none are

162

sold "off-the-shelf."  See 7/5/05 (p.m.) Trial Tr. at 22:4-13, 35:20-37:25 (Kuwert testim.);

7/18/05 (a.m.) Trial Tr. at 37:2-38:1 (Fukunaga testim.); 7/6/05 (a.m.) Trial Tr. at 56:19-57:7

(Mizukami testim.); Written Direct Testimony of Warren L. Dalziel (July 10, 2005) (Docket No.

1300) ¶¶ 96, 97, 105.

   Papst nevertheless suggests several non-infringing uses for Minebea motors

outside of the realm of hard disk drives.  See Papst Br. at  9-21.  First, Papst argues that

Minebea's motors can also be used in optical disk drives, citing Minebea's own patents and

patent applications for this proposition.  See id. at 13; DTX 938, Gerstman Expert Report

(April 4, 2005) ¶ 25; 8/2/05 (p.m.) Trial Tr. at 61:17-63:2 (Gertsman testim.).  Papst argues that

certain Minebea motors also could be used in laser security devices and bar code scanners.  See

Papst Br. at 14; 7/29/05 (a.m.) Trial Tr. at 6:16-15:7 (G. Papst testim.).  The Court rejects these

arguments because neither is based on any actual use of a Minebea motor, and the credible

testimony at trial was that neither of these theoretical options was practical and thus

"reasonable."  Papst's arguments instead relate to either Papst motors or motors only as they are

described in the patents, neither of which has any bearing on whether Minebea's motors, as they

actually were manufactured and sold, have any reasonable non-infringing uses.  Even assuming

that a remote possibility exists that a Minebea HDD motor could be used in an optical disk drive

or laser security devices and bar code scanners, the Court finds that such uses are not feasible in

the real world, and thus are not reasonable.

   Papst further argues that Minebea's sale of "imperfect" Filepro HDD motors to

Leuze Electronic for use in bar code readers constitutes a reasonable non-infringing use outside

the scope of Papst's drive patents.  See Papst Br. at 15-16; DTX 826-829 (various letters and

memoranda regarding Filepro, admitted by stipulation of the parties); DTX 859-88 (various Papst motors); DTX 892-906 (motor specifications). The Filepro motors were imperfect because they failed to function adequately in hard disk drives for a variety of reasons. See 7/18/05 (a.m.) Trial Tr. at 38:2-40:11, 66:25-67:14 (Fukunaga testim.); Declaration of Oswald Kuwert (June 1, 2005) ¶ 14. Minebea contends that its sale of "modified, scrapped" Filepro motors does not constitute a reasonable non-infringing use because it was a failed attempt by PMDM to salvage these "imperfect" HDD motors. 7/18/05 (a.m.) Trial Tr. at 38:2-40:11, 54:23-58:21, 64:20-65:14 (Fukunaga testim.). After Minebea realized that the "scrapped" HDD motors did not function properly even for Leuze's purposes, the Filepro motor was "redesigned specifically for use in the Leuze bar code scanner in accordance with the specifications of Leuze." Kuwert Decl. ¶ 14. It was only after such redesign that the Filepro motor could be used for other purposes.

Papst contends that the need to modify or redesign the motors to make them usable in Leuze's readers does not prevent this from being a reasonable non-infringing use. See Papst's Br. at 16 (citing Glass Equip. Dev., Inc., v. Besten, Inc., 174 F.3d at 1342 n.3; Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d at 924-25; and In re Singer Co., 2002 U.S. Dist. LEXIS 8609, *36 (S.D.N.Y. May 14, 2002)). The Court disagrees. Upon first sale (before the redesign) the original Filepro motors were not reasonably suitable for Leuze's use in the bar code scanners; and the complete redesign of a motor in order to make it usable is not, in this Court's view, a reasonable non-infringing use. Redesigned motors are not merely modified; they are something new. A re-designed motor simply is not the same "article," and its suitability for an alternative use is irrelevant to whether the original patented article can exhaust Papst's patent rights.

In sum, the Court agrees with Minebea that because of the extremely specialized design and construction of each HDD motor, Minebea's HDD motors have no reasonable use other than to be incorporated into hard disk drives.

b.  Minebea's motors have no HDD-related uses that do not involve assembly into potentially infringing hard drives.

Papst posits several non-infringing, allegedly reasonable uses for Minebea's motors that involve their incorporation into hard disk drives.  Based on the evidence at trial, however, the Court finds that the posited uses are not reasonable.   First, Papst claims that Minebea can sell its motors only to hard disk drive manufacturers who are already licensed to use Papst's drive patents.  See Papst's Post Trial Brief at 10.  Since such manufacturers cannot be held liable for infringement, Papst argues, Minebea's sale of motors to these customers constitutes a reasonable, non-infringing use.  See id.  The Court is skeptical of the merits of such an argument as a matter of law, as "courts have uniformly emphasized that a non-infringing use must be a use that does not practice the patent."  LG Elecs., Inc. v. Asustek Computer, Inc., 2002 U.S. Dist. LEXIS 25956, at *36 (N.D. Cal. 2002) (emphasis added) (citing Met-Coil Sys. Corp. v. Korners Unlimited, Inc., 803 F.2d 684, 685 (Fed. Cir. 1986), and Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d at 925), subsequent opinion at LG Elecs., Inc. v. Asustek Computer, Inc., 248 F. Supp. 2d 912 (N.D. Cal. 2003), aff'd in part and rev'd in part on other grounds sub nom. LG Elecs., Inc. v. Bizcom Elecs., Inc., 2006 U.S. App. LEXIS 16916 (Fed. Cir. 2006).  A licensed customer who incorporates a motor into a hard drive would not be liable for infringement, but would "practice" the patent.  See also Cyrix Corp. v. Intel Corp., 846 F. Supp. at 539 ("The purpose of the patent exhaustion doctrine, . . . is defeated if the patent owner can

'invent' a noninfringing use by licensing systems."). In any event, with respect to the Quantum

Empire and Wolverine III motors, a sale to a licensed customer was not as a factual matter a

"reasonable" use, since (1) neither company had a licensing agreement with Papst when the

motors were sold in 1993 and 1994, and (2) it was established at trial that HDD motors are

custom-designed to the specifications of each manufacturer. Sale to licensed customers therefore

is not a reasonable, non-infringing use.[72]

  Similar reasoning applies to Papst's arguments that Minebea and its customers

could have sold their products outside the United States, or waited to sell them in the United

States until after the patents at issue expired. See Papst Br. at 11. As with sales only to licensed

customers, the Court cannot agree that either of these options constitutes a "reasonable" non-

infringing use. Total avoidance of sales in the United States or sales only after patents are no

longer in force simply proves too much. As the district court in LG Electronics observed:

> Including foreign use as an example of a reasonable, non-infringing
> use in this context would eviscerate the defenses of patent
> exhaustion and implied license. As a general rule, an alleged
> infringer could always limit its infringing activities to foreign
> jurisdictions, yet no court has as yet found this fact to constitute a
> reasonable non-infringing use.

LG Elecs., Inc. v. Asustek Computer, Inc., 2002 U.S. Dist. LEXIS 25956, at *36; see also

02 Micro Int'l Ltd. v. Sumida Corp., 2006 U.S. Dist. LEXIS 18859, at *3 (E.D. Tex. 2006) (on

---

[72]  Papst's argument also seems misguided in that it improperly focuses on
alternative uses of the motors from Minebea's standpoint, that is, before the motors are sold. The
proper focus in patent exhaustion analysis is whether the purchaser can make any other
reasonable use of the article. See, e.g., United States v. Univis Lens Corp., 316 U.S. at 249 ("An
incident to the purchase of any article, whether patented or unpatented, is the right to use and sell
it, and upon familiar principles the authorized sale of an article which is capable of use only in
practicing the patent is a relinquishment of the patent monopoly with respect to the article sold.")
(emphasis added).

inducement of infringement claim, holding that uses outside the Untied States did not constitute "substantial non-infringing uses").  Such uses also do not "practice" the patents, as courts generally require.  See LG Elecs., Inc. v. Asustek Computer, Inc., 2002 U.S. Dist. LEXIS 25956, at *36.  Furthermore, the Court finds that sale after the expiration of the patents would not have constituted a reasonable use, in light of the considerable period of time that elapsed between the sale of the Empire and Wolverine motors and the expiration of the patents at issue.

Papst next argues that Minebea's customers could have used Minebea's HDD motors as replacement parts.  See Papst Br. at 12.  The Court finds that this also is not a reasonable use because no rational customer would buy Minebea's HDD motors at market price as replacement parts, when the motors are in perfectly saleable condition for use as "firsts" in hard disk drives.  Usage solely as replacement parts would make no economic sense and therefore is unreasonable.

Papst's last two suggested non-infringing uses in the realm of hard disk drives involve combining Minebea motors with HDD components in arrangements that do not fall within the claims of Minebea's drive patents.  See Papst Br. at 16-19.  The first is the incorporation of a Minebea motor into an HDD that does not include an air filter claimed in the Papst drive patents; the second is the incorporation of a motor into a hard disk drive where the motor is positioned outside of the drive's "clean room."  Id.  While Papst may be technically correct that omission of a claimed air filter might allow a hard disk drive to avoid infringement of certain Papst drive patent claims, Papst never argues that there is anything "inventive" or non-generic about the addition of an air filter.  See Papst Br. at 16-18.  Papst instead argues that Minebea has the burden of establishing that all HDD's have this type of filter in order for it to be

167

"generic."  See id. at 18.  Whether or not Minebea has such a burden, Mr. Dalziel testified

without credible contradiction that he has never seen or heard of a hard disk drive that did not

have an air filter in the clean chamber.  8/4/05 (p.m.) Trial Tr. at 65:24-66:2 (Dalziel testim.).

Based on this uncontradicted testimony, the Court concludes that the assembly of a hard disk

drive with a Minebea motor but without an air filter is not a reasonable non-infringing use,

because all (or at least the vast majority) of modern hard disk drives incorporate air filters.  See

id.

        The Court also rejects Papst's argument that placement of Minebea's HDD

motors outside of the clean room is a reasonable non-infringing use.  See Papst Br. at 18-19.

According to Mr. Dalziel, such placement would be contrary to the modern practice of placing

the motor inside the clean room.  See 8/4/05 (p.m.) Trial Tr. at 64:16-19 (Dalziel testim.) ("I

don't have personal knowledge of when the last below-the-deck motor was used, no.  From my

experience, I have not designed or seen one for ten or fifteen years.").  The Court concludes that

placement of Minebea's HDD motors outside of the clean room of a hard disk drive is not a

reasonable non-infringing use for its motors.

        In sum, at trial Minebea demonstrated that there are no reasonable non-infringing

uses for its motors in general.  It did not address this issue with respect to individual motors and

their relationship to individual patents, despite having been admonished by the Court on

numerous occasions that a patent-by-patent analysis of "design-arounds" might be necessary and

that Minebea's patent exhaustion claim must be proved on a patent-by-patent and motor-by-

motor basis.  See Minebea Co. v. Papst, No. 97-0590, 2005 U.S. Dist. LEXIS 11946 at *33

(D.D.C. June 21, 2005) ("Testimony as to whether it is possible to design around the Papst

Patents, <u>while it may be relevant to the issue of non-infringing alternatives</u>, patent exhaustion, is

inappropriate coming from Mr. Dalziel . . .  because Minebea has repeatedly told the Court that

claim construction is not necessary and has never requested a <u>Markman</u> ruling.") (emphasis

added); <u>see</u> <u>also</u> Memorandum Opinion and Order (June 24, 2005) (Docket No. 1123) at 3

(Minebea "must prove exhaustion on a claim-by-claim basis with respect to each HDD motor it

presents").

   This general showing is, on its own, insufficient for Minebea to prevail on its

exhaustion claims, which must be proved patent-by-patent and motor-by-motor.  It is probative,

of course, when the Court considers whether any individual motor has no reasonable use other

than incorporation into a hard disk drive that infringes a particular patent claim, whether as a

general matter the Minebea motors have no non-infringing uses.  Without more, however, that

fact is insufficient to prove that any individual particular motor has no non-infringing use by a

preponderance of the evidence.  Having failed to prove on a motor-by-motor or patent-by-patent

basis that its motors had no reasonable non-infringing uses, Minebea nonetheless might prevail

by showing that the motors at issue embodied the "essential features" of the patents alleged to

have been exhausted.

## 2.  Essential Features

   Minebea argues, and the evidence presented at trial shows, that as a general matter

the non-motor elements of Papst's drive patents were "generic" and "non-inventive," and that the

Papst drive patents at issue generally are directed to improvements in HDD motors rather than

improvements in the other drive elements.  Indeed, the testimony of Papst employees fully

supports this view.

During a deposition taken in connection with the Western Digital litigation, Mr. Georg Papst testified that a hard disk drive consists of a magnetic disk, a clean room, a read/write head, and an actuator or carriage mechanism for placing the head on the disk, but that Papst did not invent any of those components.  See PTX 695, 5/11/95 G. Papst Dep Tr. (Western Digital litig.) at 118:6-120:19.  Mr. Hans Dieter Papst, the head of the patent department at Papst Licensing, also testified that Papst did not invent an original clean room, read/write head, or magnetic storage disk, and that these items were all generic.  See 3/3/05 H.D. Papst Dep. Tr. at 527:10-14.  He further testified that Papst did not invent improvements to a storage disk or a read write head.  See id. at 528:13-529:8.  Former Papst employees Ulrich Koletzki and Michael Hermann testified that a clean room, a read/write head, and a magnetic storage disk were generic in that all hard disk drives include these items.  See 12/16/04 Koletzki Hague Tr. at 3, 6; 2/14/06 Hermann Hague Tr. at 41.  Mr. Manfred Reuter, the Papst Licensing employee responsible for disassembling hard disk drives and preparing reports marking off infringing characteristics of each drive, testified that in making a determination as to whether a particular hard disk drive infringed a particular claim of a Papst patent, Papst focused only on the HDD motor because every hard disk drive included the generic, non-motor components.  See 2/4/05 Reuter Dep. Tr. at 176:19-20, 178:2, 178:22-179:2, 199:21-200:1.  This evidence shows that, in general, the HDD motor is the important "inventive" element of these patents and that Minebea's HDD motors embody these patents' "essential features."

Such a showing, however, is insufficient to prove that Minebea's sales of any particular motor still at issue exhausted the patents Minebea claims that they exhausted. Minebea must prove its exhaustion claims on a patent-by-patent and motor-by-motor basis.  See

170

Memorandum Opinion and Order (June 24, 2005) (Docket No. 1123) at 3 (Minebea therefore "must prove exhaustion on a claim-by-claim basis with respect to each HDD motor and corresponding HDD product it presents [at trial].").  It must demonstrate that <u>each</u> of the motors it sold (with Papst's authorization) embodied the essential features of <u>each</u> of the patent claims Minebea asserts were exhausted.  It cannot "short-circuit" this requirement by showing that as a general matter its motors embodied the inventive features of Papst's drive patents.

Minebea argues that it "has established on a motor-by-motor basis that each of the Minebea HDD motors embodies 'essential features' of certain of the claims of the Papst patents at issue."  Minebea Br. at 58-59.  It has not.  Minebea relies on Mr. Dalziel's testimony to link the "essential features" of each allegedly exhausted patent with each motor sold by Minebea.  Mr. Dalziel summarized the results of his inquiry in Tables A and B as attached to his expert report. Table A purports to list the "main technical features" within the HDD motors claimed in each of the thirty-one Papst patents at issue, as well as the "generic" non-motor features listed in each patent claim.  <u>See</u> Minebea Br. at 51.  Table B purports to identify, on the basis of Mr. Dalziel's review of the Minebea motors at issue, what technical features are present in each motor.  <u>See id.</u> at 54.

Minebea claims that by cross-referencing Tables A and B, it has demonstrated that the "essential features" of the allegedly exhausted patent claims are embodied in the Minebea motors at issue.  Its conclusions to this effect are expressed in Appendix C to its Proposed Findings of Fact, "Minebea's Chart of Papst Patent Claims Exhausted by Motor."  Minebea argues that the HDD motors identified on its Motor/Claim Chart as exhausting particular patent

171

claims embody the essential features of those claims.  See Minebea's PFF ¶ 3.1.11.  Such a conclusion, however, is unjustifiable.

Mr. Dalziel's analysis, as amplified by his testimony at trial, did not show that any particular motor embodied the "essential features" of any particular patent claim.  Mr. Dalziel freely admitted that he never compared any particular motor to the claims of any individual patent at issue.  See 8/4/05 (p.m.) Trial Tr. at 73:13-14 (Dalziel testim.).  Only one paragraph of his written direct testimony (Paragraph 29, relating to three specific motors) sought to link specific Minebea motors to specific features of specific patents.  See Opinion and Order (July 18, 2005) (Docket No. 1417) at 12-13.  Dalziel created Table A by reading the patents, and then later, "independently" created Table B by looking at diagrams of the motors – without consulting the patents themselves.  See 8/4/05 (p.m.) Trial Tr. at 74:11-25 (Dalziel testim.).  Dalziel himself never cross-referenced the two tables and was not involved in the creation of Minebea's Motor/Claim Chart, which correlates motors to allegedly exhausted patents.  Indeed, as of trial, Mr. Dalziel had in fact never even seen the Motor/Claim Chart.  See 8/4/05 (p.m.) Trial Tr. at 73:25-74:1 (Dalziel testim.).

Nor are the results of Mr. Dalziel's analysis – Tables A and B – sufficient for the Court to link individual motors to the allegedly exhausted claims.  As Dalziel acknowledged, Tables A and B were created independently of each other and at different times, and the features described in the patents and listed in Table A do not correspond exactly to the features found in the motors and listed in Table B.  See 7/19/05 (a.m.) Trial Tr. at 71:13-23, 72:5-8, 72:20-23,

73:22-25.; 74:9-23 (Dalziel testim.).[73]   Tables A and B also omitted some motor-related features

described in the patent claims and present in some motors, so that it is impossible to determine

whether the motors in question share those features with the allegedly exhausted patents.  See

Minebea Br. at 51 n.25.  More importantly, Dalziel indicated in his testimony that some of the

"features" that are listed in Tables A and B refer not to precisely-defined structures, but rather to

functional categories of features.  See 7/19/05 (a.m.) Trial Tr. at 72:14-19 (Dalziel testim.) ("Q:

But you didn't break those out separately in Table A?  A:  In this version, no, we did not.  Again,

there was some consolidation of elements.  I didn't break it out.  I didn't separate them.  They

serve the same function, so I just combined them.").  For example, a feature described in a patent

and referred to as a "yoke" in Table A might differ from a motor feature reported as a yoke in

Table B, even though they serve the same purpose.  See 7/19/05 (a.m.) Trial Tr. at 75:12-17,

91:7-20 (Dalziel testim.) ("yoke", "radial magnetic shielding"), 57:14-17, 58:5-9 ("labyrinth

seal"); see also id. at 71:6-18.[74]

Thus, even assuming that Mr. Dalziel has correctly identified and described the

"essential features" of the patents and claims at issue, the Court has no basis for concluding that

the motors sold actually "embody" the features actually described in the patents, as Minebea

---

[73]     The "HDD Motor elements" listed in Table A are: "hub," "in-hub," "under-hub," "yoke/ferromagnetic member," "magnetic shield," "labyrinth seal," "integrated baseplate," "flange (drop-in)," "magnetic/ferro-fluidic seal," and "other".  The features identified in Table B are: "in-hub," "under-hub," "yoke/axial magnetic shield," "radial magnetic shield," "ferromagnetic hub," "labyrinth seal," "integrated base-plate," "flange (drop-in)," "ferrofluidic (magnetic) seal," "nesting cover ring," and "fluid dynamic bearings."

[74]     Mr. Dalziel even acknowledged that he did not understand the meaning of some of the terms described in the patents.  See 7/19/05 (a.m.) Trial Tr. at 76:7-20 (Dalziel testim.) ("I don't know what some of those mean, and so I've offered some alternatives based on my experience what they might mean.").

must demonstrate if it is to prevail on its exhaustion claims.  This is especially so given that each

Minebea motor was unique and custom-designed to meet the specifications of an individual

customer.  See Dalziel Expert Report (April 4, 2005) at 44-45.  Mr. Dalziel reported that the

motors are so specialized that a motor designed for a particular drive would not be usable in a

different drive manufactured by the same customer.  See id. at 45.  Moreover, "[t]he customer

specifications define every significant feature of the motors."  Id. at 44 (emphasis added).  In

view of his own expert testimony, Mr. Dalziel's loose, categorical association of motors with

patent claims is insufficient to support a finding of exhaustion.

Thus, Minebea has failed to show that the motors still at issue embody the

essential features of the patents they are alleged to have exhausted, or that those specific motors

have no non reasonable non-infringing use.  Accordingly, Minebea cannot prevail on its patent

exhaustion claims.[75]

---

[75]      Typically, patent exhaustion is an affirmative defense to a claim of patent
infringement.  It therefore normally is clear which patents and which products are at issue
because the plaintiff  identifies the alleged infringing claims in its complaint for patent
infringement.  The Declaratory Judgment Act, however, allows an alleged infringer -- or one who
has a reasonable apprehension of being sued for patent infringement -- to pursue a claim of patent
exhaustion affirmatively in an effort to have its rights declared by a court before it is sued for
infringement.  See supra at 108-112.  In this case, Minebea has sought such a declaration to
protect both itself and its customers from infringement suits.  When a company like Minebea
chooses to proceed in this fashion, however, it does so at its peril, particularly where, as here, it
attempts to encompass in its complaint virtually all possible claims of infringement against all of
its customers and all of the motors sold to them.

In advance of trial, Minebea chose to put scores of patents and motors at issue,
knowing full well that it would bear the burden of proving exhaustion with respect to each patent
and each motor asserted.  See Memorandum Opinion and Order (June 24, 2005) (Docket No.
1123) at 3; supra at 159-60.  Minebea sometimes tried to shift the burden of linking specific
patents or patent claims to specific motors by demanding that Papst specify which associations it
challenged.  But, as the Court reminded Minebea numerous times, as the plaintiff it always had
the burden of proof.  To make things more difficult for itself, for Papst and for the Court,

### F.  Conclusion

Minebea's patent exhaustion claims fail for a variety of reasons.  First, Minebea cannot show patent exhaustion with respect to the majority of motors and patents at issue in this case because only two of the motors at issue, the HP Wolverine III and the Quantum Empire, were sold in the United States and thus "under" United States patents.  Second, although Minebea has shown that it was authorized to sell these two motors under the patent licensing arrangement existing at the time of the sale, its sales of these motors were "conditional" by virtue of Papst's express disclaimers, in the relevant agreements, of the grant of any sublicenses to Minebea's customers.  Furthermore, Minebea is not entitled to a declaratory judgment of patent

---

Minebea did not even specify which particular patents it was putting at issue in its patent exhaustion claim until shortly after trial had begun.  See Minebea's Chart of Papst Patent Claims Exhausted by Motor (July 13, 2005) (Docket No. 1361).  But it was not until Minebea filed its proposed findings of fact and conclusions of law after trial that the Court was entirely sure which patents (those 31 patents now listed supra at note 50) were in fact at issue.  See Minebea's PFF ¶¶ 2.1-2.7, 8.4; see also supra note 50.

Minebea consistently told the Court that claim construction or claim interpretation was not necessary in this case.  It reiterated again and again that the Court did not need to formally construe Papst's patent claims in order to resolve the patent exhaustion count in Minebea's complaint.  It proffered its expert, Warren Dalziel, not as an expert on patent construction or patent interpretation -- and Mr. Dalziel testified that he did not engage in patent construction -- but rather to testify about his general characterizations of the Papst drive patent claim elements.  See supra note 64; Opinion (July 18, 2005) (Docket No. 1417) at 11; Minebea Co. v. Papst, 374 F. Supp. 2d at 215; Opinion (June 24, 2005) (Docket No. 1123) at 3; Minebea Co. v. Papst, No. 97-0590, 2005 U.S. Dist. LEXIS 11946 at *24, *30-*35 (D.D.C. June 21, 2005) (discussing proffered testimony of Prof. Adelman and Mr. Dalziel).  The Court advised Minebea numerous times that it was free to present its case any way it wished but that at trial it would have to prove patent exhaustion on "a claim-by-claim basis with respect to each HDD motor and HDD product it presents."  Opinion (June 24, 2005) (Docket No. 1123) at 3; see also Second Order Regarding Trial Procedures (July 1, 2005) (Docket No. 1211) at 2.  As reflected throughout the foregoing discussion, Minebea has utterly failed to do so.  It therefore cannot succeed -- and has not succeeded -- on its patent exhaustion claim.

exhaustion with respect to these motors because it has not met its burden of proving that these two motors embodied the "essential features" of the patents Minebea claims they exhaust. In addition, while Minebea did prove as a general matter that its motors could not be put to any reasonable use outside the realm of hard disk drives, it failed to show specifically that these two motors have no reasonable, non-infringing uses. Papst therefore is entitled to judgment on Count I of the Second Amended Complaint, Patent Exhaustion.

### III.  COUNT V:  CONVERSION AND UNJUST ENRICHMENT

Count V of the Second Amended Complaint seeks recovery under several alternative German law theories, characterized by Minebea as "the German equivalent to conversion and unjust enrichment."  Minebea's Summary of its Conversion Claims (Count V) (July 1, 2005) (Docket No. 1204) at 2.  All relate to Papst Motoren's alleged breach of Paragraph 9(a) of the 1990 Agreement for the Sale of Intangible Assets.  These theories include:  (1) breach of the express terms of the contract; (2) violation of Section 266 of the German Penal Code; and (3) unjust enrichment under Section 812 of the German Civil Code.

As a remedy for these claims, Minebea seeks recovery of five United States patents – U.S. Patent Nos. 5,331,483; 5,394,283; 5,594,606; 5,796,548; and 5,945,751 – that it claims are based on inventions developed by Papst Motoren employees during the period of the joint venture, and to which Minebea claims it is entitled under the 1990 Agreement for the Sale of Intangible Assets.  Minebea also has requested (without offering any justification) an accounting of any other patents that might have been appropriated by Papst Motoren in violation of the Intangible Assets Agreement.

Papst asserts several affirmative defenses.  It argues that:  (1) these claims are barred by the three-year statute of limitations under the D.C. Code; (2) Minebea is bound by several contractual provisions releasing Papst Licensing and Georg Papst from liability for such claims; and (3) a German court decision in Papst's favor precludes Minebea from re-litigating the issue of whether it had any right to own the inventions in question.  See Papst Br. at 84-90.

Minebea's claims under Count V are governed by German law.  See Memorandum Opinion and Order (June 29, 2005) (Docket No. 1172) at 6 & n.3, 9-10.  Under Rule 44.1 of the Federal Rules of Civil Procedure, foreign law is to be determined by the court as a matter of law.  See Islamic Republic of Iran Broadcasting v. Sotheby Parke Bernet, Inc., 839 F.2d 780, 782 (D.C. Cir. 1988).  In determining an issue of foreign law, the court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  FED. R. CIV. P. 44.1.  In this case, both sides proffered initial reports and rebuttal reports from expert witnesses in the field of German law. Minebea's expert was Dr. Christopher Ann of Munich Technical University; Papst's was Dr. Andreas Junius, an attorney with Clifford Chance in New York City.

### A.  Factual Background

Under the terms of the 1990 Agreement for the Sale of Intangible Assets, Minebea purchased all intangible assets of Papst's HDD Motor Division and Papst transferred them to Minebea.  See PTX 195, 1990 Agreement for the Sale of Intangible Assets (Nov. 5, 1990) ¶¶ 1-4. Upon payment, Papst was to give up all activities of its HDD Motor Division and not engage in the HDD motor manufacturing business for at least five years.  See id. ¶ 7(b).  The Joint Venture was to "be ready to take over the HDD Motor Division personnel of Papst employees for

research and development (R+D), engineering, manufacturing, marketing, sale and administration" of new HDD motors.  See id. ¶ 7(d).  The transfer of Papst Motoren's HDD Motor Division employees was not to happen immediately, but Papst Motoren was to "make its best efforts to cause all employees concerned [to enter] into contracts of employment with the GJV [the German Joint Venture, later to be named PMDM]."  Id.  Paragraph 9(a) of the Intangible Assets Agreement further provided that "both parties hereby confirm that new patents applicable only to HDD Motors shall be developed and registered under the name of GJV [PMDM] and GJV shall own and maintain such new patents."  Id. ¶ 9(a).  According to the testimony of Mr. Kuwert, Papst Motoren's patent office in San Georgen handled "patent issues" (presumably including the preparation of patent applications as well as the assignment of inventions) for PMDM during period of the Joint Venture.  See 7/5/05 (p.m.) Trial Tr. at 70:25-72:13 (Kuwert testim.) ("Patent issues were sent to Papst patent office in San Georgen.").

Some of the inventors in Papst Motoren's employ waited a considerable period of time before signing employment contracts with PMDM, and therefore were considered still to be employees of Papst Motoren for some time after the commencement of the joint venture.  See 3/26/04 H.D. Papst Dep. Tr. at 784:23-785:2 ("I . . . recall that some inventors waited for a very long time before signing the employment contract with the joint venture."); 3/25/04 H.D. Papst Dep. Tr. at 762:5-7, 762:18-22, 762:25-763:3.  Inventions developed by employees of Papst Motoren during the period of the joint venture were assigned to Papst Motoren under Section 6 of the German Employee Invention Act.  See 3/26/04 H.D. Papst Dep. Tr. at 775:17-21, 776:2-5; Expert Report of Andreas Junius (June 20, 2005) at 26-28.  Minebea claims that Papst Motoren

applied for and obtained patents in Germany and the United States based on some of these inventions, which were "applicable only to HDD motors." Minebea Br. at 89.[76]

On May 3, 1993, Papst Motoren and Minebea signed the Termination Agreement ending the Joint Venture.  The Termination Agreement provided, *inter alia*, that some of the prior agreements between the parties would remain in effect, while others would cease to be effective.  See PTX 470, 1993 Termination Agreement (May 3, 1993), Articles 2, 9; supra at 66-68.  Papst Motoren also agreed to grant Minebea a continuing license to use certain patents and patent applications that had "arisen or [been] acquired by [Papst Motoren] during the life of the [Agreement for the Sale of Intangible Assets] and in accordance with its terms and conditions."  See PTX 470, 1993 Termination Agreement (May 3, 1993), Article 7 ("Granting of Licenses").  Exhibit B for the Termination Agreement listed ten such German patents, along with their serial numbers and application dates.  See DTX 278, Letter by facsimile from H. Konig, on behalf of Papst Motoren, to R. Mizukami enclosing Exhibit B for the Termination Agreement (May 3, 1993).  Exhibit B further stated that the listed dates "constitute the priority-dates for the foreign corresponding Patent Applications of [Papst Motoren] which are also included in this license."  Id.

All of the United States patents at issue in Count V derive from German patents listed in Exhibit B.  See DTX 938, Expert Report of George H. Gerstman (March 16, 2005) (Docket No. 1445) at 15-16.  At the time of the Termination Agreement, however, applications for derivative U.S. patents had been filed with respect to only two of the German patents listed in

---

[76]     Hans Dieter Papst was head of the patent department of Papst Motoren from 1968 until 1992.  See 3/15/04 H.D. Papst Dep. Tr. at 21:5-19.

Exhibit B.  See PTX 649, United States Patent No. 5,394,283; PTX 567, United States Patent No. 5,331,483.

The Joint Venture was terminated on May 3, 1993.  On May 26, 1993, Papst Licensing – Georg Papst's new patent licensing company – purchased Papst Motoren's entire portfolio of patent rights.  See PTX 482, Assignment Agreement (May 26, 1993).  That same day, Papst Motoren sent a letter to Minebea reporting the sale of the patent portfolio to Papst Licensing and stating that Papst had "authorized and requested the Commissioner of Patents and Trademarks of the United States to issue all letters patents for the applications included in Papst Patent Rights to Papst Licensing GmbH in accordance with the [Assignment Agreement]."  See PTX 485, Letter to Minebea re: Assignment of Patent Rights to Papst Licensing GmbH (May 26, 1993) ¶ 3.  Minebea filed its complaint in this action on March 25, 1997.

## B.  Papst's Defenses

### 1.  Statute of Limitations

Papst's first affirmative defense is that Minebea's claims are barred by the District of Columbia's three-year statute of limitations.  The parties agree that the District of Columbia's general three-year statute of limitations applies to the claims in Count V.  See D.C. CODE ANN. § 12-301(8); Papst Br. at 47; Minebea Opp. at 63.  Minebea, however, argues that the claims are not time-barred because Minebea did not have actual or inquiry notice of the facts giving rise to its claims under Count V until less than three years before it filed its complaint.  To resolve this dispute, the Court must decide:  (1) when Minebea's claims accrued, and (2) whether Minebea knew or should have known of the facts giving rise to its claims on or before March 25, 1994, three years before the filing of its complaint.

180

a.  When did Minebea's claims accrue?

Since the statute of limitations cannot begin to run until the claim in question has accrued, the Court must determine as an initial matter when Minebea's claims accrued.  Minebea argued in response to Papst's motion for summary judgment on Count V that its conversion claims did not accrue until the issuance of the U.S. patents at issue.  See Minebea's Opp. to Def's Mot. Summ. J. on Conversion Claims (May 20, 2005) at 7-8.  Papst appears to take the position that Minebea's claims accrued during the joint venture, when "Papst Motoren [took] possession of and exercised ownership over" the inventions underlying the U.S. patents Minebea now seeks to recover.  See Papst Post-Trial Brief at 85.  Neither position is correct.

Each of Minebea's conversion claims is predicated on Papst Motoren's alleged breach of Paragraph 9(a) of the 1990 Intangible Assets Agreement, which states that "new patents applicable only to HDD Motors shall be developed and registered under the name of [PMDM] and [PMDM] shall own and maintain such new patents."  PTX 195, Agreement for the Sale of Intangible Assets (Nov. 5, 1990) ¶ 9(a).  As Minebea points out, this language imposes on Papst Motoren only an obligation to develop and register patents applicable only to HDD motors in the name of the joint venture; it is silent as to the underlying inventions.  See Minebea Opp. at 64 ("§9(a) of the Agreement for the Sale of Intangible Assets gives PMDM only an ownership right to new patents, not to the underlying inventions.").  Papst Motoren therefore could not have breached the contract merely by claiming ownership of the inventions; it must have taken some act to develop or register the patents in its own name.  The Court already has noted in its discussion of Minebea's patent exhaustion claim (Count I) the parties' agreement that a patent "arose" under the Intangible Assets Agreement when a patent application was filed.  Similarly,

181

the Court concludes that, for purposes of determining compliance with Paragraph 9(a), a new

patent would have been "developed" or "registered" when the patent application was filed, rather

than when the new patent was actually issued (since the parties could neither predict nor control

when a new patent was issued).  Accordingly, if Papst Motoren breached Paragraph 9(a), it did so

when it applied for new patents in its own name.

Paragraph 9(a) of the Intangible Assets Agreement refers only to "new patents

applicable only to HDD Motors," making no distinction between German patents and foreign

patents.  Consequently, under Minebea's theory of breach, each application for a "new" patent

would constitute an independent breach of the Agreement – regardless of whether the application

was to the U.S. Patent and Trademark Office or its German counterpart.  Thus, the application

for a United States patent would constitute a breach of Paragraph 9 independent of a breach by

registration of a German patent for the same invention.  Consequently, Minebea's claims for

conversion of United States patents (the only ones at issue in this case) accrued when Papst

Motoren filed applications for United States patents based on inventions developed during the

joint venture – not when it applied for German patents based on the same inventions.[77]

Paragraph 9(a) of the 1990 Intangible Assets Agreement, the provision that

Minebea claims was breached, ceased to bind the parties on May 3, 1993, because it is not one of

the paragraphs of the Agreement that survived the termination of the joint venture.  See PTX

470, 1993 Termination Agreement (May 3, 1993), Article 9.2 ("The provisions of the [Intangible

---

[77]     Neither party argues that the U.S. patents in question are not "new patents"
because they claim priority dates based on previously-issued German patents, and the Court
concludes that they are in fact "new patents" for purposes of Paragraph 9(a) of the 1990
Intangible Assets Agreement.  If the converse were true, Minebea would have no claim for
conversion or breach of contract arising from Papst's application for these U.S. patents.

Assets Agreement] not expressly listed in article 9.1 above shall cease to be effective, when this present agreement becomes legally binding as of the effective date."). Consequently, a patent application filed after May 3, 1993 cannot give rise to a conversion claim because, from that day forward, Papst was no longer bound to register patents to HDD motors only in PMDM's name.

Perhaps in acknowledgment of this fact, Minebea in its post-trial submissions identifies the application filing dates of only two of the U.S. patents at issue in Count V, both of which clearly fall within the life of the joint venture: (1) U.S. Patent No. 5,394,283, with a filing date of November 12, 1992, see PTX 649; and (2) U.S. Patent No. 5,331,483, with a filing date of July 1, 1992, see PTX 567. Applications for the other three U.S. patents at issue were filed well after the termination of the joint venture. U.S. Patent No. 5,594,606 has a filing date of February 17, 1995. See PTX 1019.[78] U.S. Patent No. 5,945,751 has a filing date of June 7, 1995. See PTX 1255. U.S. Patent No. 5,796,548 also has a filing date of June 7, 1995. See PTX 1194. Not only were the latter three patent applications filed after the termination of the joint venture; they were filed by Papst Licensing, which was not a party to the Intangible Assets Agreement. Accordingly, the filing of these three patent applications could not constitute a breach of any contractual duty owed to Minebea or PMDM under Paragraph 9(a) of the Intangible Assets Agreement. Although claims that rely on the filing of applications for the later U.S. patents could have accrued after the termination of the joint venture, it is clear that no conversion claim based on the later-filed patents can succeed. Therefore, Minebea's conversion claims accrued no later than May 3, 1993, the date the joint venture terminated.

---

[78] Although PTX 1019 was included with the other exhibits in support of Mr. Dalziel's testimony, it appears never to have been offered in evidence, and was not included with plaintiffs' post-trial submission of trial exhibits.

Minebea's claim for "unjust enrichment" does not arise solely from Papst Motoren's alleged breach of the 1990 Intangible Assets Agreement, but may involve conduct by Papst Licensing after the joint venture was terminated. Therefore this claim theoretically could have accrued on a different date from its conversion claims. Although Minebea's statement of its claim under its restitution theory is too vague to allow for certain identification of the facts giving rise to it, the last act by Papst Licensing that possibly could have given rise to such a claim is Papst Licensing's purchase of the Papst Motoren patent portfolio, which occurred on May 26, 1993. See PTX 482, Assignment Agreement (May 26, 1993). Accordingly, Minebea's unjust enrichment claim accrued no later than May 26, 1993, nearly four years before the complaint in this case was filed.

b.  The law of inquiry notice

When the fact of an injury is not immediately apparent, or when the facts giving rise to a claim have been concealed by the defendant, the limitations period does not begin to run until the plaintiff has actual or inquiry notice of the facts giving rise to the claim. See In re Estate of Delaney, 819 A.2d 968, 982 (D.C. 2003) (cause of action accrues "when the plaintiff has either actual notice of her cause of action or is deemed to be on inquiry notice because if she had met her duty to act reasonably under the circumstances in investigating matters affecting her affairs, such investigation, if conducted, would have led to actual notice"); Farris v. Compton, 652 A.2d 49, 54 (D.C. 1994) ("If the existence of an injury is not readily apparent, however, the claim does not accrue until the plaintiff, exercising due diligence, has 'discovered or reasonably should have discovered all of the essential elements of her possible cause of action[.]'"). It is not necessary that a party have notice of its specific legal claims: "the focus of the rule is on when

184

[the plaintiff] gained <u>general</u> knowledge [that she had been injured], not on when she learned of

the *precise* legal remedies [for the injury]."  <u>In re Estate of Delaney</u>, 819 A.2d at 982 (quoting

<u>East v. Graphic Arts Indus. Joint Pension Trust</u>, 718 A.2d 153, 157 (D.C. 1998)) (emphasis and

modifications in original).  The existence of a fiduciary relationship between a plaintiff and

defendant "does not alter the rule that the limitations period [begins] to run as soon as the

[plaintiff is] on inquiry notice."  <u>Ray v. Queen</u>, 747 A.2d 1137, 1142 & n.6 (D.C. 2000).

Nonetheless, whether a plaintiff has exercised reasonable diligence is a highly fact-bound issue

requiring an evaluation of all of the circumstances, including the nature of the relationship

between the plaintiff and defendant. <u>See</u> <u>id.</u>; <u>Diamond v. Davis</u>, 680 A.2d 364, 372 (D.C. 1996).

  Although the parties did not brief the issue, there is some question as to which

side bears the burden of persuasion with respect to the existence of inquiry notice.  Normally, a

defendant asserting an affirmative defense such as the statute of limitations bears the burden of

demonstrating that the plaintiff's claims are time-barred, but most jurisdictions hold that the

burden shifts back to a plaintiff who invokes an exception to the statute of limitations.  <u>See</u>, <u>e.g.</u>,

<u>O'Connor v. Boeing N. Am.</u>, 311 F.3d 1139, 1150 (9th Cir. 2002); <u>Nelson v. Sandoz Pharms.</u>

<u>Corp.</u>, 288 F.3d 954, 967 (7th Cir. 2002); <u>Ashcraft & Gerel v. Coady</u>, 244 F.3d 948, 954 (1st Cir.

2001); <u>Drazan v. United States</u>, 762 F.2d 56, 60 (7th Cir. 1985).  "Because the statute of

limitations is an affirmative defense, the burden is on the defendant to show that the statute of

limitations has run. If the defendant meets this requirement then the burden shifts to the plaintiff

to establish an exception to the statute of limitations."  <u>Campbell v. Grand Trunk W.R.R. Co.</u>,

238 F.3d 772, 775 (6th Cir. 2001).  When, however, the wrong remains undiscovered because it

is by its nature "self-concealing," or because the defendant has taken affirmative steps to conceal

it, the defendant bears the burden of proving that the plaintiff was on inquiry notice of its claims.

See Hobson v. Wilson, 737 F.2d 1, 35 (D.C. Cir. 1984) (quoting Richards v. Mileski, 662 F.2d

65, 71 (D.C. Cir. 1981) ("When tolling is proper because the defendants have concealed the very

cause of action . . . they have the burden of coming forward with any facts showing that the

plaintiff could have discovered . . . the cause of action if he had exercised due diligence."))[79]

In this case, the Court finds that no affirmative acts of concealment have been

proven, that the alleged wrong was not "self-concealing," and that the plaintiff is "well-situated

to discourse upon the scope of [its] knowledge concerning [its] cause of action." Brown v. NAS,

844 A.2d 1113, 1119 (D.C. 2004) (quoting Diamond v. Davis, 680 A.2d at 376).  The Court

therefore finds it appropriate to require plaintiffs to carry the burden of proving that they could

not have discovered their claims by the exercise of due diligence.  Accordingly, to prevail on its

conversion claims, Minebea must show by a preponderance of the evidence that it did not know

of and could not by the exercise of reasonable diligence have discovered its injury before March

---

[79]     Although Minebea argues that Papst Motoren and Georg Papst concealed the accrual of Minebea's cause of action by their "failure to inform" Minebea or PMDM of the relevant facts,  see Minebea Opp. at 65, this inaction is insufficient to demonstrate fraudulent concealment.  To prove fraudulent concealment, a plaintiff generally must show that the defendant has "done something of an affirmative nature designed to prevent discovery of the cause of action."  William J. Davis, Inc. v. Young, 412 A.2d 1187, 1191-92 (D.C. 1980) (emphasis added).  "[M]ere silence, failure to disclose, or ignorance of facts establishing a claim may not ordinarily constitute fraudulent concealment."  Id.  The requirement of an affirmative act exists even where the defendant has a fiduciary obligation to the plaintiff.  See Weisberg v. Williams, Connolly & Califano, 390 A.2d 992, 996 (D.C. 1978) ("Concealment will exist if the attorney has knowingly made false representations; it is only then that his conduct, by way of estoppel or otherwise, will toll the running of the statute.").

25, 1994, three years before the date on which it filed its complaint.  See Diamond v. Davis, 680

A.2d at 381.[80]

### c.  Was Minebea on inquiry notice?

Papst claims that Minebea was put on inquiry notice of the existence of Papst

Motoren's pending U.S. patent applications (and therefore the existence of Minebea's claims) by

two documents.  First, Article 7 of, and Exhibit B for, the May 3, 1993 Termination Agreement

listed the German counterparts of the United States patents at issue, and described them as

having "arisen or [been] acquired by [Papst Motoren] during the life of the [Intangible Assets

Agreement]."  PTX 470, 1993 Termination Agreement (May 3, 1993), Article 7; DTX 278,

Exhibit B for the Termination Agreement.  This, Papst argues, afforded Minebea notice of the

conduct Minebea claims constitutes breach of the Intangible Assets Agreement.  Second, a May

26, 1993 letter to Minebea reporting the sale of Papst Motoren's patent portfolio to Papst

Licensing stated that Papst had "authorized and requested the commissioner of Patents and

Trademarks of the United States to issue all letters patents for the applications included in Papst

Patent Rights to Papst Licensing[.]"  See PTX 485, Letter to Minebea re: Assignment of Patent

Rights to Papst Licensing GmbH (May 26, 1993).  Papst argues that "no reasonable person could

doubt that if Minebea had met its 'duty to act reasonably under the circumstances in investigating

matters affecting [its] affairs,' then it would have known all that it needed to know regarding its

---

[80]     The law of the District of Columbia is not settled as to which party bears the
burden of showing "reasonable diligence" (or a lack thereof) when fraudulent concealment or a
"self-concealing wrong" has not been shown.  See Diamond v. Davis, 680 A.2d at 375 & n.10.

alleged conversion claims by [the end of] May 1993." Papst Post-Trial Brief at 85 (citations omitted) (quoting In re Estate of Delaney, 819 A.2d at 982).

Minebea responds that Georg Papst, Papst Motoren and Papst Licensing concealed the accrual of Minebea's cause of action through their "failure to inform Minebea and PMDM of what they knew with respect to patents that were being and would be developed in the name of Papst Motoren and Papst Licensing, instead of PMDM." Minebea Obj. to Papst Prop. Concl. of Law ¶ 145 at 293. According to Minebea, "Papst's purposeful failure to meet its fiduciary obligations [to PMDM] and G. Papst's continued role as Geschäftsführer [Managing Director] of PMDM during the termination of the joint venture effectively concealed the conversion of the patents, tolling the statute of limitations." Minebea Opp. at 65.

The Court concludes that Minebea has not met its burden of showing by a preponderance of the evidence that it could not, by the exercise of reasonable diligence, have discovered the facts giving rise to its claims, and that it was not on inquiry notice before March 25, 1994, three years before it filed its complaint in this case. To the contrary, the evidence demonstrates clearly that Minebea was on inquiry notice of its claims no later than the end of May 1993.

In Article 7 of the Termination Agreement, Papst Motoren disclosed that it held patents that had "arisen or [been] acquired" by it during the time of the joint venture. PTX 470, 1993 Termination Agreement (May 3, 1993), Article 7. Exhibit B for the Termination Agreement disclosed the specific identities and application dates of the German patents fitting that description, as well as the fact that at least some of those patents had "foreign corresponding Patent Applications." DTX 278, Exhibit B for the Termination Agreement. If Papst Motoren

188

breached the Intangible Assets Agreement by registering patents in its own name during the joint

venture, then the Termination Agreement itself informed Minebea directly that such a breach had

occurred (though with respect to the listed German patents, rather than the U.S. patents at issue

in Minebea's conversion claim).[81]  This alone was enough to put Minebea on inquiry notice of its

claims by May 3, 1993.

      If there were any doubts as to this fact, however, Papst Motoren's letter to

Minebea of May 26, 1993, further informed Minebea that Papst had some United States patent

applications pending, even if it did not specify the particular German patents to which those

applications corresponded.  See PTX 485, Letter to Minebea re: Assignment of Patent Rights to

Papst Licensing GmbH (May 26, 1993) ¶ 3.  Once this information was in Minebea's possession,

"reasonable diligence" would have demanded that Minebea inquire of Papst Motoren whether it

had filed United States patent applications for hard disk drive motor inventions during the period

of the joint venture.  See Ray v. Queen, 727 A.2d at 1141.[82]

---

[81]    The requirement of Paragraph 9(a) of the Intangible Assets Agreement that new patents be developed and registered in PMDM's name applies only to patents "applicable only to HDD Motors."  PTX 195, Intangible Assets Agreement (Nov. 5, 1990) ¶ 9(a).  Had Minebea examined the ten German patents listed in Exhibit B for the 1993 Termination Agreement, it could have determined whether they were "applicable only to HDD Motors."

[82]    For Minebea to have discovered the United States patent applications relevant to its conversion claim, it likely would have needed to inquire of Papst Motoren or Georg Papst whether any such patent applications had been filed, because at the time in question patent applications pending with the United States Patent Office were not publicly available.  See Minebea Opp. at 64; see Bryson Act, § 122, 82 Pub. L. 593, 66 Stat. 792, 801 (1952) (current version at 35 U.S.C. § 122).  Because there is no evidence to indicate otherwise, and because Minebea bears the burden of persuasion here, the Court infers that if such an inquiry had been made, Papst Motoren and/or Georg Papst would have divulged their existence.  The Court draws this conclusion not because of any fiduciary duty owed by Papst Motoren or Georg Papst, but because in the absence of any evidence to the contrary the Court will not assume that Papst would have fraudulently concealed the facts giving rise to Minebea's cause of action.

Although it might have been reasonable for Minebea not to have inquired <u>during</u> the period of the Joint Venture whether Papst Motoren had breached the Intangible Assets Agreement, and to have expected Papst Motoren or Georg Papst as fiduciaries of PMDM to disclose (without prompting by Minebea) information that would reveal such a breach, this was no longer true after the termination of the joint venture.[83]   The Termination Agreement of May 3, 1993 specifically ended the parties' cooperation in the development and manufacture of hard disk drive motors.   Minebea bought out Papst Motoren's share of the joint venture, and the General Business Agreement and most of the other existing agreements between Papst Motoren and Minebea terminated.   <u>See</u> PTX 470, 1993 Termination Agreement (May 3, 1993), Articles 1, 2. Although PMDM's Articles of Association were to remain in force, it was agreed that Papst Motoren would "no longer have any duties and/or obligations out of these legal instruments and with regard to [PMDM]."   <u>Id.</u>, Article 5.1.   The parties also agreed that Papst Motoren would no longer "bear any duties and/or obligations whatever out of" another surviving set of agreements between PMDM and Minebea.   <u>Id.</u>, Article 10.   Essentially, all that remained after the Termination Agreement was signed was a patent licensing agreement between Papst Motoren

---

[83]     With the General Business Agreement, Papst Motoren and Minebea expressed their intent "to closely cooperate in the field of HDD motors" by means of the joint venture.   <u>See</u> PTX 169, General Business Agreement (Oct. 2, 1990) at 2.   During the time of the joint venture, before the intended transfer of Papst Motoren's HDD Motor Division to PMDM could take place, the patent business of PMDM was handled by Papst Motoren, and Minebea had no choice but to rely on Papst Motoren for information about patent operations.   <u>See</u> 7/5/05 (p.m.) Trial Tr. at 70:25-72:13 (Kuwert testim.); 2/11/05 Lenz Hague Tr. Question A3.   Both parties' German law experts agreed that if Papst Motoren and Georg Papst were fiduciaries of PMDM, they would have been obligated to disclose information relevant to the interests of the joint venture, including information (to which Minebea was not privy) regarding Papst Motoren's registration of patents in its own name.   <u>See</u> Expert Report of Christopher Ann (June 20, 2005) at 15 (duty to inform and disclose); Expert Report of Andreas Junius (June 20, 2005) at 17 (fiduciary duty of Georg Papst).

and Minebea/PMDM.  See id., Articles 7, 9.  Minebea therefore could not reasonably have relied

on Papst Motoren (without some inquiry by Minebea) to keep it abreast of its patent activities

after May 3, 1993.  Again, however, in the absence of evidence to the contrary, the Court will not

assume that Papst would not have responded to any inquiry made of it by providing accurate

information.  See supra at note 82.

   For his part, Georg Papst was called upon to resign as Managing Director of

PMDM as a condition of the Termination Agreement, and his termination was sealed by the

PMDM shareholder resolution of August 5, 1993.  See PTX 470, 1993 Termination Agreement

(May 3, 1993), Article 5.3; DTX 308, PMDM Shareholder Resolution (Aug. 5, 1993).  Georg

Papst's fiduciary duties to PMDM effectively terminated with his resignation.  See Junius Expert

Report at 17-18.  Accordingly, certainly after August 5, 1993, it was no longer reasonable for

Minebea to rely on Georg Papst to apprise PMDM of information about patents registered by

Papst Motoren.

   Because it had actual notice of Papst Motoren's (alleged) breach of the 1990

Agreement for the Sale of Intangible Assets by virtue of Papst Motoren's registration of German

patents in its own name, as well as notice of the existence of foreign patent applications

corresponding to those German patents, Minebea was on inquiry notice of the facts giving rise to

its conversion claims soon after its receipt of Exhibit B for the Termination Agreement and the

May 26, 1993 letter from Papst.  The possible existence of a fiduciary relationship between Papst

Motoren and/or Georg Papst and PMDM during the joint venture does not alter this fact, in light

of the fundamental change in the parties' relationship as a consequence of the termination of the

joint venture.  Had Minebea exercised reasonable diligence in "investigating matters affecting

[its] affairs," see In re Estate of Delaney, 819 A.2d at 982, it would have discovered Papst

Motoren's application for U.S. Patent Nos. 5,331,483 and 5,394,283, and thus the acts giving rise

to its cause of action.  Because it was on inquiry notice of its claims at least ten months before

March 25, 1994, the statute of limitations ran before Minebea filed its complaint and its claims in

Count V therefore are time-barred.

## 2.  Releases

Papst's second affirmative defense is that Minebea's claims against Papst

Licensing and Georg Papst are barred by several releases.  See Papst Br. at 85-88.  The first of

these is the August 5, 1993 PMDM shareholder resolution accepting Georg Papst's resignation as

Managing Director of PMDM.  See DTX 308, PMDM Shareholder Resolution (Aug. 5, 1993).

That resolution states that "Georg Friedrich Papst is no longer managing director of the

Company.  He will be discharged from his responsibility."  See id. ¶ 1.

Relying on the testimony of their respective experts, the parties agree that the

effect of this clause was to discharge Georg Papst from claims that were based on prior acts and

which Minebea (as sole PMDM shareholder at the time of the resolution) knew of or could have

discovered through the exercise of due diligence in reviewing the documents and records

available to it.  See Papst Br. at 86; Minebea Opp. at 66-67; Junius Expert Report at 38; Expert

Declaration of Christopher Ann (May 20, 2005) at 9, Ex. 40 to Ann Expert Report.  The effect of

this release, then, depends (like the application of the statute of limitations) on whether Minebea,

at the time of the release, was on inquiry notice of the facts giving rise to its conversion claims.

The Court already has found that, by virtue of the May 3, 1993 Termination Agreement and the May 26, 1993 letter announcing Papst Licensing's purchase of Papst Motoren's patent portfolio, Minebea was on inquiry notice of its conversion claims well before March 25, 1994.  See supra at 187-191.  The Shareholder Resolution was passed on August 5, 1993, but Minebea still had ample time (from May until early August) after its receipt of these documents to investigate its claims, if any, against Georg Papst while he was still Managing Director of PMDM.  Accordingly, the Court finds that Minebea was on inquiry notice of its Count V claims against Georg Papst when it passed the shareholder resolution, and that Georg Papst therefore is discharged from liability for these claims.[84]

Papst also argues that several releases contained in Article 3 of the Termination Agreement discharge Papst Motoren and Papst Licensing from liability for all claims under Count V.  See Papst Br. at 87-88.  Contrary to Papst's contention, however, these discharges – whatever their effect – do not apply to any of Minebea's claims arising under the Agreement for the Sale of Intangible Assets.

Part II of the Termination Agreement, entitled "Cessation of Agreements," specifies six agreements that ceased to be effective on the date the Termination Agreement took effect.  See PTX 470, 1993 Termination Agreement (May 3, 1993), Article 2.  The Agreement

---

[84]     As to Georg Papst, Papst also cites Article 5.3 of the Termination Agreement, which states that Minebea has "checked and established" that there are "no pending claims of any kind against" the resigning directors of PMDM (including Georg Papst), and those directors "are hereby granted discharge."  See PTX 470, 1993 Termination Agreement (May 3, 1993), Article 5.3.  The effect of this discharge is essentially the same as (and certainly is no greater than) that of the Shareholder Resolution – the waiver of claims against Georg Papst based on acts prior to the granting of the release, and of which Minebea had actual or inquiry notice.  Accordingly, the Court need not decide whether, at the time the Termination Agreement was signed, Minebea had inquiry notice of its claims against Georg Papst.

193

for the Sale of Intangible Assets is not among the agreements listed.  Article 3 further describes

the effects of this cessation.  Article 3.1 states that "The cessation agreed upon by this present TA

shall overrule and supersede any and all provisions listed in article 2 above . . . unless otherwise

provided for in this present TA."  Id., Article 3.1.  Article 3.2 states that:

> Unless expressly agreed upon differently in this present TA . . . any
> and all actions and performance of contractual duties taken . . . on
> grounds of the agreements now ceasing, shall remain valid, and
> everything and/or anything received by one party shall remain the
> property of the party having received it.  There shall be no claim
> for return and/or restitution.

PTX 470, 1993 Termination Agreement (May 3, 1993), Article 3.2.  Article 3.3 states that:

> [T]here shall no longer by any claim between the parties for
> consideration in respect of any performances of contractual duties
> made by one party of the ceasing agreements to the other on
> grounds of the agreements now ceasing.  The Parties shall consider
> the ceasing agreements as fulfilled.

Id., Article 3.3  Finally, Article 3.4 provides that "the parties to the ceasing agreements do hereby

renounce any and all conceivable claims that may have arisen or may appear to arise from the

ceasing agreements."  Id., Article 3.4.

Although the parties dispute whether the discharge of liability afforded by these

releases extends to claims of which Minebea or PMDM did not have inquiry notice, it is clear

that the waiver extends only to claims arising only under the "ceasing agreements" – a group of

agreements that does not include the Agreement for the Sale of Intangible Assets.  Although the

Termination Agreement provides that some provisions of the Intangible Assets Agreement –

including the relevant portion of Paragraph 9(a) – would cease to be effective upon

implementation of the Termination Agreement, this is not set forth in Articles 2 and 3, where the

"ceasing agreements" and the associated releases from liability are described.  Rather, the partial

194

termination of the Intangible Assets Agreement is addressed in Article 9, see PTX 470, 1993

Termination Agreement (May 3, 1993), Article 9, while Article 3 clearly indicates that the

releases contained therein apply only to claims under agreements listed in Article 2:  "The

cessation agreed upon by this present TA shall overrule and supersede any and all provisions

listed in article 2 above[.]"  Id., Article 3.1 (emphasis added).  The Intangible Assets Agreement

is not listed in Article 2, and the Article 3 releases do not apply to the parties' obligations

thereunder.[85]  Because Minebea's conversion claims arise from the alleged breach of the

Intangible Assets Agreement, and not from any of the "ceasing agreements," these releases are of

no effect in relation to Minebea's Count V claims.[86]

### 3.  The Mannheim Court Decision

Finally, Papst argues that the Court should follow the 1998 decision of the

Regional Court of Mannheim, Germany, dismissing a case brought by PMDM against Papst

Licensing seeking the reassignment of a single German patent from Papst Licensing to PMDM

under German patent law.  See Papst Br. at 88-90.  In a February 4, 2003 Memorandum Opinion

and Order denying Papst's motion for partial summary judgment on the same grounds, the Court

concluded that "defendants [had] not shown that the issues raised in Count V are identical to

those decided by the German court[,]" and that genuine issues of material fact existed with

respect to this matter.  Minebea Co. v. Papst, No. 97-0590, 2003 U.S. Dist. LEXIS 26664 at *5

---

[85]     The Intangible Assets Agreement also is the only prior agreement between the
parties specified in the Termination Agreement to survive only in part.

[86]     Dr. Ann reached a similar conclusion in his expert report.  See Ann Expert Report
at 5.  Dr. Junius did not address this argument in his rebuttal report.

(D.D.C. Feb. 4, 2003); <u>see also</u> Memorandum Opinion and Order (June 24, 2005) (Docket No. 1110) at 3 ("Even if the waivers contained in the Termination Agreement applied facially to Minebea in this case, it would be improper for this Court to systematically follow the German court's previous ruling which involved different parties and presumably different evidence than that involved here.").  Upon consideration of the evidence offered by the parties at trial, the Court finds that Papst still has failed to demonstrate an identity of issues between the Mannheim case and the litigation here.

The Mannheim court relied to a significant degree on Article 7 and Exhibit B for the Termination Agreement, which listed the single German patent at issue in that case as having been registered by Papst Motoren.  The court concluded that by signing the Termination Agreement, Minebea (and by extension PMDM) agreed that Papst Motoren rightfully owned the invention underlying the German patent of which PMDM sought reassignment.  <u>See</u> DTX 619, Judgment of the Regional Court of Mannheim (Feb. 24, 1998) at 13-14 (English transl.), Ex. 8 to Expert Report of Andreas Junius (June 20, 2005).  As this Court already has concluded, however, Minebea's conversion claims accrued not when Papst Motoren assigned to itself the inventions developed during the Joint Venture, but rather, when it filed applications for United States patents in its own name during the Joint Venture.  <u>See</u> <u>supra</u> at 182.  Accordingly, the Mannheim decision considered issues distinct from those in question here, and consequently is not applicable.

### C.  The Merits of Minebea's Count V Claims

Notwithstanding its conclusion that Minebea's Count V claims are time-barred and that PMDM (and thus Minebea) waived its claims against Georg Papst, the Court nevertheless will consider each of the claims in Count V on its merits.

### 1.  Conversion by Breach of Contract

Minebea first seeks relief based on Papst's alleged breach of the term of the Agreement for the Sale of Intangible Assets requiring that "new patents applicable only to HDD Motors shall be developed and registered under the name of [PMDM] and [PMDM] shall own and maintain such new patents."  PTX 195, Agreement for the Sale of Intangible Assets (Nov. 5, 1990) ¶ 9(a).  According to Minebea, by assuming ownership of the inventions of Papst Motoren employees pursuant to the German Employee Invention Act, Papst Motoren breached the Intangible Assets Agreement, giving rise to a claim of conversion under German law.  See Minebea Br. at 88-89; Minebea's Prop. Concl. of Law ¶¶ 4.1.4, 4.1.5.  The Court concludes that such a claim is not authorized under German law.

Minebea argues that its expert, Dr. Ann, testified that under German law a conversion claim "can arise from a breach of contractual obligations."  Minebea Br. at 84.  Dr. Ann in fact testified that a patent conversion claim may "be based on a contract between claimant and defendant that defendant refuses to honor."  Expert Report of Christopher Ann (June 20, 2005) at 28 (emphasis added).  He did not, however, state that a breach of contract, standing alone, could give rise to a conversion claim.  Rather, Dr. Ann testified that a breach of contract also could underlie a breach of trust under Section 266 of the German Penal Code ("StGB") or willful infliction of damage contrary to public policy in violation of Section 826 of the German

197

Civil Code ("BGB").  See id.  No legal authority cited in Dr. Ann's initial or rebuttal report

supports the notion that a breach of contract can give rise to a claim for conversion under

German law.  Accordingly, Minebea's claim on this ground fails.

> In any event, any claim based solely on Papst Motoren's alleged breach of

contract must fail because no defendant in this case was a party to the Agreement for the Sale of

Intangible Assets.  Minebea and Papst Motoren signed the Agreement – not Papst Licensing

(which did not exist when the Agreement was signed) and not Georg Papst.  See Papst Post-Trial

Brief at 79.  As Minebea's own expert testified, "[u]nder German law, agreements cannot legally

bind non-parties, including corporate affiliates or subsidiaries."  Expert Declaration of

Christopher Ann (May 20, 2005) at 9, Ex. 40 to Ann Report; see also Rebuttal Report of

Christopher Ann (July 4, 2005) at 8.  Accordingly, Papst Licensing and Georg Papst cannot be

held liable for Papst Motoren's alleged breach of contract.

> Minebea claims that Papst Licensing and Georg Papst nonetheless are the "proper

parties for this claim" because:  (1) Papst Licensing currently holds the U.S. patents sought by

Minebea; (2) Georg Papst, as Managing Director of Papst Motoren and PMDM on the dates to

which the converted patents claim priority, should have known about the improper assignment of

the inventions to Papst Motoren; and (3) "Papst Licensing should have known that it did not have

a legal right to the patents when it accepted assignment of the patents."  Minebea Opp. at 62-63.

Assuming for the sake of argument that all of these asserted facts are true, no departure from the

usual rule under German law is justified.

> Dr. Ann's rebuttal report states that "[e]xceptions to this rule [that a non-party

cannot be bound by a contract] have . . . been made in cases with a special set of facts, e.g. in

which the third and the obliged party had worked together in a collusive fashion to the detriment

of the other partner." Ann Rebuttal Report at 8. Dr. Ann does not, however, state the legal basis

for such an exception (he cites without explanation a commentary on Section 826 of the BGB),

nor does he discuss any of the factors that are relevant under German law to determining whether

an exception should apply. Dr. Ann's report states only that "[h]ere special circumstances could

be seen in the fact that it had always been the same person in charge of operations: <u>Georg Papst</u>

had controlled <u>PM KG</u> [Papst Motoren] as well as <u>PMDM</u>. . . . both companies knew why it was

important to obtain control of patents that rightfully should have belonged to <u>PMDM</u>." Ann

Rebuttal Report at 8 (emphasis in original).[87]

      The Court does not credit Dr. Ann's conclusory statement that Papst Licensing

should be held to Papst Motoren's contract on these facts. The purpose of expert testimony such

as that of Dr. Ann is to aid the court in determining the content of the applicable foreign law –

not to apply it to the facts of the case. <u>See</u> FED. R. CIV. P. 44.1. Furthermore, the Court is not

obliged to credit the parties' partisan application of the governing law. <u>See</u> FED. R. CIV. P. 44.1

advisory committee's note to 1966 amendment; 9 CHARLES A. WRIGHT & ARTHUR R. MILLER,

FEDERAL PRACTICE & PROCEDURE § 2444 & n.14 (2005) ("All too often counsel will do an

inadequate job of researching and presenting foreign law or will attempt to prove it in such a

partisan fashion that the court is obliged to go beyond their offerings."). In any event, the facts

cited by Dr. Ann – Papst Licensing's supposed knowledge, through Georg Papst, of the

importance of the patents in question to PMDM – are insufficient to demonstrate that Papst

---

[87]    Dr. Ann does not state that there is any justification for holding Georg Papst, in
his personal capacity, to the Intangible Assets Agreement.

Licensing and Papst Motoren "worked together in a collusive fashion" to the detriment of

PMDM or Minebea.  See Ann Rebuttal Report at 8.  Accordingly, neither Papst Licensing nor

Georg Papst can be held liable for Papst Motoren's alleged breach of the Agreement for the Sale

of Intangible Assets.[88]  Finally, there is no legal basis whatsoever for Minebea's argument that

Papst Licensing should be held liable for Papst Motoren's breach of contract simply because

Papst Licensing now holds the U.S. patents Minebea wishes to recover.  The mere fact that Papst

Licensing has what Minebea wants does not give Minebea a claim against Papst.

In sum, Minebea's claim of conversion based on the alleged breach of the

Agreement for the Sale of Intangible Assets fails because:  (1) a breach of contract, standing

alone, is insufficient to support a conversion claim under German law; (2) neither Georg Papst

nor Papst Licensing signed the Agreement or was a party to it, and Minebea has offered no

justification for holding either liable for Papst Motoren's alleged breach of that contract; and

(3) Minebea failed to file its claim within the applicable statute of limitations.

### 2.  German Penal Code Claim

Minebea claims that it has "proven conversion under Section 823 of the German

Civil Code, which provides a civil law remedy where there has been a violation of the German

---

[88]     Dr. Junius also testified that under German law, Papst Licensing could only be held vicariously liable for acts undertaken by Georg Papst on behalf of Papst Licensing – and not for actions taken by Georg Papst before Papst Licensing even existed.  See Expert Report of Andreas Junius (June 20, 2005) at 12.

The Court's conclusion that Papst Motoren alone could be held liable for its breach of the Intangible Assets Agreement also dooms Minebea's other "conversion" claims, as they all arise from the alleged breach.

Penal Code." Minebea Br. at 84-85. Minebea argues that in this case Papst Licensing has

violated Section 266 of the German Penal Code, which provides that:

> Whoever . . . violates the duty to safeguard the property interests of
> another incumbent upon him by reason of . . . legal transaction or
> fiduciary relationship, and thereby causes detriment to the person,
> whose property interests he was responsible for, shall be punished
> with imprisonment for not more than five years or a fine.

See Ann Rebuttal Report at 6-7.

Minebea appears to assert that Papst Licensing and Georg Papst violated Section

266 StGB by: (1) breaching Paragraph 9(a) of the Agreement for the Sale of Intangible Assets,

and (2) breaching their "fiduciary relationship with PMDM with respect to PMDM's right to

certain patents." Minebea Br. at 85; see also Minebea Opp. at 61. This claim fails against both

Papst Licensing and Georg Papst, for several reasons.

First, Section 823 authorizes only the recovery of damages, not the reassignment

of property rights that Minebea seeks. See Ann Expert Report at 28.[89] Furthermore, neither

Papst Licensing nor Georg Papst could have violated Section 266 StGB by breaching the

Intangible Assets Agreement because, as has been discussed, neither was a party to the contract.

It appears unlikely that even Papst Motoren, which was a party to the Agreement

for the Sale of Intangible Assets, could have violated Section 266 StGB by breaching Paragraph

9(a) of the Agreement. According to the German law authority cited by both sides:

> The elements of breach of trust in Section 266 StGB assume legal
> relationships in which the perpetrator is obligated to care for assets
> for a third party's benefit within a not-insignificant area of duty . . .

---

[89]     Needless to say, an accounting is an equitable remedy that may require the
payment of money; but such payment does not constitute damages, which is a remedy at law, not
in equity.

> The preservation of third-party pecuniary interests must constitute
> <u>the material content of the contractual relationship and not be only</u>
> <u>of subordinate importance.</u>

OLG Düsseldorf NJW 2000, 529-30, Appendix 3 to Minebea's Opposition to Papst's Post-Trial

Brief (English translation) (emphasis added); Rebuttal Report of Andreas Junius (July 6, 2005)

at 4.

Even assuming that Papst Motoren had a duty under the Intangible Assets

Agreement to "care for assets for a third party's benefit" by assuring that new patents would be

developed under the name of PMDM, it is clear from the contract that this duty was "only of

subordinate importance."  <u>See</u> OLG Düsseldorf NJW 2000, 529-30.  Rather than setting out this

duty in an independent term of the contract, the parties only "confirm" their intention that new

patents be developed and registered under the name of the joint venture, in a section of the

contract devoted almost exclusively to setting forth the terms of a licensing agreement between

Papst Motoren and Minebea that was only intended to take effect upon termination of the joint

venture.  PTX 195, Agreement for the Sale of Intangible Assets (Nov. 5, 1990) ¶ 9(a).  Papst

Motoren's obligations regarding the registration of patents therefore were not "the material

content of the contractual relationship," and a breach thereof could not constitute a violation of

Section 266 StGB.  <u>See</u> OLG Düsseldorf NJW 2000, 529-30.

Minebea also attempts to base its claim under Section 266 StGB on Papst

Motoren and Georg Papst's "fiduciary relationship with PMDM with respect to PMDM's right to

certain patents."  Minebea Br. at 85.  According to Minebea, Georg Papst's and Papst Motoren's

"failure to safeguard" PMDM's interest in these patents "therefore gives rise to a civil law claim

under Section 823 of the German Civil Code."  <u>Id.</u>  Minebea's pursuit of a claim under this

theory, however, is an unwarranted attempt to resurrect its claim for breach of fiduciary duty (Count IV), which Minebea dismissed with prejudice before trial.  See Notice of Election to Maintain Withdrawal of Counts II, III, IV, and VI (June 30, 2005) (Docket No. 1185).  As set forth in the Second Amended Complaint, Minebea's claim for breach of fiduciary duty relies, inter alia, on assertions that Georg Papst and Papst Licensing owed a fiduciary duty to Minebea and PMDM, and that they breached that duty by "self dealing in the assets of PMDM . . . by inducing Minebea to relinquish valuable patent rights owned by the joint venture; and failing to observe the high standard of candor and good faith owed by a fiduciary."  2d Am. Compl. ¶¶ 112-15.  This is the essence of Minebea's claim that defendants have violated Section 266 StGB by breach of their fiduciary duty to PMDM.  Having dismissed this claim with prejudice, Minebea will not be heard to raise it again post-trial.

In any event, this claim fails as to Papst Licensing because Minebea has failed to demonstrate (or even argue in its post-trial briefs for) the existence of a fiduciary relationship between Papst Licensing and PMDM during the period of the joint venture.  As Papst Licensing did not come into being until after the termination of the joint venture, the existence of such a duty is highly unlikely.  And although Georg Papst owed certain duties to PMDM by virtue of his position as Managing Director, he was released from liability for such claims by the PMDM shareholder resolution of August 5, 1993.

Accordingly, Minebea's claims under Section 823 BGB and Section 266 StGB fail because:  (1) Section 823 BGB supports only a claim for damages, and not the requested remedy of patent reassignment and an accounting; (2) neither Papst Licensing nor Georg Papst was in a contractual relationship with Minebea; (3) Minebea dismissed with prejudice its claim

for breach of fiduciary duty; (4) Papst Licensing owed no fiduciary duty to PMDM or Minebea

during the time of the joint venture; (5) Georg Papst was released from liability by the PMDM

shareholder resolution of August 5, 1993; and (6) Minebea's claim is barred by the statute of

limitations.

### 3.  Unjust Enrichment

Minebea next asserts a claim of unjust enrichment under Section 812 of the

German Civil Code, which states: "(1) A person who, through an act performed by another, or in

any other manner, acquires something at the expense of the latter without any legal ground, is

bound to return it to him[.]"  Ann Rebuttal Report at 8 (citing Section 812 BGB); Minebea Br. at

86.  Beyond the partial recitation of this Code section, however, Minebea provides no

information or testimony as to the actual elements of this claim under German law.  Even

Minebea's expert, Dr. Ann, indicates that there are additional elements to the claim that may not

be satisfied in this case.  See Ann Rebuttal Report at 29 ("The relevant question is whether it

[Papst's alleged enrichment] was unjust in the sense in which Sec. 812 uses this term.").

In response to Dr. Ann's report, Papst's expert states that "Papst could only be

enriched at Minebea's expense within the meaning of § 812 BGB if Papst had unlawfully

acquired funds, assets or goods that, prior to such acquisition, were in the ownership or in the

possession of Minebea."  Junius Rebuttal Report at 6.  This assertion, though suggestive of a

rule, is not a statement of German law but rather an application of the law to the facts at hand.

Again, this is not the proper role of an expert witness in foreign law.  See FED. R. CIV. P. 44.1.

Accordingly, both parties have failed to provide an adequate statement of the law governing

unjust enrichment under Section 812 BGB.[90]  And the burden of proof, of course, is on Minebea, the plaintiff in this case.

While the parties' failings with respect to foreign law could be remedied by the Court through its own research into foreign law, see FED. R. CIV. P. 44.1 (the court "may consider any relevant material or source . . . whether or not submitted by a party"); 9 FEDERAL PRACTICE & PROCEDURE § 2444 at 648 & n.14, the Court is not obligated to conduct such an inquiry.  See 9 MOORE'S FEDERAL PRACTICE § 44.1.04[3] at 44.1-15 (2002 ed.).  Rather, "when both parties have failed to prove foreign law, the forum may say that the parties have acquiesced in the application of the local law of the forum."  Oparaugo v. Watts, 884 A.2d 63, 71 (D.C. 2005); see also 9 FEDERAL PRACTICE & PROCEDURE § 2447 at 659 & n.3; RESTATEMENT (SECOND) OF CONFLICTS § 136, cmt. h (1971) ("where either no information, or else insufficient information, has been obtained about the foreign law, the forum will usually decide the case in accordance with its own local law except when to do so would not meet the needs of the case or would not be in the interests of justice. The forum will usually apply its own local law for the reason that in this way it can best do justice to the parties.").

This case has been pending for over nine years.  With seemingly boundless litigation resources at their disposal, the parties have had ample opportunity to determine for themselves the German law governing the case and to introduce materials to aid the Court in making its determinations.  Nonetheless, the parties have failed to provide the Court with

---

[90]        Dr. Junius did testify to the legal rule that "the non-fulfilment of a certain contract by the party owing the fulfilment does, in general, not give rise to a claim of the other party under § 812 BGB."  Junius Rebuttal Report at 6.  Because Papst Licensing was not a party to the Agreement for the Sale of Intangible Assets, however, this rule has no relevance here.

relevant material sufficient to allow a reasoned assessment of Minebea's claim under Section 812

BGB.[91]  It would impose an "extreme burden on the court" to conduct further independent

research on the German law of claims that the parties have, up to now, been unable even to

define with specificity.  See Fed. R. Civ. P. 44.1 advisory committee's note to 1966 amendment.

The Court concludes that in this situation "it can best do justice to the parties" by applying the

law of the forum to this claim and determine whether Minebea has proved its case under that law.

See Restatement (Second) of Conflicts § 136, *cmt. h*.  Accordingly, the Court will consider

Minebea's claim of unjust enrichment under District of Columbia law.[92]

The common law principle of unjust enrichment, as embraced by District of

Columbia law, is "founded on the principle that no one ought unjustly to enrich himself at the

expense of another, and the gist of the action is that the defendant has received money which in

equity and good conscience should be paid to the plaintiff."  Hillyard v. Smither & Mayton, Inc.,

---

[91]     Had plaintiff's theories of relief been sufficiently clear before the case went to trial, the Court could have demanded a more "complete presentation by counsel" of the German law at issue in the case.  See Fed. R. Civ. P. 44.1 advisory committee's note to 1966 amendment. Plaintiff, however, declined to provide clear descriptions of its legal theories of conversion until the eve of trial, and even then advanced somewhat different theories of relief in its post-trial briefs.  For example, Minebea's summary of its conversion claims, filed on July 1, 2005, states that it asserts a claim of Willful Infliction of Damage Contrary to Public Policy under Section 826 of the German Civil Code.  See Minebea's Summary of Its Conversion Claims (July 1, 2005) (Docket No. 1204) at 2.  Such a claim appears nowhere in Minebea's post-trial brief or proposed conclusions of law.  Furthermore, as the Court discusses in Section IV of Part Two of this Opinion (Count X), Minebea asserts in its post-trial briefs a theory of subjective bad faith that it specifically disavowed in pretrial proceedings.  See infra at 223-224.

[92]     The parties did not, of course, litigate the issue of which state's law should govern this issue in the event German law could not be discerned.  The Court recognizes that New York law also could apply; however, because the law of unjust enrichment in New York is substantially the same as that in the District of Columbia, applying New York law would not change the outcome.

76 A.2d 166, 167 (D.C. 1950); see also Nacional Financiera, S. A. v. Banco de Ponce, 120

N.Y.S.2d 373, 415 (N.Y. 1953) ("Since the action for money had and received is founded upon

the principle that no one ought unjustly to enrich himself at the expense of another, in order to

recover, the plaintiff 'must show that it is against good conscience for the defendant to keep the

money.'") (citing Schank v. Schuchman, 212 N.Y. 352, 358 (1914)).  "In such a case, the

recipient of the benefit has a duty to make restitution to the other person 'if the circumstances of

its receipt or retention are such that, as between the two persons, it is unjust for [the recipient] to

retain it.'"  4934, Inc. v. District of Columbia Dep't of Employment Servs., 605 A.2d 50, 55-56

(D.C. 1992) (quoting RESTATEMENT OF RESTITUTION § 1, cmt. a (1937)); see also Miller v.

Schloss, 218 N.Y. 400, 407 (1916).  The Court finds this not to be the case here.

        In the first place, Papst Licensing was not "enriched" by its purchase of Papst

Motoren's patent portfolio.  Neither Minebea nor PMDM ever afforded any direct benefit to

Papst Licensing, and Papst Licensing paid substantial consideration to Papst Motoren for its

patent portfolio.  See PTX 487, Purchase Contract Between Papst-Motoren GmbH and Papst

Licensing GmbH (May 26, 1993) § 5(1).  Furthermore, Minebea knew of and assented to the

intended purchase before it occurred.  See PTX 470, 1993 Termination Agreement (May 3,

1993), Article 1.2(c) ("it is being considered by the Parties that [Papst Motoren] may transfer all

patents and patent applications into a company separate from [Papst Motoren], named Papst

Licensing GmbH[.]").  Papst Motoren gave Minebea notice of the German patents it had

registered in its own name during the joint venture, and indicated that there were corresponding

foreign patent applications.  See DTX 278, Exhibit B for the Termination Agreement.  Under

these circumstances, the Court cannot conclude that it would be unjust for Papst Licensing to retain the United States patents at issue.[93]

Because Minebea has failed to prove that it would by unjust for Papst Licensing to retain ownership over the United States patents at issue in Count V, and because the claim is time-barred, Minebea's claim for unjust enrichment fails.[94]

### 4.  Claim for an Accounting

Although in earlier filings with the Court Minebea stated that it sought the remedy of an accounting for its claims of conversion and unjust enrichment, in the Court's judgment Minebea has abandoned that claim.  It filed no proposed conclusions of law or findings of fact in support of a claim for an accounting, and adduced no evidence, argument or legal authority in support of its request.  The only mention of Minebea's desire for an accounting in its post-trial briefs is a single footnote stating that "Minebea has also requested that the Court grant an

---

[93]     Even if the Court were to rely, to the extent it could, on the parties' deficient statements of German law, Minebea's claim still would fail.  Minebea has not shown that Papst Licensing's acquisition of the patents in question was unjust in the sense of being "without any legal ground," as required by Section 812 BGB.  As Minebea acknowledges, Papst Motoren's acquisition of inventions developed by its employees and the subsequent registration of patents on those inventions was authorized by Section 6 of the German Employee Invention Act, even if it was in contravention of the terms of the Agreement for the Sale of Intangible Assets.  See Minebea Br. at 85; see also Junius Expert Report at 26 ("The employer is the lawful owner of an employee's invention after the invention was utilized according to Section 6 of the German Employee Inventions Law.").  Papst Licensing paid "substantial consideration" to purchase Papst Motoren's patent portfolio.  See PTX 485, Purchase Agreement Between Papst Motoren & Papst Licensing (May 26, 1993).  It does not appear, therefore, that Papst Licensing's ownership of those patents is "without any legal ground."

[94]     Minebea's unjust enrichment claim against Georg Papst also fails because Minebea has not demonstrated that Georg Papst ever "acquired" anything in this case, to say nothing of having done so at Minebea's expense.  The United States patents at issue in Count V are held by Papst Licensing, not Georg Papst.

accounting to determine if there are other patents which have been converted by Papst." Minebea Br. at 88 & n.36.[95]  In addition to the fact that Minebea has not prevailed on any of the substantive claims in Count V, so as to support the remedy of an accounting, this statement is manifestly insufficient to support Minebea's request.  Accordingly, the Court declines to order an accounting.

## IV.  COUNT X:  LICENSE RIGHTS AND BREACH OF CONTRACT

Count X of the Second Amended Complaint seeks a declaratory judgment of patent license rights and damages for lost profits incurred as a result of Papst's alleged breach of the 1995 Settlement Agreement.  Minebea claims that Papst breached both the express terms of the contract and the implied duty of good faith and fair dealing.  Because the Court concludes that Minebea's claims under Count X are without merit, it does not reach the parties' arguments about the proper measure of damages.

### A.  Breach of the Duty of Good Faith and Fair Dealing

In Count X of the Second Amended Complaint, Minebea claims that Papst breached the implied duty of good faith and fair dealing with respect to the 1995 Settlement

---

[95]      Minebea also mentions in its objections to Papst's Proposed Conclusions of Law that it seeks an accounting, but again offers no argument or authority in support of its request. See Minebea's Resp. to Papst's Prop. Concl. of Law ¶ 131 ("it should be noted that Minebea's request for an accounting is not limited to a determination of whether there are other converted patents, but also extends to a determination of the profits Papst has received as a result of its unjust enrichment . . . Papst should be required to disgorge to Minebea the money that it unjustly received for patents that should have been owned by PMDM.").

Agreement by suing or threatening to sue Minebea's customers for infringement of patents

owned by Papst Licensing.[96]

A duty of good faith and fair dealing is implied in every contract under New York

law.  See 511 West 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 153 (N.Y.

2002).[97]  The duty has been said to constitute an "'implied obligation to exercise good faith not to

frustrate [a] contract[] into which [one has] entered.'"  Cross & Cross Props., Ltd. v. Everett

Allied Co., 886 F.2d 497, 502 (2d Cir. 1989) (modifications in original) (quoting Lowell v. Twin

---

[96]    Although Minebea has never specified, either in its complaint or in its post-trial briefs, which patents it believes are at issue in Count X, there appear to be 19 patents under which Papst filed infringement claims against hard disk drive manufacturers:

U.S. Patent No. 4,519,010
U.S. Patent No. 4,535,373
U.S. Patent No. 4,922,406
U.S. Patent No. 5,216,557
U.S. Patent No. Re 32,702
U.S. Patent No. Re 34,412
U.S. Patent No. 5,424,887
U.S. Patent No. 5,446,610
U.S. Patent No. 5,557,487
U.S. Patent No. 5,661,351
U.S. Patent No. 5,708,539
U.S. Patent No. 5,729,403
U.S. Patent No. 5,777,822
U.S. Patent No. 5,796,548
U.S. Patent No. 5,864,443
U.S. Patent No. 6,801,900
U.S. Patent No. B1 Re 32,702
U.S. Patent No. Re 35,792
U.S. Patent No. Re 37,058

See PTX 2817, Patent Infringement Complaint (March 18, 1999); PTX 2815, Patent Infringement Complaint (July 15, 2002).

[97]    The 1995 Settlement Agreement is governed by New York law.  See PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶ 7.3.

Disc, Inc., 527 F.2d 767, 770 (2d Cir. 1975)), and "a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (N.Y. 1995).  See also RESTATEMENT (SECOND) OF CONTRACTS § 205, *cmt. a* (duty "varies somewhat with the context," but "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party").

The scope of the implied covenant of good faith and fair dealing is defined in part by "the justified expectations" of the contracting parties.  See RESTATEMENT (SECOND) OF CONTRACTS § 205, *cmt. a*.  A party may breach the covenant by violating an implied term of the contract.  See Times-Mirror Magazines, Inc. v Field & Stream Licenses Co., 294 F.3d 383, 394 (2d Cir. 2002) (covenant of good faith and fair dealing "includes 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included.'") (quoting Rowe v. Great Atlantic & Pacific Tea Co., 46 N.Y.2d 62, 69 (N.Y. 1978)). Nonetheless, "no obligation can be implied that would be inconsistent with other [express] terms of the contractual relationship." Dalton v. Educ. Testing Serv., 87 N.Y.2d at 389.  "[I]t is not the function of the courts to remake the contract agreed to by the parties, but rather to enforce it as it exists." Rowe v. Great Atlantic & Pacific Tea Co., 46 N.Y.2d at 69.

Because the implied covenant of good faith and fair dealing "does not provide a court carte blanche to rewrite the parties' agreement," a court "cannot imply a covenant inconsistent with terms expressly set forth in the contract. . . . Nor can a court imply a covenant to supply additional terms for which the parties did not bargain." Banco Espanol De Credito v. Security Pacific Nat'l Bank, 763 F. Supp. 36, 45 (S.D.N.Y. 1991) (quoting Hartford Fire Ins. Co.

211

v. Federated Department Stores, 723 F. Supp. 976, 991 (S.D.N.Y. 1989)) (modification in original); see also In re Enron Corp., 292 B.R. 752, 783 (Bankr. S.D.N.Y. 2003) ("Where, as here, the parties carefully define their rights and obligations, and expressly exclude all other obligations, an implied, objective good faith obligation cannot be used to create additional or inconsistent terms.").  "A party making such a claim must prove not merely that it would have been better or more sensible to include such a covenant, but rather that the particular unexpressed promise sought to be enforced is in fact implicit in the agreement viewed as a whole." Rowe v. Great Atlantic & Pacific Tea Co., 46 N.Y.2d at 69.

### 1.  Implied Term

Minebea first argues that Papst has breached an implied term of the 1995 Settlement Agreement, under which Papst covenanted "that it would not use any patent in suit to interfere with Minebea's HDD motor sales by stopping Minebea's customers from using Minebea's motors in hard disk drives." Minebea Br. at 36.  Minebea makes the blanket claim that such an implied term exists with respect to "all patents in suit," see Minebea Br. at 36, but the Court's analysis must distinguish between patents listed in Appendix III of the 1995 Settlement Agreement – the Papst Drive Patents – and the other patents at issue.

### a.  Appendix III Patents

Minebea argues that Papst's agreement not to sue Minebea's customers for infringement of Appendix III patents (or "Papst Drive Patents") is a "necessary corollary" to the 1995 Settlement Agreement's express authorization to Minebea "to manufacture and sell HDD motors unconditionally to customers who will combine those motors into hard disk drives that

212

directly infringe those patents." Minebea Br. at 37.  According to Minebea, Papst breached this duty by suing and threatening to sue Minebea's customers, collecting patent royalties from Minebea's customers, and "wrongly stat[ing] to Minebea's customers that Minebea has no rights under the patents in issue."  Id. at 41.[98]

In response, Papst appeals to the express terms of the 1995 Settlement Agreement, from which the Court in its June 24, 2005 Patent Exhaustion Opinion held it to be "readily apparent . . . that the parties anticipated that Papst would retain the right to sue Minebea's customers for direct infringement of the Papst Drive Patents."  Minebea Co. v. Papst, 374 F. Supp. 2d at 209.  Papst argues that "[b]y doing what the Settlement Agreement expressly said that Papst had reserved its rights to do, Papst cannot have violated any implied duties[,]" and Minebea's claim for breach of the duty of good faith and fair dealing therefore must fail.  Papst Br. at 33-34.

Minebea responds that despite what "[i]solated portions of Paragraphs 2.2, 2.4, and 4.1 of the 1995 Agreement, taken out of context," appear to state, the Agreement when considered "as a whole" still supports the finding of an implied term.  Minebea Br. at 39. Minebea claims that the Court's June 24, 2005 holding that Minebea has "unconditional authority to sell motors that would contribute to the infringement of the Papst Drive Patents under the 1995 Settlement Agreement," necessitates the finding of an implied term preventing Papst from using its rights in the Papst Drive Patents "to undermine Minebea's authority." Minebea Br. at 39 (citing Minebea Co. v. Papst, 374 F. Supp. 2d at 212).

---

[98]     The Appendix III patents at issue in Count X are U.S. Patent No. 4,519,010;  U.S. Patent No. 4,535,373; U.S. Patent No. 4,922,406; U.S. Patent No. 5,216,557; U.S. Patent No. Re 32,702; and U.S. Patent No. Re 34,412.

Minebea's interpretations of both the Settlement Agreement and the Court's June 24, 2005 Opinion are unsupportable.  As the Court held in that Opinion, it is readily apparent from the contract "that the parties anticipated that Papst would retain the right to sue Minebea's customers for direct infringement of the Papst Drive Patents.  This was reiterated throughout the 1995 Settlement Agreement and is evidenced in the Loan Agreement as well."  Minebea Co. v. Papst, 374 F. Supp. 2d at 209-10.  Paragraphs 2.2 and 2.4 of the Settlement Agreement release Minebea from liability for direct or contributory infringement of various patents held by Papst, but state explicitly that this release does not extend to Minebea's customers.[99]  Paragraph 4.1

---

[99]     Paragraph 2.2 of the 1995 Settlement Agreement reads, in relevant part:

> In consideration for the Settlement Amount to be paid hereunder, Papst and each of them hereby and forever release and discharge Minebea and each of them from any and all past and future actions, . . . for infringement of the Papst Patents or the Future Patents arising out of the manufacture, distribution, use or sale of Minebea Products in whatever country, up to the Effective Date.  This release extends to all customers, distributors and end-users of Minebea Products and to all of Minebea's suppliers of Minebea Products or components thereof.  Provided, however, that this release does not extend to any Minebea customer for any act of infringement of Papst Patents or Papst Drive Patents performed where the customer combines or authorizes another to combine a Minebea Product with any component, material or process not produced by Minebea; provided, however that this exclusion shall not apply to acts of infringement of Papst Integrated Baseplate Patents.

PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶ 2.2.  Paragraph 2.4 reads in part:

> provided, however, that this provision shall not bar Papst from the legal right to assert an infringement claim against a Minebea customer or subsequent purchaser or user for direct infringement of a Papst Drive Patent, other than a Papst Integrated Baseplate Patent, or for direct infringement of a Papst Patent if acts of such customer or subsequent purchaser or user first result in the direct

grants to Minebea a non-exclusive license for "Papst Patents" and "Future Patents," but states that "no license is granted hereunder to any Minebea customer . . . with respect to any of the Papst Drive Patents."  PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶ 4.1.

Minebea argues that the portions of Paragraphs 2.2 and 2.4 of the Settlement Agreement stating that "this provision" or "this release" shall not bar an infringement suit by Papst against Minebea's customers apply only to those paragraphs, and that the Court cannot infer from those caveats that the contract "as a whole" does not bar such suits by Papst.  Leaving aside the improbability of such a construction – for what purpose would those reservations of rights fulfill if the parties <u>intended</u> that the contract would bar exactly those rights Papst sought to reserve? – the reservation of rights in Paragraph 4.1 clearly speaks to the contract as a whole.[100]  That paragraph states:

> [N]o license is granted hereunder to any Minebea customer with regard to any product of the customer which directly infringes a Papst Patent if acts of the customer or any subsequent purchaser or user first results in the direct infringement of the Papst Patent. Also, no license is granted hereunder to any Minebea customer with respect to any of the Papst Drive Patents other than the Papst Integrated Baseplate Patents.

infringement.

Id. ¶ 2.4.

[100]     "An interpretation that gives reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves part unreasonable or of no effect."  Rothenberg v. Lincoln Farm Camp. Inc., 755 F.2d 1017, 1019 (2d Cir. 1985); RESTATEMENT (SECOND) OF CONTRACTS § 203(a); see also id. § 202 cmt. h ("Preference for consistency").

PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶ 4.1.[101]  The 1995 Settlement Agreement is thus quite clear: Papst has reserved its rights to sue Minebea's customers for infringement of the Papst Drive Patents.

As the Federal Circuit has explained, "[a] patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee." Spindelfabrik Suessen-Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft, 829 F.2d 1075, 1081 (Fed. Cir. 1987); see also U.S. Philips Corp. v. Int'l Trade Comm'n, 424 F.3d 1179, 1189 (Fed. Cir. 2005); Minebea Co. v. Papst, 374 F. Supp. 2d at 207.  In this case, of course, Minebea was the sole licensee.  By expressly disclaiming any intent also to grant a license to Minebea's customers for the Papst Drive Patents, Papst unambiguously refused to covenant not to sue those customers for patent infringement.  An implied term barring such suit clearly would be inconsistent with this express term.  See Murphy v. Amer. Home Prods. Corp., 58 N.Y.2d 293, 304-05 (N.Y. 1983) (where employment contract was at-will, it would be "incongruous" and "inconsistent with other terms of the contractual relationship" to find implied term limiting employer's right of termination).

Minebea also misunderstands the significance of the Court's June 24, 2005 conclusion in the patent exhaustion context that the 1995 Settlement Agreement gave Minebea unconditional authority to sell motors that would infringe the Papst Drive Patents.  Minebea claims that this holding was necessary to reconcile a "tension between provisions in paragraphs

---

[101]    Minebea argues that the "exception" expressed in Paragraph 4.1 refers only to the license granted to Minebea in the same paragraph, but the parties' use of the general term "hereunder," as opposed to a narrower term such as "under this provision" or "under this paragraph" (as were used in Paragraphs 2.2 and 2.4 of the 1995 Settlement Agreement), clearly indicates that this disclaimer was to apply to the contract as a whole.

2.2, 2.4, and 4.1 of the 1995 Agreement . . . and the other provisions of the 1995 Agreement"

warranting that Minebea's motor sales would not infringe Papst Drive Patents and waiving

Minebea's liability for contributory infringement or inducement of infringement of those patents,

and that it somehow follows from this "tension" that Papst's express reservations of its right to

sue in those paragraphs are contrary to the purpose of the contract as a whole.  See Minebea Br.

at 38-39.

          As discussed supra at 155-158, in light of the Federal Circuit's recent decision in

LG Elecs., Inc. v. Bizcom Elecs., Inc., 2006 U.S. App. LEXIS 16916, the Court now concludes

that Minebea's authorization to sell motors under Papst's patents was in fact conditional.

Minebea's argument on this point therefore is moot.  Even if Minebea's sales had been

unconditional, however, there would be no "tension" between such a finding and a conclusion

that Papst was well within its rights to sue Minebea's customers for direct infringement of the

drive patents.  It is true that the Court observed in its patent exhaustion analysis that it may seem

"unfair" to conclude that Papst had given Minebea unconditional authority to sell motors to its

customers, "given the express language in the contract reserving the right to sue Minebea's

customers for infringement of the Papst Drive Patents."  Minebea Co. v. Papst, 374

F. Supp. 2d at 211.  But this does not constitute a legal inconsistency that demands resolution by

the finding of an implied contract term.  Whether, as a matter of patent law, Papst might or might

not have had the right to seek redress from Minebea's customers is irrelevant to whether the

parties intended the Settlement Agreement to bar such actions by Papst.  See B. Braun Med., Inc.

v. Abbott Labs, 124 F.3d at 1426 (distinguishing effects of contractual provisions from that of

exhaustion doctrine); Mallinckrodt, Inc. v. Mediport, Inc., 976 F.2d at 706 ("The principle of

exhaustion of the patent right [does] not turn a conditional sale into an unconditional one."). As Papst correctly puts it, "exhaustion is an unintended legal consequence, not something that the parties contemplated or intended to have happen." Papst Opp. at 23. The parties' clear intent, as reflected in the express language of the Settlement Agreement, must be respected.[102]

Having concluded that the 1995 Settlement Agreement clearly permits Papst to sue Minebea's customers for direct infringement of the Papst Drive Patents, the Court cannot imply – under the rubric of good faith and fair dealing – any obligation that would be inconsistent with these express terms of the contractual relationship already found. See Dalton v. Educ. Testing Serv., 87 N.Y.2d at 389; see also Times-Mirror Magazines, Inc. v Field & Stream Licenses Co., 294 F.3d at 394 ("Having already found that the express terms of the agreements clearly set forth the parties' respective rights . . . and the parties' obligations with respect to licensing agreements, we also conclude that TM cannot avoid the express terms of the contract by relying on the implied covenant of good faith and fair dealing."). By its express terms, the contract does not interfere with any legal right Papst may have to sue Minebea's customers for infringement of Papst Drive Patents. An implied covenant not to sue clearly would be inconsistent with these terms, and is not a promise that "'a reasonable person in the position of the promisee would be justified in understanding [was] included.'" Dalton v. Educ. Testing Serv., 87 N.Y.2d at 389 (quoting Rowe v Great Atl. & Pac. Tea Co., 46 N.Y.2d at 69).[103] Papst

---

[102]    If Minebea were correct that a contract authorizing the unconditional sale of a patented item was tantamount to a covenant by the patent holder not to sue the end purchasers for infringement, then the "no infringing use" prong of the patent exhaustion doctrine would have little or no significance, because the unconditional sale alone would be enough to bar suit.

[103]    The Court may not, under the covenant of good faith and fair dealing, "supply additional terms for which the parties did not bargain." Banco Espanol De Credito v. Security

did not violate the implied covenant of good faith and fair dealing by suing or threatening to sue

Minebea's customers for infringement of Papst Drive Patents.

### b.   Non-Appendix III Patents

Many of the patents upon which Minebea appears to rest its claims in Count X are

not among those listed in Appendix III of the 1995 Settlement Agreement.[104]   As the Court

discusses in its findings of fact, supra at 78-79, the Settlement Agreement preserved the rights

Minebea had obtained under earlier agreements with respect to some of these patents (that is, the

Papst Patents and counterparts of Appendix III patents).   Minebea argues that "[b]y incorporation

of Minebea's rights under the parties' 1990 and 1993 agreements," the 1995 Settlement

Agreement gives Minebea "the same unrestricted authority under Papst's non-Appendix III

patents in issue."   Minebea Br. at 37.   Minebea further argues that, as with the Appendix III

patents, a covenant not to sue Minebea's customers for infringement of the patents is a

"necessary corollary" to Minebea's unrestricted right to sell infringing motors.   See id.

Minebea is wrong, both because its "necessary corollary" reasoning is flawed (as

the Court has discussed with respect to the Appendix III patents), and because its sales under

---

Pacific Nat'l Bank, 763 F. Supp. at 45.   As the evidence shows (and the Court discusses in
connection with Minebea's patent misuse claim), Minebea bargained with Papst for its
customers' use of drive rights, and in fact declined an invitation from Papst to purchase such
rights.   See infra at 255-257.

[104]      The non-Appendix III patents at issue are U.S. Patent No. 5,424,887; U.S. Patent
No. 5,446,610; U.S. Patent No. 5,557,487; U.S. Patent No. 5,661,351; U.S. Patent No.
5,708,539; U.S. Patent No. 5,729,403; U.S. Patent No. 5,777,822; U.S. Patent No. 5,796,548;
U.S. Patent No. 5,864,443; U.S. Patent No. 6,801,900; U.S. Patent No. B1 Re 32,702; U.S.
Patent No. Re 35,792; and U.S. Patent No. Re 37,058.

these motors were in fact conditional.  See supra at 156.  As the Court has discussed at length,

although Minebea was authorized under Papst's patents to manufacture, use, and sell hard drive

motors to its customers during the life of the Joint Venture, after its termination, and after the

signing of the 1995 Settlement Agreement, all of the relevant agreements stated specifically that

Minebea was not entitled to give its customers sublicenses to Papst's patents.  See PTX 195,

Intangible Assets Agreement (Nov. 5, 1990) ¶ 4(c) ("Minebea is not entitled either to grant

sublicenses or to sell and transfer the licenses completely or partly to anyone without previous

consent by Papst given by registered letter[.]"); PTX 264, License Agreement Regarding

Intangible Assets (Mar. 15, 1991) ¶ 1(c) ("Minebea is not entitled to grant sublicenses or to sell

or transfer the licenses [to Papst's patents] completely or partly to anyone else" except the Thai

Joint Venture); PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶ 4.1 ("no license is

granted hereunder to any Minebea customer with respect to any of the Papst Drive Patents other

than the Papst Integrated Baseplate Patents"); see also PTX 1467, Loan Agreement (Apr. 27,

1993) § 4(3) ("purchasers of products from Minebea, PMDM-G and PMDM-T are not licensed

under such Drive Patents [U.S. Patent Nos. B1 Re. 32,702 and 4,337,491], notwithstanding the

use of such purchased products in disk drives or other produkts [sic] made, used or sold by such

purchasers").[105]

---

[105]   It also appears that Minebea had no rights at all with respect to a number of the
patents under which Papst sued Minebea's customers for direct infringement.  As the Court has
discussed, supra at 68, Minebea had no rights under the earlier agreements with respect to patents
that post-dated the May 3, 1993 Termination Agreement.  The following non-Appendix III
patents at issue in Count X post-date the Termination Agreement:

U.S. Patent No. 5,424,887, which issued from an application filed on August 16, 1993.
U.S. Patent No. 5,557,487, which issued from an application filed on May 30, 1995.
U.S. Patent No. 5,661,351, which issued from an application filed on June 2, 1995.

In view of the unambiguous reservations of Papst's right to pursue infringement claims against Minebea's customers, the Court can hardly conclude that Papst breached any implied term of the agreements by suing the customers under the non-Appendix III patents. Accordingly, Minebea's claim of breach of the duty of good faith and fair dealing with respect to these patents fails.

2.  Subjective Bad Faith

A party also may breach the duty of good faith and fair dealing by taking actions that, even though authorized by the contract, are made in bad faith and result in injury to the other party.  See 511 West 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d at 154 (in contract to convert apartment building into cooperative, plaintiff shareholders alleged bad faith in breach of implied promise by sponsor of conversion to sell sufficient shares to create a viable cooperative); Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce, 265 A.D.2d 513, 514 (N.Y. App. Div., 2d Dep't 1999) ("[T]o state a cause of action alleging breach of an implied covenant of good faith and fair dealing, the plaintiff must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff."); TPK Constr. Corp. v. S. Amer. Ins. Co., 752 F. Supp. 105, 112 (S.D.N.Y. 1990) (citing Kalisch-Jarcho, Inc. v. City of New York, 58 N.Y.2d 377, 385 (N.Y. 1983)) (breach of

---

U.S. Patent No. 5,708,539, which issued from an application filed on June 2, 1995.
U.S. Patent No. 5,729,403, which issued from an application filed on April 17, 1995.
U.S. Patent No. 5,777,822, which issued from an application filed on June 2, 1995.
U.S. Patent No. 5,796,548, which issued from an application filed on June 7, 1995.
U.S. Patent No. 5,864,443, which issued from an application filed on February 20, 1998.
U.S. Patent No. 6,801,900, which issued from an application filed on June 6, 1994.
U.S. Patent No. Re 35,792, which issued from an application filed on April 1, 1997.
U.S. Patent No. Re 37,058, which issued from an application filed on March 4, 1997.

covenant of good faith and fair dealing requires proof of fraud, malice, bad faith, other

intentional wrongdoing, or reckless indifference to the rights of others); In re: Insite Servs. Corp.,

287 B.R. 79, 94 (Bankr. S.D.N.Y 2002) ("the essence of a claim for breach of the duty of good

faith and fair dealing is not the defendant's acts *per se,* but the scienter behind those acts.").

Although subjective bad faith may be proved directly, it also may be inferred from a party's

course of conduct.  See Mickle v. Christie's, 207 F. Supp. 2d 237, 250 (S.D.N.Y. 2002);

Greenwood v. Koven, 880 F. Supp. 186, 200-01 (S.D.N.Y. 1995) ("There is seldom a 'smoking

gun' revealing an improper motive, and a party seeking to establish such a motive must fall back

on inferences reasonably drawn from the circumstances.").

Minebea argues that Papst breached the 1995 Settlement Agreement by engaging

in a bad faith scheme "to extract impermissible double royalty revenues from its motor

inventions[.]"  Minebea Br. at 47.  The first step of the scheme allegedly was to redefine existing

motor patents as "drive patents" "so as to remove them from the scope of license agreements

Papst previously had entered into with motor manufacturers."  Minebea Br. at 43.  The second

was to obtain "reissue patents" from the Patent and Trademark Office by adding motor claims to

existing drive patents.  By asserting these reissue patents, Papst could (according to Minebea)

"extract additional rounds of payments from drive manufacturers[.]"  Id. at 44.  Minebea asserts

that "Papst's conduct connotes a dishonest purpose and was willfully and recklessly indifferent to

the rights of others," and therefore violated Papst's duty of good faith and fair dealing under the

1995 Settlement Agreement.  Id. at 47.

Minebea's claim of breach by subjective bad faith fails on multiple grounds, the

most important of which is that until it filed its post-trial brief, Minebea steadfastly represented

to Papst and to the Court that it was not relying and would not rely on a theory of subjective bad

faith in attempting to prove its Count X claims.  For example, in its brief opposing the admission

in evidence of the 1997 Patent License Agreement between Papst and Nidec and that agreement's

relevance to the claims at issue in the case, Minebea strenuously argued that its claim for breach

of the duty of good faith and fair dealing would <u>not</u> proceed on a theory of bad faith by Papst, but

would rest solely on Papst's alleged violation of an implied term of the contract.  <u>See</u> Minebea's

Bench Brief in Opposition to Papst's Brief Concerning the Relevance of Papst-Nidec Licenses to

this Case (July 27, 2005) (Docket No. 1519) at 1, 2, 4-5 ("Although Papst's breach of the 1995

Settlement Agreement was in 'bad faith,' this fact is not an element of Minebea's claim of the

implied covenant of good faith and fair dealing.") ("An inquiry into Papst's motives . . . is

irrelevant.") (Papst's "subjective state of mind is not relevant.").

 In its argument in response to the Rule 52(c) motion for judgment as a matter of

law, made by defendant at the close of plaintiff's case-in-chief, Minebea again denied that

subjective bad faith was an aspect of its claims under Count X.  <u>See</u> 7/21/05 (a.m.) Trial Tr. at

68:4-6 (argument of Mr. Lutzker) ("There is no scienter requirement.  We think the law is quite

clear that there is no scienter requirement.  This is a contractual claim."); <u>id</u>. at 70:15-17 ("So if

there was a scienter requirement, which there's not, . . .").  Minebea also objected numerous

times at trial to evidence offered by Papst on the ground that Papst's subjective intent or

understanding of the contract was irrelevant to its breach of contract claim.  <u>See</u>, <u>e.g.</u>, 7/5/05

(a.m.) Trial Tr. at 76:5-23 (objection by Mr. Lutzker); 7/22/05 (a.m.) Trial Tr. 21:4-10

(comments of Mr. Lutzker) ("I don't believe that whether or not Mr. Schnayer was acting in good

faith with respect to his understanding of the 1995 agreement is at issue in this case. . . . There's

no reason to probe the intent of Mr. Schnayer or anyone else[.]"); id. at 24:25-25:4 (comments of

Mr. Lutzker) ("I believe that [good faith and fair dealing] is an objective standard, what is the

objective benefit of the bargain of the agreement as properly construed, and whether or not the

breaching party believed that what he was doing was a breach is irrelevant.").

Papst has relied on these representations, both during trial and in its post-trial

filings.  Its initial post-trial brief and proposed conclusions of law do not address any claim of

subjective bad faith by Papst.  Allowing Minebea to re-introduce its theory of subjective bad faith

after the evidence has closed and the trial has concluded, when Papst has no opportunity to

adduce further evidence to contradict the claim of bad faith, would be highly prejudicial to Papst.

Having expressly disavowed a theory of subjective bad faith and having caused Papst to rely on

those representations, Minebea cannot seek relief under such a theory now.

In any event, the Court cannot discern bad faith, either directly or indirectly, from

the record evidence.  In discussing Minebea's patent misuse claim, the Court concludes that there

was nothing untoward about Papst's conduct with regard to the motor patents versus the "drive

patents," and that Papst did not collect impermissible "double royalties."  See infra at 255-257.

As the Court notes there, Minebea and its customers do not pay for the same patent rights on the

same products; Minebea pays a royalty for motors only, not for a complete product license on

hard disk drives; and Minebea has never paid Papst for its customers' use of drive rights.  See

infra at 256.[106]  By asserting its drive patent rights against Minebea's customers, Papst therefore

---

[106]    In 1991, Papst offered Minebea the opportunity to purchase drive patent licenses
for PMDM's customers.  See PTX 298, Letter from Mr. G. Papst to G. Ogino (June 25, 1991)
("It is therefore my proposal to grant to PMDM the right to convey licenses under Papst's drive
patents directly to drive manufacturers. . . . In return for granting these rights to PMDM, Papst
believes that it would be entitled to a fair compensation from Minebea[.]").  Minebea declined to

did not "do anything [with] the effect of destroying or injuring the right of [Minebea] to receive the fruits of the contract.'" Dalton v. Educ. Testing Serv., 87 N.Y.2d at 389. Moreover, because (as Mr. Gerstman testified) the filing of applications for reissue patents is "absolutely common practice of the Patent Office," see 8/2/05 (p.m.) Trial Tr. at 71:2-72:11 (Gerstman testim.), Papst's conduct in this respect does not "violate community standards of decency, fairness or reasonableness," and does not evidence bad faith. See RESTATEMENT (SECOND) OF CONTRACTS § 205, *cmt. a*.

Not only was Minebea not deprived of the "fruits of the contract" by Papst's conduct, Dalton v. Educ. Testing Serv., 87 N.Y. 2d at 389, but Minebea also has failed to demonstrate, directly or indirectly, that Papst ever acted in subjective bad faith. To be sure, the evidence shows that Papst was aware of the legal and commercial significance of its distinction between motor patents and drive patents and undoubtedly was acting first and foremost in its own business interests. Nonetheless, neither these facts nor any of the other evidence cited by Minebea (most of which either predates by years the 1995 Settlement Agreement, relates only to Papst's dealings with businesses other than Minebea, or is hopelessly ambiguous), supports the notion that Papst entertained either a "sinister intention" or "a reckless indifference to the rights of others." See Kalisch-Jarcho, Inc. v. City of New York, 58 N.Y.2d at 385.

---

do so. See 7/28/05 (a.m.) Trial Tr. at 66:17-21 (G. Papst testim.); DTX 147, PMDM Board Meeting Minutes (Sept. 28, 1991). See supra at 34-36.

### B.  Express Breach of Contract

In Count X, Minebea also claims that Papst breached the express terms of the 1995 Settlement Agreement "[b]y suing and threatening to sue Minebea's customers for their use of Minebea-supplied HDD motors in HDDs and by expressly telling Minebea's customers that Minebea is not licensed under the Papst patents at issue."  Minebea Br. at 48.  This claim is indistinguishable from Minebea's claim for breach of the duty of good faith and fair dealing by breach of an implied term, and is similarly meritless.  There was no breach of contract when Papst did what the contract said it could do: sue (or threaten to sue) Minebea's customers.

Minebea claims that the 1995 Settlement Agreement "incorporates rights granted under the prior agreements" between Papst and Minebea, including "the authority to use all Papst's patents 'required and necessary' to research, development, engineering, use and sale of HDD motors."  Minebea Br. at 49.[107]  Although Minebea does not attempt to identify which of the prior agreements gave rise to such rights, it argues that this authority precludes Papst from bringing suit against Minebea's customers for infringement of Papst's patents.  Id.

This claim is without merit.  Although the Court has held that Minebea was authorized under the 1995 Settlement Agreement "to sell its motors without fear of suit by Papst for contributory infringement or inducement of infringement," it also has previously held – and holds again here – that under the contract it was clear that "Papst would retain the right to sue Minebea's customers for direct infringement of the Papst Drive Patents."  Minebea v. Papst, 374 F. Supp. 2d at 209.  It defies logic to claim that Papst violated the express terms of the contract

---

[107]     The meaning of the term "required and necessary" in the earlier agreements is discussed supra at 57-62.

by exercising a right it expressly reserved in the contract.  Accordingly, Minebea's claim for

express breach of contract fails.

## V.  COUNT XIII:  EQUITABLE ESTOPPEL, LEGAL ESTOPPEL AND IMPLIED LICENSE

### A.  Introduction

Minebea contends in Count XIII of its Second Amended Complaint that Papst's

actions misled Minebea and its customers to believe that Papst would not enforce its so-called

drive patents against Minebea's customers for their use of Minebea-supplied HDD motors in hard

disk drives.  See 2d Am. Compl. ¶ 217.  Minebea claims that because it and its customers

detrimentally relied on Papst's misleading actions, Papst should be equitably estopped from

enforcing its drive patent rights against Minebea's customers.  See id. ¶¶ 218-20.

Alternatively, Minebea claims that Papst is legally estopped from enforcing its

drive patents against Minebea's customers for their use of Minebea-supplied HDD motors in hard

disk drives.  Minebea argues that because Papst, in the 1995 Settlement Agreement, licensed or

assigned Minebea the right to sell HDD motors for use in hard disk drives, and because Papst

received consideration for that right, it cannot now take steps to derogate from the right it has

granted.  See Minebea Br. at 18-21; Minebea's Prop. Concl. of Law ¶¶ 5.1, 5.6.  Under Minebea's

theory of legal estoppel, Papst has granted Minebea's customers an implied sublicense which bars

Papst from suing them for infringement of the drive patents.  See Minebea Br. at 21; Minebea's

Prop. Concl. of Law ¶ 5.6;  see also Jacobs v. Nintendo of America, Inc., 370 F.3d 1097, 1101-02

(Fed. Cir. 2004).

### 1.  Addition of Legal Estoppel Claim to Count XIII

The Court must first address what claims Minebea may properly bring under Count XIII.  Count XIII of the Second Amended Complaint is entitled "Declaratory Judgment of Equitable Estoppel."  The claim actually asserted in Count XIII is wholly related to Minebea's theory of equitable estoppel.  There is no reference to legal estoppel or implied license in the complaint.  On July 1, 2005, Minebea submitted, pursuant to the Court's Order, five-page summaries of each of the claims to be litigated at trial.  Its summary of Count XIII was entitled "Minebea's Summary of Its Estoppel and Implied License Claim," and laid out three separate theories for recovery:  equitable estoppel, legal estoppel, and implied license.  On July 3, 2005, Papst filed two responses to Minebea's summary of Count XIII, one entitled "Papst's Summary Trial Brief Concerning Count XIII (Equitable Estoppel)" and one entitled "Papst's Summary Trial Brief Concerning Minebea's Unpled Claims of Legal Estoppel and Implied License."  In the latter filing, Papst objected to the addition of the legal estoppel and implied license theories under Count XIII, arguing that they were factually and legally different from what Minebea had pled in the Second Amended Complaint, that Minebea had not sought leave to amend its complaint pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, and that it was prejudicial to Papst to permit Minebea to inject this new theory into the case on the eve of trial, which was to begin on July 5, 2005.  See Papst's Summary Trial Brief Concerning Minebea's Unpled Claims of Legal Estoppel and Implied License (July 3, 2005) (Docket No. 1233) at 1.  Papst nevertheless went on to argue why Minebea should not succeed on the merits of its legal estoppel and implied license claims.

During opening statements on July 5, 2005, the Court raised with both parties the issue of Papst's objections to the addition of arguably new claims to Count XIII.  See 7/05/05 (a.m.) Trial Tr. at 51:5-15, 97:24-98:5 (questions by the Court).  Minebea stated at the time that it would file a response to Papst's objections, and the parties proceeded at trial to address the merits of the claims.  See id. at 51:12-15, 98:4-10 (comments of Mr. Lutzker).  Minebea filed its response to Papst's objections on July 10, 2005, arguing that:  (1) legal estoppel and implied license are legal theories, not claims, and therefore did not have to be pled in the complaint; (2) even if they were claims, they were not new to this case and Papst had notice of them as early as July 19, 2004 in Minebea's Response to Interrogatories; and (3) even if the Court found that these were separate claims that must be pled, Minebea should be permitted to amend its complaint because Papst had suffered no prejudice.  Minebea's Response to "Papst's Summary Trial Brief Concerning Minebea's Unpled Claims of Legal Estoppel and Implied License" (July 10, 2005) (Docket No. 1304).  The trial proceeded, but Papst again raised its objection to the addition of the legal estoppel and implied license claims in its Rule 52 motion at the close of Minebea's case-in-chief.  See 7/20/05 (a.m.) Trial Tr. at 78:6-17 (Mr. McLaren's Rule 52 argument).  Again, however, Papst also addressed the merits of Minebea's legal estoppel and implied license claims in its Rule 52 argument, even moving for partial summary judgment on them.  See id.

Having heard the arguments of the parties at trial, examined the pre- and post-trial briefs and conducted its own analysis of the doctrines of equitable estoppel, legal estoppel, and implied license, the Court concludes that the latter two – legal estoppel and implied license – are a single claim, independent of the equitable estoppel claim pled in Minebea's Second Amended

229

Complaint.  Nevertheless, because Minebea gave Papst some notice of this claim a year in

advance of trial, because the facts involved in the legal estoppel/implied license claim were

brought out in the course of the trial, and because the claim was tried on the merits and briefed in

considerable detail after trial, the Court finds that Papst is not prejudiced by the addition of this

legal estoppel claim.  The Court therefore will grant Minebea's motion for leave to amend its

complaint "as may be necessary to cause [it] to conform to the evidence" presented, but no

further.  FED. R. CIV. P. 15(b). Minebea is given leave to amend its complaint only with respect

to its claim for an implied license derived from legal estoppel and not any other claim or any

other form of an implied license.  Papst would be prejudiced if the Court were to permit Minebea

to amend its complaint to add any other claim, because Minebea has presented evidence only as

to the legal estoppel/implied license claim and it is the only unpled claim that has been fully

briefed and argued by the parties.

> 2.   Evolution of Minebea's Equitable Estoppel and Legal Estoppel Claims

As a preliminary matter, the Court notes that the relationship between the

doctrines of equitable estoppel, legal estoppel, and implied license has not always been clear in

the parties' filings.  Minebea's pre-trial summary of its claim under Count XIII treated each of

these three concepts as a separate theory of recovery.  See Minebea's Summary of Its Estoppel

and Implied License Claim (Count XIII) (July 1, 2005) (Docket No. 1207).   During trial,

however, Minebea appears to have recognized that an implied license was not an independent

theory of recovery, but rather a concept that derived from other theories, as its counsel stated:

> Implied license is a very loose label that . . . I think when you look
> at the cases, is a label that are [sic] applied to a lot of different legal
> theories, including equitable estoppel and legal estoppel, and

> sometimes even a label that is used to sweep in exhaustion.  But I
> don't know that there is, independent of exhaustion, legal estoppel
> or equitable estoppel, a legal claim for implied license.  I think
> implied license sweeps within it each of those separate analytical
> frameworks.

7/22/05 (a.m.) Trial Tr. at 39:6-17 (comments of Mr. Lutzker).  Minebea's post-trial briefs reflect

this understanding of the three concepts and essentially reduce their arguments to two claims of

estoppel: (1) a claim of equitable estoppel, and (2) a claim of legal estoppel, from which Minebea

argues an implied sublicense for its customers should be derived.

   The evolving nature of these arguments, coming as late in the day as they have,

has added considerably to the confusion surrounding what Minebea's claims under Count XIII

are and under what particular theories Minebea seeks declaratory judgment.  One result is that

while Minebea's post-trial filings treat legal estoppel and implied license as part of a single

claim,  Papst's initial post-trial brief addresses the two doctrines both separately and together,

seemingly unsure whether "Minebea is asserting that an implied license . . . arises out of its legal

estoppel claim" or whether "Minebea is seeking to raise an independent claim for implied

license."  See Papst Br. at 44.  Papst's brief analyzes this so-called "independent claim for

implied license" under a line of cases that employ a "non-infringing uses doctrine" analysis

different from the legal estoppel analysis.  Id. at 44-45; Papst's Prop. Concl. of Law ¶¶ 61-64.

See Met-Coil Sys. Corp. v. Korners Unlimited, Inc., 803 F.2d 684, 686 (Fed. Cir. 1986) (setting

forth a two-part implied license test that requires the demonstration of (1) no noninfringing use

for the object in question, and (2) circumstances of sale that "plainly indicate that the grant of a

license should be inferred" (quoting Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d 903,

924-25 (Fed. Cir. 1984)); see also Jacobs v. Nintendo of America Inc., 370 F.3d 1097, 1100

(Fed. Cir. 2004) (describing first prong of implied license test in Met-Coil as an application of the "'noninfringing use' doctrine").

Implied license does not exist as an independent claim;  it is the legal result of an underlying rationale.  Wang Labs., Inc. v. Mitsubishi Elecs. America, Inc., 103 F.3d 1571, 1580 (Fed. Cir. 1997).  This legal result can be reached through "various avenues," including equitable estoppel or legal estoppel.  Id. at 1580 ("These labels [equitable estoppel and legal estoppel] describe not different kinds of licenses, but rather different categories of conduct which lead to the same conclusion:  an implied license.");  see also Spindelfabrik Suessen-Schurr Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft, 829 F.2d 1075, 1080 (Fed. Cir. 1987) ("The doctrines of legal estoppel and equitable estoppel have been applied by courts to imply a license") (citing AMP, Inc. v. United States, 389 F.2d 448, 452 (Ct. Cl. 1968)).[108] Another avenue by which an implied license may be reached is through the application of the "'noninfringing use' doctrine."  Jacobs v. Nintendo of America Inc., 370 F.3d at 1100; see also Met-Coil Sys. Corp. v. Korners Unlimited, Inc., 803 F.2d at 686; Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d at 924-25.

Minebea explicitly argues a claim of legal estoppel in its post-trial filings, from which it further argues that its customers should receive an implied sublicense.  See Minebea Br. at 18-21; Minebea Opp. at 39-42.  It has maintained that under its legal estoppel claim the

---

[108]     While the Federal Circuit in Wang Labs., Inc. v. Mitsubishi Elecs. America, Inc., 103 F.3d at 1581, stated that equitable estoppel and implied license were closely related concepts and that an implied license might be derived from equitable estoppel, it also stated that the analysis of each was different and that the doctrines are "not conterminous."  This Court need not address or distinguish how an equitable estoppel analysis might differ from an implied license derived from equitable estoppel analysis because Minebea does not bring an implied license claim under the equitable estoppel rationale, but rather under the legal estoppel rationale.

implied license test which employs the noninfringing use doctrine is irrelevant because Papst has

specifically authorized Minebea to contributorily infringe its drive patents.  See Minebea's Prop.

Concl. of Law ¶ 5.5.[109]  The Court therefore will analyze Minebea's legal estoppel-derived

implied license claim as Minebea has argued that claim, and not as the so-called "independent"

claim of implied license employing the non-infringing uses doctrine that Papst argues in its initial

post-trial brief.  The Court concludes that Minebea fails both under its claim of equitable

estoppel under Count XIII and under its unpled claim of legal estoppel.

## B.  Equitable Estoppel Claim

Equitable estoppel, otherwise known as estoppel in pais, is estoppel derived from

misleading conduct.  See Wang Labs., Inc. v. Mitsubishi Elecs. America, Inc., 103 F.3d at 1581;

Gasser Chair Co. v. Infanti Chair Mfg., 60 F.3d 770, 776 (Fed. Cir. 1995); A.C. Aukerman Co. v.

R.L. Chaides Constr. Co., 960 F.2d 1020, 1042 (Fed. Cir. 1992); AMP, Inc. v. United States, 389

F.2d at 452.  Equitable estoppel requires an alleged infringer (or, in this case, the party asserting

the alleged infringers' rights) to prove three things by a preponderance of the evidence:  "(1) the

patent owner, through misleading conduct, led the alleged infringer to reasonably infer that the

patent owner did not intend to enforce its patent against the alleged infringer; (2) the alleged

infringer relied on this conduct; and (3) due to the reliance, the alleged infringer will be

materially prejudiced if the patent owner is allowed to proceed on its claims."  Gasser Chair Co.

---

[109]     The Court notes that, as stated previously, Minebea in its pre-trial summary
appeared to assert a noninfringing use implied license, but later backed away from this claim in
its post-trial filings, other than a few brief sentences in opposition to Papst.  See Minebea's Resp.
to Papst's Concl. of Law at 126, 130.  After Minebea clarified in its post-trial brief that it brought
only a legal estoppel claim, Papst's opposition to Minebea's post-trial brief addressed only the
argument under Jacobs.

v. Infanti Chair Mfg., 60 F.3d at 776.  Even where these three elements of equitable estoppel are

shown, the party asserting equitable estoppel still will not succeed on this equitable claim until

the court has "take[n] into consideration any other evidence and facts respecting the equities of

the parties in exercising its discretion and deciding whether to allow the defense of equitable

estoppel."  A.C. Aukerman Co., 960 F.2d at 1043.

### 1.  Minebea's Argument

Minebea claims that Papst is equitably estopped from pursuing infringement

claims against Minebea's customers to prevent the use of PMDM motors in their hard disk drives

because, according to Minebea, Papst indicated through its statements (both explicit and

implicit), deeds and inaction that Papst did not intend to enforce its rights against customers of

the Joint Venture or to prevent them from using the Joint Venture's motors.  Minebea Br. at 22.

Minebea argues that it was reasonable for customers of Minebea and PMDM "to expect that

Papst harbored no secret ambition" to enforce such rights.  Id.  Minebea bases its equitable

estoppel claim on both its own and its customers' allegedly reasonable reliance.  Id.  It further

purports to restrict its argument to actions taken by Papst prior to May 1993, the date on which

the Joint Venture terminated. See 7/22/05 (a.m.) Trial Tr. at 33:16-34:6, 36:1-8 (comments of

Mr. Lultzker); Minebea's Resp. to Papst's Prop. Concl. of Law at 144.

### 2.  Papst's Defenses

Papst first argues that because equitable estoppel is an equitable defense Minebea

should not be permitted to assert it as an affirmative claim for relief for which damages can be

awarded.  See Papst Br. at 46;  Papst's Prop. Concl. of Law ¶ 66.  Second, Papst maintains that

even if Minebea can assert equitable estoppel, it has limited its claim to events ending in May

1993, and it therefore is barred by the statute of limitations.  See Papst Br. at 47;  Papst's Prop.

Concl. of Law ¶ 68.  Third, Papst contends that because Minebea is arguing on behalf of its

customers and not for itself, it must demonstrate through evidence that its customers had met the

three elements of equitable estoppel – that is, that the customers themselves had reasonably relied

upon Papst's conduct and would now be materially prejudiced were Papst permitted to assert its

patents against them.  Papst Br. at 47-48; Papst's Prop. Concl. of Law ¶ 72.  Specifically, Papst

asserts that Minebea must have put forth evidence regarding those against whom Papst then was

currently litigating for patent infringement –  Maxtor/Quantum and IBM, as the only remaining

customers – and that it did not do so at trial.  Id. at 47.[110]   Finally, Papst argues that Minebea has

not proven the necessary elements of equitable estoppel, even on behalf of itself.

Papst's argument that equitable estoppel cannot form a basis for an affirmative

damages claim is irrelevant to this action because Minebea is seeking only declaratory relief

under this claim.  See 2d Am. Compl. ¶¶ 215-20 ("Count XIII:  Declaratory Judgment of

Equitable Estoppel").  As for the argument that equitable estoppel cannot form the basis for any

form of affirmative relief, Papst is simply incorrect.  The Declaratory Judgment Act gives this

Court the power to "declare the rights and other legal relations of any interested party seeking

such a declaration, whether or not further relief is or could be sought," where there exists "a case

of actual controversy."  28 U.S.C. § 2201(a).  This Court previously has found that an actual case

---

[110]     Since the close of trial, Papst and IBM have settled, leaving Maxtor/Quantum as
the only remaining customer with whom Papst has not yet settled as of the date of this Opinion.
See Papst's Notice of Settlement with IBM and Updated Pages of Findings of Fact and
Conclusions of Law (Docket No. 1653).

or controversy existed such that Minebea had a basis for a declaratory judgment claim on its defense of equitable estoppel on behalf of its customers due to its reasonable apprehension of harm. Minebea Co. v. Papst, 229 F. Supp.2d 1, 2-3 (D.D.C. 2002). The issue has been addressed in previous opinions by this Court and others, is dealt with in the subject matter jurisdiction portion of this Opinion, and need not be dealt with again here. See supra at 108-109. The Court rejects Papst's argument that Minebea may not assert a claim for equitable estoppel in a declaratory judgment action based on a reasonable apprehension of suit by Papst against its customers, and by its customers in turn against Minebea for indemnity for any payments they may make or have made to Papst.

Papst's second argument – that Minebea has failed to bring its claim within the three year statute of limitations – fails because the controversy that has made Minebea's equitable estoppel claim actionable – that is, its reasonable apprehension of suit – remains to this day. See supra at 108-109. This argument appears to be an attempt by Papst to relitigate the underlying issue of subject matter jurisdiction, and the Court, having resolved that issue in Minebea's favor, will address it no further in this context.

The Court also rejects Papst's argument that in order to succeed on its claim of equitable estoppel Minebea must prove that particular Minebea customers reasonably relied on Papst's conduct, and not simply that Minebea itself did. Papst ignores the fact that Minebea's theory of equitable estoppel is premised not on its apprehension of direct suit for infringement by Papst, but on its apprehension that Minebea's customers will seek indemnity from Minebea because of infringement suits by Papst. Under Minebea's theory, it reasonably relied to its detriment upon Papst's conduct to sell HDD motors to customers who might now sue Minebea.

236

In essence, Minebea asserts that Papst's actions and representations placed it in the position of being sued by customers who had been or will be sued by Papst.  By seeking to estop Papst from asserting its rights against those customers, Minebea seeks to protect itself from a suit for indemnification.  This theory, while admittedly indirect, comports with the theory under which the Court has found that it has subject matter jurisdiction.  See supra at 112-113.

The Court will now turn to the substance of the arguments made by Minebea and Papst under the equitable estoppel claim – that is, whether Papst's conduct prior to May 1993 can form the basis for a declaratory judgment of equitable estoppel against Papst's enforcement of its hard disk drive patent rights against Minebea's customers.

### 3.  The Merits of Minebea's Equitable Estoppel Claims and its Failure to Prove Misleading Conduct and Reasonable Reliance

The Court finds that Minebea has failed to prove the first element of equitable estoppel – that is, that Papst's conduct as of May 1993 misled Minebea or Minebea's customers to reasonably infer that Papst would not enforce its drive patent rights against Minebea's HDD motor customers.  Minebea's argument that Papst's conduct misled it and its customers selectively relies on certain letters, a press release, and certain portions of the contracts entered into by the parties.  See Minebea Br. at 24-30.  Minebea's purported evidence of misleading conduct not only ignores other explicit statements and conduct by Papst that would make its reliance on the selectively chosen evidence unreasonable, but the evidence it points to is in itself insufficient to demonstrate that it could or should reasonably have relied on Papst not to enforce its rights under the drive patents by a preponderance of the evidence.

The Court also finds that while Minebea argues that both it and its customers relied on Papst's conduct, Minebea failed to present at trial a shred of direct evidence showing its customers' actual reliance on any of this purported evidence.  Instead, Minebea presented evidence that sought (unsuccessfully) to demonstrate its own reliance on Papst's statements and conduct and apparently asks that the Court now infer Minebea's reliance to its customers.  The Court declines to do so.

### a.  Communications prior to the formation of the joint venture

To support its claim that Papst misled Minebea, Minebea relies on certain communications prior to the formation of the Joint Venture: an August 14, 1990 letter from Georg Papst to Mr. Mizukami, PTX 138; an August 17, 1990 letter from Hans Dieter Papst to Mr. Mizukami, PTX 152; and an August 24, 1990 Letter of Intent signed by both parties, PTX 157.  See Minebea Br. at 24-25.  In the August 14, 1990 letter, Georg Papst stated that the joint venture would be "entitled to take a non-exclusive, not-transferrable licence on all patent matters, as long as they will be used for spindle motors for hard disk drives and be manufactured and distributed by the Joint Venture."  PTX 138, Letter from G. Papst to R. Mizukami (Aug. 14, 1990) at 2.  In the August 17, 1990 letter, Hans Dieter Papst stated in part that "any spindle motor of the envisaged project would be free from any charge based on Papst patents."  PTX 152, Letter from H.D. Papst to R. Mizukami (Aug. 17, 1990) at 1.  In the August 24, 1990 Letter of Intent, the parties jointly stated in part that Papst intended "to transfer into the joint-venture all activities and assets including the right to use patents related to HDD Motors."  PTX 157, Letter of Intent (Aug. 24, 1990) at 1.

238

None of these letters or any other communications referenced by Minebea supports reasonable reliance by either Minebea or its customers.  First, each of the cited letters deals explicitly with the licensing of motors for use in drives, not the licensing of the hard disk drives themselves.  Furthermore, the language that Minebea argues that it and its customers reasonably relied upon is ambiguous at best, stating, for example, that the Joint Venture would be licensed in "patent matters," that the motors would be free of charges based on "Papst patents," and that the Joint Venture would receive the right to use patents "related" to the motors.  Given the ambiguity in the language of the letters and their non-binding nature, they fail to demonstrate the misleading conduct that Minebea asserts Papst engaged in.

Second, Minebea's claim that it relied on these communications also fails because it ignores the fact that any general statements of intent or other conduct on the part of the parties leading up to the formation of the Joint Venture necessarily was superseded by the reality of the Joint Venture itself.  The contracts that Minebea negotiated in forming the Joint Venture – namely the October 2, 1990 General Business Agreement and the November 5, 1990 Agreement for the Sale of Intangible Assets – were binding contracts negotiated and signed by the parties.  It is those contracts that governed their relationship and reflected what were the obligations and rights of the parties operating the Joint Venture under those agreements. Any arguable ambiguity in the communications that preceded the execution of the contracts is not relevant.  Nor could Minebea or its customers have relied upon those statements in the face of the agreements themselves, which defined the rights and obligations of the parties.  See supra at 55-92.  Reliance by Minebea or its customers upon a few ambiguous, non-legally binding communications made prior to the formation of the Joint Venture would not have been reasonable.

239

b.  General Business Agreement and Agreement for Sale of Intangible Assets

Minebea also appears to argue that the terms of the October 2, 1990 General

Business Agreement and the November 5, 1990 Agreement for the Sale of Intangible Assets

misled Minebea into believing that Papst would not enforce its patent rights against customers of

the Joint Venture.  See Minebea Br. at 24.  Minebea does not state, however,  what, precisely,

about these terms is misleading.  Rather, Minebea cites without analysis Paragraph 4 of the

General Business Agreement, which reads:

> Papst agrees to spin off [its] HDD motor division, including
> machinery, tools, materials, works in process (the 'Tangible
> Assets'), technical information and data, drawings of the HDD
> motors developed and/or being developed, know-how, the right to
> use all relevant patents, and the current order balance as of the date
> of transfer from Papst (the 'Intangible Assets') which are all
> required and necessary for the operation and business of GJV [the
> German joint venture] and TJV [the Thai joint venture].  Papst
> shall sell the Intangible Assets for the consideration specified in
> Article 5 hereunder [approximately 20 million Deutsche Marks].

PTX 169, General Business Agreement (Oct. 2, 1990) ¶ 4 (emphasis added).[111]  Minebea also

cites the November 5, 1990 Agreement for the Sale of Intangible Assets, which stated that "Papst

as the holder of patents . . . grants to Minebea the right to use all its patents; . . . world-wide as

far as they are required and necessary for research and development (R+D), manufacturing,

engineering, use and sale of HDD Motors."  PTX 193, Intangible Assets Agreement (Nov. 5,

1990) ¶ 4(a)  (emphasis added).

---

[111]     Minebea also states that the Joint Venture Agreement signed on November 5,
1990, "contained equivalent statements," but Minebea does not cite any paragraph of the
Agreement containing such statements.  Nor can the Court locate any.

The crucial phrase in each of these provisions, of course, is "required and necessary." As the Court has explained in detail, it was not required and necessary for Minebea's (and PMDM's) participation in the motor business for Minebea to obtain a license to directly infringe Papst's drive patents, or for Minebea to acquire the right to give its customers sublicenses to those same patents. Minebea could not reasonably have inferred from these contracts that it had acquired such rights.

### c.  December 10, 1990 Press Release

Minebea points repeatedly to the statement in the December 10, 1990 press release that announced the Joint Venture between the two companies. See Minebea Br. at 26-27. In particular Minebea makes much of the following statement from the press release:

> The combination of development know-how, engineering expertise and patents of Papst with Minebea's large scale production capabilities and manufacturing components in cost competitive locations is expected to create synergy effects ensuring competitiveness of the new joint venture companies which will enable them to obtain a leading position in the HDD Motor market.

PTX 204, Press Release (Dec. 10, 1990). From this statement, Minebea infers a representation to the public and a commitment to customers that by doing business with PMDM, "they would be able purchase [sic] the joint venture's HDD motors without concern that Papst-Motoren would utilize its patents to prevent them from using the motors in hard disk drives." Minebea Br. at 27. Aside from whether the inference Minebea seeks to draw logically follows, the Court affords no weight to this press release, and does not believe that either Minebea or its customers did or should have either. The public announcement of the joint venture was a classic piece of puffery with no legally binding effect on anyone. It could not have reasonably created an inference in

241

Minebea's or any customer's mind as to what its patent license rights would be. Those rights were defined, and the parties were governed, by the legally binding contracts between the parties: the October 2, 1990 General Business Agreement and the November 5, 1990 Agreement for Sale of Intangible Assets.

### d. May 1993 termination of the Joint Venture

Finally, Minebea argues that in terminating the Joint Venture in 1993, Papst misled Minebea into reasonably believing that Papst would not enforce its patent rights against Minebea's customers. "Most importantly," argues Minebea, the 1993 Termination Agreement "explicitly preserved and provided for the continuation and preservation of PMDM's right to sell HDD motors under all Papst patents as needed for PMDM's business to succeed. The Termination Agreement also explicitly bound Mr. G. Papst's new company, Papst Licensing." Minebea Br. at 30. Minebea is correct with respect to both of these propositions, but mistaken as to their significance. The Termination Agreement did preserve the rights Minebea had secured with respect to Papst's patents, which included only such patent rights as were "required and necessary" for the operation of the Joint Venture and its successor. See supra at 66-68 (discussing the Termination Agreement's preservation of rights under Paragraphs 4(a) and 4(d) of the Intangible Assets Agreement), and the preservation of only such patent rights as were "required and necessary" for the operation of the Joint Venture and its successor. As the Court has stated repeatedly, however, Minebea had never acquired the right to directly infringe Papst's drive patents, nor did it ever acquire the right to give its customers sublicenses to the drive patents. Thus, Papst's conduct in entering into the Termination Agreement could not have

misled Minebea into reasonably inferring that it or its customers had acquired rights to the drive patents.

### C.  Legal Estoppel Claim

#### 1.  The Parties' Arguments

Minebea claims that Papst is legally estopped from suing Minebea's customers for infringement under the hard disk drive patents, relying almost entirely on a single Federal Circuit case:  Jacobs v. Nintendo of America Inc., 370 F.3d 1097 (Fed. Cir. 2004).  Papst responds that Minebea's customers are not entitled to any estoppel under a proper reading of Jacobs.  It also argues that to the extent that Minebea asserts an "independent" claim of implied license, the Court should analyze that claim not under Jacobs, but under a line of Federal Circuit cases that employ the noninfringing use doctrine in a two-part implied license test, first articulated in Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d 903 (Fed. Cir. 1984).   See Papst Br. at 44; Papst's Prop. Concl. of Law ¶ 62.  See also Anton/Bauer, Inc. v. PAG, Ltd., 329 F.3d 1343 (Fed. Cir. 2003); Carborundum Co. v. Molten Metal Equip. Innovations, Inc., 72 F.3d 872 (Fed. Cir. 1995);  Met-Coil Sys. Corp. v. Korners Unlimited, Inc., 803 F.2d 684.  That test requires a party to demonstrate: (1) no noninfringing use for the object in question, and (2) circumstances of sale that "plainly indicate that the grant of a license should be inferred."  Met-Coil Sys. Corp. v. Korners Unlimited, Inc., 803 F.2d at 686 (quoting Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d at 924-25).

The Court has determined that this so-called "independent" claim of implied license, employing a two-prong analysis of noninfringing use and of the circumstances of sale, is neither what Minebea has actually pled or presented at trial and in its post-trial filings.

Furthermore, it is not the proper analysis for the case at bar.  The Federal Circuit has stated that the <u>Bandag</u> implied license test, is relevant only to circumstances where "the question is whether the sale carries with it a license to engage in conduct that would infringe the patent owner's rights," in the absence of "an express agreement between the parties."  <u>Jacobs v. Nintendo of America, Inc</u>., 370 F.3d at 1100.  In this case, the 1995 Settlement Agreement (and multiple previous contracts) expressly addressed the issue of a license for Minebea (and the scope of such license) and the absence of a license for Minebea's customers.  There is no need to apply a test to determine or infer something which has been expressly dealt with in the written agreements themselves.  <u>LG Elecs., Inc. v. Bizcom Elecs., Inc.</u>, 2006 U.S. App. LEXIS 16916 (Fed. Cir. 2006) ("In light of this express disclaimer, no license can be implied.").

Turning, therefore, to the unpled claim of legal estoppel, the Court concludes that Minebea does not succeed.

## 2.  Legal Estoppel

Legal estoppel, otherwise known as estoppel by deed, "turn[s] on the manifest intention of the parties' agreement."  <u>AMP, Inc. v. United States</u>, 389 F.2d at 452-53.   It is a "category of conduct encompassing scenarios where a patentee has licensed or assigned a right, received consideration, and then sought to derogate from the right granted."  <u>Wang Labs., Inc. v. Mitsubishi Elecs. America, Inc.</u>, 103 F.3d at 1581.  <u>See</u> <u>also</u> <u>Jacobs v. Nintendo of America, Inc.</u>, 370 F.3d at 1101 ("a party may not assign a right, receive consideration for it, and then take steps that would render the right commercially worthless") (citing <u>AMP, Inc. v. United States</u>, 389 F.2d at 453 ("a grantor of a property right or interest cannot derogate from the right granted by his own subsequent acts")).  The Federal Circuit has said that legal estoppel is a "narrower

244

category of conduct" than equitable estoppel, which turns on "the entire course of conduct" between the parties or the "conduct of the patentee [which] led the other to act."  Wang Labs., Inc. v. Mitsubishi Elecs. America, Inc., 103 F.3d at 1580 (citing DeForest Radio Tel. Co. v. United States, 273 U.S. 236, 241 (1927)).

In Jacobs v. Nintendo of America, Inc., 370 F.3d at 1100-02, the Federal Circuit held that a patent holder was legally estopped from asserting its combination patent against the customers of a component manufacturer because that patent holder had both covenanted not to sue the component manufacturer for any infringement of the combination patent and had expressly licensed the component manufacturer to produce the components for use in the patented combination.  The result, according to the court in Jacobs, was an implied sublicense to the component manufacturer's customers, permitting them to use the component in the patented combination product free of interference by the patent holder.  Id. at 1101-02.

Minebea asserts that, as was the case in Jacobs, Papst both covenanted not to sue Minebea and "specifically authorized" it to sell its HDD motors for infringing uses in hard disk drives.  Minebea Br. at 20;  Minebea's Prop. Concl. of Law ¶¶ 5.3-5.6.  Minebea maintains that Papst thereby granted Minebea's customers the right to use HDD motors in hard disk drives without interference, and may not now derogate from the right it has granted.  Minebea Br. at 21. Based on these assertions, Minebea argues that the Court should find an implied sublicense derived from legal estoppel for its customers just as the court did in Jacobs.  The Court disagrees.

Regardless of the rationale a party argues may be used to derive an implied license, where there exists an "express disclaimer, no license can be implied."  LG Elecs., Inc. v.

245

<u>Bizcom Elecs., Inc.</u>, 2006 U.S. App. LEXIS 16916 *2.[112]  Minebea's arguments notwithstanding, the 1995 Settlement Agreement contained an express disclaimer of any sublicense for Minebea's customers under the Papst Drive Patents:

> However, no license is granted hereunder to any Minebea customer
> with regard to any product of the customer which directly infringes
> a Papst Patent if acts of the customer or any subsequent purchaser
> or user first results in the direct infringement of the Papst Patent.
> Also, no license is granted hereunder to any Minebea customer
> with respect to any of the Papst Drive Patents other than the Papst
> Integrated Baseplate Patents.

PTX 771, 1995 Settlement Agreement (June 15, 1995) ¶ 4.1; <u>see</u> <u>also</u> <u>supra</u> at 212-216.  This fact alone defeats Minebea's argument for implied sublicense under any rationale.

The existence of this express disclaimer of a license also runs directly counter to the rationale under which Minebea has chosen to proceed, legal estoppel.  As stated, legal estoppel must give effect to the "manifest intention of the parties' agreement."  <u>AMP, Inc. v. United States</u>, 389 F.2d at 452.  The parties' manifest intention, as expressed in the 1995 Settlement Agreement, was that Minebea's customers would be granted no license under the Papst Patents or Papst Drive Patents, and that Papst would or, at least, could sue Minebea's customers under the Papst Patents or Papst Drive Patents:

> Papst . . . agree[s] not to assert any claim or prosecute any action,
> suit or proceeding against Minebea . . . for contributory
> infringement or inducement of infringement of any Papst Patent or
> Papst Drive Patent; provided, however, that this provision shall not

---

[112]    Although the Federal Circuit in <u>LG Elecs., Inc. v. Bizcom Elecs., Inc.</u> considered a claim for implied license under the <u>Bandag</u> noninfringing uses doctrine, the proposition that an implied term may not supplant an express term necessarily applies regardless of the "various avenues" a party may use to attempt to reach an implied license.

> bar Papst from the legal right to assert an infringement claim against a Minebea customer or subsequent purchaser or user for direct infringement of a Papst Drive Patent, other than a Papst Integrated Baseplate Patent, or for direct infringement of a Papst Patent if acts of such customer or subsequent purchaser or user first result in the direct infringement.

PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶ 2.4.  See also id. ¶ 2.2.  Papst cannot be legally estopped from doing what the Agreement expressly said it could do.

Papst has not derogated from any right granted, because it never granted any right to Minebea's customers under the drive patents in the 1995 Settlement Agreement, or in any previous contract during the course of the Joint Venture or thereafter.  See  PTX 195, 1990 Agreement for the Sale of Intangible Assets (Nov. 5, 1990) ¶ 4(c) ("Minebea is not entitled either to grant sublicenses or to sell and transfer the license completely or partly to anyone else without previous consent by Papst given by registered letter, except to the GJV [German Joint Venture] and TJV [Thai Joint Venture]"); PTX 264, License Agreement Regarding Intangible Assets (Mar. 15, 1991) ¶ 1(c) ("Minebea is not entitled to grant sublicenses or to sell or transfer the licenses [to Papst's patents] completely or partly to anyone else" except the Thai Joint Venture); PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶ 4.1;  see also supra at 95-107.  The Papst-Minebea agreements clearly did not grant a license to Minebea's customers to directly infringe the drive patents.

Minebea's analysis of Jacobs is faulty.  In Jacobs, the customer of a component part manufacturer asserted an implied license defense against the patent holder's infringement claim.  In both the instant case and in Jacobs, the patent holder and component manufacturer had entered into a settlement agreement under which the patent holder had covenanted not to sue the component part manufacturer for contributory infringement of its combination patent.  Jacobs v.

247

Nintendo of America, Inc., 370 F.3d at 1098-99.  See 1995 Settlement Agreement (June 19,

1995) ¶ 5.2 ("Papst and each of them further warrant that Minebea's manufacture, distribution,

use or sale of motors by themselves do not directly infringe the claims in the Papst Drive Patents.

Papst and each of them agree not to assert any claim or initiate any proceeding against Minebea

or any of them for contributory infringement or inducement of infringement of any Papst Drive

Patents."); Jacobs v. Nintendo of America, Inc., 370 F.3d at 1098-99 ("Covenant-not-to-sue.

Jacobs covenants not to sue Analog for any alleged infringement or violation of the '958 patent.

This covenant-not-to-sue extends to any cause of action having as an element the infringement of

the '958 patent by Analog or any other party, whether occurring in the past, present, or in the

future.").

        A covenant not to sue – such as the one in the 1995 Settlement Agreement, in this

case, as well as the one in Jacobs – conveys a "bare" or "nonexclusive" license, meaning that the

license holder has not affirmatively conveyed any patent rights.  See Jacobs v. Nintendo of

America, Inc., 370 F.3d at 1101 (citing Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal.,

Inc., 248 F.3d 1333, 1345 (Fed. Cir. 2001)).  A bare license agreement is "in essence nothing

more than a promise by the licensor not to sue the licensee."  Spindelfabrik Suessen-Schurr,

Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft, 829 F.2d

1075, 1081 (Fed. Cir. 1987); see also Minebea Co. Ltd. v. Papst, 374 F. Supp.2d at 207.  In and

of itself, this "bare" license cannot be construed to convey any further rights because "a

non-exclusive patent license is always personal in nature and confers no right to sub-license

others."  Minebea's Resp. to Papst's Prop. Concl. of Law at 121 (citing 6 ERNEST BAINBRIDGE

248

LIPSCOMB III, LIPSCOMB'S WALKER ON PATENTS § 20:28 103 (3d ed. 1987) (emphasis in original)).

The critical fact to the court in Jacobs was not the existence of this "bare" license, which protects only the holder of the license from suit.  Rather, the Federal Circuit in Jacobs upheld the district court's finding of an implied sublicense to the component manufacturer's customers only because the Jacobs settlement agreement also contained a separate, additional clause "granting [the component manufacturer] an affirmative right to engage in the manufacture and sale of [components] to be used in [combination products]."  Jacobs v. Nintendo of America, Inc., 370 F.3d at 1101.  "That grant [came] without restriction of any kind."  Id.  The court reasoned that to read this second affirmative clause as merely protecting the component manufacturer from suit would be redundant with the covenant-not-to-sue (the "bare license") that already existed in the agreement.  Id.  Therefore, the second clause was interpreted by the court in Jacobs as implicitly conveying to the customers a sublicense to use the component without interference by the patent holder.  Id.

No such redundancy exists in the 1995 Settlement Agreement between Papst and Minebea.  Nor is there any need for the Court to imply or infer terms into the agreement at issue on the ground that it has not explicitly addressed the issue of customer rights.  To the contrary, and as previously discussed, the1995 Settlement Agreement contains terms that expressly address the issue of infringement suits against customers, and expressly reserve Papst's right to sue those customers.  See PTX 771, 1995 Settlement Agreement (June 19, 1995) ¶¶ 2.2, 2.4.  As much as Minebea attempts to ignore it, the existence of these express provisions stand in complete

opposition to the facts of <u>Jacobs</u> and defeat its legal estoppel claim for an implied sublicense under that case.

## VI.  COUNT XIV:  PATENT MISUSE

In Count XIV of the Second Amended Complaint, Minebea seeks a declaratory judgment of patent misuse, alleging that Papst improperly collected double royalties on its patents and that it engaged in improper "package licensing."  Patent misuse is an equitable defense against patent infringement; it renders the patent unenforceable until the misuse is cured and thus provides a temporary defense.  <u>U.S. Philips Corp. v. ITC</u>, 424 F.3d 1179, 1184 (Fed. Cir. 2005); <u>Virginia Panel Corp. v. MAC Panel Co.</u>, 133 F.3d 860, 869 (Fed. Cir. 1998); <u>B. Braun Med., Inc. v. Abbott Labs.</u>, 124 F.3d 1419, 1427 (Fed. Cir. 1997).  The purpose of the patent misuse defense is "to prevent a patentee from using the patent to obtain market benefit beyond that which inheres in the statutory patent right."  <u>U.S. Philips Corp. v. ITC</u>, 424 F.3d at 1184 (quoting <u>Mallinckrodt, Inc. v. Medipart, Inc.</u>, 976 F.2d 700, 704 (Fed. Cir. 1992)).  The fact-intensive "key inquiry" in considering a claim of patent misuse is whether "by imposing conditions that derive their force from the patent, the patentee has impermissibly broadened the scope of the patent grant with anti-competitive effect."  <u>Id.</u> (quoting <u>C.R. Bard, Inc. v. M3 Sys., Inc.</u>, 157 F.3d 1340, 1372 (Fed. Cir. 1998)); <u>see</u> <u>B. Braun Med., Inc. v. Abbott Labs.</u>, 124 F.3d at 1426 ("fact-intensive doctrine"); <u>Virginia Panel Corp. v. MAC Panel Co.</u>, 133 F.3d at 868 (the question is whether the conduct alleged "impermissibly broaden[s] the physical or temporal scope of the patent grant with anticompetitive effect").

Patent misuse is an extension of the equitable doctrine of unclean hands, intended to "restrain practices that [do] not in themselves violate any law, but that [draw] anticompetitive

strength from the patent right" and thus are contrary to public policy. <u>Mallinckrodt, Inc. v. Medipart, Inc.</u>, 976 F.2d at 704. "All that a successful defense of patent misuse means is that a court of equity will not lend its support to enforcement of a misuser's patent." <u>Senza-Gel Corp. v. Seiffhart</u>, 803 F.3d 661, 668 (Fed. Cir. 1986). It has been held that patent misuse is "not itself an actionable tort." <u>Transitron Electronic Corp. v. Hughes Aircraft Co.</u>, 487 F. Supp 885, 893 (D. Mass 1980), <u>aff'd</u>, 649 F.2d 871 (1st Cir. 1981).

   Minebea claims that Papst has misused its patents by (1) collecting double royalties from Minebea and its customers, and (2) engaging in illegal package licensing. Although certain specific practices, such as requiring the payment of post-patent-expiration royalties, have been held to constitute patent misuse *per se*, none of Papst's alleged conduct here constitutes *per se* misuse. Accordingly, the Court considers Minebea's claims of patent misuse under a "rule of reason" analysis. <u>U.S. Philips Corp. v. ITC</u>, 424 F.3d at 1185; <u>Virginia Panel Corp. v. MAC Panel Co.</u>, 133 F.3d at 869. Under the rule of reason, the party asserting patent misuse must prove that the patent holder's behavior had anticompetitive effects. <u>See</u> <u>U.S. Philips Corp. v. ITC</u>, 424 F.3d at 1185, 1186. "[T]he finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature and effect." <u>U.S. Philips Corp. v. ITC</u>, 424 F.3d at 1197 (quoting <u>Virginia Panel Corp. v. MAC Panel Co.</u>, 133 F.3d at 869). Thus, even if Minebea could prove that Papst collected double royalties or engaged in conditional package licensing, thereby broadening the scope of its patent rights, it also must prove anticompetitive effect.

251

*A.  Double Royalties*

1.  PSC, Inc. v. Symbol Technologies, Inc.

Minebea asserts that Papst has misused its patents by collecting double royalties.

Minebea Br. at 79-82.  Minebea's double royalty theory is based primarily on Judge Telesca's

decision in PSC, Inc. v. Symbol Technologies, Inc., 26 F. Supp.2d 505, 508 (W.D.N.Y. 1998).

Minebea argues that because it has paid a royalty to Papst for the drive patents, and its motors

embody the essential features of the drive patents, Papst's collection of additional royalties from

Minebea's customers for the same drive patents (and essentially the same products) constitutes

patent misuse.  Minebea Br. at 80.  Minebea essentially argues that Minebea and its customers

each pay for the same drive rights and/or that Minebea has paid indirectly for its customers' drive

rights because Minebea's motor sales have exhausted the drive patents.  Minebea Br. at 82.

Minebea maintains that Papst's "double" collection of royalties constitutes misuse because the

motor patents are the same as the drive patents from an exhaustion standpoint.  Id.  Minebea cites

no controlling or even persuasive authority for its novel assertion that an "exhausted" (drive)

patent is the same patent as the "exhausting" (motor) patent for purposes of patent misuse.  For

the same reasons as explained in its discussion of patent exhaustion, the Court does not consider

the drive patents and the motor patents to be "the same patents" for purposes of patent misuse.

In any event, the situation presented here is very different from that in PSC.  In

PSC, there were two patents related to scan engines and integrated terminals.  The licensee paid a

royalty to the patentee to cover any products (the scan engines) that the licensee produced that

were covered by any claims of the two patents at issue.  PSC, Inc. v. Symbol Techs., Inc., 26

F. Supp. 2d. at 509.  In addition to the first royalty payment, the licensee paid a royalty to the

252

patentee when its scan engines were combined by the licensee's customers into another product (the integrated terminals) that was covered by any claims of the same two patents. Id. It was clear in PSC that the patentee collected two separate types of royalties from the licensee: The first royalty payment was for a complete license for the scan engine product. Id. The second royalty paid by the licensee was for "any product manufactured by [the licensee] that when installed in another product, was used or would be used in practicing any claim of the [two patents]." Id. Thus, the second royalty did not cover the scan engines, but instead was for each scan engine that was combined into an integrated terminal product. Id. In other words, in PSC the licensee paid for licenses under the same two patents for two entirely separate products: scan engines and integrated terminals. Id. at 509-510.

In addition to the two royalties paid by the licensee to the patentee in PSC, the patentee also collected royalties on these same two patents from the licensee's customers (the integrated terminal manufacturers). PSC, Inc. v. Symbol Techs., Inc., 26 F. Supp. 2d at 509-10. The court found that the separate royalty paid by the integrated terminal manufacturers constituted a second royalty paid under the same two patents for the same patent rights at issue on the same integrated terminal product. See id. Thus, wrote Judge Telesca, "I find that the collection of royalties from two parties for the same product improperly broadens the scope of the rights Symbol has under its patents," and thus constitutes patent misuse. Id. at 510.

The court in PSC did not expressly discuss whether the second royalty paid by the licensee was a direct or indirect royalty/license – that is, whether it was for the right to directly infringe the two patents at issue or to indirectly infringe the two patents at issue. The court implicitly held, however, that it was a direct royalty identical to the royalty thereafter paid by the

licensee's customers because the patentee collected the second royalty only on scan engines that were actually combined into integrated terminals.  PSC, Inc. v. Symbol Techs., Inc., 26 F. Supp. 2d at 510 ("[the licensee] does not pay royalties on all scan engines *per se*, but only on its scan engines that, 'when installed . . . [are] used or to be used in practicing any of the claims of [the two patents at issue].").  The court's "double royalty" holding in PSC was not premised on the fact that the licensee paid two separate royalties (one for the scan engines and one for the integrated terminals), but rather, on the fact that both the licensee and the licensee's customer paid for the exact same type of rights under the same two patents at issue (rights to directly infringe) and that both paid royalties on the exact same product (the integrated terminals).  Id.

The question for the court in PSC was whether, under a rule of reason analysis, the collection of double royalties impermissibly broadened the scope of the patent rights with anticompetitive effect, and whether it had an unreasonable restraint on trade.  PSC, Inc. v. Symbol Techs., Inc., 26 F. Supp. 2d. at 510-11.  The court held that the double royalties collected did constitute patent misuse because they illegally broadened the patentee's patent rights with an anticompetitive effect.  Id.  As Judge Telesca put it:

> The collection of two royalties by Symbol for the same product is not the type of restraint that merely regulates or promotes competition.  Instead, it has the effect of suppressing competition by increasing the manufacturing cost of a hand-held scanner or an integrated terminal when a PSC scan engine is used in those products.  The requirement that [the licensee] pay a royalty on scan engines that are sold to customers who are also obligated to pay royalties to [the patentholder] under the same patents obligates [the licensee] to either increase the cost of its engine or decrease its profit margin.  Either result unfairly restrains competition in a market that is essentially controlled by [the patentholder] because it holds patents that are necessary to the manufacture of scan engines, hand held laser scanners, and integrated terminals.

Id. at 511.

The patentee in PSC was a manufacturer of scan engines.  When integrated terminal manufacturers purchased scan engines from the patentholder, they only had to pay one royalty (for the integrated terminal product) directly to the patentholder.  PSC, Inc. v. Symbol Techs., Inc., 26 F. Supp. at 510-11.  When integrated terminal manufacturers purchased scan engines from licensees of the patentholder, however, they indirectly paid the "double" royalty by purchasing scan engines from a licensee who already had paid the royalty for the integrated terminal product; and presumably the price the licensee charged its customer reflected that royalty payment.  Id.  The anticompetitive effect was that the licensees either had to decrease their profit margins to compete with the patentholder selling directly to integrated terminal manufacturers, or the licensees (in order to cover their costs) would charge higher prices to the integrated terminal manufacturers than the manufacturers would pay if they purchased directly from the patentee.  The patentholder, for its part, could either charge less than its licensee or could raise its price to the price charged by its licensee (while the licensee's costs were relatively higher than the patentee's because the licensee must pay the royalty to the patentholder).  Id.  The situation in this case is quite different.

## 2.  Papst Did Not Collect Double Royalties

Minebea compares itself to PSC (the licensee) and Papst to Symbol (the patent holder), but Minebea's case is easily distinguished from PSC's.  Minebea and its customers do not pay for the same patent rights on the same products.  Minebea has paid Papst a single royalty payment to directly infringe Papst's motor patents and to indirectly infringe Papst's drive patents by virtue of its motor sales.  Minebea never paid for any rights to directly infringe the drive

patents and thus did not pay for any rights with regard to disk drive products.  Minebea paid a

royalty for rights "insofar as required and necessary" for it to engage in the manufacture, use and

sale of hard disk drive motors only – not for a complete product license on hard disk drives.

Therefore, what Minebea is entitled to transfer to its customers – and what its customers obtain

when they purchase motors from Minebea – is the right to directly infringe the motor patents.

What the customers do not obtain by purchasing motors from Minebea is the right to directly

infringe the drive patents, because Minebea never paid Papst for its customers' use of the drive

rights.  For the customers to obtain such rights, they would have to enter into separate licensing

agreements with Papst, as many of them have, and pay a royalty for the rights to directly infringe

the drive patents.

　　　　　Although Papst does collect two sets of royalties on its drive patents – one from

directly Minebea, and one directly from Minebea's customers – these royalties pay for different

sets of rights that apply to different products.  Minebea pays Papst for the right to indirectly

infringe the drive patents by its sale of motor products; the customers must pay Papst for the right

to directly infringe the drive patents by their manufacture of disk drive products.  Therefore,

unlike in PSC, Minebea and its customers do not pay royalties on the same patents for the same

products.

　　　　　The testimony at trial also showed that Minebea never paid Papst for its

customers' use of the drive rights.  The evidence was that Minebea would have had to pay

significantly more money to obtain a license for itself and its customers under Papst's drive

patents.  See supra at 46-49.  For example, during the March 1995 meeting between Papst and

Minebea to negotiate the 1995 Settlement Agreement, Minebea was informed that to get a license

to the drive patent rights would cost approximately ten times more than just motor rights by themselves.  7/21/05 (p.m.) Trial Tr. at 107:6-15, 108:12-23, 110:11-113:5 (Schnayer testim.); 7/28/05 (p.m.) Trial Tr. at 55:25-56:11, 57:6-11, 57:24-58:4 (G. Papst testim.).  Minebea therefore has not proven that Papst has collected any double royalties and therefore must fail on this aspect of its patent misuse claim.

## B.  Package Licensing

Minebea next asserts that Papst has engaged in patent misuse by refusing to license individual patents, and instead requiring potential licensees to take package licenses, including patents that the licensees do not want to license in order to get the patents that the licensees do want to license.  See Minebea Br. at 79, 83.  Such package licensing is a form of tying arrangement ("patent-to-patent tying") and thus may constitute patent misuse.  See id. at 82-84.  Minebea argues that Papst's alleged package licensing constitutes per se patent misuse because:  (1) Papst has market power in the market for licensing essential patents; and (2) Papst conditions the license of those patents on the licensee's acceptance of other patents (which the licensee may not want to license).  See id. at 82.

### 1.  Package Licensing is Not per se Unlawful

35 U.S.C. § 271(d)(5) provides:

> No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having . . . conditioned the license of any rights to the patent or the sale of the patented product on acquisition of a license to rights in another patent or purchase of a separate product, unless, in view of the circumstances, the patent owner has market power in

257

> the relevant market for the patent or patented product on which the
> license or sale is conditioned.

Judge Bryson, writing for the Federal Circuit in U.S. Philips Corp. v. ITC, 424

F.3d. at 1186, has explained that this provision "provides a safe harbor for certain kinds of

conduct by patentees."  Id.; see also United States Philips Corp. v. Princo Corp., 2006 U.S. App.

LEXIS 7631, at *6-*7 (Fed. Cir. 2006) (unpublished disposition) ("section 271(d)(5) 'does not

define the scope of the defense of patent misuse, but merely provides a safe harbor against the

charge of patent misuse for certain kinds of conduct by patentees.'").  Furthermore,

> [b]ecause the statute is phrased in the negative, it does not require
> that patent misuse be found in the case of all such conditional
> licenses in which the patent owner has market power; instead, the
> statute simply excludes such conditional licenses in which the
> patent owner lacks market power from the category of
> arrangements that may be found to constitute patent misuse.

U.S. Philips Corp. v. ITC, 424 F.3d. at 1186; accord United States Philips Corp. v. Princo Corp.,

2006 U.S. App. LEXIS 7631, at *6-*7 ("Section 271(d)(5) designates specific practices as not

constituting patent misuse. In particular, the statute provides that it is not patent misuse for a

patentee to 'condition[] the license of any rights to [a] patent . . . on the acquisition of a license to

rights in another patent . . . unless, in view of the circumstances, the patent owner has market

power in the relevant market for the patent . . . on which the license . . . is conditioned.'")

(modifications in original) (citing Illinois Tool Works v. Indep. Ink, Inc., 126 S.Ct. 1281 (2006)).

In view of the statutory language, the Federal Circuit rejected the notion that mandatory package

licensing always constitutes patent misuse or is per se unlawful as "not supported by precedent or

reason."  U.S. Philips Corp. v. ITC, 424 F.3d. at 1187.

258

The court in <u>Philips</u> noted "the fundamental difference between an obligation to purchase a product and the extensions of a non-exclusive license to practice a patent," and specifically distinguished patent-to-product tying arrangements from patent-to-patent tying arrangements. <u>U.S. Philips Corp. v. ITC</u>, 424 F.3d at 1189. In patent-to-product tying, the court noted, the patent owner uses the market power conferred by a patent to compel customers to purchase a product (which the customers might otherwise purchase from a competitor) in a <u>separate</u> market. It therefore is anticompetitive and may constitute patent misuse *per se.* <u>See</u> <u>U.S. Philips Corp. v. ITC</u>, 424 F.3d at 1189-90; <u>but cf.</u> <u>Illinois Tool Works v. Indep. Ink, Inc.</u>, 126 S.Ct. at 1290-91 (noting that Congress has "narrow[ed] the patent misuse defense" and that patent-to-product tying does not give rise to presumption of market power under 35 U.S.C. § 271(d)). By contrast, the court held that a patent-to-patent tying arrangement – such as a package licensing agreement which includes both essential and non-essential patents – should not be evaluated under a *per se* standard, but under a rule of reason analysis. <u>Id</u>. A patent-to-patent tying arrangement does not bar the licensee from using an alternative technology offered by a competitor of the licensor's or foreclose the competitor from licensing the alternative technology. <u>See</u> <u>U.S. Philips Corp. v. ITC</u>, 424 F.3d at 1189-90. "It merely puts the competitor in the same position he would be in if he were competing with unpatented technology." <u>Id.</u> It therefore is not *per se* illegal and must be evaluated under the rule of reason.

As Judge Bryson said in <u>Philips</u>:

> A package license is in effect a promise by the patentee not to sue his customer for infringing any patents on whatever technology the customer employs in making commercial use of the licensed patent. That surrender of rights might mean that the customer will choose not to license the alternative technology offered by the patentee's competition, but it does not compel the customer to use

> the patentee's technology.  The package license is thus not
> anticompetitive in the way that a compelled purchase of a tied
> product would be.

U.S. Philips Corp. v. ITC., 424 F.3d at 1190.  Furthermore, in Philips,

> the intervenors were not "forced" to "take" anything from Philips
> that they did not want, nor were they restricted from obtaining
> licenses from other sources to produce the relevant technology.
> Philips simply provided that for a fixed licensing fee, it would not
> sue any licensee for engaging in any conduct covered by the entire
> group of patents in the package.

Id.  The same is true in this case.

### 2.  Papst Did Not Condition Its Licenses

In support of its package licensing assertions, Minebea presented a single

document with no supporting testimony, a facsimile of a letter, dated August 20, 1997, from

NEC's outside counsel, Foley & Lardner, to Jerold Schnayer, Papst's outside counsel, regarding

the Papst/NEC license negotiations.  See PTX 1094 (Letter from John J. Feldhaus to Jerold B.

Schnayer (Aug. 20, 1997).  NEC's counsel wrote to Papst's counsel:

> [A]lthough we [NEC] have repeatedly asked for a patent-by-patent
> license proposal from Mr. Papst, we have received none.  NEC still
> wishes to consider licensing only specific patents and offers to pay
> for each patent the royalty for the entire package divided by the
> number of patents in the package.  This is NEC's patent-by-patent
> offer.  Please respond.

PTX 1094 at 2.  Minebea did not offer a witness from NEC or any other company to testify as to

the meaning of this particular document, this particular patent license, or any other patent license.

The Court finds that the language in the letter from NEC's counsel to Mr. Schnayer standing

alone falls far short of proving that Papst conditioned NEC's license of some patents on its

acceptance of other patents.  Indeed, the language in this letter is entirely consistent with Papst's

negotiating for different terms with different prospective licensees.  Furthermore, the document

may or may not mean that NEC actually wanted a patent-by-patent license; rather, it may mean

(as the exhibit plainly states) that NEC was only "considering" a patent-by-patent license or even

that NEC was just posturing, hoping to get a more favorable proposal from Papst.  Minebea has

not proven, though this lone document, any conditioning of patent licenses by Papst.

   The only trial testimony offered on the package licensing issue came from Jerold

Schnayer, Papst's outside counsel.  Mr. Schnayer testified that Papst did <u>not</u> condition its license

of some patents on the licensee's acceptance of other patents.  <u>See</u> 7/25/05 (a.m.) Trial Tr. at

69:24-71:11 (Schnayer Testim.).  With respect to his negotiations with NEC regarding the Papst

HDD patents, Mr. Schnayer testified that Papst was willing to consider licensing individual

patents to NEC, but that upon offering such licenses, NEC always came back to the negotiating

table asking for a release under additional patents.  <u>See id.</u> at 70:12-25.  Therefore, after the

parties were done posturing regarding patent-by-patent licenses versus a global license, it seemed

to Papst that NEC preferred to get a release – that is, a license under all of the Papst HDD patents

– but was unwilling to pay for it.  <u>See id.</u>  Mr. Schnayer testified as follows:

> The offer that [NEC] made was, we want to have rights under a
> few patents, but we want a release under the remaining patents.
> And I said to him [Mr. Feldhaus, NEC's outside counsel], fine, if
> you want a release under the other patents, you have to pay for it.
> You can't say I want a release and not pay for it.  So essentially,
> [NEC] wanted a license under all the patents, but he [Mr.
> Feldhaus] didn't want to pay for it.  And so that's how it ended up.
> Some of his [Mr. Feldhaus] letters that he wrote me were
> mischaracterizing what occurred.  I wrote letters back clarifying the
> situation.

<u>Id.</u> at 70:19-71:2.

261

Mr. Schnayer's uncontradicted testimony refutes Minebea's claim that Papst coerced or conditioned its license to NEC (or anyone else) upon the licensee's acceptance of other patents.  Minebea did not call a witness to rebut Mr. Schnayer's testimony.  Accordingly, because Minebea failed to prove that Papst conditioned any license for some patents upon a licensee's acceptance of other patents, Minebea failed to prove impermissible package licensing.

### C.  Minebea Did Not Prove Anticompetitive Effects

Assuming that Minebea had proved either that Papst collected a "double royalty" or that Papst engaged in "conditional package licensing" – which it has not – Minebea still would have to prove that Papst's conduct had an anticompetitive effect to make out its case of patent misuse.  See Illinois Tool Works v. Indep. Ink., 126 S.Ct. at 1290-91; U.S. Philips Corp. v. ITC, 424 F.3d at 1190.  Minebea has failed in this regard as well.

Because the conduct asserted by Minebea is not *per se* unlawful, it must be evaluated under a rule of reason analysis.  As noted, under the rule of reason, the first question is whether Minebea has proved that Papst's licensing practices "impermissibly broadened the 'physical or temporal scope' of the patent grant," and the second is whether that impermissible conduct had an "'anticompetitive effect.'"  Virginia Panel Corp. v. MAC Panel Co., 133 F.3d at 868 (quoting Windsurfing Int'l, Inc. v. AMF, Inc., 782 F.2d 995, 1001 (Fed. Cir. 1986)).  The Court has found that Minebea has not met its burden on the first prong.  If it had done so, the question then would be whether the questioned practice or practices imposed an unreasonable restraint on competition under a rule of reason analysis.  U.S. Philips Corp. v. ITC, 424 F.3d at 1197-98; Virginia Panel Corp. v. MAC Panel Co., 133 F.3d at 868-69.  While it was not necessary in this regard for Minebea to prove that Papst's conduct constituted an independent

262

violation of the antitrust laws, it was necessary to show that it unfairly restrained competition.

PSC Inc. v. Symbol Techs., 26 F. Supp. 2d at 511 (citing Zenith Radio Corp. v. Hazeltine

Research, Inc., 395 U.S. 100, 140-41 (1969)).  "[T]aking into account a variety of factors,

including specific information about the relevant business, its condition before and after the

restraint was imposed, and the restraint's history, nature and effect," Virginia Panel Corp. v.

MAC Panel Co., 133 F.3d at 869 (quoting State Oil Co. v. Kahn, 522 U.S. 3, 10 (1997)), the

Court finds that Minebea has not proved an unreasonable restraint on competition.

Papst maintains that Minebea was required to prove:  (1) a relevant market in

which Papst competes; (2) that Papst has market power in that market; and (3) that Papst uses its

market power to achieve anticompetitive effects.  Minebea says that it was not so required and

correctly points out that the cases on which Papst relies are antitrust cases and not patent misuse

cases and that patent misuse cases employ a more flexible analysis, as articulated in Virginia

Panel.  While there is clearly a close relationship between the patent misuse doctrine and the

antitrust laws, Minebea has the better of the argument.  Cf. U.S. Philips Corp. v. ITC, 424 F.3d

at 1185-86.  Still, the issue of market power in the relevant market is certainly among the variety

of pertinent factors for the Court to consider under Virginia Panel in determining whether Papst's

conduct was anticompetitive in a patent misuse case.  See 35 U.S.C. § 271(d)(5); U.S. Philips

Corp. v. ITC, 424 F.3d at 1186-87.[113]

---

[113]     The Court would reach the same conclusions as those reached in the discussion
that follows even under the more stringent requirements of proof urged by Papst.

1.   The Motor and Hard Disk Drive Product Markets

Minebea did not prove that Papst has market power in any relevant market, much less that it has engaged in "prohibited conduct" "directed toward competitors" that was "intended to injure competition."  See Integraph Corp. v. Intel Corp., 195 F.3d 1346, 1353 (Fed. Cir. 1999). Papst cannot have market power in the market for hard disk drives or the market for motors because Papst does not make or sell either hard disk drives or motors; it simply licenses patents. Minebea presented absolutely no evidence that Papst competes with Minebea or its customers in any market.  "Firms do not compete in the same market unless, because of the reasonable interchangeability of their products, they have the actual or potential to take significant business away from each other."  Integraph Corp. v. Int'l Corp., 195 F.3d at 1355.  Papst sells no products that are interchangeable with, or even that compete with, products sold by Minebea or its customers.  Indeed, Minebea's primary economics/damages expert identified Minebea's primary competitors to be Nidec and several fringe motor manufacturers, but not Papst.  See supra at 24, 61; Written Direct Testimony of Jerry A. Hausman (July 6, 2005) (Docket No. 1269) ¶ 38; see also 8/3/05 (p.m.) Trial Tr. at 37:19-38:24 (Sayers testim.).  Because Papst does not make and sell motors or hard disk drives, it does not compete with Minebea or its customers (the HDD manufacturers) in any market and has no market power in either the motor or hard disk drive product markets.[114]

---

[114]     The parties do not dispute that hard disk drives constitute a product market.  See Papst's Resp. to Minebea's PFF ¶ 10.4.6; Papst's Resp. to Minebea's Prop. Concl. of Law ¶ 3.5.2.

2.  The Purported "Technology Market"

In his written direct testimony, Professor Hausman opined that Papst had market power in a "technology market" that consists of the intellectual property necessary to produce hard disk drives, which he considers "a relevant market for antitrust purposes."  Hausman Written Direct Testimony ¶ 16.  Professor Hausman further opined that Papst has "market power" in a market that consists of its own patents – based on his assumption that anyone manufacturing an HDD necessarily would infringe at least one Papst drive patent.  Id.

The concept of having impermissible market power in a "technology market" consisting merely of one's own patents has never been adopted by the Supreme Court, by the Federal Circuit, or by any other court of appeals.  Indeed, it has been expressly rejected by courts that have considered the issue.  See In re Indep. Serv. Orgs. Antitrust Litig., 203 F.3d 1322, 1325 (Fed. Cir. 2000) ("A patent alone does not demonstrate market power."); C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d at 1368 ("It is not presumed that the patent-based right to exclude necessarily establishes market power in antitrust terms."); Abbott Labs. v. Brennan, 952 F.2d 1346, 1354 (Fed. Cir. 1991) ("A patent does not of itself establish a presumption of market power in the antitrust sense.") (citing Walker Process Equip. v. Food Mach. & Chem. Corp., 382 U.S. 172, 177-78 (1965)); Texas Instruments v. Hyundai, 49 F. Supp. 2d 893, 916 (E.D. Tex. 1999) ("[A]ntitrust law dictates [that the legitimate patent right to exclude others from IT's patent technology] is not impermissible market power.").  A patent is not a competitive market and does not define a competitive market.  This Court, too, therefore declines to accept the concept of impermissible market power based on "one's own patents" as a "technology market."

265

Even if the potential for market power in a technology market could exist based solely on Papst's patents, Minebea failed to prove that Papst has market power in this purported "technology market." Minebea relies exclusively on Professor Hausman for its technology market power argument, and Professor Hausman's market power analysis is completely dependent on his "understanding" that "anyone manufacturing a hard disk drive necessarily infringes at least one claim of a Papst Drive Patent." Hausman Written Direct Testimony ¶ 16. Professor Hausman relies for this "understanding" on the opinions of Mr. Dalziel and on certain "admissions" made by Papst and its counsel. Neither of these bases provides an adequate foundation for Professor Hausman's opinion on the issue of market power in a technology market.

As a result of this Court's pre-trial Daubert ruling, Mr. Dalziel was not permitted to opine on the subject of infringement or design around because such an infringement or design around analysis necessarily requires claim construction to define the scope of the patents at issue, and Minebea consistently has taken the position that the Court was not required to do claim construction in this case. Minebea Co. v. Papst, No. 97-0590, 2005 U.S. Dist. LEXIS 11946 *33-34 (D.D.C. June 21, 2005). Minebea told the Court repeatedly that it did not need to do claim construction and made no effort to actually prove that any hard disk drives infringed Papst's drive patents. The Court therefore concluded: "Minebea cannot have it both ways. Minebea cannot present expert testimony supporting its patent exhaustion theory by calling expert witnesses to opine that it is impossible to design around Papst's Drive Patents, but then fail to present a proper claim construction or request one from the Court." Id. at *33. See also supra note 64.

Following the Court's <u>Daubert</u> Opinion, Minebea submitted a strike-through of Professor Hausman's report that literally deleted reference to Mr. Dalziel's name but otherwise left the report unchanged, albeit without the foundational support of Mr. Dalziel's opinions.  <u>See</u> Minebea's Strike-Through Version of Professor Hausman's Expert Report (July 6, 2005) (Docket No. 1265) ¶¶ 17, 22.  In his written direct testimony, however, Professor Hausman added Mr. Dalziel's name back in, as support for his "understanding" of which products infringe Papst's patents.  Hausman Written Direct Testimony ¶ 16.  Professor Hausman's opinion cannot be accepted because Mr. Dalziel is not qualified to opine on the matters for which he is relied upon by Professor Hausman.  Mr. Dalziel has not asserted that he has conducted a thorough infringement analysis or claim construction for each hard disk drive patent and hard disk drive product on the market.  <u>See</u> <u>supra</u> note 64.  There therefore is no basis for either Professor Hausman or Mr. Dalziel to opine on whether Papst has market power in a technology market because neither has comprehensively studied such market and neither has laid the proper foundation for an opinion.

Professor Hausman also purports to rely on statements and positions taken by Papst and "admissions" made by Papst and its counsel in licensing negotiations. Hausman Written Direct Testimony ¶ 16.  For example, Professor Hausman cites to a letter written by Papst's counsel to NEC while they were negotiating a patent license.  PTX 1100, Letter from Jerold B. Schnayer, Papst's counsel, to John J. Feldhaus, NEC's counsel, re license negotiations (Aug. 28, 1997).  In the letter, Mr. Schnayer for Papst stated that it would be impractical for NEC to design around all of Papst's patents because it would substantially increase NEC's HDD production costs.  <u>Id.</u>  Papst's views on the scope of its own patents, however, are irrelevant to

267

this Court's market power analysis.  As the court explained in <u>Orion Elec. Co. v. Funai Elec. Co.</u>,

No. 01 CV 3501, 2002 U.S. Dist. LEXIS 3928, *20-21 (S.D.N.Y. March 11, 2002):

> [Defendant's] claims about the scope of the patents, however, are
> not legally relevant. [Defendant's] assertions do not have any legal
> effect and cannot block anyone from entering the relevant markets.
> It is only the legal force of the Asserted Patents themselves that can
> exclude competitors, and patent claim interpretation is a question
> of law to be decided by the courts. . . .  While plaintiffs may make
> an allegation of market power conditional upon a court's
> interpretation of the Asserted Patents, any claim of market power
> must depend upon the patents themselves, not upon the statements
> of the patentee.  Because plaintiffs have pled only Funai's alleged
> representations, they have not adequately alleged market power.

<u>Id.</u> at 21-22.  If Papst's views on the scope of its patents is irrelevant, it is likewise insufficient

for Professor Hausman to rely on Papst's alleged assertions that HDD manufacturers infringe one

or more of its patents.  In sum, the two factual predicates for Mr. Hausman's market power

opinion lack adequate foundation in the record and cannot stand, even if Mr. Hausman's

technology "market power" theory were otherwise legally viable.

Furthermore, even assuming *arguendo* that Minebea could prove a "technology

market" that includes Papst's patent rights, Minebea and/or its customers and Papst do not

compete in that market.  At trial, Minebea failed to offer evidence that Minebea and/or its

customers competed with Papst in any market.  The relationship between Papst and Minebea and

its customers is vertical, not horizontal.  While Minebea and its customers may be users of

Papst's technology, they do not have technology that competes with that of Papst.

### 3. Papst's Licensing Activities Had No Anticompetitive Effect

Minebea asserts that Papst's alleged "receipt of and attempts to collect royalty payments from both Minebea and its subsidiaries and their customers has the effect of suppressing competition by increasing the costs associated with the manufacture and sale of hard disk drives."  2d Am. Compl. ¶ 233.  Minebea failed to prove, however, that Papst's licensing activities increased the costs associated with the manufacture and sale of hard disk drives or that competition has been suppressed.  Minebea's own expert testified that the HDD market has been and remains highly competitive.  Hausman Written Direct Testimony ¶ 12 ("The HDD industry is highly competitive.").  Professor Hausman further testified that "[t]here is very little product differentiation across different firms, and drives with the same characteristics (form factor, capacity, and speed) are very close substitutes for customers."  Id.  As a result, Professor Hausman concluded, "price competition in the industry is intense" and has resulted in "a number of firms" exiting the market in recent years, "and those that remain have struggled to earn profits."  Id.

To the extent that Papst's licensing efforts did increase the costs associated with the manufacture of hard disk drives, Professor Hausman testified that any such "costs" would just get passed through to the customers, thus keeping the competitive balance intact.  See 5/20/05 Hausman Dep. Tr. at 55:2-17; Hausman Written Direct Testimony ¶ 25.  Therefore, even if Papst had intended to cause anticompetitive effects, none have actually occurred.  Moreover, there was no logical reason –  business, economic or otherwise – for Papst to try to cause any anticompetitive effect.  Because Papst was not a competitor, it had no motivation to try to upset

269

the market.  Indeed, Papst benefitted from the market being competitive and market players being successful in that market.

Finally, even assuming Minebea had proven exhaustion as to the two motors it sold under the United States patents, the number of exhausted motors is *de minimis* because so few Minebea motors that are actually sold in the United States end up in commercial hard disk drives that there is no basis to find an anticompetitive effect.  See supra at 131-141.[115]

In sum, Minebea did not prove that Papst collected double royalties or engaged in a package licensing scheme that extended Papst's patent monopoly illegally with an anticompetitive effect.  Its patent misuse claim therefore must fail.

## CONCLUSION

As the foregoing Opinion, Findings of Fact and Conclusions of Law demonstrate, the Court has carefully considered all of the evidence presented by the parties through live testimony, deposition testimony, expert reports and testimony, and hundreds of exhibits admitted in evidence, as well as a substantial number of demonstrative exhibits not formally admitted. The Court has made credibility findings where appropriate and has found the facts from the evidence as set forth in Part One of this Opinion.  The Findings of Fact have been supplemented by additional findings in the Court's discussion of each separate claim tried to the Court in July

---

[115]  Even if the Court's patent exhaustion analysis is incorrect as to which motors were sold "under" United States patents, the evidence at trial established that Minebea at most had only about 15 to 20% of the market.  8/4/05 (p.m.) Trial Tr. at 17:11-18:5 (Dubinsky testim.).  Therefore, even if Minebea could prove that every single one of its motors was sold in the United States and ended up in a hard disk drive that was sold in the United States by a HDD manufacturer that was licensed by Papst under its drive patents, Minebea still would not have proven that those licenses had a significant impact on the market.  Eighty percent of the market, or more, was using motors manufactured by someone other than Minebea.

and August of 2005.  Applying the relevant law to those findings of fact, the Court concludes that

Minebea has failed to prove its case on each claim by a preponderance of the evidence.

Furthermore, as explained in Part Two of this Opinion, in some cases Minebea's legal theories

are far-fetched and have either little or no basis in law or no relevance to the contracts,

agreements and understandings of the parties in this case.  For the reasons stated, and based on

the analysis set forth in Part Two of this Opinion, the Court concludes that, while it has subject

matter jurisdiction over each of the claims presented by Minebea, Papst is entitled to judgment

on each of the counts of the Second Amended and Supplemental Complaint that has been tried to

the Court.  Papst therefore is entitled to judgment on Count I (Patent Exhaustion); Count V

(Conversion and Unjust Enrichment); Count X (License Rights and Breach of Contract/Breach of

Duty of Good Faith and Fair Dealing); Count XIII (as amended) (Equitable Estoppel and Legal

Estoppel); and Count XIV (Patent Misuse).  A separate Order and Final Judgment to this effect

shall be issued this same day.


/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  August 17, 2006

271